## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[1] | Case No. 19-11901 (KBO) |
| Debtors. | *(Joint Administration Requested)* |

## DECLARATION OF TRACI E. NALLY IN SUPPORT OF
## CHAPTER 11 PETITIONS AND RELATED MOTIONS

I, Traci E. Nally, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      I am at least 21 years of age and am competent to give this declaration.  I have knowledge of the matters to which I hereinafter attest, except where otherwise stated.  I have also reviewed the relevant documents of the above-captioned debtors and debtor-in-possessions (the "**Debtors**") and have spoken with certain directors, officers and/or employees of the Debtors and certain professionals employed by the Debtors, as necessary, and where I have relied upon such information do believe such information to be true.

2.      I am the Executive Vice President of the Debtors.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

3.      On August 30, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  The News-Gazette, Inc. (0894) and D.W.S., Inc. (7985).  The Debtors' headquarters are located at 15 East Main Street, Champaign, Illinois 61820.

4.      I submit this First Day Declaration on behalf of the Debtors in support of (i) the Debtors' voluntary petitions under chapter 11 of title 11 of the United States Code, (as amended, the "**Bankruptcy Code**"), and (ii) the Debtor's "first-day" motions described in paragraph 6 below (collectively, the "**First Day Motions**")[2].  The Debtors seek the relief set forth in the First Day Motions with the goal of allowing the Debtors to continue to operate post-petition and minimizing the adverse effects of the commencement of these chapter 11 cases (the "**Chapter 11 Cases**") on their business.  I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the continued survival of the Debtors and the success of these Chapter 11 Cases.

5.      The boards of directors of the Debtors have authorized the filing of this Chapter 11 Case.

6.      The Debtors are seeking relief on the following First Day Motions:

(a)      Debtors' Motion for an Order Authorizing and Directing Joint Administration of the Debtors' Chapter 11 Cases (the "**Joint Administration Motion**");

(b)      Debtors' Application for Appointment of Stretto as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date (the "**Claims Agent Application**");

(c)      Motion of the Debtors for Entry of an Order (i) Authorizing the Debtors to File a Consolidated Creditor Matrix, and (ii) Authorizing the Debtors to File a Consolidated List of the Debtors' Twenty (20) Largest Unsecured Creditors (the "**Consolidated Matrix Motion**");

(d)      Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Pay Certain Prepetition Wages, Salaries, Benefits, and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Obligations, and (ii) Granting Related Relief (the "**Employee Wage Motion**");

---

[2]    Some or all of the First Day Motions may be filed on the day following the Petition Date.

(e)     Debtors' Motion for the Entry of Interim Order and Final Orders (i) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment, (ii) Establishing Procedures for Resolving Objections by Utility Companies, and (iii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service (the "**Utility Motion**");

(f)     Motion of the Debtors for Entry of Interim and Final Orders (i) Authorizing the Debtors to Maintain Existing Bank Accounts, Business Forms and Books and Records and (ii) for Related Relief (the "**Cash Management Motion**");

(g)     Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105(a), 363(b), 503(b)(9), 1107(a) and 1108 of the Bankruptcy Code Authorizing (i) the Debtors to Honor Certain Prepetition Obligations for the Benefit of Customers, Subscribers and Advertisers; (ii) the Debtors to Pay the Prepetition Claims of Certain Critical Vendors and Administrative Claimholders; and (iii) Financial Institutions to Honor and Process Prepetition Checks and Transfers to Certain Critical Vendors (the "**Customers Program & Critical Vendor Motion**");

(h)     Debtors' Motion for Interim and Final Orders Authorizing the Debtors to pay Prepetition Taxes and Fees (the "**Prepetition Taxes Motion**");

(i)     Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (i) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto; and (ii) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies (the "**Insurance Motion**");

(j)     Motion of the Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations to Newspaper Carriers and D.W.S., Inc. Contractors (the "**Carriers and Broadcast Contractors Motion**");

(k)     Motion of the Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations to Freelancers (the "**Freelancers Motion**").

## I.      <u>INTRODUCTION</u>

### A.      **Description and History of the Debtors' Business.**

7.     Debtor The News-Gazette, Inc is the leading local news source in Champaign County, Illinois.  It publishes The News-Gazette daily newspaper, plus a number of surrounding weekly newspapers, companion websites and ancillary publications, as described in further detail below.

8. Debtor DWS, Inc. is a wholly-owned subsidiary of Debtor The News-Gazette, Inc. DWS, Inc operates three (3) radio stations and companion websites, as described in further detail below.

9. The company was founded in 1919 by David W. Stevick, and was owned and operated by the Stevick family until the death of Marajen Stevick Chinigo (daughter of David W. Stevick) in 2002. In accordance with her wishes, and as part of the administration of her estate, all stock in the company was transferred to The Marajen Stevick Foundation ("**MSF**"), a not-for-profit entity, in 2008. MSF appoints a board of directors to govern The News-Gazette, Inc. and DWS, Inc.

10. The News-Gazette is published daily, with average circulation of 21,822 Monday through Friday and 24,324 on Sunday. Over the last decade, circulation trends have generally been better than industry averages owing in large part to a continued commitment to maintaining a very high-quality news product. During the last two years, however, the rate of decline in circulation has increased meaningfully.

11. Debtors also publish five (5) weekly newspapers in communities surrounding Champaign, Illinois, two (2) advertising-oriented shopper products, and two (2) magazines.

12. Debtors' radio operations include three stations. WDWS-AM is a news and sports talk format with eight hours of local programming Monday-Friday. It is consistently rated at the top of the local market in the 35+ age demographic. WHMS-FM is an adult contemporary music station, and WKIO-FM provides listeners with a classic hits music format.

13. The flagship website is available at news-gazette.com and is a co-branded offering of content generated by The New-Gazette and WDWS. It averages over 600,000 unique users and 4.5 million pageviews a month. Weekly newspapers and music stations also have companion websites.

14.     In 2008, the company took on substantial debt to complete the first phase of a new 48,865-square-foot printing and distribution facility. The first phase included only the distribution portion of the operation and became operational in the summer of 2008. Originally, plans called for an expansion of the facility and the acquisition of a new printing press with the goal of becoming a regional printing facility and adding meaningful commercial printing revenue.

15.     The "great recession" of 2008, however, marked the beginning of an accelerated trend of advertising revenue declines for the newspaper business in general. As revenues fell and financial performance suffered, expansion plans had to be shelved because Debtors could neither access, nor afford, the capital necessary to complete the project.

16.     In recent years, Debtors have made significant structural changes to their operations designed to position it for the future as a stand-alone local media company. In addition to ongoing staff reductions, all newspaper production operations were outsourced and associated assets were liquidated. The radio and newspaper business were consolidated into a single operating entity. The net effect has been a continued reduction in expenses and the elimination of all secured debt.

17.     While expense reduction efforts have shown success, total revenues have continued to erode. In recent years, the pace has accelerated with total revenues of about $17,170,000.00 in 2016 shrinking to about $13,080,000.00 in 2018.

