## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[1] | Case No. 19-11901 (KBO) |
| Debtors. | *(Joint Administration Pending)* |

**DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL, OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF THE SALE, CURE AND OTHER NOTICES; AND (E) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF**

The News-Gazette, Inc. ("**News-Gazette**") and the above-captioned debtors and debtors in possession (each a "**Debtor**" and, collectively, the "**Debtors**") hereby submit this motion (the "**Motion**") pursuant to sections 105, 363, 364, 365 and 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "**Bankruptcy Code**"), and rules 2002, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "**Bankruptcy Rule**," and collectively, the "**Bankruptcy Rules**"), for (I) an order (the "**Bidding Procedures Order**") substantially in the form attached hereto as __Exhibit 1__ (A) approving the Debtors' proposed auction (the "**Auction**") and bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "**Bidding Procedures**") in substantially the form attached as an exhibit to the Bidding Procedures Order to govern the sale (the "**Sale**") of all or

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  The News-Gazette, Inc. (0894) and D.W.S., Inc. (7985).  The Debtors' headquarters are located at 15 East Main Street, Champaign, Illinois 61820.

substantially all of the Debtors' assets (the "**Assets**"); (B) approving bid protections; (C) establishing procedures for the assumption and assignment of executory contracts and unexpired leases; (D) approving the form and manner of notice of the Sale, the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "**Cure Notice**") and the other notices set forth herein; and (E) scheduling the Auction and a hearing before this court (the "**Sale Hearing**") to consider approval of the Sale; and (II) an order in substantially the form attached as **Exhibit 2** hereto (the "**Sale Order**") authorizing (A) the Sale of the Acquired Assets to the bidders with the highest or otherwise best bid (the "**Successful Bidders**") pursuant to the Stalking Horse APA, and/or Modified Asset Purchase Agreements (*as defined below*), in each case free and clear of all claims, liens and encumbrances as provided therein upon the consummation of such Sale and payment in full of all consideration under the Asset Purchase Agreement; and (B) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidder; and (III) certain related relief.[2]    In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.       Headquartered in Champaign, Illinois, Debtor The News-Gazette, Inc. publishes multiple daily and weekly newspapers, companion shoppers, niche publications, and companion digital web sites and is the leading local news source in the east central Illinois region of Champaign County. Debtor D.W.S., Inc., a wholly-owned subsidiary of Debtor The News-Gazette, Inc. (collectively, the "**Company**"), owns and operates three radio stations in Champaign, Illinois and one station in Arcola, Illinois.

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures, as applicable.

2.     As set forth in more detail in the Affidavit of Traci E. Nally, the Debtors have experienced significant financial difficulties over the past several years, including a loss of advertising revenue and a corresponding deterioration in earnings before interest, taxes, depreciation and amortization ("**EBITDA**"), a common benchmark for performance of a business, including media businesses like the Debtors.

3.     To address these problems, the Debtors undertook a number of initiatives intended to stabilize the business and position it for the future.  Up to this point, despite substantial cost savings measures, the Company's increased costs and the Company's fixed costs have eaten up cost cutting measures while overall revenue declines — all while the Debtors' pension funding obligations continue to increase.  Unfortunately, it has now become apparent to the Debtors that, despite their best efforts, the Debtors are no longer a sustainable stand-alone business under the current cost structure.

4.     To preserve going-concern value and enable the Debtors to continue to serve the East Central Illinois community, for about the last year, the Debtors have been exploring their strategic alternatives including a possible outside management arrangement and/or the sale of some or all of the business assets.  Ultimately, the Debtors determined that a sale of the business as a going concern to a buyer with the financial resources and media footprint to further economize operations represented the best opportunity to maximize value for the benefit of the community and all stakeholders.

5.     As part of that effort, on December 20, 2018, the Debtors engaged Dirks, Van Essen, Murray and April ("**Dirks**") to solicit interest from third parties with respect to a possible merger, consolidation, tender or exchange offer, or sale or exclusive license of all or a majority of the Debtor's assets or outstanding equity interests.

6.      Dirks drafted marketing materials and contacted potentially interested parties as detailed below (the "**Prepetition Marketing Process**").   In consultation with the Debtors' management, Dirks prepared an information memorandum summarizing the Debtors' business and the opportunity presented as well as financial and other information.   Based on prior industry relationships and additional research, Dirks compiled a list of potential strategic and media-focused financial buyers who might be interested in investing in or acquiring the Debtors.   The Debtors also built a comprehensive online data room to facilitate due diligence requests from potential investors or buyers.

7.      Dirks contacted 35 potential purchasers and distributed the information memorandum to 22, all of which executed non-disclosure agreements.   The parties that executed non-disclosure agreements were provided access to a confidential data room established by Dirks and six of them conducted interviews with the Debtors' management (collectively, "**Diligence Information**").   The Diligence Information provided prospective investors or buyers with detailed information on, among other topics, the Debtors' business, strategy, growth opportunities, technology, legal and regulatory matters, and historical financial performance.

8.      As the Prepetition Marketing Process continued, a process letter was sent to ten parties.   Ultimately, three letters of intent were received. One letter proposed a purchase of the consolidated businesses, one proposed a purchase of newspaper business, and one proposed a purchase of the radio business.

9.      After exposing the assets to the open market for more than six months, the Debtors have reached an agreement (the "**Stalking Horse APA**") for the going-concern sale (the "**Stalking Horse Sale**") of the Assets with stalking horse purchaser Champaign Multimedia Group, LLC (the "**Stalking Horse Bidder**") which represented the highest and best offer for the assets.   Thus,

on July 1, 2019, the Debtors and the Stalking Horse Bidder executed a revised letter of intent, and on August 27, 2019, the parties executed the Stalking Horse APA providing for the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder through these chapter 11 cases. The Stalking Horse APA has the effect of setting a floor for the sale of the Debtors' assets, thus maximizing the return for the Debtors' stakeholders.

10.     Dirks' sale process (the "**Sale Process**") enabled the Debtors to identify a stalking horse that provides a clear path through and out of chapter 11 (the "**Chapter 11 Cases**" or "**Bankruptcy Proceedings**").  The Sale Process has provided the Debtors with ample time to run a robust marketing process for the Debtors' assets and maximize value for stakeholders, while ensuring the business emerges from the restructuring proceedings in a reasonable time frame.

11.     In sum, the Sale process described herein provides for, among other things, the assumption by the purchaser(s) of certain pre- and postpetition liabilities of the Debtors, and the continued operation of the Debtors' business as a going concern under new ownership post-closing.  Given the Debtors' challenged operating performance and pension funding obligations, among other factors, leading up to the commencement of the Bankruptcy Proceedings, this proposed sale process presents the best option for maximizing the value of the Debtors' estates and stakeholder recoveries.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Local 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is

later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.     Venue of this proceeding and this Motion is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory predicates for the relief sought herein are in Bankruptcy Code sections 105, 363, 364, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014.

## BACKGROUND

### A.  GENERAL.

15.     On August 30, 2019 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief.

16.     The Debtors are continuing in possession of their respective properties and are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17.     No request has been made for the appointment of a trustee or examiner.  No official committee of unsecured creditors has been appointed in these Chapter 11 cases.

### B.  THE STALKING HORSE APA AND PROPOSED SALE.

18.     As noted above, the Debtors have entered into the Stalking Horse APA with the Stalking Horse Bidder, described in more detail below.  Because the Stalking Horse APA has the effect of setting a floor and maximizing the potential proceeds of the Sale, the Debtors believe that granting certain bid protections (collectively, the "**Bid Protections**") to such purchaser is warranted.

(a)     To reimburse the Stalking Horse Bidder in connection with the proposed sale and serving as the Stalking Horse Bidder, in the event that the Successful Bidder (as that term is defined in the Bid Procedures) is not the Stalking Horse Bidder and the sale of the Purchased Assets to a Successful Bidder, other than the Stalking Horse Bidder, closes, then the Stalking Horse Bidder shall be entitled to an expense reimbursement the (the "**Expense Reimbursement Fee**") as an allowable administrative expense under Section 503(b) of the Bankruptcy Code and shall be paid at the closing of a sale to a Successful Bidder who is not the Stalking Horse Bidder;

(b)     Notwithstanding anything in the Stalking Horse APA to the contrary, the Expense Reimbursement Fee shall be limited to the aggregate amount equal to the reasonable and documented out-of-pocket costs, fees, and expenses of the Stalking Horse Bidder (including legal, accounting, and other consulting fees and expenses, other than any success or similar fees payable to any financial advisors, consultants or other Persons) incurred in connection with the transactions contemplated to occur pursuant to the Stalking Horse APA, including, without limitation, (a) the negotiation and execution of the Stalking Horse APA, and (b) carrying out its obligations under the Stalking Horse APA prior to the Closing; *provided, however*, that such Expense Reimbursement Amount shall not exceed an amount equal to $225,000;

(c)     The minimum cash overbid amount shall equal the minimum amounts set forth in the Bidding Procedures attached hereto, which include pro rata amounts for the cash consideration for the Acquired Assets, plus the Expense Reimbursement Fee, *plus* a minimum overbid. For the avoidance of doubt, bidding on the Debtor's Assets at any auction shall proceed in increments of not less than $100,000 on a pro rata basis; and

(d)     In the event of a credit bid by a secured creditor (a "**Credit Bid**"), any Credit Bid submitted or made by a secured creditor, and that may be permitted by the Court, shall include a cash component sufficient to pay (in addition to all costs required by the Bid Procedures Order and after the return of the Deposit to the Stalking Horse Bidder as provided in the Stalking Horse APA), the maximum amount of the Expense Reimbursement Fee (*i.e.* $225,000) as an administrative expense (with any remaining balance of such maximum amount to be returned upon the Court's determination of the allowable Expense Reimbursement Fee), which Expense Reimbursement Fee shall be paid at the closing of a sale to a secured creditor who makes a Credit Bid and is the Successful Purchaser.

C.    **BIDDING PROCEDURES.**

19.    The Debtors' ability to successfully emerge from the Bankruptcy Proceedings depends on the coordinated going-concern sale of the enterprise as contemplated herein.

20.    Towards that end, and to ensure that the Debtors receive the maximum value for the Assets, the Debtors will conduct an Auction, and the Stalking Horse APA will be subject to higher or better offers.  The Bidding Procedures will govern the conduct of the Auction for these Chapter 11 Cases, and is subject to approval by this Court.  As discussed further below, the Debtors propose conducting a hearing with this Court to seek approval of the Auction and the Bidding Procedures as well as, ultimately, the Sale itself.

21.    While all interested bidders should read the Bidding Procedures in their entirety, the following is a summary of their salient features:[3]

(a)    **Provisions Governing Qualification of Bids and Bidders:**  To be eligible to participate in the Auction, each Bid, and each Bidder must, respectively, be reasonably determined by the Sellers, in consultation with their advisors, to satisfy each of the following conditions, among others:

- *Good Faith Deposit:*  Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds, in the amount of ten percent (10%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement (*as defined below*), which deposit shall be held in an escrow account to be identified and established by the Sellers (the "**Good Faith Deposit**").

- *Executed Agreement:*  Each Bid must be based on the Stalking Horse APA attached hereto as **Exhibit 3**, and such Bid must include binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "**Modified Asset Purchase Agreement**").  A Bid must also include a copy of the Modified Asset Purchase Agreement

---

[3]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text or elsewhere in this Motion, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

(including all exhibits thereto) marked against the applicable Stalking Horse APA to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Bidder, such as the expense reimbursement and break-up fee provisions contained in the Stalking Horse APA, which terms shall not be in any Modified Asset Purchase Agreement). Each Modified Asset Purchase Agreement must exclude any and all preference, fraudulent conveyance, and other claims of Sellers arising under Chapter 5 of the Bankruptcy Code or similar state law.

- *Scope of Bid / Lots:* A Bid must be for all or substantially all of the Acquired Assets or for one or more of the following Lots (or such other Lots as the Sellers may otherwise agree to):[4]

    (a) substantially all of the assets of the newspaper business (the "**Newspaper Lot**");

    (b) substantially all of the assets of the Radio Business, including the relevant real estate assets (the "**Radio Lot**").

- *Minimum Bid:* A Bid must have a purchase price that includes a combination of cash, in the amounts below, as well as the assumption of any postpetition liabilities, if any, and cure costs associated with the relevant Lot,[5] and subject to any adjustments typical of similar transactions, that, in the Sellers' reasonable business judgment, has a value equal to or greater than the following, subject to the terms of these Bidding Procedures:

    (a) For substantially all of the Acquired Assets: $4,825,000;

    (b) For the Newspaper Lot: $2,412,500;

    (c) For the Radio Lot: $2,412,500.

- *Designation of Assigned Contracts and Leases; Cure Costs:* A Bid must specifically (a) identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers and (b) provide for the Bidder's payment in full in cash of all

---

[4] Any Bid for the Radio Lot that does not also include a bid for the Newspaper Lot, and vice versa, must include a commitment to enter into an IP sharing agreement on substantially the same terms that exist today. Any bid for less than substantially all of the assets of the Debtors must allocate the purchase price to each Lot included in such bid.

[5] A schedule of the post-petition liabilities for each lot and a schedule of estimated cure costs for executory contracts that could be assumed by any Bidder has been made available in the electronic data room that each Prospective Purchaser has access to.

of the cure costs related to any such executory contracts and unexpired leases.

- *Designation of Assumed Liabilities:*  A Bid must identify all liabilities which the Bidder proposes to assume.

- *Corporate Authority:*  A Bid must include written evidence reasonably acceptable to the Sellers demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction then the Bidder must furnish written evidence reasonably acceptable to the Sellers of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

- *Disclosure of Identity of Bidder:*  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid (including any co-bidder or team bidder), and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid must also fully disclose any connections or agreements with the Sellers, the Stalking Horse Bidder or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Sellers.

- *Proof of Financial Ability to Perform:*  A Bid must include detailed, written evidence that the Sellers may conclude, in consultation with their advisors, demonstrates that the Bidder has and will continue to have the necessary financial ability to consummate the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia,* the following:

  (a)  contact names and numbers for verification of financing sources;

  (b)  evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Sellers in the amount

of the cash portion of such Bid as are needed to consummate the Alternate Transaction;

(c) the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Sellers;

(d) a description of the Bidder's pro forma capital structure; and

(e) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers demonstrating that such Bidder has the ability to consummate the Alternate Transaction.

- *Regulatory and Third Party Approvals:*  A Bid must set forth (a) each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, (b) the time period within which the Bidder expects to receive such regulatory and third-party approvals, (c) those actions the Bidder will take to ensure receipt of such approvals as promptly as possible, and (d) a detailed description of any steps the Bidder will take to address any delay in obtaining such approvals (*e.g.* transition services agreement).

- *Contact Information and Affiliates:*  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

- *Contingencies:*  Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Sellers than those set forth in the Stalking Horse APA, as determined by the Sellers in good faith, and (b) may not be conditioned on (i) obtaining financing, (ii) any internal approvals or credit committee approvals, or (iii) the outcome or review of due diligence, including with respect to any environmental, employee, vendor, labor, health and/or safety matters.

- *Irrevocable:*  Each Bid must be irrevocable until ten (10) business days after the conclusion of the Sale Hearing for the relevant Acquired Assets or Lot; *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the earlier of the consummation of the Sale of the relevant Acquired Assets or Lot or the Extended Outside Date (*as defined below*).

- *Compliance with Diligence Requests:*  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Sellers to the reasonable satisfaction of the Sellers.

- *As-Is, Where-Is:*  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the applicable Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the applicable Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Stalking Horse APA.

- *Confidentiality Agreement:*  To the extent not already executed, the Bid must include an executed Confidentiality Agreement.

- *Termination Fees:*  The Bid (other than a Bid pursuant to the Stalking Horse APA) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

- *Adherence to Bidding Procedures:*  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

- *Closing Date:*  The Bid must include a commitment to consummate the transactions contemplated by the Modified Asset Purchase Agreement by no later than December 4, 2019 or such later date as Debtors may agree to in writing (the "**Outside Date**").  In no event shall the consummation of the Sale occur later than January 19, 2020 without the written consent of Debtors (any such date, the "**Extended Outside Date**").  In the event the Bid contemplates an Extended Outside Date in order to address any antitrust, regulatory or permitting issues, the Bid must include a mechanism to cover any and all costs incurred after the Outside Date in a manner acceptable to the Sellers.

- *No Late Bids*:  Unless otherwise ordered by a Court, the Sellers shall not consider any Bids for the Acquired Assets or with respect to any Lot submitted after the conclusion of the Auction for the Acquired Assets or with respect to any such Lot, and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(b)   **Auction, Auction Procedures and Overbids**:   The Auction shall be conducted according to the following procedures, subject to the terms of the Bidding Procedures:

- *Participation:*  Only the Sellers, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Bidder and any such other Qualified Bidders will be entitled to make any Bids at the Auction.

- *Auction Baseline Bids*:  Prior to commencement of the Auction, the Sellers will provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement that is the highest and otherwise best Qualified Bid for the applicable Acquired Assets as determined by the Sellers (such highest and otherwise best Qualified Bid, the "**Auction Baseline Bid**").  In addition, at the start of the Auction, the Sellers will describe the terms of the Auction Baseline Bids to the other Qualified Bidders.

- *Joint Bidding and Anti-Collusion Representations*:  Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Court.