18.     The rapid loss of revenue has, in turn, led to deterioration in earnings before interest, taxes, depreciation and amortization ("**EBITDA**"), a common benchmark for performance of a business, including media businesses.

19.     Between 2016 and 2018, EBITDA declined from about $70,000.00 to negative $4,830,000.00. The 2018 amount includes about $3,750,000.00 of one-time expense associated with the recognition of multi-employer defined benefit plan withdrawal liabilities generated from the elimination of newspaper production operations.

20.     To preserve going-concern value and enable the Debtors to continue to serve the East Central Illinois community, for about the last year, the Debtors have been exploring their strategic alternatives including a possible outside management arrangement and/or the sale of some or all of the business assets.  Ultimately, the Debtors determined that a sale of the business as a going concern to a buyer with the financial resources and media footprint to further economize operations represented the best opportunity to maximize value for the benefit of the community and all stakeholders.

21.     On December 20, 2018, the Debtors engaged Dirks, Van Essen, Murray and April ("**Dirks**") to solicit interest from third parties with respect to a possible acquisition of either the newspaper or radio businesses individually, or the combined businesses.

22.     Dirks drafted marketing materials and contacted potentially interested parties as detailed below (the "**Prepetition Marketing Process**").  In consultation with the Debtors' management, Dirks prepared an information memorandum summarizing the Debtors' business and the opportunity presented as well as financial and other information.  Based on prior industry relationships and additional research, Dirks compiled a list of potential strategic and media-focused financial buyers who might be interested in investing in or acquiring the Debtors.  The Debtors also built a comprehensive online data room to facilitate due diligence requests from potential investors or buyers.

23.     Dirks contacted 35 potential purchasers and distributed the information memorandum to 22, all of which executed non-disclosure agreements.  The parties that executed non-disclosure agreements were provided access to a confidential data room established by Dirks and six of them conducted interviews with the Debtors' management (collectively, "**Diligence Information**").  The Diligence Information provided prospective investors or buyers with detailed

information on, among other topics, the Debtors' business, strategy, growth opportunities, technology, legal and regulatory matters, and historical financial performance.

24.     As the Prepetition Marketing Process continued, a process letter was sent to ten parties.  Ultimately, three letters of intent were received. One letter proposed a purchase of the consolidated businesses, one proposed a purchase of newspaper business, and one proposed a purchase of the radio business.  Ultimately, after exposing the assets to the open market for more than five months, the Debtors concluded that selling the business to Community Media Group LLC ("**CMG**") represented the highest and best offer for the assets.  Thus, on July 1, 2019, the Debtors and CMG executed a revised letter of intent, and on August 27, 2019, CMG's affiliate, Champaign Multimedia Group LLC (the "**Stalking Horse Bidder**") executed an Asset Purchase Agreement with the Debtors (the "**Stalking Horse Agreement**") providing for the sale of substantially all of the Debtors' assets to CMG through these Chapter 11 Cases.

25.     The Stalking Horse Agreement requires a closing on the sale by November 4, 2019 (the "**Closing Date**"), or else CMG will have the right to terminate the Stalking Horse Agreement and will have no obligation to consummate the transaction.  To meet this deadline, the Stalking Horse Agreement requires or otherwise contemplates adherence to a number of milestones, including:

| DATE | TASK |
|------|------|
| August 30, 2019 | Petition Date |
| August 30, 2019 | Debtors file Bid Procedures and Sale Motion |
| September 4, 2019 | Debtors serve Sale Notices on entire creditor matrix |
| September 4, 2019 | Debtors serve Assumption/Assignment Notices on contract counterparties |

| DATE | TASK |
|---|---|
| September 13, 2019 | Entry of Bid Procedures Order |
| September 16, 2019 | Debtors serve amended sale notice on creditor matrix |
| September 16, 2019 | Debtors serve amended Assumption/Assignment notices on contract counterparties |
| September 27, 2019 | Objection Deadline for Sale Motion |
| September 27, 2019 | Objection Deadline for Assumption/Assignment |
| September 27, 2019 | Bid Deadline |
| September 28, 2019 | Determination of Qualified Bidders |
| September 30, 2019 | Auction, if necessary |
| October 1, 2019 | Supplemental Objections to Sale (objections to auction process) |
| October 2 | Sale Hearing |
| October 3 | Entry of Sale Order |
| October 17 | Sale Appeal Deadline |
| October 30 | Completion of sixty-day WARN notice period |
| November 4 | Closing |

26.    Through these cases, the Debtors intend to finalize their now more than six-month-long marketing efforts by timely and efficiently executing the bid procedures and auction process contemplated by the Stalking Horse Agreement.  Once sale proceeds have been maximized and received by the estate, the Debtors contemplate filing a plan of liquidation that will provide for a

distribution of those proceeds to creditors according to the priorities set forth in the Bankruptcy Code.

## II.    <u>EVIDENTIARY SUPPORT FOR FIRST DAY PLEADINGS</u>[3]

27.    The Debtors have filed or will file a number of "first day" and "second day" motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases and to ensure the best outcome for the Debtors, their estates, their creditors, and all other parties-in-interest.  A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

28.    I have reviewed each of the First Day Pleadings, including the exhibits thereto.  The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the First Day Pleadings and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest. Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Pleadings should be approved.

29.    The relief sought in the First Day Motions will minimize the adverse impact of these cases on the Debtors' customers, employees, and suppliers, while allowing the Debtors to maximize value for their creditors.  I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to operate effectively as a debtors-in-possession.

30.    Some of the First Day Motions request authority to pay or otherwise honor certain prepetition claims.  I am advised that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that "except to the extent relief is necessary to avoid

---

[3]    Any capitalized terms used but not defined in this section shall have the meaning ascribed to it in the underlying applicable motion or application.

immediate and irreparable harm," the court shall not consider motions to pay prepetition claims during the first twenty-one (21) days after the filing of a petition.  As set forth in more detail below and in the First Day Motions, I believe that the Debtors' requests for authority to pay prepetition claims are narrowly tailored to those circumstances where the failure to pay such claims would bring immediate and irreparable harm, or which would otherwise be entitled to administrative priority under the Bankruptcy Code.

A.   **DEBTORS' MOTION FOR AN ORDER AUTHORIZING AND DIRECTING JOINT ADMINISTRATION OF RELATED CHAPTER 11 CASES (THE "JOINT ADMINISTRATION MOTION")**

31.     Pursuant to the Joint Administration Motion, the Debtors seek the entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  The Debtors also request that the Clerk of the Court (the "**Clerk**") maintain one file and one docket for all of the Debtors' Chapter 11 Cases, which file and docket shall be the file and docket for The News-Gazette, Inc.

32.     I believe that joint administration of these Chapter 11 Cases is warranted because the Debtors' financial affairs and business operations are closely related, and will ease the administrative burden on the Court and parties in interest in these Chapter 11 Cases.  I anticipate that numerous notices, applications, motions, pleadings, hearings, orders, and other documents filed in these Chapter 11 Cases will affect all of the Debtors.  With two (2) affiliated Debtors, each with its own case docket, the failure to administer these Chapter 11 Cases jointly would result in numerous duplicative pleadings being filed and served upon parties identified in separate service lists.  Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Debtors, the Clerk, creditors, and other parties in interest in these Chapter 11 Cases.