  Before submitting any Bid with co-bidding or team bidding arrangements, whether formal or informal, among a Qualified Bidder and any third party (including any other Preliminary Interested Purchaser or Qualified Bidder) (such a Bid, a "**Joint Bid**"), each Qualified Bidder must disclose such Joint Bid to the Sellers, and the Sellers may determine whether the Joint Bid constitutes a Qualified Bid for purposes of participating in the Auction.  The identity of any and all co-bidders or team bidders involved in submitting any Joint Bid, if the Sellers determine that such Joint Bid constitutes a Qualified Bid, will be disclosed on the record at the Auction

- *Terms of Overbids:*  Any Overbid after and above the Auction Baseline Bid shall be made in increments valued at not less than such amount as shall be announced at the Auction (in an amount greater than any approved bid protections or sale-related administrative expenses), in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Sellers in consultation with their advisors.  Only the Stalking Horse Bidder may credit bid the amount of any Bid Protections.

- *Scope of Bid / Lots:*  A Bid must be for all or substantially all of the Acquired Assets or for one or more of the Lots.

- *Remaining Terms Are the Same as for Qualified Bids:*  Subject to the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid, *provided, however*, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse APA or Modified Asset Purchase Agreement, as the case may be, in connection therewith.  Any Overbid must remain open and binding on the Bidder as provided herein

- *Announcement of Overbids:*  The Sellers will announce at the Auction the material terms of each Overbid, the total amount of consideration and form offered in each such Overbid (including the cash or cash equivalent component thereof), and the basis for calculating such total consideration.

- *Consideration of Overbids:*  Subject to the deadlines set forth herein, the Sellers reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Sellers and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; modify or supplement any or all of the Auction procedures or rules; or give Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.  When comparing Overbids to the immediately preceding Qualified Bid, the Sellers will treat any credit bid as being made in cash or in cash equivalents.

(c)     **Additional Procedures**:  The Sellers may at any time establish, at or prior to the Auction, other or additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Stalking Horse APA.  Any Auction rules adopted by the Sellers that would modify any of the terms of the Stalking Horse APA or the rights of the Stalking Horse Bidder under the Bidding Procedures (as may be consensually modified at the Auction) requires the consent of the Stalking Horse Bidder.

- *Stalking Horse Bidder Bid*:  The Stalking Horse Bidder shall be entitled to (a) credit bid all or a portion of its Bid Protections, consistent with these Bidding Procedures; and (b) submit additional bids and make modifications to the Stalking Horse APA at the Auction consistent with these Bidding Procedures.

- *Additional Bids; Modifications*:  All Qualified Bidders, including the Stalking Horse Bidder, shall have the right to submit additional bids and make additional modifications to the Stalking Horse APA or Modified Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to such Stalking Horse APA or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Sellers' business judgment, be less favorable to the Sellers than the terms of such original agreement.

- *Subsequent Bids*:  Each Qualified Bidder must submit a subsequent Bid that satisfies the minimum bid increment in each round of bidding in order to continue participating in the Auction.  Qualified Bidders shall not be allowed to skip rounds of bidding on the Acquired Assets and/or a particular Lot once they participate in the Auction for the Acquired Assets and/or any given Lot.

(d)     **Backup Bidder:**  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest and otherwise best Bid at the Auction (other than the Stalking Horse Bidder) with respect to some or substantially all of the Acquired Assets, as determined by the Sellers, in the exercise of their business judgment, will be designated as a backup bidder (a "**Backup Bidder**").  A Backup Bidder shall be required to keep its last submitted Bid (the "**Backup Bid**") open and irrevocable until the earlier of the consummation of the transaction with the Successful Bidder or the Extended Outside Date.

- *Closing with Backup Bidder:*  Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the Acquired Assets, the Sellers may deem the Backup Bidder for such assets to have the new Successful Bid, and the Sellers will be authorized,

without further order of the Court, to consummate the transaction with such Backup Bidder at the price of its last bid.  Such Backup Bidder will be deemed to be the Successful Bidder and the Sellers will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Court.  All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Sellers on and as of the date that the Court approves the Bid as the Successful Bid.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than the Stalking Horse Bidder) with respect to some or substantially all of the Acquired Assets or any given Lot or Lots, the Stalking Horse Bidder will NOT be required to be a Backup Bidder and will be permitted to terminate the Stalking Horse APA as provided therein and be entitled to the return of its Deposit as provided in the Stalking Horse APA.

(e)    **Alteration of Procedures:**  The Sellers reserve the right (after consulting with their advisors) to modify the Bidding Procedures and implement other or additional procedural rules that the Sellers determine, in their business judgment will better promote the goals of the bidding process and discharge the Sellers' fiduciary duties; provided however that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse APA, the Bidding Procedures Order or any other Order of the Court, unless agreed in writing by the applicable Stalking Horse Bidder or otherwise ordered by the Court.

22.    Subject to the execution of acceptable Confidentiality Agreements, the Debtors will permit existing interested parties and any new prospective purchaser to perform reasonable due diligence with respect to the Assets and will assist them with such efforts.

**D.    APPLICABLE NOTICES.**

23.    Contemporaneously herewith, the Debtors have filed a motion (the "**Motion to Expedite**") to schedule an expedited hearing on the Bidding Procedures Order on or before **September 13, 2019** (the "**Bidding Procedures Hearing**").

24.    Under Bankruptcy Rule 2002(a) and (c), the Debtors must notify their creditors of the proposed Sale, including disclosure of the time and place of the Auction and the Sale Hearing, the terms and conditions of the Sale, the Bidding Procedures and the deadline for filing any

objections thereto.  Accordingly, the Debtors have served a copy of this Motion and the proposed Bidding Procedures Order and Sale Order, as well as the Motion to Expedite (the "**Notice of Motion**") in the manner set forth below.  Consistent with Local Rule 6004-1(b)(iv)(C), the Debtors have highlighted elsewhere in this Motion all provisions of the proposed Sale Order to be highlighted.  In addition, paragraphs 16 and 17 of the Sale Order provide for mutual releases for the Debtors and the Successful Purchaser upon the Closing, which releases are intended to ensure that the estate achieves finality at the conclusion of the Sale Process.

25.    The Debtors also propose, within three (3) days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable, to serve a copy of the Bidding Procedures Order and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) the U.S. Trustee; (e) the Federal Communications Commission; (f) the Internal Revenue Service;  (g) the Securities and Exchange Commission; (h) the U.S. Attorney for the District of Delaware; (i) parties under collective bargaining agreements, including without limitation the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444 for the Circulation District Managers and the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444/14407 for the Newsroom; (j) multiemployer pension plans in which or to which a Debtor or any of its Affiliates is or was participating or contributing, including without limitation the CWA/ITU Negotiated

Pension Plan and the GCIU-Employer Retirement Fund; and (k) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

26.     In addition, on or about September 4, 2019, the Debtors (or their agents) will serve by first-class mail, postage prepaid, the notice of the sale, substantially in the form attached to the Bidding Procedures Order (the "**Sale Notice**"), upon all other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

27.     Finally, on or about September 17, 2019, the Debtors will cause the Sale Notice to be published on one occasion in the *News-Gazette*.

**E.     ASSUMPTION AND ASSIGNMENT OF THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

28.     In accordance with the proposed Bidding Procedures Order, on or about September 4, 2019 the Debtors will file with this Court and serve on each non-Debtor counterparty to an executory contract or unexpired lease related to the Assets the Cure Notice, substantially in the form attached to the Bidding Procedures Order.[6]  The Cure Notice shall:

(a)     state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**");

(b)     notify the non-Debtor counterparty that such party's contract(s) or lease(s) may be assumed and assigned to the Successful Bidder of the Assets at the conclusion of the Auction;

(c)     state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors; and

(d)     state the Contract Rejection Deadline (as defined below) by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s) (such objection, a "**Contract and/or Lease Objection**"); *provided,*

---

[6]   The Debtors intend to serve Cure Notices on the non-Debtor counterparty to an executory contract or unexpired lease related to the Assets as soon as possible after filing their schedules and statements of financial affairs.  The Debtors anticipate that they will have served the Cure Notices prior to the hearing on the present Motion.

*however*, that the inclusion of a contract or lease on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder, the Successful Bidder(s) or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed and assigned in connection with the Sale of the Assets.  If no Cure Amount is listed, the Debtors believe that no amount to cure defaults under the respective executory contract or unexpired lease is owed by it thereunder.  The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice.

29.     All Contract and/or Lease Objections must be filed and served so as to be received by **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Contract and/or Lease Objection Deadline**").

30.     The Debtors propose that any Contract Objection must be in writing and filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, and served so as to be received by the Contract Objection Deadline, on the following parties (collectively, the "**Notice Parties**"):  **The Sellers**, 15 East Main Street, Champaign, Illinois 61850, Attention:   John   Reed   (jreed@newsgazetteinc.com)   and   Traci   E.   Nally (tnally@newsgazetteinc.com); **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 North LaSalle Street, Suite 1700, Chicago, Illinois  60602, Attention: Nicholas M. Miller, Esquire (nmiller@nge.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attention: William E. Chipman, Jr., Esquire (chipman@chipmanbrown.com); and **Broker to the Sellers**, Dirks, Van Essen, Murray & April, 119 East Marcy Street, Suite 100, Santa Fe, New Mexico 87501, Attention: Phil Murray (phil@dirksvanessen.com).

31.     Any Contract and/or Lease Objection must state (a) the basis for such objection and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

32.     Any Contract and/or Lease Objection solely to the Cure Amount(s) shall not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party objects solely to Cure Amount(s): (i) the Debtors may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties; or (ii) notwithstanding anything in the Successful Bidders APA to the contrary, the Successful Bidder may elect to remove such contract and/or lease that is the subject of the Contract and/or Lease Objection from its list of Assigned Contracts to be assumed and assigned and have no obligation to take an assignment of, or pay a Cure Amount for, said contract and/or lease.  So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s) or lease(s).  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

33.     If no Contract and/or Lease Objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

34.     As soon as reasonably practicable after receiving the schedule from the Stalking Horse Bidder or other Qualified Bidder, the Debtors will prepare and file a list of those executory contracts and unexpired leases that such bidders elect to have assumed and assigned (the "**Designated Contracts**") at Closing pursuant to section 365 of the Bankruptcy Code, subject to any right to add or delete executory contracts or unexpired leases in accordance with the Stalking Horse APA.

35.     As soon as reasonably practicable thereafter, the Debtors will post on the Case Website (a) the list of any Designated Contracts, which the Debtors will update as and when executory contracts or unexpired leases are added or deleted by any such Bidders and (b) a description of the Bidders and information as to the Bidders' ability to perform the Debtors' obligations under the relevant Designated Contracts.

36.     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder under the applicable executory contract(s) or unexpired lease(s) (an "**Adequate Assurance Objection**" and together with a Contract and/or Lease Objection, an "**Objection**"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the Court and serve such objection on the Debtors, the Notice Parties and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is received on or before **12:00 p.m. (*prevailing* Eastern Time)** on **September 27, 2019** (the "**Adequate Assurance Objection  Deadline**").  An Adequate Assurance Objection shall be filed on or before the Adequate Assurance Objection Deadline in accordance with, and subject to, the Contract Objection Procedures set forth above.

37.     If any non-Debtor counterparty does not timely file and serve a Contract and/or Lease Objection, an Adequate Assurance Objection and/or an Objection as set forth above, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

**F.     REQUEST TO SET A DATE FOR THE SALE HEARING AND SALE OBJECTION DEADLINE.**

38.     The Debtors intend to present the Successful Bid for approval by Court at the Sale Hearing currently proposed for **October 2, 2019 at _____ a.m./p.m. (*prevailing* Eastern Time)**, or at such other time ultimately scheduled by the Court.  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

39.     All objections to the Sale (a "**Sale Objection**") must be in writing and filed on and served so as to be received by **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Sale Objection Deadline**") with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.  In addition, any Sale Objection must be served on the Notice Parties and counsel to the Stalking Horse Bidder, John M. Steiner, Esquire, 525 William Penn Place, 28th Floor, Pittsburgh, Pennsylvania 15219, jsteiner@leechtishman.com,  so as to be received on or before the Sale Objection Deadline; *provided however*, that any objections to the conduct of the Auction or selection of the Successful Bid or Back-Up Bids (a "**Supplemental Objection**") shall be in writing, filed with the Court, together with proof of service, and served so as to be received by the Notice Parties and the Stalking Horse Bidder and its counsel, on or before

the commencement of the Sale Hearing.  Failure to file and serve a Sale Objection or Supplemental

Objection as aforesaid shall be deemed to be consent to the Sale for purposes of section 363(f) of

the Bankruptcy Code.

**G.     TABLE OF RELEVANT DATES.**

40.     The following table summarizes the proposed dates requested in connection with

the Sale Process:

| | |
|---|---|
| Service of Sale Notice | September 4, 2019 |
| Service of Cure Notice | September 4, 2019 |
| Bidding Procedures Objection Deadline | September 11, 2019 |
| Bidding Procedures Hearing | September 13, 2019 |
| Service of Amended Sale Notice | September 16, 2019 |
| Service of Amended Cure Notice | September 16, 2019 |
| Publication of Sale Notice | September 17, 2019 |
| Contract Objection Deadline / Sale Objection Deadline | September 27, 2019 |
| Bid Submission Deadline | September 27, 2019 |
| Adequate Assurance Objection Deadline | September 27, 2019 |
| Auction | September 30, 2019 |
| Publication of Designated Contracts | October 1, 2019 |
| Supplemental Objections to Sale | October 1, 2019 |
| Sale Hearing | October 2, 2019 |

**BASIS FOR RELIEF**

A.    **THE BIDDING PROCEDURES ARE FAIR AND REASONABLE.**

41.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.  In accordance with the Bidding Procedures, the Debtors seek to market the Assets through a competitive bidding process to maximize value and avoid the further deterioration of the Debtors' business through a prompt sale of the Assets.  Consequently, the Debtors believe that good cause exists to expose their assets to sale at auction and to approve the procedures proposed herein.  An auction conducted substantially in accordance with the Bidding Procedures will enable the Debtors to obtain the highest and best offers for the Assets.

42.    The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding and sale process is conducted fairly and will yield the highest value for their estates and creditors.  The Bidding Procedures are designed to facilitate a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids for Assets as provided in the Bidding Procedures.  The Bidding Procedures also provide potential bidders with sufficient notice and opportunity to acquire information necessary to submit a timely and informed bid.  Thus, the Debtors and all parties in interest can be assured that the consideration for the Assets will be fair and reasonable.  At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with their advisors, the highest and best offer for the Assets.

43.    The Debtors believe that the Bidding Procedures provide an appropriate framework for the sale of the Assets that will enable the Debtors to review, analyze and compare, in a relatively

uniform fashion, all offers received to determine which offer is the highest and best and in the best interests of the Debtors' estates and creditors.   The Debtors believe that the proposed deadlines and milestones for noticing, marketing and selling the Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids.   Accordingly, the Debtors believe the Court should approve the Bidding Procedures.   Similar procedures have been routinely approved, including in the context of asset sales involving debtor assets in the United States.   *See, e.g., In re Hobbico, Inc. et al*, Case No. 18-10055 (KG) (Bankr. D. Del. Mar. 14, 2018); *In re Phoenix Brands, LLC, et al.*, Case No. 16-11242 (BLS) (Bankr. D. Del. June 7, 2016); *In re Nortel Networks Inc., et al.*, Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); *In re the Great Atlantic & Pacific Tea Company, Inc.*, Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); *In re Delia's, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); *In re Synago Technologies, Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013); *In re ICL Holding Company, Inc. (f/k/a LCI Holding Company, Inc.)*, Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25, 2013).

**B.     APPROVAL OF THE SALE IS WARRANTED UNDER BANKRUPTCY CODE SECTION 363(B).**

44.     Compelling business justifications exist for the proposed Sale.   Absent the transactions contemplated by the Sale Process, the Debtors' businesses and liquidity position would further deteriorate, putting the going concern value of the businesses at risk.   The Sale Process provides adequate opportunity to continue to market the business without lingering unnecessarily in bankruptcy.   Given the significant value of the Company's brands, and the negative impact the proceedings may have on its brands, the Debtors cannot afford to linger in bankruptcy.   As a result, and cognizant of their fiduciary obligation to maximize distributable value for all creditors, the Debtors believe that a sale of substantially all of their assets offers the best

available alternative for the business and the Debtors' stakeholders.   Accordingly, the Debtors have determined that they should pursue the Sale of the Assets as set forth in the Bidding Procedures.

45.     The Sale pursuant to section 363 of the Bankruptcy Code will enable the expeditious transfer of the Assets, an approach necessary to maximize and preserve the going-concern value of such Assets.  Section 363 of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . ."  11 U.S.C. § 363(b)(1).  "It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).  Following the decision in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to section 363.  *See, e.g., In re ICL Holding Co. Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 107071 (2d Cir. 1983); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 417-18 (Bankr. S.D. Tex. 2009); *Dai-Ichi Kangyo Bank Ltd. V. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999).

46.     "In evaluating whether a sound business purpose justifies sale of property under Section 363, courts consider a variety of factors, which essentially represent a 'business judgment' test."  *In re Culp*, 550 B.R. 683, 697 (Bankr. D. Del. 2015).  The "sound business purpose" test requires a debtor to establish:  "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."

*In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. at 176).