33.     Moreover, jointly administering the Chapter 11 Cases will not adversely affect the Debtors' respective constituencies, because the Joint Administration Motion requests only administrative, not substantive, consolidation of the estates.  Parties in interest will therefore not be harmed by the relief requested, but instead, will benefit from the cost reductions and avoidance of confusion or potential mis-filings in erroneous cases associated with the joint administration of these Chapter 11 Cases.  I submit that the joint administration of these Chapter 11 Cases is in the best interests of their estates, their creditors, and all other parties in interest.

**B.     DEBTORS' APPLICATION FOR APPOINTMENT OF STRETTO AS CLAIMS AND NOTICING AGENT ("CLAIMS AGENT APPLICATION")**

34.     Pursuant to the Claims Agent Application, the Debtors seek the entry of an order appointing Stretto[4] ("**Stretto**") as the Court-appointed claims and noticing agent for these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

35.     The Debtors believe that the selection of Stretto satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors have reviewed engagement terms from at least three (3) court-approved claims and noticing agents to ensure selection on appropriate terms.  Moreover, particularly in light of certain concessions obtained from Stretto, the Debtors believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.  The terms of Stretto's retention are set forth in that certain Engagement Agreement annexed to the Claims Agent Application as **Exhibit A** (the "**Engagement Agreement**").  Through the Claims Agent Application, the Debtors are seeking approval solely of the terms and provisions as set forth therein and the proposed order attached thereto.

---

[4]    Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.

36.     Although the Debtors have not yet filed their schedules of assets and liabilities, I anticipate that there will be in excess of 4,200 entities to be noticed in these cases.  Considering the number of expected claimants and the complexity of the Debtors' businesses, I respectfully submit that authorizing the relief requested herein is in the best interests of both the Debtors' estates and their creditors, and appropriate in these Chapter 11 Cases due to the number of creditors, equity holders, and other parties-in-interest involved in these cases, which will likely impose heavy administrative and other burdens on the Debtors, the Court, and the Clerk's Office. Accordingly, I believe that appointing Stretto as the claims and noticing agent in these Chapter 11 Cases will maximize the value of the Debtors' estates for all of its stakeholders.

**C.     MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED CREDITOR MATRIX, AND (II) AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED LIST OF THE DEBTORS' TWENTY (20) LARGEST UNSECURED CREDITORS (THE "CONSOLIDATED MATRIX MOTION")**

37.     Pursuant to the Consolidated Matrix Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, and (ii) authorizing the Debtors to file a consolidated list of the Debtors' twenty (20) creditors holding the largest unsecured claims in lieu of filing lists for each Debtor.

38.     The Debtors presently maintain computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in the Chapter 11 Cases.  I submit that, when preparing their petitions in these Chapter 11 Cases, a large number of the creditors are shared amongst them, and that the significant overlap between creditors for each Debtor renders the use of the consolidated lists both logical and administratively expedient.  I believe this information may be utilized to provide interested parties with notices and other similar documents as contemplated by Local Rule 1007-2 on a consolidated basis.  Requiring the Debtors to submit Debtor-specific creditor matrices for each of the Debtors would be an unnecessarily burdensome task and would likely result in duplicate mailings.  Accordingly, the Debtors seek

authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

39.     Moreover, concurrently with this Motion, the Debtors have filed the Claims Agent Application seeking the appointment of Stretto ("**Agent**") as claims and noticing agent in the Chapter 11 Cases. If the Claims Agent Application is granted, the Agent will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor and security holder database, and (b) complete the mailing of notices and other documents in the chapter 11 cases to the parties in these databases.  After consultation with the Agent, I believe that filing the lists in the format or formats currently maintained in the ordinary course of business will be sufficient to permit Agent to notify promptly all applicable parties as required by Local Rule 1007-2.

40.     Because a large number of the creditors are shared between the Debtors, I submit that filing separate Top 20 Lists for each Debtor would be of limited utility.  I believe a single, consolidated list of the company's twenty (20) largest unsecured, non-insider creditors will aid the U.S. Trustee in its' efforts to communicate with these creditors.  Therefore, I respectfully request authorization to file a single Top 20 List in these Chapter 11 Cases.  I believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these cases.

**D.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES, SALARIES, BENEFITS, AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED OBLIGATIONS, AND (II) GRANTING RELATED RELIEF (THE "EMPLOYEE WAGE MOTION")**

41.     Pursuant to the Employee Wage Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors to (a) pay certain prepetition wages, benefits and other compensation (collectively, the "**Prepetition Employee Obligations**"), and (b) continue

employee compensation and employee benefit programs (collectively, the "**Employee Benefits Programs**"), and (ii) granting related relief.

42.     As of the Petition Date, the Debtors employed approximately 131 employees, of whom 108 are full-time employees (the "**Full-Time Employees**") and 23 are part-time employees (the "**Part-Time Employee**" and, together with the Full-Time Employees, the "**Employees**").  All of the Employees are located at the Debtors' facilities in Illinois.  30 of the Debtors' Employees are represented by a union.

43.     The Employees perform a variety of critical functions including, but not limited to, sales for the company's products, distributor supervision, inventory management and product shipping, component procurement and product manufacture, maintenance of financial records and human resources.  The Employees' skills and their knowledge and understanding of Debtors' operations, customer relations, and infrastructure are essential to the effective reorganization of the Debtors' business.

**THE EMPLOYEE WAGES AND BENEFITS**

44.     In the ordinary course of business, the Debtors pay their Employees wage and salary obligations (collectively, the "**Wages**") on either a salaried or hourly basis.  Among the Debtors' Employees, 61 are salaried or commissioned employees and 70 are hourly employees. Nearly all of the Employees receive their wages, salaries, and other compensation by direct deposit, with the remaining Employees receiving checks.

45.     The Employees are paid on a bi-weekly basis.  The first pay period following the Petition Date (the "**Straddling Pay Period**") will end on September 8, 2019 for all employees. The payday for the Straddling Pay Period is September 13, 2019.

46.     Payroll is funded to the Payroll Processor on the Tuesday preceding the payday, with the applicable Employees paid the following Friday.  As of the Petition Date, the Debtors

estimate they owe Employees approximately $163,859.03 on account of accrued but unpaid Wages, all of which will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases (collectively, the "**Unpaid Wages**").  I believe that, as of the Petition Date, no Employee is owed Unpaid Wages in excess of the $13,650.00 cap under section 507(a)(4) of the Bankruptcy Code.

47.    Subject to approval of this Motion, salaried and hourly employees will be paid on September 13, 2019 for services rendered from August 26, 2019 to September 8, 2019. Commissioned employees will be paid a draw against commissions earned from August 1, 2019 to August 31, 2019 amount on September 13.  The remaining commission amounts will be paid on September 27.  All employees will be paid by Debtors' Payroll Processor using funds provided by Debtors after to the Petition Date.