47.     As discussed above, the Debtors have concluded that, in light of the nature of the Debtors' business and the liquidity problems they face, the Sale of the Assets presents the best alternative for the Company and maximizes stakeholder recoveries.  Pursuing the Sale through the proposed Bidding Procedures will ensure that the Debtors can complete a transaction within a reasonable time, thereby preserving the value of the Debtors' brands and limiting the time and cost spent during the course of the Bankruptcy Proceedings.  Consequently, the proposed Sale of the Assets in accordance with the Bidding Procedures satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under Bankruptcy Code section 363(b).

48.     While the Debtors are confident that the Purchase Prices set forth in the Stalking Horse APA represents fair and reasonable consideration for the Assets, adequate "market exposure" and the auction process — the best means for establishing whether a fair and reasonable price is being paid — will provide additional support.

49.     In addition to a fair and reasonable value offered by the Successful Bidders for the Assets, the Sale will be the product of vigorous arms'-length, good faith negotiations between the relevant parties.  In particular, the negotiation of the Stalking Horse APA has involved substantial time and energy by the Sellers and such Stalking Horse Bidder and their respective professionals, and the Stalking Horse APA reflects a give-and-take, with substantial compromises and concessions made by all sides.

50.     Accordingly, the Debtors submit that the Sale of the Assets as contemplated herein and in the Bidding Procedures is in the best interests of the Debtors, their estates and creditors, and should be approved.

**C.    THE ACQUIRED ASSETS SHOULD BE SOLD FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES UNDER 11 U.S.C. § 363(1).**

51.    The Debtors also submit that, subject to the consummation of the Sale and payment in full of all of the consideration under the Asset Purchase Agreement, the Sale of the Assets that are acquired pursuant to the Asset Purchase Agreement should be free and clear of any and all claims, liens and encumbrances under Bankruptcy Code section 363(f) (other than Assumed Liabilities and Permitted Encumbrances as provided in any Modified Asset Purchase Agreement submitted by Qualified Bidders).  Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) of the Bankruptcy Code is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens and encumbrances. *See In re Pacific Energy Resources Ltd., et al.*, Case No. 09-10785 (KJC) D. Del. Aug. 18, 2009); *In re Flying J Inc., et al.*, Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992); *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995).

52.    The Debtors submit that there are no liens on any of the Purchased Assets.  Out of an abundance of caution, however, the Debtors submit that, in the event such lien were to be discovered, any such lien that is not an assumed liability or permitted encumbrance under any Modified Asset Purchase Agreement submitted by Qualified Bidders would satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  If an entity with liens on the Assets

does not consent to the proposed Sale of such assets, the Debtors intend to demonstrate at the Sale Hearing their satisfaction of the requirements of section 363(f) of the Bankruptcy Code. Alternatively, the Debtors may, subject to the consummation of the Sale and payment in full of all of the consideration under the Asset Purchase Agreement, sell the Assets that are acquired pursuant to the Asset Purchase Agreement free and clear of any other interests under section 363(f)(5) of the Bankruptcy Code because any such liens on any assets sold will attach to the proceeds of the Sale in their order of priority and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  Accordingly, pursuant to Bankruptcy Code section 363, the Debtors may sell the Assets that are acquired pursuant to any Asset Purchase Agreement free and clear of all claims, liens and encumbrances upon the consummation of such Sale.

53.     Moreover, the Debtors will send the Sale Notice to any purported lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtors request that unless a party asserting a lien on any of the Assets (other than with respect to Assumed Liabilities and Permitted Encumbrances) timely objects to this Motion, such party shall be deemed to have consented to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

54.     Subject to the consummation of the Sale and payment in full of all of the consideration under the Asset Purchase Agreement, it is also appropriate to sell the Assets that are acquired pursuant to the Asset Purchase Agreement free and clear of successor liability relating to the Debtors' businesses. Such limitations on successor liability ensure that any Successful Bidder

is protected from claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g., In re Tran World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an underfunded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

55.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts.  To that end, the Successful Bidder(s) should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets that are acquired pursuant to the applicable Asset Purchase Agreement free and clear upon consummation of such Sale.

**D.     A SUCCESSFUL BIDDER SHOULD BE ENTITLED TO THE PROTECTIONS OF BANKRUPTCY CODE SECTION 363(M).**

56.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship*

*v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark BellFurniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); *In re Temtechco, Inc.*, 1998 WL 887256, at *4 (D. Del. 1998).

57.     As noted above, any Asset Purchase Agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bidding Procedures, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder for the Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

**E.    ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

58.     To enhance the value of the Debtors' estates (by curtailing further administrative liability and eliminating substantial rejection claims), the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign the executory contracts and/or unexpired leases associated with the Subject Assets to the Successful Bidder.  The Debtors further request that the Sale Order provide that the assigned executory contracts and/or unexpired leases will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in Bankruptcy Code sections 365(b)(2), (f)(1) and (f)(3), that prohibit such assignments.

59.     The Debtors may, subject to Court approval, assume and assign executory contracts and unexpired leases under Bankruptcy Code section 365.  11 U.S.C. § 365(a).  Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases

upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See, e.g., In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007); *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992); *Sharon Steel National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re NII Holdings, Inc.*, Case No. 14-12611 (SCC) (Bankr. S.D.N.Y. Apr. 20, 2015); *In re Delia's, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003).   The assumption and assignment of the executory contracts and/or unexpired leases related to the Assets is an integral component of the Sale, without which the Sale would not be a viable option.

60.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under the lease is provided.  11 U.S.C. § 365(b)(1)(A)-(C).

61.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env.' Eng' g Corp. (In re Sanshoe Worldwide)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007); *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).

62.     As set forth above, pursuant to the terms of the proposed Bidding Procedures Order, the Debtors will send the Cure Notice to all counterparties to the executory contracts and unexpired leases notifying such counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder of such contracts and/or leases.  The Cure Notice will also set forth the Cure Amount, if any, owing for each such contracts and/or leases according to the Debtors' books and records.

63.     Counterparties to such contracts and/or leases will be given sufficient time (as set forth herein and in the proposed Bidding Procedures Order) to object to the proposed Cure Amounts, if any, set forth in the Cure Notice.  If no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s) and the applicable non-Debtor counterparty.  The payment of the Cure Amounts specified in the Cure Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant non-Debtor counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under the applicable executory contract(s) and/or lease(s) pursuant to Bankruptcy Code section 365(b)(1), unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder.

64.     Bankruptcy Code section 365(f)(2)(B) states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance."  11 U.S.C. § 365(f)(2)(B).  If necessary, the Successful Bidder must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bidding Procedures Order.

The affected non-Debtor counterparties will also be able to challenge the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.

65.     Any assumption and assignment of an assigned contract and/or lease will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code.  The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the assigned contracts and/or leases.  The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to Bankruptcy Code section 365 with respect to the potential assumption and assignment of the applicable assigned contracts and/or leases.  Consequently, assumption and assignment of the assigned executory contracts and/or leases in connection with the Sale of the Assets is appropriate under the circumstances.

**F.     THE BID PROTECTIONS ARE FAIR AND REASONABLE AND SHOULD BE APPROVED.**

66.     Approval of bid protections in connection with the sale of significant assets is analyzed under the business judgment standard, and courts routinely deem bid protections appropriate in chapter 11 cases.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other provisions negotiated in good faith).  The Third Circuit has held that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same

provision." *See, e.g., Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP)*, 594 F.3d 200, 206 (3d Cir. 2010).

67.     Accordingly, the Third Circuit has found that bid protections must meet the standard set forth in the administrative expense provisions of the Bankruptcy Code §503(b), which is generally satisfied if such bid protections provide some benefit to the Debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).  Benefits to the Debtor's estate may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would had been limited" and where the availability of the break-up fees and expenses "were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely . . . increasing the likelihood that the price at which the debtor is sold will reflect true worth." *Id.* at 537.

68.     Courts in this Circuit and elsewhere routinely approve protections in the form of a break-up fee and expense reimbursement, finding such protections to satisfy the business judgment rule and/or the administrative expense standard, as applicable.  *In re Point Blank Solutions Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del., Oct. 5, 2011); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del. Feb. 8, 2010); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (Bankr. D. Del. July 28, 2009); *See also In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537 (explaining that approval of break-up fees and other forms of bid protection in connection with the sale of significant assets pursuant to section 363 is an established practice in chapter 11 cases).

69.     Here the Bid Protections are reasonable and appropriate under both the business judgment rule and the administrative expense standard in light of the size and nature of the transactions contemplated herein, the efforts that have been expended by the Stalking Horse Bidder in connection therewith, the circumstances of these Chapter 11 Cases, and the value contributed to the Debtors' estate.   Therefore, the Bid Protections should be approved.   Moreover, the Bid Protections here are a necessary incentive to ensure that the Stalking Horse Bidder is committed to the Sale process and to purchasing the Acquired Assets and assuming the Assumed Liabilities for what the Debtors believe is fair consideration.   Without the Bid Protections, the Stalking Horse Bidder would not have been willing to enter into the Stalking Horse APA.   Further, payment of the Bid Protections will not diminish the value of the Debtors' estates, as the Debtors do not intend to terminate or breach the Stalking Horse APA and pay the Bid Protections, unless doing so would permit the Debtors to accept a higher or better Bid.   Finally, in light of the minimum price thresholds, maximum Bid Protection Amounts, and the limitations on closing conditions and termination rights set forth herein, the Debtors are assured that the Bid Protections granted to the Stalking Horse Bidder are reasonable compensation for the floor that the Stalking Horse Bid has set for the Debtors' Assets through the Stalking Horse APA.

70.     Pursuant to the proposed Bidding Procedures Order, the Bid Protections would be payable in accordance with the terms of the Stalking Horse APA.   Upon payment by Sellers of the Bid Protections, the Stalking Horse Bidder would be precluded from pursuing any other remedy against the Sellers.

**G.     THE FORM, MANNER AND EXTENT OF NOTICE OF THE MOTION AND THE PROPOSED SALE ARE APPROPRIATE AND ADEQUATE UNDER THE CIRCUMSTANCES.**

71.     The Debtors will serve the Sale Notice and the Cure Notice in accordance with the Bidding Procedures Order, and have served the Notice of Motion as set forth above.   The notice

of the proposed Sale to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale.

72.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

(a)     Section 363 Notice — Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."   11 U.S.C. § 102(1)(A).  As set forth above, creditors have been provided notice of the salient details regarding this Motion and the Sale Hearing.  Accordingly, notice is sufficient under Bankruptcy Code section 363.

(b)     Bankruptcy Rule 2002 — Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business, "unless the court for cause shown shortens the time or directs another method of giving notice."   In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002.  As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

(c)     Bankruptcy Rules 6004 and 6006 — Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the non-Debtor counterparty to such contract or lease, as well as on other parties in interest as the Court may direct.  The Sale Notice and the Cure Notice have been or will be served on counterparties to the Assigned Contracts, thereby satisfying this requirement.

(d)     Procedural Due Process — The notices of this Motion that are being provided as described herein, including the notice being provided by publication as set forth above, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).  Parties in interest have been and should be found to have been afforded adequate notice of this Motion, the Sale(s), the Bidding Procedures and the other relief requested herein.

73.     The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, the Bid Protections, and the Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the sale of the Assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

## H.     THE STAY OF THE SALE ORDER SHOULD BE WAIVED.

74.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

75.     The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Assets and assignment and assumption of the related executory contracts and/or unexpired leases.  To require the Debtors to effectively be liable under the applicable executory contracts and/or unexpired leases for an extra fourteen (14) days and to delay the closing at a time when the Debtors need to move expeditiously to meet the applicable milestones will burden the estates and require unnecessary expenditures of the Debtors' limited resources.  The Debtors note that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) are routinely granted. *In re Radioshack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 10, 2015); *In re Dendreon Corp.*, No. 14-12515 (LSS) (Bankr. D. Del. Feb. 20, 2015); *In re Delia's, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); *In re Trump Entertainment Resorts, Inc.*, Case No. 14-12103 (KG) (Bankr. D. Del. Jan. 30, 2015); *In re Midway Games Inc.*, Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); *In re Nortel Networks Inc., et al.*, Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); 10 *Collier on Bankruptcy*

¶ 6004.09 (15th ed. 1999) (noting that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure).

## NO PRIOR REQUEST

76.     No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

77.     Notice of this Motion has been provided to: (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets at any time; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) the U.S. Trustee; (e) the Federal Communications Commission; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the U.S. Attorney for the District of Delaware; (i) parties under collective bargaining agreements, including without limitation the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444 for the Circulation District Managers and the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444/14407 for the Newsroom; (j) multiemployer pension plans in which or to which a Debtor or any of its Affiliates is or was participating or contributing, including without limitation the CWA/ITU Negotiated Pension Plan and the GCIU-Employer Retirement Fund; and (k)  all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

78.     The Debtors submit that, under the circumstances, no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested

herein and grant the Debtors such other and further relief as this Court deems just and proper.

Dated:  August 30, 2019
        Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
        olivere@chipmanbrown.com

—and—

**NEAL, GERBER & EISENBERG LLP**
Nicholas M. Miller (*Pro Hac* Admission Pending)
Thomas C. Wolford (*Pro Hac* Admission Pending)
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602
Telephone:    (312) 269-8000
Facsimile:    (312) 269-1747
Email:    nmiller@nge.com
        twolford@nge.com

*Proposed Counsel for the Debtors and
Debtors-in-Possession*

**EXHIBIT 1**

**BIDDING PROCEDURES ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[1] | Case No. 19-11901 (KBO) |
| Debtors. | *(Joint Administration Pending)* |

**ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL,
OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (B) APPROVING
BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF
THE SALE, CURE AND OTHER NOTICES; AND (E) SCHEDULING AN
AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE**

Upon the motion ("**Motion**")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**" or the "**Company**") pursuant to sections 105, 363, 364, 365 and 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "**Bankruptcy Code**"), and rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "**Bankruptcy Rule**," and collectively, the "**Bankruptcy Rules**"), for (I) an order (the "**Bidding Procedures Order**") (A) approving the Debtors' proposed auction (the "**Auction**") and the bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "**Bidding Procedures**") to be employed in connection with the proposed sale (the "**Sale**") of all, or substantially all, of the Debtors' assets (the "**Assets**"); (B) approving bid protections; (C) establishing procedures for the assumption and assignment of executory contracts and unexpired leases; (D) approving the form and manner of notice of the Sale, the notice of assumption and assignment of executory contracts

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  The News-Gazette, Inc. (0894) and D.W.S., Inc. (7985).  The Debtors' headquarters are located at 15 East Main Street, Champaign, Illinois 61820.

[2]   Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

and unexpired leases, including the form and manner of notice of proposed cure amounts (the "**Cure Notice**") and the other notices set forth herein; and (E) scheduling the Auction and a hearing before the court (the "**Sale Hearing**") to consider approval of the Sale (collectively, (I) (A) through (E) above, the "**Bidding Procedures Relief**"); and (II) an order (the "**Sale Order**") authorizing (A) the Sale of the Assets to the bidder(s) with the highest or otherwise best bid(s) (the "**Successful Bidder**") free and clear of all claims, liens, interests and encumbrances as provided therein; and (B) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidders; and (III) certain related relief; and the Court having considered that portion of the Motion seeking the Bidding Procedures Relief, and the arguments of counsel made and the evidence adduced, at the hearing held on that portion of the Motion (the "**Bidding Procedures Hearing**"); and due and sufficient notice of the Bidding Procedures Hearing and the relief sought therein having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the Bidding Procedures Relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

A.       This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates

---

[3]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365, 503 and Bankruptcy Rules 2002, 6004, 6006 and 9014.

B.       The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

C.       The Debtors have articulated good and sufficient business reasons for the Court to (i) approve the Bidding Procedures, the Assumption and Assignment Procedures, the form and manner of the Sale Notice, the Cure Notice and the other notices of the Motion, the Auction and the Sale Hearing as set forth herein, (ii) set the date for the Auction, the Sale Hearing, and the other dates set forth herein and (iii) grant the relief requested in the Motion as provided herein.

D.       Due, sufficient and adequate notice of the Bidding Procedures Hearing and the relief granted in this Order has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required.  The Debtors' notice of the Motion and the relief requested in the Motion for which approval was sought at the Bidding Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, this Bidding Procedures Order and that portion of the Motion being approved hereby is required.

E.       The Debtors' Sale Notice, Cure Notice and other notices with respect to the Sale, the Auction, the assumption and assignment procedures set forth in section E of the Motion (the "**Assumption and Assignment Procedures**"), and the Sale Hearing are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof and no further notice of each is necessary or required.

F. The Bidding Procedures, substantially in the form attached as **Exhibit A**, and incorporated herein by reference as if fully set forth herein, are fair, reasonable and appropriate, were negotiated in good faith and represent the best method for maximizing the value of the Debtors' estates in connection with the Sale.

G. The Bid Protections, to the extent payable under the Stalking Horse APA and the terms and restrictions of this Order, shall be deemed (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b), (ii) of substantial benefit to the Debtors' estates, and (iii) reasonable and appropriate in light of the size and nature of the transactions.

H. The Assumption and Assignment Procedures are reasonable and appropriate.

I. Champaign Multimedia Group, LLC (the "**Stalking Horse Bidder**") has submitted a bid (the "**Stalking Horse Bid**") to purchase substantially all of the Purchased Assets under the terms and conditions of that certain asset purchase agreement by and between the Stalking Horse Bidder and the Debtors (the "**Stalking Horse APA**").