48.    The gross payroll for the Straddling Pay Period will be approximately $270,655.07 of which approximately $169,853.03 (the "**Pre-Petition Accrued Payroll**") will be on account of services rendered prior to the Petition Date.

49.    Certain of the Employees are also entitled to reimbursement of expenses such as cell phone, travel and mileage expenses, meals and entertainment, employee relations, supplies and parts, services, and food and beverage products.

50.    Expense reimbursements on account of expenses incurred by Employees prior to the Petition Date (the "**Pre-Petition Accrued Expense Reimbursements**") will be included in the payroll for the Straddling Pay Period.  The Debtors estimate that expense reimbursements will be less than $17,774.00 in the aggregate per pay period.

51.    During each pay period, Debtors (a) deduct certain amounts from Employees' paychecks, including, without limitation, taxes and garnishments for, among other things, child support, flexible spending account, life insurance, health, dental, and vision insurance, 401K

contributions and other benefits (collectively, the "**Deductions**"), and (b) forward the amounts to the appropriate third party recipients.

52.     The majority of healthcare benefits are provided to the Employees through Health Alliance Medical Plans.  As of the Petition Date, all premiums for healthcare insurance policies covering the Employees were current, and the Debtors do not seek leave to make any payments on account of healthcare premiums for the Employees.

53.     Debtors provide a healthcare reimbursement account benefit that provides reimbursement to employees, through a third-party administrator, for a portion of the health insurance deductible as expenses are incurred by employees.  As such, these amounts are funded in arrears.  Debtors estimate that, as of the petition date, payments of $25,000 are due to the third-party administrator for this benefit.

54.     Debtors also provide other benefits including, but not limited to, medical, prescription, stop loss, dental, vision, life insurance, accidental death and dismemberment insurance, term life insurance, employee assistance program, FMLA administration, flexible spending accounts, disability plans, and a 401K plan.

55.     The Debtors estimate that, (a) as of the Petition Date, approximately $1,005.55 in employee non-tax payroll Deductions for pay periods that ended prior to the Petition Date had not been forwarded to the appropriate third-party recipient, and (b) the payroll for the Straddling Pay Period will include approximately $20,674.20 in employee non-tax related payroll Deductions.

56.     In addition, the Debtors estimate that as of the Petition Date, all employee and employer taxes for which Debtors are obligated on account of its Employees' earnings (the "**Employer Payroll Taxes**") have been forwarded to the appropriate taxing authority.  Employee and employer taxes to be included in the payroll for the Straddling Pay Period are approximately $71,722.00.

57.    Employees are also entitled to take 1 to 6 weeks of vacation based on length of service.  Employees are paid for any unused earned and accrued vacation days if the employee is terminated or resigns.    As of the Petition Date, the Debtors estimate that approximately $491,851.17 in earned vacation time had accrued.

58.    By policy, non-union employees with more 10 years or more of service are entitled to 10 days of sick pay at termination. Some union employees, by contract, are entitled to between 10 and 20 days of sick pay at termination. As of the Petition Date, the Debtors estimate that approximately $154,214.50 of sick pay has accrued.

59.    By contract, some union employees with more than 1 year of service are entitled to between four and six weeks of severance pay upon termination due to reduction in staffing, merger, consolidation, sale, or suspension of operations. As of the Petition Date, the Debtors estimate that approximately $130,683.52 of severance pay has accrued.

60.    When accounting for all earned and accrued wages, vacation, sick pay, and severance benefits, approximately 21 Employee are owed unpaid wages, vacation, sick pay and severance benefits that, in total, exceed the $13,650.00 cap under section 507(a)(4) of the Bankruptcy Code.

**TEMPORARY EMPLOYEES**

61.    On an as-needed basis, the Debtors have historically supplemented their workforce on occasion with temporary employees, who provide much needed support for the Company. Temporary employees are not entitled to the Employee Obligations described in the Motion.  The Debtors request authority to utilize the services of the temporary employees, as needed at their discretion, on a postpetition basis.  The Debtors do not believe they owe any temporary employees for services performed prior to the Petition Date.

THE PAYROLL PROCESSOR

62.     As noted above, the Debtors use Automatic Data Processing, Inc. (the "**Payroll Processor**" or "**ADP**") to administer payroll funds made available to Employees through direct deposit.  The Payroll Processor's responsibilities include processing payroll and transferring funds from the Debtors to their Employees and to the relevant taxing authorities.  The Debtors pay the Payroll Processor approximately $1,850.00 per month.   Because the services provided by the Payroll Processor are crucial to the smooth functioning of the Debtors' payroll system, the Debtors request permission to pay any unpaid Payroll Processor fees, and to continue to pay fees that accrue during these bankruptcy cases in the ordinary course of business.

63.     The payment of the Employee Obligations and continuation of the Employee Benefits Programs serve the sound business purpose of maximizing the value of the Debtors' estates.  The Debtors' success in these Chapter 11 Cases, and the future of the reorganized company, hinges in large part on the morale and continued dedication and efforts of their Employees.  The vast majority of the Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses, support their families, and maintain their health and well-being.   Consequently, these Employees would be exposed to significant financial difficulties if the Debtors were not permitted to (i) continue paying compensation, (ii) provide employee benefits, and (iii) maintain existing programs.  Through the payment of the Employee Obligations, the Debtors seek to motivate and encourage the Employees to continue to support the Debtors' reorganization efforts.  Accordingly, this Court should grant the requested relief under section 363 of the Bankruptcy Code.

64.     The potential harm and economic disadvantage that would stem from the failure to pay the Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid.  Any failure by the Debtors to pay the Employee Obligations would negatively

impact the morale of the Debtors' workforce at a critical time for the Debtors and their business. The Debtors seek to minimize the personal hardship the Employees would suffer if the Employee Obligations are not paid when due or as expected.  The Debtors have examined other options short of payment of the Employee Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations.  Therefore, the Debtors can only meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Employee Obligations.

65.    The relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is, therefore, justified under the applicable authority.  Paying the Employee Obligations and continuing with the Employee Benefits Programs will benefit the Debtors' estates and their creditors by allowing the Debtors to continue business operations postpetition.  The Employees provide the Debtors with services essential to conduct the Debtors' business, and the Debtors believe that absent the payment of the employee compensation and benefits owed to the Employees, the Debtors will experience employee turnover and instability at this critical time.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce (all of whom cannot be replaced without significant efforts, which may prove increasingly difficult during these Chapter 11 Cases).

66.    Payment of the Employee Obligations is a necessary and critical element of the Debtors' efforts to preserve their going concern value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these Chapter 11 Cases.  Indeed, the Debtors believe that without the relief requested herein, their Employees may seek alternative opportunities.  Such a development would deplete the Debtors' workforce, thereby undermining the Debtors' restructuring efforts.

67.     Accordingly, for all of the foregoing reasons, I submit that cause exists for granting the relief requested in this Motion.