J. The Stalking Horse APA and the protections being afforded the Stalking Horse Bidder are reasonably designed to maximize the value to be achieved for the Purchased Assets in connection with the Bid Procedures. As such, the Bid Protections (defined below) and the Bid Procedures, (1) are reasonable and appropriate under the circumstances, (2) confer a benefit to the Debtors' estates, and (3) are supported by, and constitute a proper exercise of, the Debtors' sound business judgment.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. Those portions of the Motion seeking approval of the Bidding Procedures Relief are GRANTED, as set forth herein.

2.      Any objection to the portions of the Motion seeking approval of the Bidding Procedures Relief or any other relief granted in this Order, to the extent not resolved, waived or withdrawn, and all reservations of rights included therein, is hereby overruled and denied on the merits.

## I.      THE STALKING HORSE BIDDER.

3.      The Stalking Horse Bidder is approved as the stalking horse bidder for the purchase of the Purchased Assets, on the terms and conditions of the Stalking Horse APA, subject to: (i) higher and better bids under the terms of the Bid Procedures; (ii) approval by this Court after proper notice and hearing.

4.      The Stalking Horse APA is hereby approved as the Form APA (the "**Form APA**") for purposes of submitting a Qualifying Bid and is appropriate and reasonably calculated to enable the Debtors and other parties in interest to easily compare and contrast the differing terms of the Bids presented at the Auction.

## II.      BID PROTECTIONS FOR THE STALKING HORSE BIDDER.

5.      The following bid protections ("**Bid Protections**") shall govern the conduct of the sale of the Debtor's Assets:

(a)      To reimburse the Stalking Horse Bidder in connection with the proposed sale and serving as the Stalking Horse Bidder, in the event that the Successful Bidder (as that term is defined in the Bid Procedures) is not the Stalking Horse Bidder and the sale of the Purchased Assets to a Successful Bidder, other than the Stalking Horse Bidder, closes, then the Stalking Horse Bidder shall be entitled to an expense reimbursement the (the "**Expense Reimbursement Fee**") as an allowable administrative expense under Section 503(b) of the Bankruptcy Code and shall be paid at the closing of a sale to a Successful Bidder who is not the Stalking Horse Bidder;

(b)      Notwithstanding anything in the Stalking Horse APA to the contrary, the Expense Reimbursement Fee shall be limited to the aggregate amount equal to the reasonable and documented out-of-pocket costs, fees, and expenses of the Stalking Horse Bidder (including legal, accounting, and other consulting fees and expenses, other than any success or similar fees payable to any

financial advisors, consultants or other Persons) incurred in connection with the transactions contemplated to occur pursuant to the Stalking Horse APA, including, without limitation, (a) the negotiation and execution of the Stalking Horse APA, and (b) carrying out its obligations under the Stalking Horse APA prior to the Closing; *provided, however*, that such Expense Reimbursement Amount shall not exceed an amount equal to $225,000;

(c) The minimum cash overbid amount shall equal the minimum amounts set forth in the Bidding Procedures attached hereto, which include pro rata amounts for the cash consideration for the Acquired Assets, *plus* the Expense Reimbursement Fee, *plus* a minimum overbid. For the avoidance of doubt, bidding on the Debtor's Assets at any auction shall proceed in increments of not less than $100,000 on a pro rata basis; and

(d) In the event of a credit bid by a secured creditor (a "**Credit Bid**"), any Credit Bid submitted or made by a secured creditor, and that may be permitted by the Court, shall include a cash component sufficient to pay (in addition to all costs required by the Bid Procedures Order and after the return of the Deposit to the Stalking Horse Bidder as provided in the Stalking Horse APA), the maximum amount of the Expense Reimbursement Fee (*i.e.* $225,000) as an administrative expense (with any remaining balance of such maximum amount to be returned upon the Court's determination of the allowable Expense Reimbursement Fee), which Expense Reimbursement Fee shall be paid at the closing of a sale to a secured creditor who makes a Credit Bid and is the Successful Purchaser.

## III.     BIDDING PROCEDURES.

6.      The Bidding Procedures in the form attached hereto as **Exhibit A** and incorporated herein by reference as if fully set forth in this Order are hereby APPROVED in their entirety. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures. The failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

**The Bid Deadline**

7.      As further described in the Bidding Procedures, a potential Bidder who desires to make a Bid for the Assets that satisfies the bidding requirements set forth in the Bidding

Procedures shall deliver its Bid, so as to be received by no later than **4:00 p.m. (*prevailing Eastern Time*) on September 27, 2019** (the "**Bid Deadline**") to the following parties (collectively, the "**Notice Parties**"):

      (i)    **The Sellers**, 15 East Main Street, Champaign, Illinois 61820, Attention: John Reed (jreed@newsgazetteinc.com) and Traci E. Nally (tnally@newsgazetteinc.com);

      (ii)    **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 North LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller (nmiller@nge.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attention: William E. Chipman, Jr., Esquire (chipman@chipmanbrown.com);

      (iii)    **Broker to the Sellers**, Dirks, Van Essen, Murray & April, 119 East Marcy Street, Suite 100, Santa Fe, New Mexico, Attn: Phil Murray, Esquire (phil@dirksvanessen.com).

**IV.**      **Notices of Sale, Bidding Procedures, Bid Protections and the Sale Hearing**

      8.    The notices described below are hereby approved, and the service or publication thereof (as applicable) as described below constitutes proper, timely, adequate and sufficient notice of the Sale, the Bidding Procedures, and the Sale Hearing, and no other or further notice shall be required.

      9.    Within three (3) Business Days after the entry of this Order, or as soon thereafter as practicable, the Debtors (or their agents) shall serve this Order and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon the following parties (collectively, the "**Supplemental Notice Parties**"):

      (a)    all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years;

      (b)    all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets;

(c)     all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion;

(d)     the U.S. Trustee;

(e)     the Federal Communications Commission;

(f)     the Internal Revenue Service;

(g)     the Securities and Exchange Commission;

(h)     the U.S. Attorney for the District of Delaware;

(i)     parties under collective bargaining agreements, including without limitation the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444 for the Circulation District Managers and the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444/14407 for the Newsroom;

(j)     multiemployer pension plans in which or to which a Debtor or any of its Affiliates is or was participating or contributing, including without limitation the CWA/ITU Negotiated Pension Plan and the GCIU-Employer Retirement Fund; and

(k)     all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

10.     On September 4, 2019, as set forth in the certificate of service filed on [●], 2019 [Docket No. ___], the Debtors (or their agents) served by first-class mail, postage prepaid, a notice of sale (the "Sale Notice") upon all known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases. Such notice is deemed sufficient and proper notice of the Sale to such creditors and contract counterparties.

11.     On or about September 17, 2019, the Debtors shall publish the Sale Notice on one occasion in the *News-Gazette*. Such publication notice is deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

12.     The Sale Hearing to approve the Sale shall be held on **October 2, 2019 at _____ a.m./p.m. (*prevailing* Eastern Time),** at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, before the Honorable [●].

13.     All objections to the Sale (a "**Sale Objection**") must be in writing and filed on and served so as to be received by **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Sale Objection Deadline**") with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.  In addition, any Sale Objection must be served on the Notice Parties and counsel to the Stalking Horse Bidder, John M. Steiner, Esquire, 525 William Penn Place, 28th Floor, Pittsburgh, Pennsylvania 15219, jsteiner@leechtishman.com,  so as to be received on or before the Sale Objection Deadline; *provided however*, that any objections to the conduct of the Auction or selection of the Successful Bid or Back-Up Bids (a "**Supplemental Objection**") shall be in writing, filed with the Court, together with proof of service, and served so as to be received by the Notice Parties and the Stalking Horse Bidder and its counsel, on or before the commencement of the Sale Hearing.

14.     Failure to file and serve a Sale Objection or Supplemental Objection as aforesaid shall be deemed to be consent to the Sale for purposes of section 363(f) of the Bankruptcy Code.

15.     The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest either by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the court, in each case subject to the Bidding Procedures.

V.        THE AUCTION.

16.      The Debtors are authorized, subject in all respects to the terms of this Order and the Bidding Procedures, to conduct the Auction with respect to the Assets.  The Auction shall take place on **September 30, 2019 at 10:00 a.m. (*prevailing* Eastern Time)** at the offices of Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders and each of their respective counsel and advisors.  The Debtors are authorized, subject to the terms of this Order and the Bidding Procedures, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

17.      Only the Debtors, the Stalking Horse Bidder and the Qualified Bidders, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Bidder and such other Qualified Bidder(s) will be entitled to make any Bids at the Auction.  The Debtors and their professionals shall direct and preside over the Auction, and the Auction shall be transcribed.

18.      The Stalking Horse Bidder (in its capacity as a Qualified Bidder) and each other Qualified Bidder participating in the Auction must confirm that it has (a) not engaged in any collusion with respect to the bidding or Sale of the Assets, (b) reviewed, understands and accepts the Bidding Procedures and (c) consented to the core jurisdiction of the Court.

19.      Subject to the rights of parties in interest to (i) challenge the Sale or the Sale Process, (ii) challenge the Debtors' decisions with respect to the Sale Process, or (iii) such other rights as such parties may have under applicable law, the Debtors may, in each case pursuant and subject to, and in accordance with, the Bidding Procedures, (a) determine, in their business judgment, which Qualified Bid is the highest and best proposal for the Assets and which is the

next highest and best proposal for the Assets and (b) reject any bid that, in the Debtors' business judgment, is (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules or (z) contrary to the best interests of the Debtors and their estates.

20.     Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Bidder shall be a Qualified Bidder.

## VI.        THE STALKING HORSE APA .

21.     Pursuant to sections 105, 363, 364 and 503 of the Bankruptcy Code, the Debtors are hereby authorized and directed to pay the Bid Protections at the Closing of any Competing Transaction pursuant to and subject to the terms and conditions set forth in the Stalking Horse APA, as an administrative expense of the estate.

## VII.       CONTRACT AND LEASE ASSUMPTION AND ASSIGNMENT PROCEDURES.

22.     The Assumption and Assignment Procedures as set forth in the Motion are hereby approved and made part of this Order as if fully set forth herein.  The Assumption and Assignment Procedures are appropriate and fair to all non-Debtor counterparties and comply in all respects with the Bankruptcy Code.

23.     The decision to assume and assign the applicable assumed and assigned contracts and/or leases to the Successful Bidder(s) is subject to Court approval and the consummation of a Sale of the Assets.  Accordingly, absent the consummation of such Sale, the applicable assumed and assigned contracts and/or leases shall not be deemed assumed and/or assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

(a)    **Cure Notice**

24.    On September 4, 2019, as set forth in the certificate of service filed on [●], 2019 [Docket No. ____], the Debtors (or their agents) served by first-class mail, postage prepaid, Cure Notices upon all counterparties to the Debtors' executory contracts and unexpired leases and any other affected parties.  Such notice is (a) reasonably calculated to provide sufficient and effective notice to all non-Debtor counterparties to assumed and assigned contracts or leases and any other affected parties of the Debtors' intent to assume and assign some or all of such contracts or leases and to afford the non-Debtor counterparty to each such contract or lease the opportunity to exercise any rights affected by the Motion pursuant to Bankruptcy Rules 2002, 6004 and 6006, and (b) hereby approved.

25.    The inclusion of a contract or lease on a Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder, the Successful Bidder(s) or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed and assigned in connection with the Sale of the Assets.  The Debtors retain all of their rights, claims and causes of action with respect to the contracts or leases listed on the Cure Notice.

(b)    **Contract and/or Lease Objection Procedures**

26.    All Contract and/or Lease Objections must be filed and served so as to be received by **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "*Contract* and/or **Lease Objection Deadline**").

27.    Any Contract and/or Lease Objection must be in writing and filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, and served so as to be received by the Notice Parties on or before the Contract and/or Lease Objection Deadline.

28.     Any Contract and/or Lease Objection must state (a) the basis for such objection and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

29.     Any Contract and/or Lease Objection solely to the Cure Amount(s) shall not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party objects solely to Cure Amount(s): (i) the Debtors may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties; or (ii) notwithstanding anything in the Successful Bidders APA to the contrary, the Successful Bidder may elect to remove such contract and/or lease that is the subject of the Contract and/or Lease Objection from its list of Assigned Contracts to be assumed and assigned and have no obligation to take an assignment of, or pay a Cure Amount for, said contract and/or lease.  So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s) or lease(s).  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

30.     If no Contract and/or Lease Objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

31.     As soon as reasonably practicable after receiving the schedule from the Stalking Horse Bidder or other Qualified Bidder, the Debtors will prepare and file a list of those executory

contracts and unexpired leases that such bidders elect to have assumed and assigned (the "**Designated Contracts**") at Closing pursuant to section 365 of the Bankruptcy Code, subject to any right to add or delete executory contracts or unexpired leases in accordance with the Stalking Horse APA.

32.    As soon as reasonably practicable thereafter, the Debtors will post on the Case Website (a) the list of any Designated Contracts, which the Debtors will update as and when executory contracts or unexpired leases are added or deleted by any such Bidders and (b) a description of the Bidders and information as to the Bidders' ability to perform the Debtors' obligations under the relevant Designated Contracts.

33.    To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder under the applicable executory contract(s) or unexpired lease(s) (an "**Adequate Assurance Objection**" and together with a Contract and/or Lease Objection, an "**Objection**"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the Court and serve such objection on the Debtors, the Notice Parties and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is received on or before **12:00 p.m. (***prevailing* **Eastern Time) on September 27, 2019** (the "**Adequate Assurance Objection  Deadline**").  An Adequate Assurance Objection shall be filed on or before the Adequate Assurance Objection Deadline in accordance with, and subject to, the Contract Objection Procedures set forth above.

34.    If any non-Debtor counterparty does not timely file and serve a Contract and/or Lease Objection, an Adequate Assurance Objection and/or an Objection as set forth above, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s)

under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

## VIII.    RELATED RELIEF.

35.    The Debtors are hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Order.

36.    This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

37.    The Debtors are authorized to proceed with the Sale without the necessity of complying with any state or local bulk transfer tax or state or local bulk transfer laws or requirements.

38.    This Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors' estates.

39.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

40.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

41.    Any and all objections to the Sale are hereby preserved and subject to the terms and deadlines set forth in this Order.

Dated: _____, 2019
      Wilmington, Delaware

                                     _____

                                     THE HONORABLE KAREN B. OWENS
                                     UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Bidding Procedures**

## BIDDING PROCEDURES

These bidding procedures (the "**Bidding Procedures**") set forth the process by which The News-Gazette, Inc. and D.W.S., Inc. (collectively, the "**Company**" or the "**Sellers**") shall conduct a sale (the "**Sale**") by auction (the "**Auction**") of some or substantially all of their assets.

On [•], 2019, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered an order (the "**Bidding Procedures Order**"), which, among other things, authorized the Sellers to determine the highest and otherwise best offer(s) for their assets, subject to the process and procedures set forth below.

The Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") captioned *In re The News-Gazette, Inc. et al.*, Case No. 19-11901 (KBO) (Bankr. D. Del. August 30, 2019).

On August 30, 2019, the Sellers filed the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, Interests and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "**Sale Motion**").[1]  The Bidding Procedures Order and the order approving the Sale are referred to herein, collectively, as the "**Sale Orders**."

As referenced in the Sale Motion, the Sellers are aware of numerous prospective buyers that may submit, or already have submitted, letters of intent and/or indications of interest to become a purchaser for some or all of the Sellers' assets (collectively, the "**Prospective Purchasers**").

## I.    ASSETS TO BE SOLD

The Sale Motion contemplates one or a combination of multiple offers to purchase all or substantially all of the Sellers' assets (such assets that a Successful Bidder acquires pursuant to the terms of the Stalking Horse APA or Modified Asset Purchase Agreement (*as defined below*) that is consummated in connection with the Successful Bid of such Successful Bidder, collectively, the "**Acquired Assets**").  A party may participate in the bidding process by submitting a Bid (*as defined below*) for all of the Acquired Assets or for smaller subsets of the Acquired Assets (as described in more detail below, the "**Lots**").

Subject to the terms of the Sale Orders, upon the consummation of the Successful Bid and payment of all consideration in accordance with the terms thereof, all of the Sellers' right, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, interests, charges, options and interests thereon (collectively, the "**Liens**") except as otherwise provided in the Stalking Horse APA or Modified Asset Purchase

---

[1]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Sale Motion.

Agreement (*as defined below*) submitted by a Successful Bidder (*as defined below*) (including any exhibits or schedules thereto), with such Liens to attach to the proceeds of the sale of the Acquired Assets with the same validity and priority as such Liens applied against the Acquired Assets immediately prior to the consummation of such Successful Bid.

## II.    BIDDING PROCESS

### A.    Overview

The Sellers and their advisors will, subject to the other provisions of these Bidding Procedures:

1.    coordinate the efforts of Preliminary Interested Purchasers (*as defined below*) in conducting their due diligence investigations;

2.    receive offers from Bidders (*as defined below*);

3.    determine whether any person is a Qualified Bidder (*as defined below*); and

4.    conduct the Auction and further negotiate any offers made to purchase the Acquired Assets.

### B.    Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Sellers and to submit competing bids for the Acquired Assets.  The Sellers will assist Preliminary Interested Purchasers in conducting their respective due diligence investigations and will accept Bids until **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Bid Deadline**"), subject to any extension of the Bid Deadline in accordance with, and subject to, these Bidding Procedures.