**E.   DEBTORS' MOTION FOR THE ENTRY OF INTERIM ORDER AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE (THE "UTILITY MOTION")**

68.     Pursuant to the Utility Motion, the Debtors seek the entry of interim and final orders, substantially in the form attached thereto, (a) approving the Debtors' proposed form of adequate assurance of postpetition payment to its utilities, as that term is used in section 366 of the Bankruptcy Code (the "**Utility Companies**"), of a two (2) week deposit for each Utility Company for a total of approximately $10,940.00 (b) approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these cases, a debt that is owed by the Debtors for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance.

69.     In connection with the operation of their businesses and the management of their properties, the Debtors obtain utility services, including electric, gas, water, sewer, telecommunications, cable and other similar utility services (collectively, the "**Utility Services**"), from the Utility Companies covering a number of utility accounts.

70.     On average, prior to the Petition Date, the Debtors spent approximately $23,704.00 each month on account of Utility Services.  To the best of my knowledge, there are few, if any, material defaults or arrearages with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.  None of the Utility Companies for the Debtors' facilities hold deposits.

71.     Uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts.  It is essential that the Utility Services continue uninterrupted.  Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance to the Utility Companies without jeopardizing the Debtors' business operations.

72.     I maintain that the relief requested in this Motion strikes a fair balance between protecting the rights of the Utility Companies and the rights of the Debtors under the Bankruptcy Code and the need for the Debtors to continue to receive, for the benefit of their estates, the Utility Services upon which they depend.  I do not believe that the Utility Companies will be prejudiced by the Proposed Adequate Assurance, the requirement to provide the Debtors with uninterrupted access to Utility Services, and the procedures for resolving objections to the Proposed Adequate Assurance.

**F.**     **MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO MAINTAIN EXISTING BANK ACCOUNTS, BUSINESS FORMS AND BOOKS AND RECORDS AND (II) FOR RELATED RELIEF (THE "CASH MANAGEMENT MOTION")**

73.     Pursuant to the Cash Management Motion, the Debtors request entry of interim and final orders, (i) authorizing, but not directing, the Debtors to maintain their existing Bank Accounts, Business Forms and Books & Records, and (ii) granting the Debtors a thirty (30) day-extension to comply with the investment and deposit requirements of section 345(b) of the Bankruptcy Code, if applicable, or file a motion seeking an additional extension or waiver of the

requirements of section 345(b) of the Bankruptcy Code.  I submit that the relief requested is necessary to continue the uninterrupted operations of the Debtors' business and is in the best interest of the Debtors, their estates, creditors, and other parties-in-interest and, therefore, should be granted.

74.      Prior to the Petition Date, in the ordinary course of business the Debtors employed a cash management system to efficiently collect, transfer, and disburse funds generated by their business operations (the "**Cash Management System**").  The Cash Management System facilitates the Debtors cash forecasting and reporting, as well as enables the Debtors to maintain control over the administration of their Bank Accounts and to monitor and record the collection and disbursement of funds.  The Debtors do not engage in any intercompany transfers.

75.      The Debtors maintain five (5) checking accounts and one (1) savings account all of which are located at Busey Bank in Champaign, Illinois (the "**Bank Accounts**").  One of the checking accounts serves as the general operating account. The other four exist for the specific purposes of (a) transferring funds to the payroll processor, (b) clearing subscriber ACH payments for subscriptions, (c) transferring funds to the third-party administrator of flex spending and health reimbursement account benefit plans and (d) transferring funds to the US Postal Service for postage expense associated with mailing newspapers. The savings account carries a $20,000.00 balance as required by the Office of the Illinois State Fire Marshall as a guarantee that Debtors have funds necessary to remove a decommissioned underground heating oil storage tank.

76.     Debtors have maintained its prepetition Bank Accounts and the Debtors have utilized numerous preprinted business forms (the "**Business Forms**") in the ordinary course of business.  The Debtors' accounting system prints all checks other than payroll checks, which are generated by a third-party payroll company.  Any checks issued post-petition will include a "debtor-in-possession" designation.  The Debtors also maintain books and records to document, among other things, their revenues and expenses (collectively, the "**Books & Records**").

77.     I submit that no party in interest will be prejudiced by Debtors' maintenance of the Bank Accounts.  I believe that if the Debtors were required to replace their existing Bank Accounts with new accounts as of the Petition Date in accordance with the UST Operating Guidelines, such requirement would unnecessarily disrupt Debtors' business and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.

78.     Nor will any party in interest be prejudiced if the Debtors are authorized to continue to use their Books & Records and Business Forms.  The Debtors will ensure that going forward, all checks generated by Debtors' in-house accounting system will reflect its status as a debtor-in-possession.  I submit that these efforts are prudent and sufficient to protect the interests of parties dealing with Debtors on a post-petition basis, while avoiding unnecessary expense and administrative delays at this critical time.

79.     I respectfully submit that under the circumstances, the maintenance of the Debtors' Cash Management System in substantially the same form as it existed prior to the Petition Date is in the best interests of the Debtors' estates and creditors.  Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) assist the Debtors in their effort to maximize value for their estates.

80.     Although Busey Bank is not an authorized depository, it is a highly-rated financial institution that is well-capitalized and financially stable.  Notwithstanding that Busey Bank has not qualified for "authorized depository" designation, I believe Busey Bank is well-positioned to continue to perform the depository and cash management functions for the Debtors during these Chapter 11 Cases.

81.     As described above, the Debtors' Cash Management System is critical to the ongoing stability of the Debtors' business and transition into chapter 11.  Requiring the Debtors to transfer the Bank Accounts to a designated authorized depository would place a needless administrative burden on the Debtors that would unnecessarily divert the attention of the Debtors' management at a critical junction in these Chapter 11 Cases.

82.     Here, the Bank Accounts are held at a well-capitalized and financially-stable institution insured by the FDIC.  Thus, I believe that any funds that are deposited in the Bank Accounts are secure.  Moreover, the Cash Management System reflects a disciplined and prudent strategy, permitting the Debtors to balance the need to maximize returns on excess cash while ensuring that such excess cash is readily available for use in the Debtors' business operations. Requiring the Debtors to bond the Bank Accounts, as contemplated by section 345(b) of the Bankruptcy Code (unless the Court orders otherwise), would impose considerable costs on the Debtors and their estates.

G.     **MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105(A), 363(B), 503(B)(9), 1107(A) AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING (I) THE DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS FOR THE BENEFIT OF CUSTOMERS, SUBSCRIBERS AND ADVERTISERS; (II) THE DEBTORS TO PAY THE PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND ADMINISTRATIVE CLAIMHOLDERS; AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS PREPETITION CHECKS AND TRANSFERS TO CERTAIN CRITICAL VENDORS (THE "CUSTOMERS PROGRAM & CRITICAL VENDOR MOTION")**

83.     Pursuant to the Customer Programs & Critical Vendor Motion, the Debtors seek entry of Interim and Final Orders, authorizing (i) the Debtors to honor, in their sole discretion,

certain prepetition obligations for the benefit of their customers, advertisers, and subscribers in the ordinary course of their businesses, (ii) the Debtors to pay the prepetition claims of certain critical vendors (the "**Critical Vendor Claims**") and administrative claimholders, and (iii) financial institutions to honor and process prepetition checks and transfers to certain critical vendors.