The key dates for the Sale process are as follows:[2]

| | |
|---|---|
| September 27, 2019 at 4:00 p.m. ET | **Bid Deadline**: Due Date to submit a Qualified Bid and Good Faith Deposit (*each as defined below*) |
| September 30, 2019 at 10:00 a.m. ET | **Auction**:    To be held at Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 |

---

[2]    These dates are subject to extension or adjournment as provided for herein with respect to one or more Lots (as defined below) or other applicable Acquired Assets.

| | |
|---|---|
| October 2, 2019 at [●] a.m./p.m. ET | **Sale Hearing**:  To be held at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom ____, Wilmington, Delaware 19801 |

C.      Access to Diligence Materials

To participate in the bidding process either as a Stalking Horse Bidder or to effectuate an alternate sale transaction for some or substantially all of the Acquired Assets (an "**Alternate Transaction**") and to receive access to due diligence materials (the "**Diligence Materials**"), a party must submit to the Sellers an executed confidentiality agreement in substantially the same form as that which was previously approved by Murray (as defined below) and circulated to Prospective Purchasers, and otherwise in form and substance satisfactory to Murray and the Sellers (a "**Confidentiality Agreement**"), and provide preliminary evidence satisfactory to the Sellers and their advisors of such party's financial wherewithal to consummate a transaction as a Stalking Horse Bidder or through an Alternate Transaction.

A party who executes such a Confidentiality Agreement for access to Diligence Materials, and provides such preliminary evidence of financial wherewithal, shall be a "**Preliminary Interested Purchaser**."  The Sellers will afford any Preliminary Interested Purchaser the time and opportunity to conduct reasonable due diligence in accordance with a diligence protocol determined by the Sellers and their advisors; *provided, however*, that the Sellers shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (*as defined below*) on or before the Bid Deadline.

The Sellers reserve the right to withhold any Diligence Materials that the Sellers determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Purchaser who is a competitor or customer of the Sellers or is affiliated with any competitor or customer of the Sellers.  Neither the Sellers nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Purchaser.

All due diligence requests must be directed to Dirks, Van Essen, Murray & April, Attention Phil Murray ("**Murray**"), at Phil@dirksvanessen.com.

D.      Due Diligence from Bidders

Each Preliminary Interested Purchaser and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Sellers or their advisors regarding such Preliminary Interested Purchaser or Bidder, as applicable, and its contemplated transaction.  Failure by a Preliminary Interested Purchaser or Bidder (other than the Stalking Horse Bidder) to comply with requests for additional information and due diligence access may be a basis for the Sellers to determine that such Bidder is not a Qualified Bidder.

## III.    AUCTION QUALIFICATION PROCESS

Qualifying Bids.  To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "**Bid**"), and each party submitting such a Bid (other than any party designated as a Stalking Horse Bidder) (each, a "**Bidder**"), must be reasonably determined by the Sellers to satisfy each of the following conditions:

1.    Good Faith Deposit:  Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds, in the amount of ten percent (10%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement (*as defined below*), which deposit shall be held in an escrow account to be identified and established by the Sellers (the "**Good Faith Deposit**").

2.    Executed Agreement:  Each Bid must be based on the Stalking Horse APA, and such Bid must include binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "**Modified Asset Purchase Agreement**").  A Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto) marked against the applicable Stalking Horse APA to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Bidder, such as the expense reimbursement and break-up fee provisions contained in the Stalking Horse APA, which terms shall not be in any Modified Asset Purchase Agreement).  Each Modified Asset Purchase Agreement must exclude any and all preference, fraudulent conveyance, and other claims of Sellers arising under Chapter 5 of the Bankruptcy Code or similar state law.

3.    Scope of Bid / Lots:  A Bid must be for all or substantially all of the Acquired Assets or for one or more of the following Lots (or such other Lots as the Sellers may otherwise agree to):[3]

(a)    substantially all of the assets of the newspaper business (the "**Newspaper Lot**");

(b)    substantially all of the assets of the Radio Business, including the relevant real estate assets (the "**Radio Lot**");

4.    Minimum Bid:  A Bid must have a purchase price that includes a combination of cash, in the amounts below, as well as the assumption of any postpetition liabilities, if any, and cure costs associated with the relevant

---

[3]    Any Bid for the Radio Lot that does not also include a bid for the Newspaper Lot, and vice versa, must include a commitment to enter into an IP sharing agreement on substantially the same terms that exist today.  Any bid for less than substantially all of the assets of the Debtors must allocate the purchase price to each Lot included in such bid.  Any other Lot that could be evaluated by the Debtors pursuant to Section IX.E., below, should also include an allocation of value as described in this footnote.

Lot,[4] and subject to any adjustments typical of similar transactions, that, in the Sellers' reasonable business judgment, has a value equal to or greater than the following, subject to the terms of these Bidding Procedures:

      (a)      For substantially all of the Acquired Assets:  $4,825,000;

      (b)      For the Newspaper Lot:  $2,412,500;

      (c)      For the Radio Lot: $2,412,500;

5.      <u>Designation of Assigned Contracts and Leases; Cure Costs</u>:  A Bid must specifically (a) identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers and (b) provide for the Bidder's payment in full in cash of all of the cure costs related to any such executory contracts and unexpired leases.

6.      <u>Designation of Assumed Liabilities</u>:  A Bid must identify all liabilities which the Bidder proposes to assume.

7.      <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Sellers demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction then the Bidder must furnish written evidence reasonably acceptable to the Sellers of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

8.      <u>Disclosure of Identity of Bidder:</u>  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid (including any co-bidder or team bidder), and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid must also fully disclose any connections or agreements with the Sellers, the Stalking Horse Bidder or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Sellers.

9.      <u>Proof of Financial Ability to Perform:</u>  A Bid must include detailed, written evidence that the Sellers may conclude, in consultation with their advisors, demonstrates that the Bidder has and will continue to have the necessary financial ability to consummate the Alternate Transaction and comply with

---

[4]   A schedule of the post-petition liabilities for each lot and a schedule of estimated cure costs for executory contracts that could be assumed by any Bidder has been made available in the electronic data room that each Prospective Purchaser has access to.

section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, *inter alia,* the following:

(a) contact names and numbers for verification of financing sources;

(b) evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Sellers in the amount of the cash portion of such Bid as are needed to consummate the Alternate Transaction;

(c) the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Sellers;

(d) a description of the Bidder's pro forma capital structure; and

(e) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers demonstrating that such Bidder has the ability to consummate the Alternate Transaction.

10. <u>Regulatory and Third Party Approvals</u>: A Bid must set forth (a) each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, (b) the time period within which the Bidder expects to receive such regulatory and third-party approvals, (c) those actions the Bidder will take to ensure receipt of such approvals as promptly as possible, and (d) a detailed description of any steps the Bidder will take to address any delay in obtaining such approvals (*e.g.* transition services agreement).

11. <u>Contact Information and Affiliates</u>: A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

12. <u>Contingencies</u>: Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Sellers than those set forth in the Stalking Horse APA, as determined by the Sellers in good faith, and (b) may not be conditioned on (i) obtaining financing, (ii) any internal approvals or credit committee approvals, or (iii) the outcome or review of due diligence, including with

respect to any environmental, employee, vendor, labor, health and/or safety matters.

13. <u>Irrevocable</u>:  Each Bid must be irrevocable until ten (10) business days after the conclusion of the Sale Hearing for the relevant Acquired Assets or Lot; <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the earlier of the consummation of the Sale of the relevant Acquired Assets or Lot or the Extended Outside Date (*as defined below*).

14. <u>Compliance with Diligence Requests</u>:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Sellers to the reasonable satisfaction of the Sellers.

15. <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the applicable Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the applicable Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Stalking Horse APA.

16. <u>Confidentiality Agreement</u>:  To the extent not already executed, the Bid must include an executed Confidentiality Agreement.

17. <u>Termination Fees</u>:  The Bid (other than a Bid pursuant to the Stalking Horse APA) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

18. <u>Adherence to Bid Procedures</u>:  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

19. <u>Closing Date</u>:  The Bid must include a commitment to consummate the transactions contemplated by the Modified Asset Purchase Agreement by no later than December 4, 2019 or such later date as Debtors may agree to in writing (the "**Outside Date**").  In no event shall the consummation of the Sale occur later than January 19, 2020 without the written consent of

Debtors (any such date, the "**Extended Outside Date**").  In the event the Bid contemplates an Extended Outside Date in order to address any antitrust, regulatory or permitting issues, the Bid must include a mechanism to cover any and all costs incurred after the Outside Date in a manner acceptable to the Sellers.

20.    <u>No Late Bids</u>:  Unless otherwise ordered by a Court, the Sellers shall not consider any Bids for the Acquired Assets or with respect to any Lot submitted after the conclusion of the Auction for the Acquired Assets or with respect to any such Lot, and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

21.    <u>Bid Notice</u>:  The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline:

(a)    The Sellers, 15 East Main Street, Champaign, Illinois 61820, Attention: John Reed (jreed@newsgazetteinc.com) and Traci E. Nally (tnally@newsgazetteinc.com);

(b)    Counsel to the Sellers, Neal Gerber & Eisenberg, LLP, 2 North LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller, Esquire (nmiller@nge.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attention: William E. Chipman, Jr., Esquire (chipman@chipmanbrown.com);

(c)    Broker to the Sellers, Dirks, Van Essen, Murray & April 119 East Marcy Street, Suite 100, Santa Fe, New Mexico 87501, Attention:  Phil Murray, Esquire (phil@dirksvanessen.com).

A Bid received from a Bidder before the Bid Deadline that meets all of the above requirements for the Acquired Assets shall constitute a "**Qualified Bid**" and such Bidder shall constitute a "**Qualified Bidder**"; *provided* that if the Sellers receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Sellers will promptly provide the Bidder with notice of the basis for the disqualification of such Bid and provide such Bidder with the opportunity to remedy any deficiencies prior to the Bid Deadline; *provided, further*, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Sellers to the satisfaction of the Sellers, then the Sellers may disqualify any Qualified Bidder and Qualified Bid, in the Sellers' discretion, and such Bidder shall not be entitled to attend or participate in the Auction.

Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph 22 above as provided therein. All Qualified Bids will be considered, but the Sellers reserve their right to reject any or all bids. However, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred.  Additionally, notwithstanding anything herein to the contrary,

the Stalking Horse APA submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid. The Sellers will inform counsel to the Stalking Horse Bidder, and any Qualified Bidders, whether the Sellers consider any Bid to be a Qualified Bid as soon as practicable but in no event later than one day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Sellers and their agents and representatives (other than as may be set forth in a definitive agreement executed by the Sellers), regarding the Sellers, any of the Acquired Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

Without the consent of the Sellers, a Qualified Bidder may not amend, modify or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Bid, during the period that such Bid is required to remain irrevocable and binding.

## IV.    AUCTION

### A.    Auction

If multiple Qualified Bids (including the Stalking Horse APA) with respect to the same Acquired Assets or Lots are submitted by the Bid Deadline, the Sellers will conduct the Auction to determine the highest and otherwise best Qualified Bid with respect to such Acquired Assets or Lots.

### B.    Assessment Criteria

The Sellers' determination of the highest and otherwise best Qualified Bid with respect to the Acquired Assets will take into account any factors the Sellers reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following:

1.    the amount and nature of the consideration, including any assumed liabilities and retention of employees;

2.    the type and nature of any modifications to the Stalking Horse APA requested by each Bidder in such Bidder's Modified Asset Purchase Agreement;

3.    the extent to which such modifications are likely to delay the consummation of the sale of the applicable asset(s) and the cost to the Sellers of such modifications or delay;

4.    the total consideration to be received by the Sellers and the net consideration to be received by the Sellers after taking into account the Stalking Horse Bidder's Bid Protections with respect to each round of bidding;

5.      the likelihood of the Bidder's ability to consummate a transaction and the timing thereof, including the ability to obtain, or waive, as applicable, regulatory approvals;

6.      the net benefit to the Sellers' estates (collectively, the "**Bid Assessment Criteria**").

C.      <u>Cancellation of the Auction</u>

If multiple Qualified Bids for the Acquired Assets or Lots have not been timely received, then the Auction for the Acquired Assets or Lots will be canceled.

## V.  PROCEDURES FOR THE AUCTION

If multiple Qualified Bids for the Acquired Assets or Lots have been timely submitted by the Bid Deadline, then the Sellers will commence the Auction for such Acquired Assets or Lots on **September 30, 2019 at 10:00 a.m. (*prevailing* Eastern Time)** at the offices of Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, or such other place and time as the Sellers shall notify all Qualified Bidders, subject to these Bidding Procedures.

The Auction will be conducted according to the following procedures:

A.      <u>Participation</u>

Only the Sellers, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Bidder and any such other Qualified Bidders will be entitled to make any Bids at the Auction.

B.      <u>The Sellers Shall Conduct the Auction</u>

The Sellers and their advisors shall direct and preside over the Auction, and the Auction shall be transcribed. The Sellers will conduct the Auction in the manner they reasonably determine will result in the highest and otherwise best Qualified Bid(s), including, without limitation, by requiring separate rounds of bulk and/or Lot bidding and sealed bidding, open outcry, or any other form of Bid submission (including in connection with any bulk or Lot bidding). Any rules developed by the Sellers will provide that each Qualified Bidder will be permitted what the Sellers determine to be an appropriate amount of time to respond to the previous bid at the Auction.

C.      <u>Auction Baseline Bids</u>

Prior to commencement of the Auction, the Sellers will provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement that is the highest and otherwise best Qualified Bid for the applicable Acquired Assets as determined by the Sellers (such highest and otherwise best Qualified Bid, the "**Auction Baseline Bid**"). In addition, at the start of the Auction, the Sellers will describe the terms of the Auction Baseline Bids to the other Qualified Bidders.

D.    Joint Bidding and Anti-Collusion Representations

Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Court.

Before submitting any Bid with co-bidding or team bidding arrangements, whether formal or informal, among a Qualified Bidder and any third party (including any other Preliminary Interested Purchaser or Qualified Bidder) (such a Bid, a "**Joint Bid**"), each Qualified Bidder must disclose such Joint Bid to the Sellers, and the Sellers may determine whether the Joint Bid constitutes a Qualified Bid for purposes of participating in the Auction. The identity of any and all co-bidders or team bidders involved in submitting any Joint Bid, if the Sellers determine that such Joint Bid constitutes a Qualified Bid, will be disclosed on the record at the Auction.

E.    Terms of Overbids

The Sellers will accept Overbids, as further described below. An "**Overbid**" is any bid made at the Auction subsequent to the Sellers' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

1.    Minimum Overbid Increments:  Any Overbid after and above the Auction Baseline Bid shall be made in increments determined by the Sellers valued at not less than such amount as shall be announced at the Auction (in an amount greater than the pro rata amount of any approved bid protections or sale-related administrative expenses), in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Sellers.

2.    Credit Bidding:  Only the Stalking Horse Bidder may credit bid the amount of any Bid Protections.

3.    Remaining Terms Are the Same as for Qualified Bids:  Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, *provided, however*, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse APA or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder as provided herein.

At the Sellers' discretion, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers), reasonably demonstrating such Bidder's ability to consummate the Alternate Transaction proposed by such Overbid.

F.     Announcement and Consideration of Overbids

    1.    Announcement of Overbids:  The Sellers will announce at the Auction the material terms of each Overbid, the total amount of consideration and form offered in each such Overbid (including the cash or cash equivalent component thereof), and the basis for calculating such total consideration.

    2.    Consideration of Overbids:  Subject to the deadlines set forth herein, the Sellers reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Sellers and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; modify or supplement any or all of the Auction procedures or rules; or give Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.  When comparing Overbids to the immediately preceding Qualified Bid, the Sellers will treat any credit bid as being made in cash or in cash equivalents.

G.     Other Procedures

    1.    Jurisdiction of the Court:  All Qualified Bidders (including the Stalking Horse Bidder) at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the determination of what constitutes a Qualified Bid and the procedures used to make that determination, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

    2.    Stalking Horse Bidder Bid:  The Stalking Horse Bidder shall be entitled to (a) credit bid all or a portion of its Bid Protections, consistent with these Bidding Procedures; and (b) submit additional bids and make modifications to the Stalking Horse APA at the Auction consistent with these Bidding Procedures.

    3.    Additional Bids; Modifications:  All Qualified Bidders, including the Stalking Horse Bidder, shall have the right to submit additional bids and make additional modifications to the Stalking Horse APA or Modified Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to such Stalking Horse APA or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Sellers' business judgment, be less favorable to the Sellers than the terms of such original agreement.

4.    <u>Subsequent Bids</u>:  Each Qualified Bidder must submit a subsequent Bid that satisfies the minimum bid increment in each round of bidding in order to continue participating in the Auction.  Qualified Bidders shall not be allowed to skip rounds of bidding on the Acquired Assets and/or a particular Lot once they participate in the Auction for the Acquired Assets and/or any given Lot.

H.    <u>Additional Procedures</u>

The Sellers may at any time establish, at or prior to the Auction, other or additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Stalking Horse APA.  Any Auction rules adopted by the Sellers that would modify any of the terms of the Stalking Horse APA or the rights of the Stalking Horse Bidder under the Bidding Procedures (as may be consensually modified at the Auction) requires the consent of the Stalking Horse Bidder.