84.    Prior to the Petition Date, and in the ordinary course of business, the Debtors engaged in certain practices the ("**Customer Programs**"), to develop and maintain their hard-earned reputation with subscribers, advertisers and the broader marketplace.

85.    If the Debtors are not authorized to seamlessly continue to honor these prepetition programs after the Petition Date and pay amounts accrued prepetition after the Petition Date, the Debtors risk harming their relationships with subscribers.  In other words, the maintenance of the Customer Programs is essential to the continued viability of the Debtors' businesses and, ultimately, to the prospects of a value-maximizing sale.

86.    Pursuant to the Customer Programs, which are common in the Debtors' industry and also expected and relied upon by the Debtors and their customers, the Debtors (1) offer billing adjustments and refunds to advertisers and subscribers, (2) fulfill prepaid subscriptions and prepaid advertisements, (3) provide customer service to subscribers, and (4) accept payments from advertisers and subscribers via credit card.  Each of the Customer Programs is used to generate goodwill and ensure customer satisfaction, thereby retaining customers and ultimately enhancing revenue.

87.    As set forth below, the Debtors currently owe money in regard to some of the Customer Programs.  The Debtors' Customer Programs include, *inter alia*, the following:

**Billing Adjustments and Refunds**

88.     Despite the Debtors' best efforts, from time to time, subscribers, advertisers and other customers are invoiced incorrectly or invoiced correctly for services that they do not receive. In these circumstances, the Debtors owe their customers refunds (the "**Refunds**").  The vast majority of these Refunds are for home delivery subscription accounts in an average of approximately $55.00.  The Debtors process these Refunds in the ordinary course of business.

89.     Because there is necessarily some interval of time from the discovery of the basis for a Refund and the processing of that Refund, it is difficult to predict with certainty the amount outstanding on account of such Refunds.  As of the Petition Date, however, the Debtors estimate that they owe refunds to approximately seventy-five (75) customers in the total amount of approximately $4,200.00.[5]

**Prepaid Newspaper Delivery and Advertising**

90.     A significant portion of the Debtors' revenue comes from subscriptions and advertising.  The Debtors receive payments from many of their customers in advance of providing newspaper delivery or advertising (the "**Prepaid Subscriptions**" and "**Prepaid Advertisements**").  The Debtors do not typically incur cash liability on account of the Prepaid Subscriptions and Prepaid Advertisements; instead, the Debtors incur an obligation to print, insert and deliver the Prepaid Subscriptions and Prepaid Advertisements.

91.     Continuing the Debtors' practices with respect to the Prepaid Subscriptions and Prepaid Advertisements is essential to the Debtors' ongoing business operations.  Any interruption in newspaper delivery or advertisement placement would threaten the Debtors' operations.  It is, therefore, crucial that the Debtors obtain authorization to continue performing such obligations in the ordinary course.

---

[5]   Such customers may have setoff or recoupment rights that would permit them, with Court approval to the extent necessary, to offset the Debtors' obligations to them against prepetition amounts they owe the Debtors.

**Customer Service Program**

92.     To serve their customers, the Debtors have engaged certain third-party call centers to handle customer service calls and address inquiries related the Debtors' media products (the "**Call Centers**").  The Call Centers function as essential intermediaries between the Debtors and their customers.  Accordingly, I believe that failure of the Call Centers to perform their services could severely undermine customer loyalty, and ultimately, revenue.  The Debtors estimate that they owe the Call Centers approximately $2,500 as of the Petition Date.

**Credit Card and Other Payment Processors**

93.     In addition to cash and checks, the Debtors accept Visa, MasterCard, Discover and American Express credit cards (collectively, "**Cards**") at both their offices and online points of sale.  To process the Cards, the Debtors are party to certain agreements (collectively, the "**Payment Processing Agreements**") with merchant banks, payment processors, and payment gateway providers (collectively, the "**Payment Processing Companies**"). Pursuant to the Payment Processing Agreements, the Debtors generally receive the gross customer sales less any billing adjustments or Refunds (*as defined above*).  The processing fees charged by each company vary, but are in the range of 2.5 to 3.5% (the "**Processing Fees**") of the transaction value.  The fees owing to the Payment Processing Companies are automatically debited from the Debtors' general operating account on a monthly basis and average approximately $8,767.00 per month.

94.     The Debtors' continued acceptance of Card payments is essential to the operation of the Debtors' business because they represent a significant percentage of all payment transactions.  Requiring all purchases to be made in cash would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be borne by their estates.  To avoid disrupting these vital payment processing services, the Debtors seek authority to continue paying the Processing Fees in the ordinary course of their business pursuant to the terms of the Payment

Processing Agreements, whether arising before or after the Petition Date, in a manner consistent with past practices.

**THE DEBTORS' SELECTION OF CRITICAL VENDORS**

95.     In addition to the Customer Programs, the Debtors believe that the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in various instances, the Critical Vendors are the only source from which the Debtors can obtain certain goods and services within a time frame and at a price that will permit the Debtors to continue operating their businesses.  A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition and may force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements.

96.     In this context, the Debtors have examined the extent to which payment of Critical Vendor Claims is necessary to avoid irreparable harm and to ensure the Debtors have access to adequate amounts of trade credit on a postpetition basis.  Specifically, the Debtors have reviewed their accounts payable and have undertaken a process to identify those vendors who are truly essential to the Debtors' operations.  The Debtors have further developed certain procedures that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis and in accordance with the terms of the parties' prepetition dealings ("**Customary Trade Terms**"), or on terms otherwise acceptable to the Debtors.

97.     The Debtors consulted with appropriate members of their management team to identify those vendors that are essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole source" provider; (b) whether certain customizations prevent the Debtors from obtaining goods or services from alternative sources within a reasonable

timeframe; (c) if a vendor is not a sole source provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is procured; (d) whether the Debtors have favorable pricing and other terms with the vendor that would be lost if the Debtors were to switch to a new vendor; and (e) whether a vendor meeting the standards of (a), (b), (c), and (d) is likely to refuse to continue providing goods or services postpetition if its prepetition claims are not paid.  The Debtors have estimated that total prepetition liability to Critical Vendors is approximately $4,424.00. Of that amount, $2,949.33 was for services received by the Debtors within twenty (20) days prior to the Petition Date.[6]

98.    The Debtors also propose that all payments of Critical Vendor Claims shall be applied first to the Critical Vendor's claims for goods, if any received by the Debtors within twenty (20) days prior to the Petition Date.  These claims are entitled, in most instances, to priority as administrative claims pursuant to section 503(b)(9) of the Bankruptcy Code.  Accordingly, such payments will only affect the timing of the distribution, but not the amount, of the Critical Vendor Claims.