I.    <u>Sale Is As Is/Where Is</u>

Except as otherwise may be provided in the Stalking Horse APA, any Modified Asset Purchase Agreement, or any order by the Court approving any Sale of the Acquired Assets as contemplated hereunder, the Acquired Assets sold pursuant to the Bidding Procedures shall be conveyed upon the consummation of the purchase and sale in their then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

J.    <u>Closing the Auction</u>

The Auction will continue in additional rounds of bidding until the Sellers select the Bid(s) that represent the highest and otherwise best offer(s) for the Acquired Assets (a "**Successful Bid**," and the Bidder(s) submitting such Successful Bid(s), a "**Successful Bidder**").  The Successful Bidders shall have the rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or Modified Asset Purchase Agreement.  In selecting each Successful Bid, the Sellers will consider the Bid Assessment Criteria.

The Sellers may close the Auction with respect to the relevant Acquired Assets or Lots when all Successful Bidder(s) submit fully executed sale and transaction documents memorializing the terms of the Successful Bid(s), and the Sellers announce the Successful Bid(s) and the Successful Bidder(s).  Promptly after the Auction closes with respect to the relevant Acquired Assets or Lots, the Sellers will file with the Court a notice of the Successful Bid(s) and the Successful Bidder(s) with respect to the relevant Acquired Assets or Lots.

The Sellers shall not consider any Bids for the Acquired Assets and/or any Lot submitted after the conclusion of the Auction with respect to the Acquired Assets and/or any such Lot.

K.      Backup Bidder

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest and otherwise best Bid at the Auction (other than the Stalking Horse Bidder) with respect to some or substantially all of the Acquired Assets, as determined by the Sellers, in the exercise of their business judgment, will be designated as a backup bidder (a "**Backup Bidder**").  A Backup Bidder shall be required to keep its last submitted Bid (the "**Backup Bid**") open and irrevocable until the earlier of the consummation of the transaction with the Successful Bidder or the Extended Outside Date.

Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the Acquired Assets, the Sellers may deem the Backup Bidder for such assets to have the new Successful Bid, and the Sellers will be authorized, without further order of the Court, to consummate the transaction with such Backup Bidder at the price of its last bid.  Such Backup Bidder will be deemed to be the Successful Bidder and the Sellers will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Court.  All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Sellers on and as of the date that the Court approves the Bid as the Successful Bid.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than the Stalking Horse Bidder) with respect to some or substantially all of the Acquired Assets or any given Lot or Lots, the Stalking Horse Bidder will NOT be required to be a Backup Bidder and will be permitted to terminate the Stalking Horse APA as provided therein and be entitled to the return of its Deposit as provided in the Stalking Horse APA.

## VI.     BID PROTECTIONS

The Stalking Horse Bidder is entitled to the Bid Protections (i) in the amounts set forth in, and in accordance with the terms of, the Stalking Horse APA and the Bidding Procedures Order, and (ii) which shall be paid at the Closing of any sale of the Acquired Assets or any Lot(s) to any bidder that is not the Stalking Horse Bidder.

Pursuant to the Bidding Procedures Order, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

## VII.    SALE HEARING

The Successful Bid and Backup Bid (or, if no Qualified Bid other than that of the Stalking Horse Bidder is received, then the Stalking Horse APA) will be subject to approval by the Court. The sale hearing to approve the Successful Bids and any Backup Bids shall take place on **October 2, 2019 at [●] a.m./p.m. (*prevailing* Eastern Time)** before the Court (the "**Sale Hearing**").

The Sale Hearing may be adjourned by the Sellers with respect to certain Acquired Assets or Lots, subject to the terms herein.

## VIII.   RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders (except the Stalking Horse Bidder) shall be held in one or more escrow accounts by the Sellers, but shall not become property of the Sellers' estates absent further order of the Court or as expressly provided below.  The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than three (3) business days after the conclusion of the Sale Hearing.  The Good Faith Deposit of a Backup Bidder, if any, shall be returned to such Backup Bidder no later than seventy-two (72) hours after the consummation of the transaction with the Successful Bidder.  If the Successful Bidder timely consummates the winning transaction, its Good Faith Deposit shall be credited towards the applicable purchase price.  If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate an Alternate Transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Sellers.  Notwithstanding anything in this paragraph to the contrary, the Good Faith Deposit of the Stalking Horse Bidder shall be held as provided in the Stalking Horse APA and shall be returned to the Stalking Horse Bidder in accordance with the Stalking Horse APA.

## IX.   RESERVATION OF RIGHTS OF THE SELLERS

Notwithstanding anything to the contrary herein, the Sellers further reserve the right as they may reasonably determine to be in the best interest of their estates to:

A.      determine which Bidder(s) is a Qualified Bidder(s);

B.      determine which Bid(s) is a Qualified Bid(s);

C.      determine which Qualified Bid is the highest and best proposal for the Acquired Assets and which is the next highest and best proposal for the Acquired Assets;

D.      reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Sellers and their estates;

E.      determine any Lots and revise the minimum bid values above with respect to any Lot;

F.      impose additional terms and conditions with respect to all potential Bidders;

G.      extend the deadlines set forth herein; and

H.  modify the Bidding Procedures and implement additional procedural rules that the Sellers determine, in their business judgment, will better promote the goals of the bidding process and discharge the Sellers' fiduciary duties; provided however that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse APA, the Bidding Procedures Order or any other Order of the Court, unless agreed in writing by the Stalking Horse Bidder and Sellers or otherwise ordered by the Court.

**EXHIBIT B**

**SALE NOTICE**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[1] | Case No. 19-11901 (KBO) |
| Debtors. | (Jointly Administered) |

**NOTICE OF BIDDING PROCEDURES, AUCTION DATE, AND SALE HEARING**

PLEASE TAKE NOTICE THAT:

1.       On August 30, 2019, The News-Gazette, Inc. (the "**Company**") and D.W.S., Inc. (collectively with the Company, the "**Debtors**" or "**Sellers**") filed for relief before the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") captioned *In re The News-Gazette, Inc. et al.,* Case No. 19-11901 (KBO) (Bankr. D. Del. Aug. 30, 2019).

2.       On August 30, 2019, the Sellers filed with the Court the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "**Sale Motion**").[2] By the Sale Motion, the Sellers seek, *inter alia*, to conduct a sale (the "**Sale**") by auction (the "**Auction**") of all or substantially all of their assets (the "**Assets**") and to assume and assign certain executory contracts and unexpired leases (the "**Designated Contracts**"), pursuant to an asset purchase agreement by and among the Sellers and the stalking horse purchaser (the "**Stalking Horse APA**"). The Stalking Horse APA will be subject to higher or otherwise better offers at the Auction.

3.       On September [●], 2019, pursuant to the Sale Motion, the Court entered an order (the "**Bidding Procedures Order**") approving the Auction and bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "**Bidding Procedures**") in connection with the proposed Sale. A copy of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures can be obtained free of charge on _____.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  The News-Gazette, Inc. (0894) and D.W.S., Inc. (7985). The Debtors' headquarters are located at 15 East Main Street, Champaign, Illinois 61820.

[2]     Capitalized terms used herein but not otherwise defined in this notice (the "**Notice**") shall have the meanings ascribed to them in the Sale Motion.

4.      The Auction shall take place on **September 30, 2019 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, or such other place and time as the Sellers shall notify all Qualified Bidders (as defined in the Bidding Procedures).

5.      A hearing to approve the Sale (the "**Sale Hearing**"), including the assumption and assignment of the Designated Contracts, will be held on **October 2, 2019 at [●] a.m./p.m. (*prevailing* Eastern Time)** before the Court.

6.      Pursuant to the Bidding Procedures Order, any objections to the Sale ("**Sale Objections**") must be set forth in writing and must state with particularity the grounds for such objections or other statements of position.  All Sale Objections must be in writing and filed on and served so as to be received by **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Sale Objection Deadline**") at the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801; *provided* that objections to the conduct of the Auction or selection of the Successful Bid (as defined in the Bidding Procedures) or Backup Bid (a "**Supplemental Objection**"), which shall be in writing, may be filed with the Court, together with proof of service, and served so as to be received by the Notice Parties (*as defined below*) on or before **4:00 pm (*prevailing* Eastern Time) on October 1, 2019.**  Any Sale Objection or Supplemental Objection must be served on the following parties so as to be received by the Sale Objection Deadline:  **The Sellers**, 15 East Main Street, Champaign, Illinois 61820, Attention: John Reed (jreed@newsgazetteinc.com) and Traci E. Nally (tnally@newsgazetteinc.com); **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 North LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller, Esquire (nmiller@nge.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attention: William E. Chipman, Jr., Esquire (chipman@chipmanbrown.com); and **Broker to the Sellers**, Dirks, Van Essen, Murray & April, 119 East Marcy Street, Suite 100, Santa Fe, New Mexico, Attn: Phil Murray, Esquire (phil@dirksvanessen.com).

7.      UNLESS AN OBJECTION IS TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE COURT AND THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

8.      This Notice is subject to the fuller terms and conditions of the Sale Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Sellers encourage parties-in-interest to review such documents in their entirety.

Dated: _____, 2019          **CHIPMAN BROWN CICERO & COLE, LLP**
      Wilmington, Delaware

_____

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:     (302) 295-0191
Facsimile:      (302) 295-0199
Email:            chipman@chipmanbrown.com
                       olivere@chipmanbrown.com

—and—

**NEAL, GERBER & EISENBERG LLP**
Nicholas M. Miller (*Pro Hac* Admission Pending)
Thomas C. Wolford (*Pro Hac* Admission Pending)
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602
Telephone:     (312) 269-8000
Facsimile:      (312) 269-1747
Email:            nmiller@nge.com
                       twolford@nge.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**EXHIBIT C**

**CURE NOTICE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[1] | Case No. 19-11901 (KBO) |
| Debtors. | (Jointly Administered) |

### NOTICE OF POTENTIAL
### ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
### CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE AMOUNTS

**PLEASE BE ADVISED** that on August 30, 2019, The News-Gazette, Inc. (the "**Company**") and D.W.S., Inc. (collectively with the Company, the "**Debtors**" or "**Sellers**") filed for relief before the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") captioned *In re The News-Gazette, Inc., et al.,* Case No. 19-11901 (KBO) (Bankr. D. Del. Aug. 30, 2019).

**PLEASE BE ADVISED** that on August 30, 2019 the Sellers filed with the Court the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "**Sale Motion**").[2] By the Sale Motion, the Sellers seek, *inter alia,* to conduct a sale (the "**Sale**") by auction (the "**Auction**") of all or substantially all of their assets (the "**Assets**") and to assume and assign certain executory contracts and unexpired leases (the "**Designated Contracts**") to the successful bidder for such Assets (the "**Purchaser**").

**PLEASE BE FURTHER ADVISED** that, on September [●], 2019, pursuant to the Sale Motion, the Court entered an Order (the "**Bidding Procedures Order**"), which, among other things, approves auction and bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "**Bidding Procedures**") in connection with the proposed Sale. A copy of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures can be obtained free of charge at _____.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: The News-Gazette, Inc. (0894) and D.W.S., Inc. (7985). The Debtors' headquarters are located at 15 East Main Street, Champaign, Illinois 61820.

[2]   Capitalized terms used herein but not otherwise defined in this notice (the "**Notice**") shall have the meanings ascribed to them in the Sale Motion.

**PLEASE BE FURTHER ADVISED** that a hearing to approve the Sale (the "**Sale Hearing**"), including the assumption and assignment of certain Stalking Horse Bidder Designated Contracts, will be held on **October 2, 2019 at [●] a.m./p.m. (*prevailing* Eastern Time),** before the Court.

**PLEASE BE FURTHER ADVISED** that pursuant to the Motion, the Sellers may assume and assign the contract(s) identified on **Exhibit A** (the "**Subject Contract(s)**") to the Successful Bidder for the Subject Contract(s) at the Auction.[3]  The cure amount (the "**Cure Amount**"), if any, the Sellers believe is required to satisfy all amounts and obligations due and owing under each Subject Contract by the Sellers, including any monetary defaults and compensation for pecuniary losses, is listed on **Exhibit A** (the "**Cure Schedule**").

**PLEASE BE FURTHER ADVISED** that the deadline to file an objection to the assumption and assignment of the Subject Contract(s) and the Cure Amount(s) for such Subject Contract(s) (together, "**Cure Objections**") is **September 27, 2019 at 4:00 p.m. (*prevailing* Eastern Time)** (the "**Cure Objection Deadline**").

**PLEASE BE FURTHER ADVISED** that Cure Objections, if any, must be filed with the Court, and all such Cure Objections must also be served upon: **The Sellers**, 15 East Main Street, Champaign, Illinois 61820, Attention: John Reed (jreed@newsgazetteinc.com) and Traci E. Nally (tnally@newsgazetteinc.com); **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 North LaSalle Street, Suite 1700, Chicago, Illinois  60602, Attention: Nicholas M. Miller, Esquire (nmiller@nge.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attention: William E. Chipman, Jr., Esquire (chipman@chipmanbrown.com); and **Broker to the Sellers**, Dirks, Van Essen, Murray & April, 119 East Marcy Street, Suite 100, Santa Fe, New Mexico, Attn: Phil Murray, Esquire (phil@dirksvanessen.com).

**PLEASE BE FURTHER ADVISED** that the Cure Objection must state (i) the basis for the objection and (ii) with specificity, what Cure Amount(s) the party to the Subject Contract(s) believes is required (in all cases with appropriate documentation in support thereof).

**PLEASE BE FURTHER ADVISED** that any objection solely to the Cure Amount(s) may not prevent or delay the Sellers' assumption and assignment of the Subject Contract(s) by a Successful Bidder.  If a non-Debtor counterparty (a "**Contract Counterparty**") objects solely to Cure Amount(s), the Sellers may, with the consent of the Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties.  So long as Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable Subject Contract(s), the Sellers can, without further delay, assume and assign such Subject Contract(s) to the Successful Bidder.  Under such circumstances, the objecting Contract Counterparty's recourse is limited to the funds held in reserve.

---

[3]  The Sellers may modify the list of Available Contracts that will be assumed and assigned in connection with the Sale.  In addition, the inclusion of any contract or agreement on Exhibit A shall not constitute an admission by the Sellers that any such Subject Contract is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code and the Sellers reserve all rights with respect thereto.

**PLEASE BE FURTHER ADVISED** that any objections to the adequate assurance of future performance by any Successful Bidder under the applicable Subject Contract(s) must be filed with the Court and served on the Notice Parties and the applicable Successful Bidder so that such objection is received on or before **September 27, 2019 at 12:00 p.m. (*prevailing* Eastern Time)** (the "**Adequate Assurance Objection Deadline**").

**PLEASE BE FURTHER ADVISED** that unless a Cure Objection or an objection to adequate assurance of future performance, as applicable, is filed and served by a Contract Counterparty to any Subject Contract by the Cure Objection Deadline or the Adequate Assurance Objection Deadline, as applicable, such Contract Counterparty shall be (i) deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assignment of such Subject Contract, (ii) forever barred from objecting to the assumption and assignment of such Subject Contract or the failure of the Successful Bidder to provide adequate assurance of future performance and (iii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the Cure Schedule.

**PLEASE BE FURTHER ADVISED** that the hearings with respect to Cure Objection(s) or objection(s) to the adequate assurance of future performance may be held (a) at the Sale Hearing, or (b) at such other date as the Court may designate.

**PLEASE BE FURTHER ADVISED** that all requests for information concerning the Sale should be in writing and directed to counsel to the Sellers at the address referenced below.

Dated: _____, 2019
     Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

_____
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
        olivere@chipmanbrown.com

—and—

**NEAL, GERBER & EISENBERG LLP**
Nicholas M. Miller (*Pro Hac* Admission Pending)
Thomas C. Wolford (*Pro Hac* Admission Pending)
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602
Telephone:      (312) 269-8000
Facsimile:      (312) 269-1747
Email:          nmiller@nge.com
                twolford@nge.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**EXHIBIT A**

**Cure Schedule**

| NAME OF SUBJECT CONTRACT | NAME OF NON-DEBTOR COUNTERPARTY | CURE AMOUNT |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**Exhibit 2**

**Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[1] | Case No. 19-11901 (KBO) |
| Debtors. | (Joint Administration Requested) |

**ORDER (I) AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE NEWS-GAZETTE, INC. AND D.W.S., INC. TO CHAMPAIGN MULTIMEDIA GROUP, LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Sale Motion**")[2] of The News-Gazette, Inc. ("**News-Gazette**") and D.W.S., Inc. (each a "**Debtor**" and, collectively, the "**Debtors**"), filed in the above-captioned cases on August 30, 2019, Dk. No. ____, for, among other things, entry of an order (this "**Sale Order**") (A) authorizing and approving Debtors' entry into that certain Asset Purchase Agreement with Champaign Multimedia Group, LLC ("**Purchaser**"), together with all related documents, agreements, exhibits, schedules, and addenda thereto (as may be amended, the "**Purchaser APA**"), a copy of which is attached hereto as **Attachment 1**, approving the sale (the "**Sale**") of substantially all of Debtors' assets as set forth in the Purchaser APA (collectively, the "**Purchaser Purchased Assets**"), free and clear of all liens, claims, encumbrances and interests of any kind to Purchaser; (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**")[3] of Debtors that may be assumed and assigned to

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  The News-Gazette, Inc. (0894) and D.W.S., Inc. (7985).  The Debtors' headquarters are located at 15 East Main Street, Champaign, Illinois 61820.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Purchaser APA (*as defined below*) or, if not defined in the Purchaser APA, the Sale Motion.