99.    If a Critical Vendor accepts a payment on account of a prepetition obligation of a Debtor (a "**Vendor Payment**") and thereafter fails to provide the applicable Debtor with the requisite Customary Trade Terms, the Debtors seek authority to (a) treat any Vendor Payment received by the Critical Vendor as an unauthorized postpetition transfer under section 549 of the Bankruptcy Code that the Debtors may (i) recover from the Critical Vendor in cash or goods, or (ii) at the Debtors' option, apply as a credit against any outstanding postpetition claims held by such Critical Vendor, or (b) upon recovery of any Vendor Payment under (i) or (ii), reinstate the prepetition claim of the Critical Vendor in the amount recovered by the applicable Debtor, less

---

[6]    A complete list identifying the Critical Vendors has been provided to the United States Trustee and the Court. Such list will also be provided promptly to counsel for any official committee appointed in these Chapter 11 Cases.

that Debtor's reasonable costs incurred in recovering such amounts.  In essence, the Debtors seek to return the parties to their respective positions immediately before entry of the Order if a Critical Vendor refuses to supply goods to the Debtors on Customary Trade Terms following payment of its Critical Vendor Claim.[7]

100.    For those Critical Vendors who have agreed to provide goods to the Debtors on different terms otherwise acceptable to the Debtors, the Debtors reserve the right to seek written acknowledgment of such terms on a case by case basis.

**H.    DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO PAY PREPETITION TAXES AND FEES (THE "PREPETITION TAXES MOTION")**

101.    Pursuant to the Prepetition Taxes Motion, the Debtors seek entry of interim and final orders, (i) authorizing, but not directing, the Debtors to pay, in their discretion, certain prepetition taxes and related obligations as necessary to conduct their business operations in the ordinary course and (ii) authorizing financial institutions to honor all checks, drafts, and other forms of payment, including fund transfers, used by the Debtors relating to the foregoing.

102.    In the ordinary course of Debtors' businesses, the Debtors (a) collect sales taxes and incur taxes, including, but not limited to, sales, use, real property, and other taxes in conducting their businesses (collectively, the "**Taxes**"); and (b) pay fees and similar charges and assessments (collectively, the "**Fees**") to various taxing, licensing, and regulatory authorities (collectively, the "**Authorities**") to conduct Debtors' businesses.  The Taxes and Fees are paid to the respective Authorities in accordance with all applicable laws and regulations.

---

[7]    To ensure that Critical Vendors continue to do business with the Debtors, the Debtors propose in their discretion (i) that a letter substantially in the form of the letter attached to the motion (the "**Vendor Agreement**") be delivered to, and executed by, the Critical Vendors, along with a copy of the order granting the relief requested herein and (ii) that payment of Critical Vendor Claims include a communication of the following statement:

"By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the District of Delaware, dated _____, 2019 in the Chapter 11 Cases of The News-Gazette, Inc., *et al.* (Case No. 19-XXXXX), authorizing the Debtors to pay prepetition obligations of critical vendors and submits to the jurisdiction of that Court for enforcement thereof."

103.    Each of the Taxes and Fees incurred by Debtors fall under one of the following categories: (a) sales and use taxes, and (b) real property taxes.

**Sales and Use Taxes**

104.    Debtors collect and remit sales taxes in connection with the operation of the businesses.   Generally, sales taxes are remitted to the Authorities quarterly following their collection.  Debtors also may be responsible for remitting use taxes on account of the purchase of various supplies and equipment.   Use taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and does not charge state taxes.  The Debtors estimate that they owe approximately $50.00 with respect to sales and use taxes incurred prior to the Petition Date.

**Real Property Taxes**

105.    Local law grants the Authorities the ability to levy property taxes against Debtors' real property.  If the Debtors fail to pay these taxes, it is possible that statutory liens may be imposed on Debtors' real property.  The Debtors pay real property taxes in Champaign, Ford and Douglas Counties, Illinois.  As of the Petition Date, the Debtors' financial records indicate that approximately $79,200.00 in real property taxes have accrued prepetition but will not become payable to the applicable Authorities until after the Petition Date, all of which prepetition amount will become due prior to any final hearing on this Motion.

106.    The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Authorities will not exceed approximately $100,000.00.   The Debtors request the ability to pay up to $79,250.00 on an interim basis, and $100,000.00 on a final basis.  The payment

of such Taxes and Fees is appropriate in these Chapter 11 Cases.  Some of these outstanding tax liabilities are for trust fund taxes that Debtors has collected and holds in trust for the benefit of the Authorities.  Therefore, these funds do not constitute property of Debtors' estates and could not otherwise be used by Debtors.

107.    Without question, the payment of the Taxes and Fees is necessary here.  It is in the best interest of the Debtors' estates that the Taxes and Fees be paid on time to avoid any disruptions.  Delayed payment of the Taxes and Fees may cause the Authorities to take precipitous action, including a marked increase in state audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors time and resources.  Prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.  Based on the foregoing, I submit that the relief requested herein is in the best interest of the Debtors, their estates, their creditors, their stakeholders, and other parties in interest and, therefore, should be granted.

I.    **MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (I) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION AND SATISFY PREPETITION OBLIGATIONS RELATED THERETO; AND (II) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE INSURANCE POLICIES (THE "INSURANCE MOTION")**

108.    Pursuant to the Insurance Motion, the Debtors request entry of the Proposed Orders authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto; and (ii) renew, amend, supplement, extend, or purchase Insurance Policies.

109.    In the ordinary course of business, the Debtors maintain approximately seven (7) insurance policies that are administered by various third-party insurance carriers (collectively, the "**Insurance Carriers**").  These policies provide coverage for, among other things, workers' compensation, commercial liability, business automobile, multimedia liability, machinery & equipment, directors' & officers, employment practices, fiduciary & employed lawyers' liability,

and owners/contractors protective liability (collectively, the "**Insurance Policies**").  A schedule

of the Insurance Policies is attached to the Insurance Motion as **Exhibit C**.[8]

110.    The aggregate annual premium for the Insurance Policies for the policy period

spanning from February 2, 2019 to February 2, 2020, is approximately $183,859.00 not including

applicable taxes and surcharges, deductibles, and broker and consulting fees and commissions.

111.    As of the Petition Date, the Debtors have paid approximately $140,382.00.  The

Debtors request authority to pay up to $4,525.00 in the aggregate, on an interim basis, on account

of prepetition amounts outstanding under the Insurance Policies that will become due and owing

within the first twenty-one (21) days of these Chapter 11 Cases, and to continue honoring all

obligations thereunder on a postpetition basis in the ordinary course of business.

112.    Pursuant to the Insurance Policies, the Debtors may be required to pay various

deductibles or retention amounts (the "**Insurance Deductibles**"), depending upon the type of

claim and insurance policy involved.  Under certain policies, the Insurance Carriers may pay

claimants and then invoice the Debtors for any Insurance Deductible.  In such situations, the

Insurance Carriers may have prepetition claims against the Debtors.  While the Debtors are not

aware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtors

seek authority to honor any amounts owed to the Insurance Carriers to ensure uninterrupted

coverage under their Insurance Policies.