[3]   Unless context otherwise requires, the term "**Assigned Contracts**" as used herein shall refer only to those agreements listed on Schedule 1.2(c) of the Purchaser APA, as such listing may be amended through Closing.

Purchaser in connection with the Sale, subject to and at the time of the Closing of the Sale; and (C) granting related relief; and the Court having previously entered the Order: (I) Approving Bid Procedures for Sale of Substantially All of the Debtors' Assets; (II) Approving Designation of Stalking Horse Bidder for Sale of Debtors' Assets; (III) Approving Certain Bid Protections for the Stalking Horse; (IV) Authorizing and Scheduling an Auction; (V) Scheduling Hearing for Approval of the Sale of Assets Free and Clear of Liens and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; (VI) Approving Certain Deadlines and the Form, Manner, and Sufficiency of Notice; and (VII) Granting Other Related Relief, Docket No. _____, on September 13, 2019, (the "**Bid Procedures Order**"); and the Court having conducted the Sale Hearing on October 2, 2019; and all parties in interest having been heard or having had the opportunity to be heard regarding the Purchaser APA; and it appearing that adequate and proper notice of the Sale Motion has been given and that no other or further notice need be given; and the Sale Hearing having been held to consider the relief requested in the Sale Motion; and upon the record of the Sale Hearing and all of the proceedings held before the Court; and the Court having found and determined that the relief sought in the Sale Motion is in the best interests of Debtors, their estate, their creditors and all other parties in interest; and that the legal and factual bases set forth in the Sale Motion, and the testimony adduced at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:[4]**

A.    <u>Jurisdiction</u>. The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §157(b)(1).

---

[4] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

B. <u>Venue</u>. Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §1408. This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

C. <u>Statutory Predicates</u>. The statutory and legal predicates for the relief requested in the Sale Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Bankruptcy Rule 6004-1.

D. <u>Notice</u>. Notice of the proposed Sale of the Purchaser Purchased Assets and the Sale Hearing has been provided to the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the District of Delaware; (ii) counsel for the Committee, if appointed; (iii) the District Director of Internal Revenue; (iv) parties under collective bargaining agreements, including without limitation the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444 for the Circulation District Managers and the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444/14407 for the Newsroom; (v) multiemployer pension plans in which or to which a Debtor or any of its Affiliates is or was participating or contributing, including without limitation the CWA/ITU Negotiated Pension Plan and the GCIU-Employer Retirement Fund; (vi) all entities known, as of the date of this Sale Motion, to have a lien, or to have asserted a lien, on the Purchaser Purchased Assets; (vii) all Debtors' creditors; and (viii) all other parties requesting notice in the Debtors' chapter 11 cases (collectively, the "**Notice Parties**"). Notice of the Sale was (a) uploaded to the Court's Electronic Access to Sales Information system, (b) was published in the *News-Gazette* on September 17, 2019, and (c) posted to the Debtors' claims and noticing agent's website.

E.      <u>Notice Sufficient</u>.  Based upon the affidavits of service previously filed with the Court and the evidence presented at the Sale Hearing, adequate and sufficient notice of the Sale Motion, Sale Hearing, the Sale, and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assigned Contracts to Purchaser, has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9006 and Local Bankruptcy Rule 9006-1. A reasonable opportunity to object and be heard with respect to the Sale, the Sale Motion and the relief requested therein, the assumption and assignment of the Assigned Contracts to Purchaser and the amounts necessary under section 365(b) of the Bankruptcy Code to cure defaults thereunder, as such amounts have been transmitted pursuant to a written notice delivered to the applicable counterparty, has been afforded to all interested persons and entities, including the Notice Parties.

F.      <u>Purchaser Purchased Assets Property of the Estates</u>.  The Purchaser Purchased Assets sought to be transferred and/or assigned by Debtors to Purchaser pursuant to the Purchaser APA are property of Debtors' estate and title thereto is vested in Debtors' estate.

G.      <u>Sufficiency of Marketing</u>.  Based upon the record of the Debtors' chapter 11 cases, all creditors and other parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Purchaser Purchased Assets. Under the circumstances, Debtors and its professionals have adequately and appropriately marketed the Purchaser Purchased Assets.

H.      <u>Corporate Authority</u>.  Subject to the entry of this Sale Order, Debtors:  (i) have full power and authority to execute the Purchaser APA and all other documents contemplated thereby; (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Purchaser APA (collectively, the "**Transactions**"), and (iii) have taken all company action necessary to authorize and approve the Purchaser APA and the sale of the Purchaser Purchased

Assets, and any actions required to be performed by Debtors in order to consummate the Transactions contemplated in the Purchaser APA. No consents or approvals, other than those expressly provided for in the Purchaser APA or this Sale Order, are required for Debtors to consummate the Sale.

I.    <u>Arm's-Length Sale and Purchaser's Good Faith</u>.   The Purchaser APA was negotiated and is undertaken by Debtors and Purchaser at arm's-length without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Neither Purchaser nor any of its affiliates, members, officers, directors, or shareholders is an "insider" of either of the Debtors as that term is defined by section 101(31) of the Bankruptcy Code. Purchaser (i) recognized that Debtors were free to deal with any other party interested in acquiring the Purchaser Purchased Assets and (ii) willingly subjected the Purchaser Purchased Assets to a competitive bidding process in accordance with the Bid Procedures Order. All payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed, Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common identity of directors or controlling stockholders exists between Purchaser and the Debtors. As a result of the foregoing, Purchaser is a "good faith buyer" within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the Sale specifically and these Chapter 11 Cases generally.

J.    <u>Sale Highest or Best Offer</u>.   The offer submitted by Purchaser for the Purchaser Purchased Assets as reflected in the Purchaser APA, including the form and total consideration to be realized thereunder, is the highest and best offer for the Purchaser Purchased Assets. No other

person or entity or group of persons or entities has offered to purchase the Purchaser Purchased Assets for an amount that would provide greater value to Debtors than Purchaser, including through the reduction of claims against Debtors' estate. The Court's approval of the Sale Motion with respect to the Purchaser Purchased Assets, the Purchaser APA, and the Transactions, maximize Debtors' recovery for the Purchaser Purchased Assets, and, thus, is in the best interests of Debtors and their estates, creditors and all other parties in interest.

K.     No Fraudulent Transfer.  The purchase price set forth in the Purchaser APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable law, and may not be avoided under section 363(n) or any other section of the Bankruptcy Code. The Purchaser APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither Debtors nor Purchaser has entered into the Purchaser APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

L.     No Liability under Section 363(n).  Neither Debtors nor Purchaser engaged in any conduct that would cause or permit the Purchaser APA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

M.     Transfer of Purchaser Purchased Assets Free and Clear.  Debtors are the sole and lawful owners of the Purchaser Purchased Assets. Pursuant to section 363(f) of the Bankruptcy Code, and except as otherwise provided in the Purchaser APA and this Sale Order, and except for Assumed Liabilities, the transfer of each of the Purchaser Purchased Assets to Purchaser will be,

as of the Closing, a legal, valid, and effective transfer of the Purchaser Purchased Assets, which transfer vests or will vest Purchaser with all right, title, and interest of Debtors to the Purchaser Purchased Assets free and clear of, among other things, (i) all Liens, claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, royalties, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or permission, subleases, leases, conditional sale arrangements, (ii) all claims as defined in section 101(5) of the Bankruptcy Code) including all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of Debtors or any other person prior to Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of Debtors' chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, including but not limited to the Withdrawal Liabilities, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material on non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of Debtors' Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, successor liability or otherwise (clauses (i), (ii), and (iii), together, the "**Interests**").

N.     <u>Free and Clear Findings Required by Purchaser</u>.  Purchaser would not have entered into the Purchaser APA and would not consummate the transactions contemplated thereby if the Sale was not free and clear of any and all Interests (other than Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code, or if Purchaser would, or in the future could, be liable for any of such Interests.  Effective upon the Closing, Purchaser shall not be responsible for any Interests (other than Assumed Liabilities), including in respect of the following:  (i) labor or employment agreements; (ii) all mortgages, deeds of trust, and security interests; (iii) any intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (iv) any welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of Debtors, any affiliate of Debtors, or any member of Debtors' "control group;" (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Worker Adjustment and Retraining Notification Act, 29 U.S.C §§ 2101 *et. seq.*, or (l) any other state or federal benefits or claims relating to any employment with Debtors or any of its predecessors; (vi) Interests arising under any environmental, health and safety laws with respect to any assets owned or operated by Debtors or any corporate predecessor at any time prior to the Closing and any liabilities of Debtors other than

the Assumed Liabilities; (vii) any bulk sales Tax, bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) any and all Interests arising out of violations, or other non-compliance with any law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or any other authority or requirement enforced by, or under the supervision of the Occupational Safety and Health Administration; and (x) any theories of successor liability or causes of action related thereto. A sale of the Purchaser Purchased Assets other than one free and clear of all Interests would yield substantially less value for Debtors' estate, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Purchaser APA maximizes Debtors' recovery on the Purchaser Purchased Assets, and, thus, is in the best interests of Debtors and its estate, creditors and all other parties in interest.

O.     Satisfaction of Section 363(f) Standards.  Debtors may sell the Purchaser Purchased Assets free and clear of all Interests because, with respect to each creditor or other person or entity asserting an Interest, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale or the Sale Motion with respect to the Purchaser Purchased Assets are deemed to have consented to the Sale Motion with respect to the Purchaser Purchased Assets and to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

P.     No Successor Liability.  Purchaser is not holding itself out to the public as a continuation of Debtors and is not an "insider" or "affiliate" of Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders exists now or has ever existed between Purchaser and Debtors. The conveyance of the Purchaser Purchased Assets does not amount to a consolidation, merger or *de facto* merger of Purchaser and

Debtors and/or Debtors' estates, there is no substantial continuity between Purchaser and Debtors, there is no continuity of enterprise between Debtors and Purchaser, Purchaser is not a joint employer or co-employer with Debtors or a mere continuation of Debtors or their estates, and Purchaser does not constitute a successor to Debtors or their estates. Purchaser's acquisition of the Purchaser Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. Purchaser's operations shall not be deemed a continuation of Debtors' business as a result of the acquisition of the Purchaser Purchased Assets. Purchaser would not have acquired the Purchaser Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

Q.      _Assignment Objection Procedures_. Prior to the filing of the Sale Motion, Purchaser had not indicated to Debtors which Assigned Contracts, if any, Purchaser would request to be assumed and assigned as part of the Purchaser APA. Therefore, to conserve the parties' and the Court's resources, as well as to avoid unnecessary cost and potential confusion to counterparties to the Assigned Contracts (each a "**Counterparty**" and collectively, the "**Counterparties**"), Debtors have requested that the Court approve the Assignment Objection Procedures (as defined below). Such Assignment Objection Procedures are fair, reasonable, and protect the interests of all Counterparties to Assigned Contracts.

R.      _Assigned Contracts_. Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Debtors or

Purchaser as a result of the assumption and/or assignment of the Assigned Contracts. All Counterparties of the Assigned Contracts who did not or do not timely file an objection to the assumption and assignment of the Assigned Contract(s) to which they are counterparty are deemed to consent to the assumption by Debtors of their respective Assigned Contract(s) and the assignment thereof to Purchaser, and Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof. Upon the assignment and sale to Purchaser, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to Purchaser, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer. Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of Debtors, their estates and creditors, and other parties in interest. The Assigned Contracts being assigned to Purchaser are an integral part of the Sale and, accordingly, their assumption and assignment are reasonable and an enhancement to the value of Debtors' estate.

S.    Cure/Adequate Assurance.  Pursuant to the Purchaser APA, the Cure Amounts will be paid by Purchaser as "**Assumed Liabilities**" under the Purchaser APA. Subject to any objections submitted in accordance with the Assignment Objection Procedures (as defined below), Purchaser has demonstrated adequate assurance of future performance of all Assigned Contracts within the meaning of section 365 of the Bankruptcy Code, including its promise to perform Debtors' obligations under the Assigned Contracts for periods on and after the Closing. The Cure

Amounts are deemed the amounts necessary to "cure" all "defaults" (each, within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts. Except as provided by the Assignment Objection Procedures (*as defined below*), any objections to the Cure Amounts, to the extent not otherwise resolved, are hereby overruled. To the extent that any Counterparty failed to timely object to its Cure Amount or the assignment of its Assigned Contract or to raise any other alleged default or breach of contract, such Counterparty is deemed to have consented to such Cure Amount and to the assignment of its respective Assigned Contract(s) to Purchaser and to have waived any other defaults or breaches. The payment of the Cure Amounts as provided in the Purchaser APA is appropriate and is deemed to fully satisfy Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by Debtors, and the assignment by Debtors to Purchaser, of each of the Assigned Contracts.

T.    <u>Purchaser Purchased Assets Assignable</u>.  Any contractual provision or applicable non-bankruptcy law that purports to prohibit, restrict, or condition assignment of any of the Purchaser Purchased Assets has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

U.    <u>Sale as Exercise of Business Judgment</u>.  Entry into and consummation of the Purchaser APA constitute the exercise by Debtors of sound business judgment, and such acts are in the best interests of Debtors, their estates and creditors, and all parties in interest. The Court finds that Debtors have articulated good and sufficient business reasons justifying the Sale. Additionally: (i) the Purchaser APA constitutes the highest and best offer for the Purchaser Purchased Assets; (ii) the Purchaser APA and the closing thereon presents the best opportunity to realize the maximum value of the Purchaser Purchased Assets and avoid a decline and devaluation

of the Purchaser Purchased Assets; (iii) there is risk of deterioration of the value of the Purchaser Purchased Assets if the Sale is not consummated promptly; and (iv) the Purchaser APA and the closing thereon will provide a greater recovery for Debtors' creditors than would be provided by any other presently available alternative. Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

V.     Compelling Reasons for an Immediate Sale.   Good and sufficient reasons for approval of the Purchaser APA have been articulated by Debtors. Debtors have demonstrated compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code; and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale is necessary and appropriate to preserve and to maximize the value of Debtors' estates. To maximize the value of the Purchaser Purchased Assets and to preserve the viability of the business to which the Purchaser Purchased Assets relate, it is essential that the Sale occur promptly. Time is of the essence in consummating the Sale.

W.     Expense Reimbursement Fee.   Champaign Multimedia Group, LLC ("**CMG, LLC**") has expended considerable time, money, and energy pursuing the purchase of the Purchaser Purchased Assets and has engaged in extended arm's-length and good faith negotiations with Debtors. Recognizing this expenditure of time, energy, and resources, Debtors have agreed to pay the Expense Reimbursement Fee to CMG, LLC in the event Debtors consummate the Sale of the Purchaser Purchased Assets with a party other CMG, LLC or its Affiliate(s). The Expense Reimbursement Fee is (a) an actual and necessary cost and expense of preserving Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred upon Debtors' estates by AMG; and (c) reasonable and appropriate

in light of the size and nature of the proposed sale, the commitments that have been made, and the efforts that have been expended by CMG, LLC. Debtors have demonstrated a sound business justification for authorizing the payment of the Expense Reimbursement Fee to CMG, LLC, which Expense Reimbursement Fee has been negotiated at arm's-length and is reasonable under the circumstances.

X.      No Sub Rosa Plan.  The Sale does not constitute a *sub rosa* chapter 11 plan. The Sale neither impermissibly restructures the rights of Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization for Debtors.

Y.      Final Order.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. §158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      Sale Motion Granted.  The relief requested in the Sale Motion with respect to the Purchaser Purchased Assets is GRANTED and the Sale is approved, all as set forth in this Sale Order.

2.      Objections Overruled.  All objections with regard to the relief sought in the Sale Motion with respect to the Assets that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

3.      Approval.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchaser APA, the assumption and assignment of the Assigned Contracts to Purchaser as of the Closing Date, and the sale of the Purchaser Purchased Assets and the other transactions

contemplated thereby are hereby approved in all respects. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Debtors, Purchaser, and each of their respective officers, agents, professionals and other representatives are authorized and directed to perform their obligations under, and comply with the terms of, the Purchaser APA, and to consummate the Sale, including the sale, transfer and assignment of all of Debtors' right, title and interest in the Purchaser Purchased Assets to Purchaser free and clear of any and all Interests (other than the Assumed Liabilities) in accordance with the terms of the Purchaser APA and this Sale Order.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Debtors, Purchaser and each of their respective officers, directors, employees, professionals, agents and other representatives are each hereby authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the sale of the Purchaser Purchased Assets to Purchaser and the Closing of the Sale, pursuant to the Purchaser APA and this Sale Order, (b) assume and assign the Assigned Contracts to be assumed and assigned to Purchaser as of the Closing Date, and (c) perform, consummate, implement and close fully the Purchaser APA together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchaser APA. Debtors and Purchaser are hereby authorized and directed to perform their respective covenants and undertakings as provided in the Purchaser APA prior to or after the Closing of the Sale without further order of the Court. Purchaser and Debtors shall have no obligation to close the Sale except as is contemplated and provided for in the Purchaser APA.