113.    Continuation of the Debtors' Insurance Policies, and entry into new insurance

policies, is essential to the preservation of the value of the Debtors' business and operations.

Moreover, in many instances, insurance coverage is required by the regulations, laws, and

---

[8]    In addition to the Insurance Policies listed on **Exhibit C** to the Insurance Motion, the Debtors maintain numerous
insurance policies with respect to, among other things, employee health, dental, disability, and life insurance
benefits. These programs are described, and relief is requested with respect to such programs, in the *Debtors'
Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages,
Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs,
and (II) Granting Related Relief* filed contemporaneously herewith.

contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's (the "**U.S. Trustee**") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, to ensure uninterrupted coverage, I request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, and enter into new Insurance Policies in the ordinary course of business.

114.     In the ordinary course of business, the Debtors utilize certain insurance brokers (the "**Insurance Brokers**") to obtain their Insurance Policies. The Insurance Brokers primarily assist the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates. The Insurance Brokers are compensated for their services through either commissions from the Insurance Carriers or payment by the Debtors of a set percentage of the policy premium reduced by any related commissions the Insurance Brokers receive from the Insurance Carriers (the "**Brokerage Fees**"). To the best of my knowledge, the Debtors do not owe any prepetition Brokerage Fees. To the extent the Debtors have to pay the Brokerage Fees in the future, the Debtors seek the Court's authority to do so since the employment of the Insurance Brokers allows the Debtors to obtain and manage their Insurance Programs in a reasonable and prudent manner and to realize considerable savings in the procurement of the Insurance Programs by having access to market comparables provided by the Insurance Brokers.

**J.      MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING PAYMENT OF PREPETITION OBLIGATIONS TO NEWSPAPER CARRIERS AND D.W.S., INC. CONTRACTORS (THE "CARRIERS AND BROADCAST CONTRACTORS MOTION")**

115.     Pursuant to the Carriers and Broadcast Contractors Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay (i) certain pre-petition obligations owed to independent contractor carriers who deliver the News-Gazette newspaper to subscriber customers, and (ii) certain pre-petition obligations owed to independent

contractor broadcasters at DWS; and (b) authorizing and directing banks and other financial institutions to receive, process, honor, and pay certain checks presented for payment and electronic payment requests relating to the foregoing.

116.    News-Gazette relies upon independent contractor carriers (the "**Carriers**") to perform the critical function of delivering the Debtors' flagship News-Gazette newspaper to subscriber customers on a daily basis (the "**Daily Newspaper Carriers**") and weekly basis (the "**Weekly Newspaper Carriers**").  As of the Petition Date, News-Gazette utilized approximately 185 Carriers.

117.    Daily Newspaper Carriers are paid weekly on Fridays, based upon the number of newspapers they delivered in the preceding Sunday through Saturday period. Weekly Newspaper Carriers are paid monthly, based on the number of newspapers they delivered in the previous month.

118.    The first pay period following the Petition Date for the Daily Newspaper Carriers (the "**DNC Straddling Pay Period**") ends on August 31, 2019, with the next payday occurring on September 6, 2019.  The next pay period following the Petition Date for the Weekly Newspaper Carriers likewise is September 6, 2019 (the "**WNC Straddling Pay Period**").

119.    The gross payments made for the DNC Straddling Pay Period will be approximately $45,351.10; the gross payments made for the WNC Straddling Pay Period will be approximately $2,291.25 (collectively, the "**Pre-Petition Accrued Carrier Payments**").

120.    Without the Carriers, the Debtors would be unable to deliver the News-Gazette daily or weekly newspapers on a timely basis.  If deliveries are not made, or are materially delayed, News-Gazette would immediately incur massive refund obligations to subscribers and, ultimately, risk the hard-earned goodwill among its subscriber base.

121.    In addition, debtor DWS relies upon a small number of independent contractors to host and supply key portions of its content, including weather reports, talk shows, sports and music.

122.    Two of those contractors (the "**DWS Contractors**") are, collectively, owed a total of approximately $2,600.00 for services rendered prior to the Petition Date (the "**Pre-Petition Accrued DWS Contractor Payments**").

123.    The relief requested in this Motion is critical to maintain the enterprise value of the Debtors and ensure workforce stability.   In order to preserve value for the estates and all stakeholders, it is imperative that the Carriers and DWS Contractors continue to be compensated without significant interruption.  Absent approval of the relief requested in this Motion, both the Carriers and the DWS Contractors may face hardship that could compel them to seek opportunities elsewhere.

124.    Further, maintaining good relations with the Carriers and the DWS Contractors, who are responsible for much of DWS' radio content, is essential to consummating the proposed sale of the Debtors' assets. For all these reasons, I respectfully submit that the Motion should be granted.

**K.    MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING PAYMENT OF PREPETITION OBLIGATIONS TO FREELANCERS (THE "FREELANCERS MOTION")**

125.    Pursuant to the Freelancers Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay certain pre-petition obligations owed to independent contractor freelancers (the "**Freelancers**") who provide various forms of content, such as articles and photos, to the publication, and (b) authorizing and directing banks and other financial institutions to receive, process, honor, and pay certain checks presented for payment and electronic payment requests relating to the foregoing.

126.    The News-Gazette relies upon Freelancers to perform the critical function of providing a portion of the content for the Debtors' flagship News-Gazette newspaper, their weekly newspapers and all companion websites.

127.    As of the Petition Date, News-Gazette utilized approximately 51 active Freelancers who provided work in August.  On average the Freelancers are paid $8,827.30 a month, in the aggregate.

128.    The Freelancers are typically paid by the 9th of the month for services provided in the preceding month.

129.    The first pay period following the Petition Date for the Freelancers (the "**Freelancer Straddling Pay Period**") ends on August 31, 2019.  The Freelancers would normally be paid by September 9, 2019.

130.    The gross payments made for the Freelancer Straddling Pay Period will be approximately $8,827.30 on account of content provided from August 1, 2019 through August 31, 2019, and approximately $8,827.30 (the "**Pre-Petition Accrued Freelancer Payments**") will be on account of services rendered prior to the Petition Date.

131.    As some of the Freelancers submit their own invoices, sometime invoices are received for work after the Freelancers are normally paid and such invoices are paid late.  As of the date of this Motion, I am unaware of any delinquent invoices on account of pre-petition work; however, if Debtors do receive invoices, it is expected to be less than $2,000.00.

132.    Without the Freelancers, the Debtors would be missing significant amounts of content.

133.    The relief requested in this Motion is critical to maintain the enterprise value of the Debtors and ensure workforce stability.  In order to preserve value for the estates and all stakeholders, it is imperative that the Freelancers continue to be compensated without significant

interruption.   Absent approval of the relief requested in this Motion, the Freelancers may face hardship that could compel them to seek opportunities elsewhere.

134.    Further, maintaining good relations with the Freelancers is essential to consummating the proposed sale of the Debtors' assets.  For all these reasons, I respectfully submit that the Motion should be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:  August 30, 2019                    By: */s/ Traci E. Nally*
                                          Traci E. Nally