4.     <u>Transfer Free and Clear</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the Closing, neither Purchaser or any of its Affiliates nor any of their respective successors and assigns shall have any liability for any Interest, except for Assumed Liabilities, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or

contingent, whether as a successor, vicariously or otherwise, of any kind, nature or character whatsoever, including for any Interests arising under, without limitation:   (i) any labor or employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (iv) any welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any affiliate of Debtors, or any member of Debtors' "control group", including but not limited to the Withdrawal Liabilities; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Worker Adjustment and Retraining Notification Act, 29 U.S.C §§ 2101 et. seq., or (l) any other state or federal benefits or claims relating to any employment with Debtors or any of its predecessors; (vi) Interests arising under any environmental, health and safety laws with respect to any assets owned or operated by Debtors or any corporate predecessor at any time prior to the Closing Date and any liabilities of Debtors other than the Assumed Liabilities; (vii) any bulk sales Tax, bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) any and all Interests arising out of violations, or other non-compliance with any law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or

any other authority or requirement enforced by, or under the supervision of the Occupational

Safety and Health Administration; and (x) any theories of successor liability or causes of action

related thereto. All Interests, to the extent not paid in full at Closing, shall attach to the proceeds

of the sale of the Purchaser Purchased Assets, in the order of priority, with the same validity, force

and effect which they now have as against the Purchaser Purchased Assets, subject to any rights,

claims and defenses that Debtors and other parties in interest may possess with respect thereto.

5.　　Surrender of Possession.  Any and all Purchaser Purchased Assets in the possession

or control of any person or entity, including any vendor, supplier or employee of Debtors, shall be

transferred to Purchaser free and clear of all Interests, except for Assumed Liabilities, and shall be

delivered to Purchaser and deemed delivered at the time of Closing (or such other time as provided

in the Purchaser APA).

6.　　Valid Transfer.  Effective upon the Closing, the transfer to Purchaser of Debtors'

rights, title and interests in the Purchaser Purchased Assets pursuant to the Purchaser APA shall

be, and hereby is deemed to be, a legal, valid and effective transfer of Debtors' right, title and

interest in the Purchaser Purchased Assets, and vests with or will vest in Purchaser all right, title

and interest of Debtors in the Purchaser Purchased Assets, free and clear of all Interests (other than

Assumed Liabilities).

7.　　Injunction.  Except as expressly provided in the Purchaser APA or this Sale Order,

effective upon the Closing all Persons and Entities (as those terms are defined under Section 101

of the Bankruptcy Code), including, but not limited to, all debt security holders, equity security

holders, holders of any preferential purchase rights or similar rights, including, but not limited to

tag along rights, drag along rights and co-sale rights, governmental, tax and regulatory authorities,

lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons

holding Interests (other than Assumed Liabilities) against or in Debtors or Debtors' interests in the Purchaser Purchased Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of Debtors' chapter 11 cases, whether imposed by agreement, understanding, law, equity, successor liability or otherwise), shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against Purchaser, or its affiliates, agents, advisors, representatives, officers, successors and assigns, the Purchaser Purchased Assets, or the interests of Debtors or Purchaser in such Purchaser Purchased Assets, including, without limitation, taking any of the following actions with respect to an Interest (other than, with respect to Purchaser only, the Assumed Liabilities): (a) commencing or continuing in any manner any action or other proceeding against such parties or the Purchaser Purchased Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against such parties or the Purchaser Purchased Assets; (c) creating, perfecting or enforcing any liens, claims, encumbrances or other interests against such parties or the Purchaser Purchased Assets; (d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due Purchaser or its affiliates, agents, advisors, representatives, officers, successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.  All persons are hereby enjoined from taking any action that would interfere with or adversely affect Debtors' ability to transfer the Purchaser Purchased Assets in accordance with the terms of the Purchaser APA and this Sale Order.  Following the Closing, no

holder of an Interest (including as such term is used in section 363(f)) against Debtors shall interfere with Purchaser's title to or use and enjoyment of the Purchaser Purchased Assets.

8.      Good Faith Buyer.  The Purchaser APA has been entered into by Purchaser in good faith and Purchaser is a good faith buyer of the Purchaser Purchased Assets as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization of the Sale provided herein shall neither affect the validity of the Sale nor the transfer of the Purchaser Purchased Assets to Purchaser, free and clear of Interests, unless such authorization is duly stayed before the Closing pending such appeal. Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

9.      No Bulk Sales/Bulk Sales Tax.  No bulk sales law or any similar law or bulk sales Tax of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchaser APA, the Sale Motion and this Sale Order.

10.     Fair and Equivalent Value.   The consideration provided by Purchaser for the Purchaser Purchased Assets under the Purchaser APA shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

11.     Transfer of Marketable Title.  Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of Debtors' rights, title and interests in the Purchaser Purchased Assets and/or a bill of sale transferring good and marketable title in such Purchaser Purchased Assets to Purchaser

at the Closing pursuant to the terms of the Purchaser APA, free and clear of all Interests (other than Assumed Liabilities).

12.   <u>No Successor Liability</u>.   The consummation of the Sale does not amount to a consolidation, merger or *de facto* merger of Purchaser and Debtors and/or its estate, there is no substantial continuity between Purchaser and Debtors, there is no continuity of enterprise between Debtors and Purchaser, Purchaser is not a mere continuation of Debtors or its estate, and Purchaser does not constitute a successor to Debtors or its estate. Notwithstanding any state and/or federal law or any other law (whether in equity, common law or statutory law), upon the Closing, Purchaser's acquisition of the Purchaser Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of the Closing. Purchaser's operations shall not be deemed a continuation of Debtors' business as a result of the acquisition of the Purchaser Purchased Assets. The transfer of the Purchaser Purchased Assets to Purchaser, except as otherwise set forth in the Purchaser APA, does not, and will not, subject Purchaser to any liability whatsoever, with respect to operation of the Debtors' business prior to the Closing.

13.   <u>Assignment Objection Procedures</u>.   The following "Assignment Objection Procedures" are hereby approved:

a.   On or before the Closing Date, Debtors shall file a notice (the "**Purchaser Cure Notice**") with the Court identifying the name of each Assigned Contract and the proposed cure amount associated with such Assigned Contract, and shall serve such notice on the Counterparty to each Assigned Contract.

b.   Each Counterparty to an Assigned Contract shall have 10 days from the date the Purchaser Cure Notice is served (the "**Objection Deadline**") to object to the proposed cure amount, or to the assumption and assignment of the Assigned Contract to Purchaser on any ground (including non-monetary defaults, adequate assurances of future performance, *etc.*).

c.     Debtors, at the direction of Purchaser, and without any Court order, may amend the Purchaser Cure Notice at any time prior to the Closing Date to add or remove Assigned Contracts. If an Assigned Contract is added to the Purchaser Cure Notice by such amendment(s), the Objection Deadline for the Counterparty to such newly added Assigned Contract(s) shall be extended to a date that is ten (10) days after the date the amended Purchaser Cure Notice is served.

d.     If a Counterparty does not file an objection on or before the Objection Deadline, it waives any right to object to the assumption of its Assigned Contract by Debtors and the assignment of its Assigned Contract to Purchaser, and such Assigned Contract shall be deemed assumed and assigned as of the Closing Date.

e.     If a Counterparty files a timely objection and such objection is not otherwise resolved by the parties, the Court will resolve such objection at a hearing on a date designated by the Court.  To the extent an objection is not resolved prior to the Closing, Purchaser may, without further approval of the Court or notice to any party, elect to (i) not have Debtors assume and assign the Assigned Contract to it or (ii) have Debtors postpone the assumption of such Assigned Contract until the resolution of such objection; *provided that* Debtors, Purchaser, and the relevant Counterparty shall have authority to compromise, settle, or otherwise resolve any objection without further order of the Court, with any such agreed upon Cure Amount being paid to the Counterparty as a condition subsequent to such assumption and assignment.

f.     Any timely filed objection by a Counterparty to an Assigned Contract in accordance with that certain Notice to Counterparties to Executory Contracts and Unexpired Leases that May Be Assumed and Assigned, Docket No. _____ (the "**Original Cure Notice**"), shall be deemed fully preserved and shall be considered a timely filed objection by such counterparty to the assumption and assignment of its Assigned Contract pursuant to the Purchaser APA.

g.     If a Counterparty's objection is resolved after the Closing Date and the relevant contract is to be assumed and assigned pursuant to such resolution, then such Counterparty's Assigned Contract will be deemed assumed and assigned as of the Closing Date.

h.     Upon assignment of any Assigned Contract, such Assigned Contract and any Counterparty to such Assigned Contract shall be subject to the terms of this Sale Order.

i.     Debtors' assumption of any Assigned Contract is subject to the consummation of the Purchaser Sale.

14.   <u>Authorization to Assign</u>.  Pursuant to section 365(f) of the Bankruptcy Code, and notwithstanding any provision of any contract governing the Purchaser Purchased Assets or any Assigned Contract to be assumed and assigned to Purchaser or applicable non–bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchaser Purchased Assets or the Assigned Contracts, Debtors are authorized to (a) assign, sell and transfer the Purchaser Purchased Assets to Purchaser and (b) assume and assign the Assigned Contracts to Purchaser, which assignments shall take place on and be effective as of the Closing or as otherwise provided by a separate order of this Court.  Notwithstanding the foregoing, as of the date of entry of this Sale Order, if a Counterparty timely filed an objection in accordance with the Assignment Objection Procedures and such objection remains unresolved, or if such Counterparty's Objection Deadline has not yet passed, the assignment of such Counterparty's Assigned Contract shall be conditioned upon the resolution of such objection in accordance with the Assignment Objection Procedures.

a.   There shall be no accelerations, assignment fees, increases, or any other fees charged to Purchaser or Debtors as a result of the assumption and assignment of the Purchaser Purchased Assets and the Assigned Contracts.

b.   Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts to be assumed and assigned to Purchaser as of Closing. Notwithstanding the foregoing, unless required by Purchaser under the Purchaser APA, Debtors shall not be required by the Court to assume and assign any Assigned Contracts, and, if no such assumption and assignment occurs, no Cure Amounts shall be due and no adequate assurance of future performance shall be required.

c.   Debtors are authorized to execute and deliver to Purchaser such agreements, documents and other instruments as may facilitate or document the sale,

assignment, transfer, conveyance and delivery of the Assigned Contracts to Purchaser. Debtors shall file a final notice listing all Assigned Contracts as soon as practicable following the closing of the Sale.

15. <u>Assigned Contracts</u>. As of the Closing, subject to the provisions of this Sale Order, Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assigned Contracts to be assumed and assigned to Purchaser first arising and attributable to the time period occurring on or after the Closing Date and shall have all rights thereunder. Each Counterparty to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against Debtors or Purchaser, or the property of either of them, any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of transactions contemplated by the Purchaser APA, including the Sale and the assumption and assignment of the Assigned Contracts. Any party that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to object to the assumption and assignment of such Assigned Contract in accordance with the Assignment Objection Procedures.

          a. Upon Closing, (i) all defaults (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through the payment of the Cure Amounts, (ii) no other amounts will be owed by Debtors, its estate or Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assigned Contracts and (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against Debtors, its

estate, Purchaser, or the Purchaser Purchased Assets, that any additional amounts are due or that any defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing, whether declared or undeclared, or known or unknown. Purchaser's promise pursuant to the terms of the Purchaser APA to pay the Cure Amounts and to perform Debtors' obligations under the Assigned Contracts for the period on or after the Closing shall constitute adequate assurance of its future performance under the Assigned Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code.

b.      Upon assumption of the Assigned Contracts, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to Purchaser notwithstanding any provision in such Assigned Contracts or other restrictions prohibiting assignment or transfer.  The assumption and assignment of the Assigned Contracts as authorized under this Sale Order will take effect as of the Closing. Furthermore, other than Assigned Contracts, no other executory contract or unexpired lease shall be deemed assumed by Debtors and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code. The failure of Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of Debtors' or Purchaser's rights to enforce every term and condition of such Assigned Contract.

c.      All Counterparties to the Assigned Contracts to be assumed and assigned to Purchaser as of the Closing shall cooperate and expeditiously execute and deliver, upon the reasonable request of Purchaser, and shall not charge Debtors or

Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

16.     Release of Interests.  Effective upon the Closing, this Sale Order:  (a) is and shall be effective as a determination that all Interests (other than Assumed Liabilities) of any kind or nature whatsoever existing as to the Purchaser Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) is and shall be binding upon and shall govern the acts of all Persons and Entities (as those terms are defined in Section 101 of the Bankruptcy Code), including but not limited to, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchaser Purchased Assets conveyed to Purchaser, and all recorded Interests (other than Assumed Liabilities) against the Purchaser Purchased Assets shall be deemed stricken from such Persons' and/or Entities' records, official and/or otherwise.

17.     Approval to Release Interests.  If any person or entity that has filed financing statements, mortgages, mechanic's liens or other documents or agreements evidencing Interests in, Liens on, or claims against the Purchaser Purchased Assets shall not have delivered to Debtors before the Closing, in proper form for filing and executed by the appropriate parties, the appropriate documentation with respect to the release of such Interests, Debtors and Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents

on behalf of such person or entity with respect to the Purchaser Purchased Assets. Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests against the Purchaser Purchased Assets other than the Assumed Liabilities. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

18.     Allocation of Purchaser Purchased Assets.   Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Purchaser Purchased Assets, including the Assigned Contracts, among its affiliates, designees, assigns, and/or successors, in a manner as it in its sole discretion deems appropriate, and to assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Purchaser Purchased Assets, including the Assigned Contracts, to its affiliates, designees, assignees and/or successors with all of the rights and protections accorded to Purchaser under this Sale Order and the Purchaser APA with respect thereto. Debtors shall cooperate with and take all actions reasonably requested by Purchaser to effectuate any of the foregoing.

19.     Expense Reimbursement Fee.   The Expense Reimbursement Fee is approved, which shall not exceed $_____, and shall be payable by Debtors to CMG, LLC at closing on the sale of the Purchaser Purchased Assets only in the event that Debtors consummate the Sale of the Purchaser Purchased Assets with a party other CMG, LLC or its Affiliate(s). For the avoidance of doubt, Purchaser shall have no liability for the Expense Reimbursement Fee.

20.     Governmental Authorization to Effectuate Sale and Assignments.   Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to

consummate the transactions contemplated by the Purchaser APA. No governmental unit may revoke or suspend any lawful right, license, trademark or other permission relating to the use of the Purchaser Purchased Assets sold, transferred or conveyed to Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Transactions. For the avoidance of doubt, the sale of the Purchaser Purchased Assets authorized herein shall be of full force and effect, regardless of whether Debtors or any of its affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

21.     <u>Authorization of Purchaser to Operate</u>. To the greatest extent available under applicable law and to the extent provided for under the Purchaser APA, Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of Debtors with respect to the Purchaser Purchased Assets, and, to the greatest extent available under applicable law and to the extent provided for under the Purchaser APA, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing.

22.     <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>.  To the extent this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Debtors' chapter 11 cases, the terms of this Sale Order shall govern. To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Purchaser APA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

23.     <u>Binding Effect of Sale Order; Subsequent Orders</u>.  This Sale Order and the Purchaser APA shall be binding in all respects upon Debtors and all successors and assigns of the Debtors, their estates, all creditors of, and holders of equity interests in, Debtors, any holders of

Liens, claims or other Interests in, against or on all or any portion of the Purchaser Purchased Assets (whether known or unknown), Purchaser and all successors and assigns of Purchaser, all successors and assigns to the Purchaser Purchased Assets and any trustee, examiner, "responsible person" or other fiduciary appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code. The Purchaser APA shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to Purchaser hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest. This Sale Order shall not be modified by any chapter 11 plan(s) confirmed in these chapter 11 cases or any subsequent order(s) of this Court.

24. <u>Failure to Specify Provisions</u>. The failure specifically to include or make reference to any particular provisions of the Purchaser APA or any related ancillary document in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchaser APA and all related ancillary documents are authorized and approved in their entirety.

25. <u>Retention of Jurisdiction</u>. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Sale Order, including, without limitation, the authority to:  (i) interpret, implement and enforce the terms and provisions of this Sale Order (including the exculpation, release and injunctive provisions in this Sale Order) and the terms of the Purchaser APA, all amendments thereto and any waivers and consents thereunder; (ii) protect Purchaser, or the Purchaser Purchased Assets, from and against any Interests (other than Assumed Liabilities); (iii) compel delivery of all Purchaser Purchased Assets to Purchaser; (iv) compel

Debtors and Purchaser to perform all of their respective obligations under the Purchaser APA; and (v) resolve any disputes arising under or related to the Purchaser APA or the Sale.

26.     <u>Automatic Stay</u>.  Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchaser APA or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

27.     <u>No Material Modifications</u>.   The Purchaser APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; *provided, however*, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

28.     <u>Immediate Effect</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. §158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the Court expressly finds there is no reason for delay in the implementation of this Sale Order and, accordingly:  (i) the terms of this Sale Order shall be immediately effective and enforceable upon its entry and the fourteen (14) day stay provided in Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) is hereby expressly waived and shall not apply; (ii) Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Sale Order; and (iii) Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Sale Order.

29.     <u>Provisions Non-Severable</u>.  The provisions of this Sale Order are nonseverable and mutually dependent.

30.   <u>Satisfaction of Conditions Precedent</u>.  Neither Purchaser nor Debtors shall have an obligation to close the Transactions until all conditions precedent in the Purchaser APA to each of their respective obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Purchaser APA.


Date: _____        _____
      Wilmington, Delaware              The Honorable Karen B. Owens
                                       United States Bankruptcy Judge

## **Exhibit 3**

Form APA