# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made as of August 26, 2019 (the "**Effective Date**"), by and among News-Gazette, Inc., an Illinois corporation ("**News-Gazette**"), D.W.S., Inc., a Delaware corporation ("**D.W.S.**", and together with News-Gazette, the "**Sellers**" or individually, as the context may require, a "**Seller**"), and Champaign Multimedia Group, LLC, an Illinois limited liability company ("**Purchaser**"). Capitalized terms not otherwise defined in this Agreement are used as defined in <u>Exhibit A</u>.

## RECITALS

WHEREAS, News-Gazette owns and publishes the following daily and weekly newspapers, companion shoppers, niche publications, and companion digital web sites (the "**Newspapers**"): the daily and Sunday News - Gazette, Champaign, Illinois; Ford County Record, Paxton, Gibson City, Illinois; The Rantoul Press, Rantoul, Illinois; Piatt County Journal-Republican, Piatt County, Illinois; Mahomet Citizen; and The Independent News; and

WHEREAS, D.W.S. owns and operates radio stations WDWS(AM), Champaign, Illinois (Facility Id. No. 14961), WHMS-FM, Champaign, Illinois (Facility Id. No. 14962), and WKIO(FM), Arcola, Illinois (Facility Id. No. 57469) and holds a construction permit for an FM translator station to rebroadcast the signal of WDWS-AM (translator call sign W230CW) (the "**Radio Stations**"); and

WHEREAS, on or before August 30, 2019 (the "**Petition Date**") Sellers will (i) file voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), (ii) seek to prosecute a jointly administered case (the "**Bankruptcy Case**"), and (iii) continue to manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, Sellers wish to sell and assign to Purchaser, and Purchaser wishes to purchase and assume from Sellers, the Purchased Assets and the Assumed Liabilities, all on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code (the "**Acquisition**");

NOW, THEREFORE, intending to be legally bound hereby, the parties agree as follows:

## I.    PURCHASE AND SALE OF ASSETS

1.1    <u>Agreement to Purchase and Sell</u>. On the terms and subject to the conditions contained in this Agreement, Purchaser agrees to purchase from Sellers, and Sellers agree to sell, transfer, convey, assign and deliver to Purchaser, at the Closing, all right, title and interest in and to the Purchased Assets. The Purchased Assets shall be sold to Purchaser free and clear of all Liens, Claims and encumbrances, including but not limited to, any claims for successor liability ("**Successor Liability Claims**") and the Withdrawal Liabilities, pursuant to and under Section 363 of the Bankruptcy Code.

1.2    <u>Purchased Assets</u>. The Purchased Assets are the following assets of Sellers used in or arising out of the operations of the Newspapers and the Radio Stations (the "**Purchased Assets**"), which shall not include any Excluded Assets:

(a)    all inventory, comprised of circulation, distribution, and office supplies (the "**Inventory**");

(b)    all furniture, fixtures, improvements, equipment (including office equipment),

machinery, parts, computer hardware, tools, printing presses, rolling stock, vehicles, leasehold improvements, towers, transmitters, antennas, receivers, spare parts and all other tangible personal property, as set forth on Schedule 1.2(b) which will include specified exceptions (the "**Personal Property**");

(c)    all Assigned Contracts listed on Schedule 1.2(c), and for the avoidance of doubt, Purchaser shall have the right to amend, modify, add or delete Assigned Contracts up to the time of the Sale Hearing;

(d)    all claims and rights (and benefits arising therefrom) relating to the Purchased Assets with or against all Persons whomsoever;

(e)    all Permits which are required for the operations of a Newspaper or a Radio Station or for the ownership and use of the Purchased Assets;

(f)    all Intellectual Property, including: (i) the web sites and the content thereon, Internet addresses and URLs; (ii) the names and mastheads of the Newspapers and all trade names and trade dress and related goodwill associated with the names of the Newspapers and derivatives thereof (the "**Mastheads**"); (iii) the names and call letters of the Radio Stations and all trade names and trade dress and related goodwill associated with the names of the Radio Stations and derivatives thereof; and (iv) all goodwill associated with the Intellectual Property of the Newspapers and the Radio Stations;

(g)    all books (except of Sellers' corporate minute books, similar legal records of corporate existence, legal files and affairs, and historical memorabilia relating to the Stevick family as opposed to books related to their business operations), papers, files and records, whether in hard copy, electronic or other format, including the following types of files and records: books of account and accounting information; budgets; contract files; current and former customer, dealer, advertiser and supplier files (including advertiser contracts, copies of newsprint contracts, subscriber and non-subscriber lists (including those of independent contractors which distribute the Newspapers)) and advertiser lists; lists of rack and box locations; lists of dealers; customer credit information; collection information; pricing information; historical and current circulation draw information; manufacturing and production information; market research and survey reports and records; equipment maintenance records; equipment warranty information; sales, advertising and promotional materials; software specifications and drawings (including all documentation and source code); equipment drawings; manuals; written confirmations or certificates relating to Permits; industry information; the Radio Stations' public inspection files; filings with the FCC relating to the Radio Stations; records required by the FCC to be kept by the Radio Stations, and information relating to trade secrets and customer specifications;

(h)    all rights to proceeds under insurance policies related to the Purchased Assets and Assumed Liabilities but expressly excluding the Key Man Insurance Policies owned by Sellers;

(i)    all accounts receivable, billed or unbilled, notes receivable, negotiable instruments and chattel paper of the Newspapers (the "**Accounts Receivable**");

(j)    the prepaid expenses, security and other deposits and advances and other prepaid items as set forth on Schedule 1.2(j) ("**Prepaids**");

(k) all rights under warranties, indemnities and all similar rights against third Persons, to the extent related to any Purchased Assets or Assumed Liabilities;

(l) all addresses and telephone numbers of the Newspapers and the Radio Stations;

(m) the Radio Station Fee Property;

(n) the Radio Station Leased Property;

(o) all libraries, morgue and archives of the Newspapers; and

(p) all goodwill and the going concern value of the Newspapers and the Radio Stations.

1.3    Excluded Assets. The Purchased Assets shall not include the following assets of Sellers (the "**Excluded Assets**"):

(a) real estate associated with the Newspapers;

(b) stock in D.W.S., Inc.

(c) cash, bank and/or financial accounts, short-term investments including Key Man Life Insurance Policies owned by Sellers and all rights, claims and causes of action relating to any of the foregoing;

(d) all ERISA Plans and assets thereof, Benefit Arrangements and other commitments or agreements with respect to employment, whether written or oral, express or implied;

(e) all deferred or prepaid Tax assets, Tax refunds, and any right to net operating loss;

(f) organizational and capitalization materials and corporate records, including minutes and stock books and records;

(g) all internal audit and tax records and all records pertaining to Excluded Assets;

(h) personnel and employment files;

(i) Sellers' corporate minute books, similar legal records of corporate existence, legal files and affairs, and historical memorabilia relating to the Stevick family;

(j) all Contracts other than the Assigned Contracts;

(k) all accounts receivable, billed or unbilled, notes receivable, negotiable instruments and chattel paper of the Radio Stations;

(l) all rights of Sellers under this Agreement and the other documents executed in connection herewith;

(m) all claims, causes of action, rights of recovery, rights of set-off and other similar rights of any kind, including but not limited to insurance proceeds, to the extent relating to any Excluded Asset or any Excluded Liability;

3

(n)   Sellers' policies of directors and officers liability insurance and all premiums, claims and rights thereunder or relating thereto;

(o)   any intercompany obligations owing to Sellers;

(p)   all preference, fraudulent conveyance, and other claims of Sellers arising under Chapter 5 of the Bankruptcy Code or similar state law;

(q)   any Excluded Liability;

(r)   any professional retainers paid by Sellers;

(s)   copies of any business records of any kind that must be retained by Seller as required by Legal Requirements or as needed for the prosecution of the Bankruptcy Case and the wind down of the businesses;

(t)   any other item set forth on Schedule 1.3 hereof; and

(u)   any asset that is not a Purchased Asset.

## II.   ASSUMPTION OF LIABILITIES; EXCLUDED LIABILITIES; BANKRUPTCY COURT PROCEEDINGS

2.1   Agreement to Assume. At the Closing, Purchaser shall assume and be responsible for only the following: (a) the prepaid subscriptions of the Newspapers as set forth on the Closing Date Statement; (b) only those Cure Amounts specified in the Schedule 1.2(c); and (c) the obligations of Sellers under the Assigned Contracts in respect of the period following the Closing (the "**Assumed Liabilities**").

2.2   Excluded Liabilities. Purchaser shall not assume and shall not be responsible to pay, perform or discharge any obligation or liability of a Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Sellers shall remain responsible for the Excluded Liabilities and all liabilities of Sellers and their Affiliates under this Agreement. Without limiting the foregoing, Sellers shall pay to or on behalf of its employees all payroll and benefit obligations approved by the Bankruptcy Court. Any liability owed to Sellers' employees accruing prior to an employee's termination of employment with Seller, which could include regular wages, benefits, termination pay obligations such as vacation, sick personal and severance pay ("**Employee Accruals**"), whether approved by the Bankruptcy Court for payment or not, are not being transferred in any way to Purchaser and are Excluded Liabilities. For the avoidance of doubt, any and all liabilities of Sellers in and relating to defined benefit plans, pensions and/or other similar retirement plans or benefits, including but not limited to withdrawal liabilities in respect of multiemployer pension plans in which or to which a Seller or any of its Affiliates is or was participating or contributing ("**Withdrawal Liabilities**"), are Excluded Liabilities.

2.3   Bankruptcy Court Approvals. Sellers and Purchaser acknowledge and agree that the terms and conditions of this Agreement are subject to Bankruptcy Court approval and entry of the Sale Order.

(a)   On the Petition Date Sellers will file a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the Bankruptcy Court thereby commencing Bankruptcy Case.

(b)   On the Petition Date Sellers shall file the Sale Motion with a proposed Sale Order in substantially the form of Exhibit G, and any amendments or changes

by Purchaser in its sole discretion. Purchaser shall cooperate in all reasonable respects in Sellers' efforts to obtain the Sale Order and shall provide information demonstrating adequate assurance of future performance under Section 365 of the Bankruptcy Code with respect to each Assigned Contract.

(c)    On the Petition Date Sellers shall file a motion with the Bankruptcy Court seeking entry of the Bid Procedures Order in substantially the form of Exhibit H, with such changes as recommended by Purchaser in its reasonable discretion. In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the establishment of a base value for the assets of Sellers, upon the valid termination of this Agreement under the circumstances described in Section 11.3, Sellers shall pay to Purchaser the Expense Reimbursement Amount.

(d)    On or after the Petition Date Sellers shall file a motion with the Bankruptcy Court for an order authorizing the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of those Contracts that may be designated by Sellers and Purchaser to be assumed by Sellers and assigned to Purchaser and may be included in Schedule 1.2(c) (the "**Assigned Contracts**"). Sellers will send notice to counterparties to all executory contracts and unexpired leases that such contracts may become Assigned Contracts. Each such executory contract and unexpired lease will be identified on an exhibit to the notice. The exhibit to the notice will set forth the amount, if any, Sellers believe to be necessary to cure defaults under each such executory contract or unexpired lease to enable it to be assumed and assigned ("**Cure Amounts**") and if no Cure Amount was estimated to be applicable with respect to any particular contract, the amount of such Cure Amount designated for such contract was "$0.00".

(e)    Purchaser shall pay only those Cure Amounts as listed in Schedule 1.2(c) at Closing.

(f)    Sellers shall or shall cause, at the Closing, each Assigned Contract to be assumed by the relevant Seller and assigned to Purchaser in accordance with Section 365 of the Bankruptcy Code and the Sale Order. On the Closing Date, Sellers shall be released from any further liability under the Assigned Contracts.

2.4    Competing Transactions. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids with respect to any asset sale pursuant to Section 363 of the Bankruptcy Code, the effect of which could be the direct or indirect transfer of all or substantially all of the Purchased Assets in a single transaction or a series of related transactions to one or more parties other than Purchaser or any of its Affiliates (each a "**Competing Transaction**"). Subject only to the Debtors' fiduciary duties or as otherwise ordered by the Bankruptcy Court, Sellers may not initiate contact with, solicit or encourage any Person other than Purchaser to serve as a stalking horse for the Purchased Assets.

2.5    FCC Approvals.

(a)    On or before the next Business Day following the Petition Date, D.W.S. shall file an application with the FCC the objective of which shall be to obtain the FCC's consent to the assignment of the Permits issued by the FCC with respect to the Radio Stations (the "**FCC Permits**") from D.W.S. to D.W.S., debtor-in-possession.

(b)    No later than five (5) Business Days following approval by the FCC of the application described in Section 2.5(a), D.W.S., debtor-in-possession and

Purchaser shall file a long-form application (or applications) with the FCC, the objective of which shall be to obtain the FCC's consent to assignment of the FCC Permits from D.W.S., debtor-in-possession, to Purchaser (the "**FCC Consent**"). The application fee(s) associated with such application(s) shall be borne evenly between D.W.S., debtor-in-possession and Purchaser.

(c)    D.W.S., debtor-in-possession, and Purchaser shall coordinate to respond to the FCC on matters raised by the FCC (if any) in regard to the assignment of the FCC Permits from D.W.S., debtor-in-possession, to Purchaser.

(d)    D.W.S. and Purchaser shall each pay 50% of the FCC filing fees required in connection with the applications required to be filed under Sections 2.5(a) and 2.5(b) herein.

## III.    PURCHASE PRICE; NET WORKING CAPITAL ADJUSTMENT; BID DEPOSIT

3.1    Purchase Price. The purchase price for the Purchased Assets (the "**Purchase Price**") shall be: (a) $4,500,000, subject to adjustment as provided herein (the "**Cash Portion of the Purchase Price**"); and (b) the Assumed Liabilities. The Cash Portion of the Purchase Price *less* the Deposit (which will be disbursed at Closing in accordance with Section 3.4(d)) shall be paid by Purchaser on the Closing Date, in immediately available funds, by wire transfer pursuant to the instructions set forth on Schedule 3.1.

3.2    Adjustment.

(a)    The Cash Portion of the Purchase Price will be increased to the extent the Closing Net Working Capital is greater than the Target Net Working Capital, or decreased to the extent the Closing Net Working Capital is less than the Target Net Working Capital, in each case on a dollar-for-dollar basis (the "**Adjustment Amount**").

(b)    Exhibit D sets forth the preliminary Closing Date Statement and calculation of the Adjustment Amount estimated as of the Closing Date. At the Closing, Sellers shall deliver to Purchaser the Closing Date Statement updated to reflect the Adjustment Amount estimated as of the Closing Date and calculated as of two (2) Business Days prior to the Closing Date; and at the Closing an adjustment to the Cash Portion of the Purchase Price will be made as set forth in Section 3.2(a) above on the basis of such Closing Date Statement furnished at Closing. Within sixty (60) calendar days following Closing Purchaser and Sellers shall jointly prepare and agree upon the final calculation of the Adjustment Amount. If the parties are unable jointly to agree upon the final calculation of Adjustment Amount within such sixty (60) day period, they will submit for resolution the items in dispute to the Bankruptcy Court.

(c)    On or before the third (3rd) Business Day following the final determination of the Adjustment Amount, Purchaser or Sellers, as the case may be, shall pay to the other party such amount equal to the difference between the Adjustment Amount paid at Closing and the Adjustment Amount as finally determined. Such payments owed to Purchaser shall be entitled to administrative expense priority and, in any event, shall be paid in immediately available funds by wire transfer to such account as designated in writing by the party entitled to receive the payment.

3.3    [Reserved]

3.4     Bid Deposit.

    (a)     Within two (2) Business Days after the Effective Date, Purchaser shall deposit with Attorney's Title Guaranty Fund, serving as escrow agent (the "**Escrow Agent**"), an amount equal to Four Hundred Fifty Thousand Dollars ($450,000) (the "**Deposit**") in immediately available funds. The Deposit shall be held pursuant to an escrow agreement in form and substance satisfactory to Purchaser, Sellers and Escrow Agent. The Deposit shall bear interest at the prevailing money market rate and such interest shall become part of the Deposit.

    (b)     If this Agreement is terminated pursuant to Section 11.1 other than pursuant to Section 11.1(d), the Escrow Agent shall deliver the Deposit to Purchaser no later than the second Business Day following the termination of this Agreement.

    (c)     If this Agreement is terminated pursuant to Section 11.1(d), the Escrow Agent shall deliver the Deposit to Seller no later than the second Business Day following the termination of this Agreement.

    (d)     If the Closing occurs, the Deposit shall be delivered by the Escrow Agent to the Seller and credited against the Purchase Price.

3.5     Allocation of Purchase Price. The Purchase Price (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as set forth on Schedule 3.5.

3.6     Withholding Tax. Purchaser shall be entitled to deduct and withhold from the Purchase Price all Taxes that Purchaser may be required to deduct, withhold and pay under any provision of applicable Tax law. All such withheld amounts shall be treated as delivered to Sellers hereunder.

3.7     Prorations.

    (a)     Delinquent real estate taxes on the Radio Station Fee Property shall be paid by D.W.S. at or prior to Closing. Real estate taxes on the Radio Station Fee Property which are not in delinquency shall be apportioned between D.W.S. and Purchaser in accordance with the prevailing custom of the county in which the Radio Station Fee Property is located.

    (b)     Taxes other than real estate taxes imposed on or with respect to Purchased Assets, if any, that are Assumed Liabilities that relate to the Pre-Closing Tax Period shall be apportioned as of the Closing such that Sellers shall be liable for (and shall reimburse Purchaser to the extent that Purchaser shall have paid) that portion of such Taxes relating to, or arising in respect of the Pre-Closing Tax Period, and Purchaser shall be liable for (and shall reimburse Sellers to the extent a Seller shall have paid) that portion of such Taxes relating to, or arising in respect to the Post-Closing Tax Period.

    (c)     Unless otherwise addressed in this Agreement, items of expense and revenue pertaining to Purchased Assets that relate to a period which spans the Closing Date shall be apportioned by Sellers and Purchaser as of the Closing such that the appropriate party bears the expense and receives the revenue in respect of the relevant part of such period.

    (d)     Charges for utilities which serve the Purchased Assets will be apportioned by the parties as of the Closing.

(e)     D.W.S. and Purchaser shall prorate the annual FCC regulatory fees as of the Closing Date on the basis of the fiscal year of the FCC.

(f)     All amounts to be prorated will be reflected on a closing statement to be prepared jointly by Purchaser and Sellers, or by the title company involved in the transaction with the oversight and approval of Purchaser and Sellers, and applied as adjustments to the payments at Closing. To the extent the amounts of any such pro ratable items are not applied as an adjustment to the payments at Closing, appropriate settlement shall be made within thirty (30) calendar days after the amount of any such item is finally known.

## IV.   REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally represent and warrant to Purchaser that, except as set forth in the Schedules delivered by Sellers to Purchaser concurrently herewith (the "**Schedules**") and to the best of their Knowledge:

4.1     Corporate Authority and Other Matters.

(a)     News-Gazette is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois, and D.W.S. is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each Seller has all necessary corporate power and authority to own its properties and assets and to conduct its operations as now conducted.

(b)     The operations of the Newspapers and the Radio Stations as currently conducted do not require a Seller to be licensed or qualified to do business in any jurisdiction other than Illinois. D.W.S. is duly qualified to do business in the State of Illinois.

(c)     Except for the need for the Sale Order, each Seller has full corporate power and authority to execute and deliver this Agreement and all documents and instruments required to be executed by it pursuant to this Agreement (the "**Seller's Ancillary Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

(d)     All corporate acts required to be taken by each Seller to authorize the execution and delivery of this Agreement and its Seller's Ancillary Documents, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby have been duly and properly taken and no other corporate proceeding on the part of a Seller is necessary to authorize such execution, delivery and performance.

(e)     This Agreement has been, and each of Seller's Ancillary Documents will be, duly executed and delivered by each Seller, as applicable. Except for the need for the Sale Order, each of this Agreement and Seller's Ancillary Documents constitutes the legal, valid and binding obligation of such Seller, as applicable, enforceable in accordance with its terms.

(f)     Except as set forth in Schedule 4.1(f) and the need for the Sale Order and the FCC Consent, no consent, authorization, order or approval of, or filing or

registration with, any Governmental Body or any other Person is required for the execution and delivery by Sellers of this Agreement and Seller's Ancillary Documents and the consummation by Sellers of the transactions contemplated hereby and thereby.

(g)     Neither the execution and delivery of this Agreement and Seller's Ancillary Documents by Sellers nor the consummation by Sellers of the transactions contemplated hereby and thereby will conflict with or result in a breach or violation of any of the terms conditions or provisions of: (i) the articles of incorporation or by-laws of such Person; (ii) any Legal Requirement applicable to such Person or the Purchased Assets; or (iii) any written or oral contract, indenture, mortgage, note or other instrument relating to the Purchased Assets or by which the Purchased Assets may be bound. The execution and delivery by Sellers of this Agreement and Seller's Ancillary Documents and the consummation by Sellers of the transactions contemplated hereby and thereby will not give rise to any default, acceleration, or right of termination under any contract included in the Purchased Assets.

(h)     Marajen Stevick Foundation, an Illinois nonprofit corporation, owns 100% of the equity of News-Gazette. News-Gazette owns 100% of the equity of D.W.S.

4.2     Financial, Title and Other Matters.

(a)     Seller has disclosed all material transactions to which a Newspaper or a Radio Station has been a party or otherwise involved.

(b)     Seller has provided complete and accurate copies of (i) the audited or reviewed balance sheets and statements of income of the Newspapers and the Radio Stations, as of and for the three most recent complete fiscal years, (ii) the unaudited balance sheets of the Newspapers as of July 31, 2019 (the "**Balance Sheet Date**") and the unaudited statement of income of the Newspapers and the Radio Stations for the seven-month period then ended (the financial statements referred to in items (i) and (ii) are the "**Financial Statements**") and (iii) unaudited profit and loss statements of the Newspapers and the Radio Stations for each month from January 1, 2018 through the month ended on the Balance Sheet Date. The Financial Statements fairly present in all material respects the financial positions of the Newspapers and the Radio Stations as of the respective dates thereof and the results of operations of the Newspapers and the Radio Stations for the respective periods covered by such statements. Except for liabilities which would be classified as "current liabilities" in accordance with the accounting systems consistently maintained by Sellers and incurred in the ordinary course of business from and after the Balance Sheet Date, none of the Newspapers or Radio Stations has liabilities or obligations of a kind that should be reflected on a balance sheet prepared in accordance with the accounting systems consistently maintained by Sellers, whether accrued, contingent or otherwise, except as and to the extent reflected in the unaudited balance sheet, dated the Balance Sheet Date.

(c)     All of the Inventory is in the physical possession and control of Sellers. The Inventory is in good, usable and salable condition, and is of a quality and quantity historically used in the normal operation of the Newspapers and the Radio Stations. Except as set forth on Schedule 4.2(c), none of the Inventory is older than six (6) months. At the Closing, each Newspaper and Radio Station will have on hand Inventory sufficient for its normal operation.

(d)     Seller has provided complete and accurate copies of all insurance policies which name a Seller as an insured and which pertain to the Purchased Assets or the employees of a Newspaper or Radio Station. All such insurance policies are in full force and effect, and Sellers have not received notice of termination or non-renewal of any such insurance policies. Except as set forth on <u>Schedule 4.2(d)</u>, there are no claims related to the Purchased Assets or the Assumed Liabilities pending under any such insurance policies as to which coverage has been denied or disputed or in respect of which there is an outstanding reservation of rights. Neither Sellers nor any of their Affiliates have received any written notice of cancellation of, or alteration of coverage under, any of such insurance policies. All premiums due on such insurance policies have either been paid or, if not yet due, properly accrued. True and complete copies of the insurance policies have been made available to Purchaser.

(e)     Sellers have good and valid title to the Purchased Assets, free and clear of all Liens, Claims and encumbrances (other than those disclosed on <u>Schedule 4.2(e)</u>).

(f)     Each item of Personal Property is being sold AS IS and WHERE IS.

(g)     D.W.S. has good, marketable and insurable fee simple title to the Radio Station Fee Property and good, marketable and insurable leasehold title to the Radio Station Leased Property. The lease(s) underlying the Radio Station Leased Property are included on <u>Schedule 4.2(g)</u>; and all such leases are in full force and effect and there are no defaults or breaches under any such lease by D.W.S. or any other Person which remains uncured and no event or circumstance exists which would be reasonably likely to become a default thereunder. D.W.S. will transfer at the Closing good, marketable and insurable fee simple title to the Radio Station Fee Property and good, marketable and insurable leasehold title to the Radio Station Leased Property, in each case free and clear of all Liens, Claims and encumbrances.

(h)     The Real Property, other than the studios and offices currently at 15 E Main St, Champaign, IL, is the only real property used in the operation of the Radio Stations. D.W.S. has not transferred the Radio Station Fee Property or any interest thereof. There are no outstanding contracts made by D.W.S. for any improvement to the Real Property which have not been fully paid. Except as set forth on <u>Schedule 4.2(h)</u>, the construction, use and operation of the Real Property are and have been in compliance in all material respects with applicable Legal Requirements. Except as set forth on <u>Schedule 4.2(h)</u>, none of the buildings, structures and other improvements located on the Real Property violates any restrictive covenant, permit, condition, agreement or any easement, right of way or other encumbrance or restriction affecting the Real Property, nor, to the Knowledge of Sellers, does any building, structure or other improvement of any third Person encroach upon the Real Property or any easement or right of way benefiting the Real Property. To the Knowledge of Sellers, the Real Property and its continued use, occupancy and operation as currently used, occupied and operated does not constitute a nonconforming use under any applicable Legal Requirement. To the Knowledge of Sellers, the continued use, occupancy and operation of the Real Property, including the right of egress and ingress thereto, is not dependent on the granting of any permit, exception, approval, condition or variance. Sellers have no Knowledge of any: (i) pending or threatened condemnation, fire, health, safety, building, zoning or other land use proceeding which could impact the use, occupancy and operation of any portion of the Real Property; (ii) special improvements, liens, assessments or

assessment proceeding affecting any of the Real Property, other than liens for real estate taxes not yet due and payable; or (iii) threatened termination or reduction of the current access from the Real Property to existing roads or to sewer, water or other utility services presently serving the Real Property. None of the Radio Station Fee Property is subject to a leasehold interest.

4.3     Advertising. With respect to advertising matters of the Newspapers and the Radio Stations:

(a)     The advertising revenues of each Newspaper and Radio Station for the trailing twelve (12) month period determined as of the Balance Sheet Date is set forth on Schedule 4.3(a).

(b)     Seller has provided to Purchaser for each Newspaper complete and accurate information regarding advertising rate cards, advertising credits or rebates, advertising agency commissions, prepaid advertising, and barter revenue and expense items.

(c)     Schedule 4.3(c) includes a list of all contracts for advertising in, distribution of, and commercial printing with respect to, the Newspapers and all other printed publications of the Newspapers.

4.4     [Reserved]

4.5     Circulation. With respect to circulation activity of the Newspapers:

(a)     Seller has provided to Purchaser for each Newspaper the complete and accurate net paid circulation and the actual circulation revenues of each Newspaper for the trailing twelve (12) month period determined as of the Balance Sheet Date.

(b)     Seller has provided to Purchaser for each Newspaper the complete and accurate monthly circulation report of average monthly paid, unpaid and total net distributions during the period from January 1, 2018 to the Balance Sheet Date. Since January 1, 2018, News-Gazette has not taken any action, and, to the Knowledge of Sellers, no event has occurred or circumstance exists, which reasonably could have the effect of causing a material reduction in paid or unpaid circulation.

(c)     Seller has provided to Purchaser for each Newspaper complete and accurate internal subscription rates as of the Balance Sheet Date. Since the Balance Sheet Date, there have been no deviations from such internal subscription rates and there have been no changes to the "published" rates.

(d)     Seller has provided to Purchaser for each Newspaper complete and accurate lists of (i) independent contractors which distribute the Newspapers and all related publications of the Newspapers and the fees paid to each, together with their respective locations and the volume of the Newspapers and such publications delivered to each delivery location, (ii) rack and box locations, current dealer and the respective number of copies delivered to each, (iii) independent correspondents and (iv) current subscribers and non-subscribers, and the respective subscription expiration dates for each.

(e)     News-Gazette undertakes the mailing of the Newspapers and all related publications in accordance with applicable Legal Requirements and has obtained and maintained the certifications and updates of its address data base in order to

meet the addressing standards necessary to qualify for the mailing privileges and postage discounts claimed in all USPS Postage Statements. Seller has provided to Purchaser for each Newspaper each USPS Permit Number and CASS or CDS certifications to support such mailings.

(f)     Seller has provided to Purchaser for each Newspaper the complete and accurate number of page views per month for the web sites of the Newspapers for each month during the period from January 1, 2018 to the Balance Sheet Date.

4.6     <u>Conduct of Business.</u>

(a)     Except as set forth in <u>Schedule 4.6(a)</u>, since January 1, 2018, Sellers have not, with respect to any of the Newspapers or Radio Stations:

   (i)     suffered any casualty, damage, destruction or loss, or any material interruption in use, of any material assets or property (whether or not covered by insurance), on account of fire, flood, riot, strike, theft, or other hazard or act of God;

   (ii)    made or suffered any material change in the conduct or nature of any aspect of a Newspaper or Radio Station;

   (iii)   committed to make any non-ordinary course capital expenditure, which as of the date hereof has not been paid in full;

   (iv)    made any change in accounting methods or principles; or

   (v)     factored any accounts receivable; or

(b)     With respect to any Newspaper and Radio Station, Sellers have not suffered, and to the Knowledge of Sellers there are no facts which could reasonably result in, any Material Adverse Effect.

4.7     <u>Contracts; Permits.</u>

(a)     <u>Schedule 4.7(a)</u> includes a list of all contracts and leases, written or oral, to which a Seller is a party and which relate to the Purchased Assets, including: leases; employment and employment-related agreements; advisory or consulting agreements; covenants not to compete; employee confidentiality and other agreements protecting proprietary or confidential information; loan agreements; notes; security agreements; sales representative, distribution, franchise, advertising and similar agreements; license agreements; commercial printing contracts; subscriptions; purchase orders and purchase contracts; and sales orders and sales contracts (the "**Contracts**"). All such Contracts are in full force and effect and are binding upon the relevant Seller, and, to the Knowledge of Sellers, the other parties thereto, and Sellers have not released any right thereunder. Except as set forth on <u>Schedule 4.7(a)</u>, no default by a Seller has occurred under any such Contract, and, to the Knowledge of Sellers, no default by the other party has occurred thereunder. No event or condition exists which, with the lapse of time, the giving of notice, or both, would result in a default under any such Contract. Sellers have provided Purchaser with complete and accurate copies of written Contracts and complete and accurate descriptions of the material terms of oral Contracts required to be disclosed in <u>Schedule 4.7(a)</u>.

(b)     <u>Schedule 4.7(b)</u> identifies, for each Newspaper and Radio Station, every license,

permit, registration and governmental approval, agreement and consent issued (or in the process of being issued) to Seller, and every agreement with a Governmental Body that relates to such Newspaper and Radio Station (the "**Permits**"). Sellers are in compliance in all material respects with the Permits.

(c)    Without limitation of the matters stated elsewhere in the Agreement, Sellers represent and warrant concerning the Permits with respect to the Radio Stations as follows:

    (i)    Schedule 4.7(c)(i) contains a true and complete list of the FCC Permits. D.W.S. is the holder of each such FCC Permit and D.W.S. is the authorized legal holder of such FCC Permit. Except as set forth in Schedule 4.7(c)(i), the Radio Stations and the facilities of the Radio Stations are being and have been operated in material compliance with such FCC Permits, and such FCC Permits are all of the FCC licenses, permits and authorizations required for the operation of the Radio Stations substantially as presently operated.

    (ii)    Except as set forth in Schedule 4.7(c)(ii), (A) to the Knowledge of Sellers, there are no petitions, complaints, or investigations, pending or threatened from or before the FCC relating to the Radio Stations or the FCC Permits, (ii) there are no notices of violations, notices of apparent liability, pending license terminations, forfeitures, proceedings or other actions pending or, to the Knowledge of Sellers, threatened from or before the FCC relating to the Radio Stations or the FCC Permits and (iii) D.W.S. has not filed with the FCC any applications or petitions relating to the Radio Stations or the FCC Permits which are pending before the FCC.

    (iii)    The Purchased Assets relating to the Radio Stations are in compliance with all rules and regulations of the Federal Aviation Administration applicable to the Radio Stations. Each antenna structure that is required to be registered with the FCC has been registered with the FCC. Schedule 4.7(c)(iii) contains a list of the antenna registration numbers for each tower owned or leased by D.W.S. that requires registration under the rules and regulations of the FCC. All material reports and other filings required by the FCC with respect to the Radio Stations have been properly and timely filed.

    (iv)    The operation of the Radio Stations does not expose workers or others to levels of radio frequency radiation in excess of applicable "Radio Frequency Protection Guides".

    (v)    D.W.S. has operated the Radio Stations in compliance with the Communications Laws.

4.8    <u>Employees</u>.

(a)    With respect to employees of the Newspapers and the Radio Stations, Sellers will provide any current or historical information concerning employees (including salaries, hours, wages, dates of employment and positions, and, for employees on leave or other inactive status, a general description of the type of leave or inactive status), employee benefits and collective bargaining agreements as needed by Purchaser.

(b)     Sellers will have complied with all obligations arising under WARN in relation to all employment losses, terminations, layoffs and/or hours reduction among the employees of the Newspapers and Radio Stations.

4.9     Actions.

(a)     Except as set forth in Schedule 4.9(a), there are no Actions pending, or to the Knowledge of Sellers threatened, against a Seller or its Affiliates which could reasonably be likely to impair any of the Purchased Assets (before or after the Closing), or impede the consummation of the transactions contemplated hereby. To the Knowledge of Sellers, there are no facts which, if known by a potential claimant (including for the avoidance of doubt any Governmental Body), would give rise to such an Action.

(b)     Neither Seller is bound by any decree, order or arbitration award (or agreement entered into in any proceeding with any Governmental Body) with respect to the Purchased Assets.

(c)     Except as set forth on Schedule 4.9(c), Sellers are in compliance in all material respects with Legal Requirements applicable to the Purchased Assets and the Newspapers and Radio Stations.

4.10    Environmental Matters.

(a)     D.W.S. maintains all Environmental Permits that are required for the operation of the Radio Stations. D.W.S. is in compliance in all material respects with Environmental Laws and Environmental Permits applicable to the Real Property. Each notice, citation inquiry or complaint which D.W.S. has received of any liability or potential liability under any Environmental Law or Environmental Permit is set forth on Schedule 4.10(a), and all such violations have been corrected. Copies of all Environmental Permits maintained by D.W.S. with respect to the Real Property are set forth in Schedule 4.10(a).

(b)     There has been no storage, treatment, generation, transportation, disposal or Release of any Hazardous Materials by D.W.S. or its predecessors in interest, or by any other Person for which D.W.S. is or may be held responsible, in connection with a Radio Station in violation of Environmental Laws where the violation would result in a liability that would have a Material Adverse Effect.

(c)     To the Knowledge of Sellers, Schedule 4.10(c) sets forth the list of all Containers that are presently located at, or have been removed from, the Real Property. All Containers that have been removed have been so removed in accordance with applicable Environmental Laws.

(d)     Without limiting the foregoing, to the Knowledge of Sellers, except as disclosed in Schedule 4.10(d):

(i)      there is no asbestos contained in or forming part of any building, building component, structure or office space located on the Real Property;

(ii)     no polychlorinated biphenyls are used or stored on the Real Property; and

(iii)    no Lien has been recorded under any Environmental Law with respect to

14

the Real Property.

(e) The Real Property has not been listed or proposed for listing on the National Priorities List or on the Comprehensive Environmental Response, Compensation and Liability Information System list, both promulgated under CERCLA, or on any list under any state equivalent requiring removal, remedial, response or corrective action pursuant to any Environmental Law. D.W.S. has not been named by a Governmental Body as a potentially responsible party under any Environmental Laws.

(f) Schedule 4.10(f) contains a list of all environmental reports and audits relating to the Real Property in the possession of Sellers or their Representatives, and complete and accurate copies of such reports and audits have been furnished to Purchaser.

4.11   Intellectual Property.

(a) Schedule 4.11(a) identifies all of the following which relate to any of the Newspapers and Radio Stations and in which a Seller claims any ownership rights: (i) trademarks, service marks, trade names, trade dress and the like (collectively, with the associated goodwill "**Trademarks**"), together with information regarding all registrations and pending applications to register any such rights; (ii) common law Trademarks; (iii) patents on and pending applications to patent any technology or design; (iv) registrations of and applications to register copyrights; and (v) licenses of rights in computer software, URLs, Trademarks, patents, copyrights, unpatented formulations, manufacturing methods and other know-how, whether to or by a Seller. The general intangible assets of each of the Newspapers and Radio Stations, including the rights required to be so identified in clauses (i) through (v), are referred to collectively as the "**Intellectual Property**." All licenses related to any of the Intellectual Property are freely transferable by Sellers to Purchaser without any payments to or consents from any third Persons.

(b) (i) The relevant Seller is the owner of or is duly licensed to use each Trademark and its associated goodwill; (ii) each registered Trademark registration exists and has been maintained in good standing; (iii) each patent and application included in the Intellectual Property exists, is owned by or licensed to the relevant Seller, and has been maintained in good standing; (iv) each copyright registration exists and is owned by the relevant Seller; (v) to the Knowledge of Sellers, no other Person claims the right to use in connection with activities similar to those carried on by the Newspapers and the Radio Stations and in the same geographic area, any mark that is identical or confusingly similar to any of the Trademarks; (vi) to the Knowledge of Sellers, there is no claim with respect to, and Sellers have no reason to believe that any other Person asserts ownership rights in, any of the Intellectual Property; (vii) to the Knowledge of Sellers, there is no claim, and Sellers have no reason to believe that a Seller's use of any Intellectual Property infringes any right of, any other Person; (viii) to the Knowledge of Sellers, no Person is infringing any of a Seller's rights in any of the Intellectual Property in the relevant market area of the Newspapers and the Radio Stations; (ix) Sellers are under no obligation to pay any royalties or similar payments in connection with any license of Intellectual Property; (x) the consummation of the transactions contemplated by this Agreement will not result in the impairment of Purchaser's right to use any of the Intellectual Property following the Closing nor infringe upon the rights of any Person; and (xi) Sellers are the owners of or duly licensed to use all Intellectual Property

necessary for the operations of the Newspapers and the Radio Stations as now conducted and operated.

4.12    Taxes.

(a)    All Tax Returns required to be filed by Sellers have been, or will be, timely filed. Such Tax Returns are, or will be, accurate and complete. All Taxes due and owing by Sellers (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)    Sellers have withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other Person, and Sellers have complied with all information reporting and backup withholding provisions of Applicable Legal Requirements.

(c)    None of the Purchased Assets (i) is property which is required to be treated as being owned by any other Person pursuant to the so-called "safe harbor lease" provisions of former section 168(f)(8) of the Code; (ii) directly or indirectly secures any debt the interest on which is tax exempt under section 103(a) of the Code; or (iii) is "tax-exempt use property" within the meaning of Section 168(h) of the Code. As of the Closing, Sellers will have paid, or will have made adequate provision to pay, all Taxes payable by Sellers and all penalties, assessments or deficits of every nature or description, in respect of the Newspapers or the Radio Stations up to the Closing Date, and currently and as of the Closing there will be no Liens, Claims or encumbrances for due but unpaid Taxes with respect to the Purchased Assets.

(d)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Sellers.

(e)    All deficiencies asserted, or assessments made, against Sellers as a result of any examinations by any taxing authority have been fully paid.

(f)    Sellers are not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

(g)    There are no Liens, Claims or encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing any Liens for Taxes on any of the Purchased Assets.

(h)    Sellers are not, and have not been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

4.13    Fair Housing Act. News-Gazette is in compliance in all material respects with the Fair Housing Act, 42 U.S.C., Chapter 45, and its associated rules and regulations, with respect to the advertising which is printed or disseminated in the Newspapers or any other publications of the Newspapers.

4.14    Independent Contractor Status. All independent contractors providing services to the Newspapers are qualified as independent contractors in accordance with applicable Legal Requirements. No carrier, distributor or similarly-situated independent contractor providing services to News-Gazette has claimed to News-Gazette any ownership or equity interest in the distribution list of any carrier or the distribution route for a Newspaper.

4.15    General.

    (a)    The copies of the documents furnished by Sellers to Purchaser pursuant to this Agreement are accurate and complete to the best of Sellers' Knowledge.

    (b)    Except as set forth in Schedule 4.15(b), none of Sellers or any of their Affiliates has dealt with any Person who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment in connection with the transactions contemplated by this Agreement or introducing the parties to each other.

    (c)    Sellers have used their best efforts in making the representations and warranties of Sellers in this Agreement, Seller's Ancillary Documents and the certificates, schedules and other documents and instruments delivered or to be delivered to Purchaser in connection with this Agreement. Sellers have been truthful and not misleading to the best of their ability and have tried to not omit any material fact required to be stated herein or therein.

## V.    PURCHASER'S REPRESENTATIONS AND WARRANTIES

5.1    Purchaser's Representations and Warranties. Purchaser represents and warrants to Sellers that, except as set forth in the schedules delivered by Purchaser to Sellers concurrently herewith (the "**Purchaser's Schedules**"):

    (a)    Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Illinois. Purchaser has all necessary limited liability company power and authority to own its properties and assets and to conduct its business as now conducted.

    (b)    Except for the need for the Sale Order, Purchaser has full limited liability company power and authority to execute and deliver this Agreement and all documents and instruments required to be executed by Purchaser pursuant to this Agreement ("**Purchaser's Ancillary Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

    (c)    All limited liability company acts required to be taken by Purchaser to authorize the execution and delivery of this Agreement and Purchaser's Ancillary Documents, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby have been duly and properly taken and no other limited liability company proceeding on the part of Purchaser is necessary to authorize such execution, delivery and performance.

    (d)    This Agreement has been, and Purchaser's Ancillary Documents will be, duly executed and delivered by Purchaser. Except for the need for the Sale Order, each of this Agreement and Purchaser's Ancillary Documents constitutes the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms.

    (e)    Except as set forth in Purchaser's Schedule 5.1(e) and the need for the Sale Order and the FCC Consent, no consent, authorization, order or approval of, or filing or registration with, any Governmental Body or any other Person is required for

Execution Document

the execution and delivery by Purchaser of this Agreement and Purchaser's Ancillary Documents and the consummation by Purchaser of the transactions contemplated hereby and thereby.

(f)     Neither the execution and delivery of this Agreement and Purchaser's Ancillary Documents by Purchaser nor the consummation by Purchaser of the transactions contemplated hereby and thereby will conflict with or result in a breach or violation of any of the terms conditions or provisions of (i) Purchaser's certificate of incorporation or by-laws (ii) any Legal Requirement applicable to Purchaser or (iv) any written or oral contract, indenture, mortgage, note or other instrument to which Purchaser is a party.

(g)     None of Purchaser or its Affiliates has dealt with any Person who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment in connection with the transactions contemplated by this Agreement or introducing the parties to each other.

(h)     Except as set forth in Purchaser's Schedule 5.1(h), there are no Actions pending, or to the Knowledge of Purchaser threatened, against Purchaser or its Affiliates which could reasonably be likely to impede the consummation of the transactions contemplated hereby. To the Knowledge of Purchaser, there are no facts which, if known by a potential claimant (including for the avoidance of doubt any Governmental Body), would give rise to such an Action.

(i)     Purchaser has and will have at Closing cash available which is sufficient to enable it to consummate the Acquisition.

(j)     Purchaser is legally, financially and otherwise qualified to be the licensee of and to acquire, own, operate and control, the Radio Stations under the Communications Laws.

## VI.    CONDUCT PRIOR TO CLOSING

6.1     General. Sellers and Purchaser shall have the rights and obligations with respect to the period between the Effective Date and the Closing Date which are set forth in this ARTICLE VI.

6.2     Sellers' Obligations. The following are Sellers' obligations:

(a)     Sellers acknowledge and agree: (i) that a material inducement to Purchaser's agreement to purchase the Purchased Assets is Purchaser's ability to make full use of the Purchased Assets immediately upon Closing; and (ii) that Purchaser's right of due diligence hereunder includes but extends beyond inspection of the Purchased Assets and encompasses the broad ability of Purchaser to test and validate its business plan for the Newspapers and the Radio Stations with the use of the Purchased Assets with a view that Purchaser will be able to implement its business plan immediately upon Closing. Accordingly, after the Petition Date to the greatest extent reasonably possible, Sellers shall afford to Purchaser and its Representatives unfettered access to: (A) the personnel of Sellers; (B) the IT systems of Sellers; (C) the books, contracts, documents, and other records of Sellers in regard to the Newspapers and Radio Stations; (D) the Real Property; (E) and such other areas as determined by Purchaser. Consistent with this undertaking, Sellers will instruct its personnel and other Representatives to make themselves available and to cooperate fully with Purchaser and its

Representatives. Without limitation of the foregoing, Purchaser and its Representatives shall have the right to conduct environmental, engineering and other testing of the Real Property and the other Purchased Assets, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Real Property.

(b)    Sellers shall use its commercially reasonable efforts to obtain all consents required for completion of the transactions contemplated by this Agreement, including but not limited to, obtaining entry of the Sale Order, and, without limitation, Sellers will make necessary filings with relevant Governmental Bodies to obtain clearance for completion of the transaction contemplated herein (the "**Consents**").

(c)    Sellers shall carry on the operations of the Newspapers and the Radio Stations in the ordinary course, consistent with past practice, and shall use their commercially reasonable efforts to preserve the business relationships and the goodwill of any Person having business relations with the Newspapers and the Radio Stations, and to retain the Newspapers and Radio Stations intact, including the maintenance all of the Purchased Assets in good operating condition and repair, ordinary wear and tear excepted.

(d)    Without the prior written consent of Purchaser and the approval of the Bankruptcy Court (if required), Sellers shall not, and shall not suffer or permit any of their Affiliates to, with respect to any Newspaper or Radio Station:

    (i)    enter into or assume any agreement other than in the ordinary course of business and consistent with past practice;

    (ii)    sell, transfer or otherwise dispose of any material asset or property used in the Newspaper or Radio Station, except for Inventory in the ordinary course of business consistent with past practice and except for cash applied in payment of trade liabilities in the ordinary course of business consistent with past practice or create any Lien on any asset or property;

    (iii)    fail to pay its undisputed accounts payable as they become due in the ordinary course of business;

    (iv)    accelerate the collection of any accounts receivable of the Newspapers or provide incentives for the payment of any such accounts receivable or discounts;  or

    (v)    make changes in advertising rates, subscription prices or adopt any program with respect to prepaid subscriptions, advertising credits or rebates.

(e)    Without the prior written consent of Purchaser, and except for employees expected to assist with the winddown of the bankruptcy estate, Sellers shall not offer any employee of a Newspaper or Radio Station alternate employment or independent contractor an alternate contract, or take any other action which would or could cause such employee or independent contractor to reject an offer of employment or services from Purchaser.

(f)    On or before the Petition Date, Sellers shall make all necessary filings and notifications under WARN.

Execution Document

(g)     Other than as set forth and authorized in the Bid Procedures Order or as otherwise required by their fiduciary duties, Sellers shall not, and shall not authorize or permit any of their Affiliates or any of their respective Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Sellers shall immediately cease and cause to be terminated, and shall cause their Affiliates and all of their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to an Acquisition Proposal. Sellers shall promptly (and in any event within three (3) Business Days after receipt thereof by a Seller or its Representative) advise Purchaser orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could be reasonably be expected to result in an Acquisition Proposal or inquiry and the identity of the Person making the same. Purchaser acknowledges and agrees that the obligations of Sellers and their Affiliates and their respective Representatives are subject to applicable Legal Requirements in connection with the Bankruptcy Case, specifically including any higher or better offers made in connection with Bidding Procedures Order.

(h)     Sellers shall promptly notify Purchaser of:

(i)      any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Sellers hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.2 to be satisfied;

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Body in connection with the transactions contemplated by this Agreement; and

(iv)     any Actions commenced or, to the Knowledge of Sellers, threatened against, relating to or involving or otherwise affecting a Newspaper or Radio Station or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.9, or that relates to the consummation of the transactions contemplated by this Agreement.

Purchaser's receipt of information pursuant to this Section 6.2(h) shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement and shall not be deemed to amend or supplement the Schedules.

(i)      Sellers shall remove the underground storage tank located on the Radio Station

Fee Property in compliance with all Legal Requirements. The removal of the tank is not a condition of Closing; however, if the tank is not removed prior to the Closing Date, this provision survives Closing. Alternatively, in Purchaser's discretion, Purchaser may take a credit at Closing in the amount of $13,278.00.

(j)     D.W.S. will operate the Radio Stations in compliance with the Communications Laws.

6.3     <u>Joint Obligations</u>. Sellers and Purchaser shall each be bound by the following obligations:

(a)     The parties waive compliance with any bulk sales, bulk sales Tax, bulk transfer or similar Legal Requirement that may otherwise be applicable with respect to the transactions contemplated by this Agreement, it being agreed by the parties that any liabilities arising out of such non-compliance shall be treated as Excluded Liabilities.

(b)     Neither party shall intentionally perform any act which, if performed, or omit to perform any act which, if not performed, would prevent, hinder or excuse the performance of this Agreement by a party hereto, or which reasonably could have the effect of rendering any representation or warranty herein to be untrue in any material respect.

(c)     Sellers and Purchaser will diligently and with commercially reasonable efforts pursue the entry of the Bid Procedures Order and the Sale Order authorizing and approving the transfer of the Purchased Assets to Purchaser free and clear of all Liens, Claims and encumbrances, including but not limited to, Successor Liability Claims and the Withdrawal Liabilities. The parties agree that they will promptly take such actions as are reasonably requested by the other to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and taking such other actions that may be required by the Bid Procedures Order.

(d)     Sellers and Purchaser will diligently and with commercially reasonable efforts pursue the FCC Consent.

(e)     Notwithstanding anything to the contrary in this Agreement, Purchaser shall not, directly or indirectly, control, supervise, or direct the operations of any of the Radio Stations prior to the Closing. Consistent with the Communications Laws, control, supervision, and direction of the operations of the Radio Stations prior to the Closing shall remain the responsibility of Sellers as the holder of the FCC Permits.

## VII.   CONDITIONS TO CLOSING

7.1     <u>Conditions to Seller's Obligations</u>. The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment or waiver of all of the following conditions at or prior to the Closing:

(a)     The representations and warranties of Purchaser contained herein (without giving effect to any limitations as to "materiality" or "Material Adverse Effect" set forth therein) shall be true and correct in all material respects at and as of the

21

Closing Date with the same effect as though made at and as of such time (except for representations that are as of a specific date which representations shall be true and correct in all material respects as of such date). Purchaser shall have in all material respects duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by Purchaser at or prior to the Closing. Purchaser shall have delivered to Sellers a certificate, dated as of the Closing Date, signed by a duly authorized officer of Purchaser, to the effect set forth above in this Section 7.1(a).

(b)     Sellers shall have received all of the agreements, certificates, documents and items specified in Section 8.3 hereof.

(c)     No Action shall have been commenced or threatened by any Governmental Body or other Person to restrain, enjoin or hinder, or to seek material damages on account of, consummation of the transactions contemplated hereby.

(d)     Entry of the Final Sale Order by the Bankruptcy Court.

(e)     Receipt of the FCC Consent.

7.2     Conditions to Purchaser's Obligations. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment or waiver of all of the following conditions at or prior to the Closing:

(a)     The representations and warranties of Sellers contained herein (without giving effect to any limitations as to "materiality" or "Material Adverse Effect" set forth therein) shall be true and correct in all material respects at and as of the Closing Date with the same effect as though made at and as of such time (except for representations that are as of a specific date which representations shall be true and correct in all material respects as of such date). Sellers shall have in all material respects duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by them at or prior to the Closing. Each Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date, signed by a duly authorized officer of such Person, to the effect set forth above in this Section 7.2(a).

(b)     Purchaser shall have received all of the agreements, certificates, documents and items specified in Section 8.4 hereof.

(c)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a final order in full force and effect and shall not have been, or subject to being, appealed, reversed, vacated, stayed, or reconsidered, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of Purchaser (the "**Final Sale Order**").

(d)     The Assigned Contracts shall have been assumed by Sellers and assigned to Purchaser pursuant to Sections 365 of the Bankruptcy Code.

(e)     All Consents shall have been obtained and be in full force and effect at the Closing, without cost to Purchaser, and Seller shall have furnished Purchaser with adequate evidence to such effect.

(f)     No Material Adverse Effect shall have occurred.

(g)     No Action shall have been commenced or threatened by any Governmental Body or other Person to restrain, enjoin or hinder, or to seek material damages on account of, consummation of the transactions contemplated hereby.

(h)     Receipt of the FCC Consent.

(i)     All applicable conditions under WARN shall have been satisfied.

## VIII.   CLOSING

8.1     <u>Time and Place of Closing</u>. The transactions contemplated by this Agreement shall be consummated (the "**Closing**") by the electronic exchange of documents with Sellers' documents being transmitted from Sellers' legal counsel and Purchaser's documents being transmitted from Purchaser's legal counsel, at 10:00 a.m. Central Time, on November 4, 2019, or on such other date or at such other time or place as shall be agreed upon by Sellers and Purchaser (the "**Closing Date**"). The Closing shall be deemed to be effective as of 12:01 a.m., Central Time, on the day immediately following the Closing Date.

8.2     <u>Form of Documents</u>. At the Closing, the parties shall deliver the documents and take the actions specified in this <u>ARTICLE VIII</u>. All documents which Sellers shall deliver shall be in form and substance reasonably satisfactory to Purchaser and its counsel, and all documents which Purchaser shall deliver shall be in form and substance reasonably satisfactory to Sellers and their counsel.

8.3     <u>Purchaser's Deliveries</u>. Purchaser shall deliver to Sellers the following:

(a)     The Cash Portion of the Purchase Price (*less* the Deposit which shall be credited and applied toward payment of the Cash Portion of the Purchase Price) after giving effect to prorations and other relevant provisions of this Agreement.

(b)     A certificate duly executed by an officer of Purchaser certifying that attached thereto are accurate and complete copies of (i) Purchaser's certificate of formation certified by the Secretary of State of the State of Illinois, (ii) Purchaser's operating agreement, (iii) an incumbency certificate with respect to the officers of Purchaser executing this Agreement and Purchaser's Ancillary Documents on behalf of Purchaser and (iv) resolutions of the board of managers of Purchaser authorizing the execution, delivery and performance of this Agreement and Purchaser's Ancillary Documents.

(c)     A certificate of good standing of Purchaser, issued not earlier than twenty (20) calendar days prior to the Closing Date by the Secretary of State of the State of Illinois.

(d)     The certificate specified in <u>Section 7.l(a)</u>, dated the Closing Date and signed by a duly authorized officer of Purchaser.

(e)     Countersigned copies of bills of sale (individually, a "**Bill of Sale**"), in substantially the form set forth as <u>Exhibit B</u> and conformed for the Purchased Assets relating to the Newspapers and the Purchased Assets relating to the Radio Stations, duly executed by Purchaser.

(f)     Countersigned copies of assignment and assumption agreements (individually, an "**Assignment and Assumption Agreement**"), in substantially the form set forth as <u>Exhibit C</u> and conformed for the Purchased Assets relating to the Newspapers and the Purchased Assets relating to the Radio Stations, duly

executed by Purchaser.

(g)    Countersigned copies of the Transition Agreements in respect of short-term occupancy of Purchaser in Sellers' properties (the, "**Transition Agreements**"), in substantially the form set forth as <u>Exhibit I-1 and Exhibit I-2</u>, duly executed by Purchaser.

(h)    Countersigned copy of an assignment of the lease relating to the Radio Station Leased Property, in form and substance satisfactory to Purchaser, duly executed by Purchaser.

(i)    Countersigned copy of an assignment of the FCC Permits, in form and substance satisfactory to Purchaser, duly executed by Purchaser.

(j)    Without limitation of the foregoing, all other documents reasonably required by Sellers in connection with the transactions contemplated by this Agreement.

8.4    <u>Sellers' Deliveries</u>. Sellers (as relevant) shall deliver to Purchaser the following (where applicable in recordable form):

(a)    The certificates specified in <u>Section 7.2(a)</u>, dated the Closing Date and signed by duly authorized officers of Sellers.

(b)    Countersigned copies of the Bills of Sale, duly executed by News-Gazette or D.W.S., as the case may be.

(c)    Countersigned copies of the Assignment and Assumption Agreements, duly executed by News-Gazette or D.W.S., as the case may be.

(d)    Certificates of title or origin (or like documents) with respect to vehicles included in the Purchased Assets and other Personal Property for which a certificate of title or origin is required in order for title thereto to be transferred to Purchaser.

(e)    A general warranty deed ("**Deed**") with respect to the Radio Station Fee Property, in substantially the form set forth as <u>Exhibit J</u>, duly executed and acknowledged by D.W.S.

(f)    A FIRPTA Certificate from D.W.S. with respect to the Radio Station Fee Property.

(g)    A certificate, dated the Closing Date and signed by duly authorized officers of Sellers, attaching thereto the updated preliminary Closing Date Statement as of two (2) Business Days prior to the Closing Date (as contemplated in <u>Section 3.2(b)</u>), and certifying that the Closing Date Statement attached to such certificate and the Closing Date Statement attached as <u>Schedule 3.2(b)</u> in each case set forth a good faith estimate of the Adjustment Amount as of the Closing Date.

(h)    The Final Sale Order.

(i)    Evidence of the receipt and effectiveness of the Consents specified in <u>Section 7.2(e)</u>.

(j)    An owner's policy of title insurance (or "marked up" title commitment) for the

Radio Station Fee Property in the amount of the value of the Radio Station Fee Property and a leasehold policy of title insurance (or "marked up" title commitment) for the Radio Station Leased Property in the amount of the value of the Radio Station Leased Property, in each case containing exceptions to coverage which are reasonably acceptable to Purchaser. For the avoidance of doubt the title policy for the Radio Station Fee Property shall exclude the standard survey exception. Purchaser will pay for the recertification of the survey provided by Sellers.

(k)    A landlord estoppel with respect to the Radio Station Leased Property in form and substance satisfactory to Purchaser.

(l)    Countersigned copies of the Transition Agreements, duly executed by Sellers.

(m)    Evidence of the FCC Consent.

(n)    Countersigned copy of an assignment of the lease relating to the Radio Station Leased Property, in form and substance satisfactory to Purchaser, duly executed by D.W.S.

(o)    Countersigned copy of an assignment of the FCC Permits, in form and substance satisfactory to Purchaser, duly executed by D.W.S.

(p)    Without limitation of the foregoing, all other documents reasonably required by Purchaser in connection with the transactions contemplated by this Agreement.

## IX.    POST-CLOSING AGREEMENTS

9.1    <u>Post-Closing Agreements</u>. From and after the Closing, the parties shall have the respective rights and obligations which are set forth in this <u>ARTICLE IX.</u>

9.2    <u>Inspection of Records</u>. Subject to applicable Legal Requirements (including those relating to employment and personnel matters), Sellers and Purchaser and their respective Affiliates shall, for a two (2) year period after the Closing Date, maintain and make available for inspection by the other party or such party's Representatives, at reasonable times and during normal business hours, their books and records (including work papers in the possession of their accountants) which reasonably relate to a Newspaper or Radio Station or the transactions contemplated by this Agreement. The right of inspection includes the right to make reasonable extracts or copies, at the expense of the inspecting party. The Representatives of a party inspecting the records of the other party shall be reasonably satisfactory to the other party.

9.3    <u>Matters Regarding Consents</u>. Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any claim, contract, lease, Permit, or any such arrangement if doing so without the necessary Consent(s) related to such arrangement would constitute a breach thereof or adversely affect the rights of Purchaser or Sellers thereunder. If a Consent is not obtained prior to Closing, Sellers shall at their risk and expense make available to Purchaser the benefits of such underlying arrangement. Nothing contained in this <u>Section 9.3</u> shall limit the liability if any of Sellers pursuant to this Agreement for failing to have disclosed the need for, or failing to have obtained any Consent. For the avoidance of doubt, the party obligated to deliver Consents in connection with the transactions contemplated by this Agreement shall bear the costs of obtaining such Consents.

9.4    <u>Use of Trademarks; References to Seller</u>. From and after Closing, Sellers shall cease to use the names of the Newspapers and the Radio Stations, the URLs, and any name, slogan, logo or

trademark which in any such case is similar to the name of a Newspaper or Radio Station or any of their relevant Trademarks. Sellers will be allowed to use trademarked corporate names in the winddown of its business.

9.5    Employees. With respect to the employees of the Newspapers and the Radio Stations:

   (a)    Sellers shall remain obligated under the ERISA Plans and the Benefit Arrangements and for payments and furnishing of benefits thereunder (if any). Sellers shall be obligated for the payment of the accrued salaries and wages with respect to all periods through the Closing.

   (b)    Purchaser shall not be obligated to offer employment to any employee of Sellers. Purchaser shall have the right to offer employment after the Closing individuals previously employed by a Newspaper or Radio Station on terms and conditions established by Purchaser in its sole discretion.

   (c)    Nothing in this Section 9.5 or elsewhere in this Agreement shall create any third-party beneficiary rights.

9.6    Remittances of Accounts Receivable.

   (a)    In the event a Seller shall receive any instrument of payment of any of the Accounts Receivable with respect to a Newspaper, such Seller shall immediately deliver it to Purchaser, endorsed where necessary, without recourse, in favor of Purchaser.

   (b)    On or about the date which is the sixtieth (60th) day following the Closing, Purchaser shall deliver to D.W.S. instruments of payment of Accounts Receivable with respect to a Radio Station which Purchaser had received during such period, and on or about the date which is six (6) months following the Closing, Purchaser shall deliver to D.W.S. instruments of payment of Accounts Receivable with respect to a Radio Station which had not theretofore been delivered to D.W.S; in all such cases endorsed where necessary, without recourse, in favor of D.W.S. Purchaser will collect Accounts Receivable using standard procedures employed in its normal course of business.

9.7    Taxes, Fees and Charges. Sellers and Purchasers shall pay, respectively, when due all Taxes, fees, recording charges and similar expenses required by the transfer of the Purchased Assets imposed by law upon a Seller or upon Purchaser, or in accordance with custom and practice in Champaign County, Illinois, and each party shall make all necessary filings with respect thereto.

9.8    Disclosure of Confidential Information. Sellers shall refrain, and shall cause their Affiliates to refrain, from disclosing to any Person (other than as required by Applicable Legal Requirements) any confidential information relating to the Newspapers and the Radio Stations, except such information as was publicly available at prior to the Closing Date.

9.9    Covenants Not to Compete and Not to Solicit.

   (a)    As an inducement for Purchaser to enter into this Agreement, each Seller agrees that from and after the Closing and continuing for a period of five (5) years after the Closing Date (the "**Non-Compete Period**") neither such Seller nor any of its Affiliates shall, directly or indirectly, on its own behalf or in combination with any other Person:

      (i)    engage (through ownership, contract or otherwise) in the Restricted Area

in any business activity competitive with a Newspaper or a Radio Station, as the case may be, as conducted on the date hereof or within the twelve (12) months prior to the date hereof; or

(ii) divert, entice or otherwise take away from Purchaser the business or patronage of any customers of a Newspaper or Radio Station.

(b) Sellers acknowledge that the restrictive covenants contemplated by this Section 9.9 are reasonable and necessary for the protection of Purchaser, and if any such territorial, time, scope or other limitation is ruled unreasonable by a court of competent jurisdiction, Purchaser and Sellers agree to reform any such limitation(s) to that which is reasonable and enforceable under the circumstances. The invalidity or unenforceability of any provision of this Section 9.9 shall not invalidate or render unenforceable the remaining provisions hereof. In the event of any breach of Section 9.9(a), the time period of the breached covenant shall be extended for the period of such breach.

9.10 Non-Disparagement. From and after the date of this Agreement, Sellers shall not disparage any Newspaper, Radio Station, Purchaser or any Representative of Purchaser, and Sellers shall cause their Affiliates to refrain from doing so. From and after the date of this Agreement, Purchaser shall not disparage Sellers, and Purchaser shall cause its Affiliates to refrain from doing so.

9.11 Injunctive Relief. The parties acknowledge that any breach of Section 9.8, Section 9.9 or Section 9.10 will cause irreparable injury to the non-breaching party and that actual damages may be difficult to ascertain, or, in any event, may be inadequate. Accordingly, each party agrees that in the event of any such breach, the non-breaching party shall be entitled to injunctive relief in addition to such other remedies that may be available to it.

9.12 Further Assurances. The parties shall execute such further documents, and perform such further acts, as may be reasonably necessary to transfer the Purchased Assets to Purchaser and otherwise to comply with the terms of this Agreement and consummate the transactions contemplated hereby.

## X.    [RESERVED]

## XI.    TERMINATION

11.1 Right to Terminate. This Agreement and the transactions contemplated hereby may be terminated at any time prior to the Closing by prompt notice given in accordance with Section 12.2:

(a) by the mutual written consent of Purchaser and Sellers;

(b) by Purchaser or Sellers if: (i) the Sale Order has not been entered in the Bankruptcy Case on or before the Closing Date; (ii) the Sale Order is entered by the Bankruptcy Court and has not become a Final Sale Order on or before the Closing Date; (iii) the Closing does not occur on or before the Closing Date; or (iv) the Sale Order is amended, supplemented or otherwise modified in any material respect without the prior written consent of Purchaser;

(c) by Purchaser, if a Seller shall have: (i) breached or failed to perform in any material respect any of its covenants or agreements contained in this Agreement, and which breach or failure to perform is incapable of being cured or has not been cured within ten (10) calendar days after the giving of notice thereof by Purchaser to such Seller or such longer period if such breach cannot reasonably

be expected to be cured within such ten (10) calendar day period and such Seller is diligently pursuing such cure, but in no event later than the Closing Date; or (ii) breached in any material respect any of its representations or warranties contained in this Agreement which breach is incapable of being cured or has not been cured within ten (10) calendar days after the giving of notice thereof by Purchaser to such Seller or such longer period if such breach cannot reasonably be expected to be cured within such ten (10) calendar day period and such Seller is diligently pursuing such cure, but in no event later than the Closing Date; or

(d)     by Sellers, if Purchaser shall have: (i) breached or failed to perform in any material respect any of its covenants or agreements contained in this Agreement, and which breach or failure to perform is incapable of being cured or has not been cured within ten (10) calendar days after the giving of notice thereof by Sellers to Purchaser or such longer period if such breach cannot reasonably be expected to be cured within such ten (10) calendar day period and Purchaser is diligently pursuing such cure, but in no event later than the Closing Date; or (ii) breached in any material respect any of its representations or warranties contained in this Agreement which breach is incapable of being cured or has not been cured within ten (10) calendar days after the giving of notice thereof by Sellers to Purchaser or such longer period if such breach cannot reasonably be expected to be cured within such ten (10) calendar day period and Purchaser is diligently pursuing such cure, but in no event later than the Closing Date.

(e)     by Purchaser or Sellers if the Bankruptcy Case is dismissed by the Bankruptcy Court or converted to a Chapter 7 bankruptcy case;

(f)     by Purchaser or Sellers if a Governmental Body shall have issued an order or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Acquisition, which order or other action is final and non-appealable;

(g)     by Purchaser, if the Bid Procedures Order is not entered by the Bankruptcy Court;

(h)     if not previously terminated pursuant to the terms of this Agreement, with no further action by any Party if the Bankruptcy Court enters an order approving, and Sellers close on, a Competing Transaction; or

(i)     by Purchaser, if Purchaser is determined not to have submitted the Successful Bid or be the Successful Bidder (as those terms are defined in the Bid Procedures Order and related Bid Procedures) at the Auction (as that term is defined in the Bid Procedures Order and related Bid Procedures), it being expressly acknowledged and agreed by Sellers that Purchaser, notwithstanding any bid procedure to the contrary, will not be required or compelled to be a back-up bidder, reserve bidder, or any other term used to describe a Person submitting the second highest and best bid at the Auction.

11.2     Effect of Termination. In the event of termination of this Agreement as provided above, this Agreement shall immediately terminate and have no further force and effect, except (a) that the covenants and agreements set forth in Sections 3.4(b) or (c), this Section 11.2, and Article XII (Miscellaneous) shall survive such termination indefinitely, (b) as set forth in Section 11.3 and (c) that nothing in Section 11.1 or this Section 11.2 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement. Notwithstanding anything to the contrary herein, the sole and exclusive remedy hereunder of Sellers for a Purchaser breach is the right of Sellers to terminate this Agreement and retain the Deposit as liquidated damages (and not as a

penalty). Sellers and Purchaser have made this provision for liquidated damages because it would be difficult to calculate, on the date hereof, the amount of actual damages for such breach, and Sellers and Purchaser agree that the amount of the Deposit represents reasonable compensation to Sellers for such breach.

11.3    Payment of Expense Reimbursement Amount. Section 11.2 notwithstanding, if this Agreement is validly terminated pursuant to Section 11.l(h), then Purchaser will be entitled to payment of, and Sellers shall be jointly and severally obligated to pay or cause to be paid to Purchaser, the Expense Reimbursement Amount. The Expense Reimbursement Amount shall be paid to Purchaser promptly (and in any event within five (5) Business Days) after the termination giving rise to such payment. In the event any portion of the Expense Reimbursement Amount is contested as to reasonableness, all amounts not so contested will be paid forthwith. Sellers' obligation to pay the Expense Reimbursement Amount pursuant to this Agreement shall survive the termination of this Agreement and shall constitute an administrative expense of Sellers.

## XII.    MISCELLANEOUS

12.1    Publicity. All press releases concerning this transaction shall be issued only by mutual agreement of Purchaser and Sellers.

12.2    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient and on the next Business Day, if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.2).

If to a Seller:

News-Gazette, Inc.
15 E. Main Street
Champaign, IL 61820
Attention: John L. Reed, President
Email: jreed@newsgazetteinc.com

with copies (which shall not constitute notice hereunder) to:

Traci E. Nally, Esquire
15 E. Main Street

Champaign, IL 61820
Email: tnally@newsgazetteinc.com

Nicholas M. Miller, Esq.
Neal Gerber & Eisenberg LLP
2 N. LaSalle St.
Suite 1700
Chicago, IL 60602
Fax No. 312-980-0789
Email: nmiller@nge.com


If to Purchaser:

Champaign Multimedia Group, LLC
805 South Logan Street
West Frankfort, IL 62896
Attention:  Larry J. Perrotto, Chairman
Fax No.:  618.932.3848
Email: ljperrotto@cmgms.com

with a copy (which shall not constitute notice hereunder) to:

Frederick C. Leech, Esquire
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place
Pittsburgh, PA  15219
Fax No.:  412.227.5551
Email: fleech@leechtishman.com

or to such other respective address as may be designated by notice given in accordance with the provisions of this <u>Section 12.2</u>.

     12.3   <u>Expenses.</u> Except as otherwise provided herein, each party shall bear all fees and expenses incurred by such party in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

     12.4   <u>Entire Agreement</u>. This Agreement and the documents to be executed and delivered by the parties pursuant to the provisions hereof (when executed and delivered) constitute the entire agreement and supersede all prior agreements, understandings and representations, both written and oral, between the parties with respect to the subject matter hereof.

     12.5   <u>Interpretation</u>. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. Any references in this Agreement to gender shall include all genders including the neuter and words imparting the singular number only shall include the plural and vice versa. This Agreement shall be construed without regard to any presumption or rule requiring construction of interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedule and Exhibits referred

to herein shall be construed with and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

12.6    <u>Survival; Non-Waiver</u>. All representations and warranties shall survive the Closing regardless of any investigation or lack of investigation by any of the parties hereto. Subject to the provisions of this Agreement, including <u>Section 11.2</u>, in the event of a breach of any representation, warranty or covenant, the party to whom such representation, warranty or covenant has been made shall have all rights and remedies for such breach available to it, regardless of any disclosure to, or investigation made by or on behalf of such party. The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement or to exercise any right or privilege in this Agreement conferred, or the waiver by such party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, right or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized Representative of the waiving party.

12.7    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

12.8    <u>Severability</u>. The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

12.9    <u>Applicable Law; Waiver of Jury Trial.</u>

(a)    This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Illinois to the extent that bankruptcy law does not supersede state law.

(b)    Each party irrevocably submits to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware, for the purposes of any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby.

(c)    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.9(C).

12.10    <u>Binding Effect; Benefit</u>. This Agreement shall inure to the benefit of and is binding upon the parties hereto and their successors and permitted assigns. Nothing in this Agreement, express or

implied, is intended to confer on any Person other than the parties hereto and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

12.11   Assignability. This Agreement shall not be assignable by either party without the prior written consent of the other party except that Purchaser may assign all or any part of its rights and delegate all or any part of its duties under this Agreement to an Affiliate and may assign its rights under this Agreement to its lenders for collateral security purposes.

12.12   Amendments. This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the parties hereto.

12.13   Headings. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

**[Signature page follows]**

Execution Document

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement on the date first above written.

SELLERS:

News-Gazette, Inc.

By: _____
Name: ____JOHN L REED____
Title: ____PRESIDENT____

D.W.S., Inc.

By: _____
Name: ____JOHN L REED____
Title: ____PRESIDENT____

PURCHASER:

Champaign Multimedia Group, LLC

By: _____
Name: Larry J. Perrotto
Title:  Chairman

# EXHIBIT A

## CERTAIN DEFINITIONS

"**Accounting Principles**" means GAAP applied in the manner set forth in Exhibit D.

"**Accounts Receivable**" "has the meaning specified in Section 1.2(i).

"**Acquisition**" has the meaning specified in the Recitals.

"**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than Purchaser or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of a Newspaper, Radio Station or the Purchased Assets.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Adjustment Amount**" has the meaning specified in Section 3.2(a).

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.

"**Agreement**" has the meaning specified in the introductory paragraph to this Agreement.

"**Assigned Contracts**" has the meaning specified in Section 2.3(d).

"**Assignment and Assumption Agreement**" has the meaning specified in Section 8.3(f).

"**Assumed Liabilities**" has the meaning specified in Section 2.1.

"**Balance Sheet Date**" has the meaning specified in Section 4.2(b).

"**Bankruptcy Case**" has the meaning specified in the Recitals.

"**Bankruptcy Code**" has the meaning specified in the Recitals.

"**Bankruptcy Court**" has the meaning specified in the Recitals.

"**Bid Procedures Order**" means a final non-appealable order of the Bankruptcy Court that has not been nor subject to being, appealed, reversed, vacated or reconsidered: (a) approving, among other things, the Expense Reimbursement Amount in full; (b) ordering that any allowed claim of Purchaser on account of the Expense Reimbursement Amount shall be entitled to administrative expense priority; and (c) ordering that any prevailing bid with respect to a Competing Transaction must (i) be in cash, (ii) contain no contingencies other than those set forth in this Agreement, (iii) provide for the purchase of the Purchased Assets substantially similar to the terms and conditions contained in this Agreement, (iv) be in the Overbid amount; and (v) provide that incremental bidding after the Overbid shall be in an amount not less than One Hundred Thousand Dollars ($100,000) on account of all of the Purchased Assets.

"**Bill of Sale**" has the meaning specified in Section 8.3(e).

34

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to be closed under the laws of the State of Illinois.

"**Cash Portion of the Purchase Price**" has the meaning specified in Section 3.1.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sec. 9601 et seq.

"**Claims**" has the meaning given to it under Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning specified in Section 8.1.

"**Closing Date**" has the meaning specified in Section 8.1.

"**Closing Date Statement**" means the financial statement of the Newspapers as of the Closing Date, setting forth the categories and amounts of the items constituting Current Assets and Current Liabilities, in each case prepared in accordance with the Accounting Principles.

"**Closing Net Working Capital**" means the amount by which (a) the Current Assets determined in accordance with the Accounting Principles, exceeds (b) the Current Liabilities determined in accordance with the Accounting Principles. For illustrative purposes only, Exhibit D sets forth a sample calculation of Closing Net Working Capital.

"**Code**" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

"**Communications Laws**" means, collectively, the Communications Act of 1934, as amended, and the rules, regulations and published policies promulgated thereunder by the FCC.

"**Competing Transaction**" has the meaning specified in Section 2.4.

"**Consents**" has the meaning specified in Section 6.2(b).

"**Containers**" means above-ground and underground storage tanks, vessels and related equipment and containers.

"**Contracts**" has the meaning specified in Section 4.7(a).

"**Cure Amounts**" has the meaning specified in Section 2.3(d).

"**Current Assets**" means Accounts Receivables of the Newspapers (the same being ninety-five percent (95%) of the recorded value of such Accounts Receivable as of the Closing Date), Inventory (only to the extent usable), and Prepaids.

"**Current Liabilities**" means the prepaid subscriptions of the Newspapers.

"**Deed**" has the meaning specified in Section 8.4(e).

"**Deposit**" has the meaning specified in Section 3.4(a).

"**D.W.S.**" has the meaning specified in the introductory paragraph to this Agreement.

"**Effective Date**" has the meaning specified in the introductory paragraph to this Agreement.

"**Employee Accruals**" has the meaning specified in Section 2.2.

"**Environmental Laws**" means all federal state and local statute ordinances, rules regulations and policies, all court orders and decrees and arbitration awards and the common law, which pertain to Environmental matters or contamination of any type whatsoever.

"**Environmental Permits**" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws.

"**Environmental Representations**" means the representations and warranties set forth in Section 4.10.

"**Escrow Agent**" has the meaning specified in Section 3.4(a).

"**Excluded Assets**" has the meaning specified in Section 1.3.

"**Excluded Liabilities**" has the meaning specified in Section 2.2.

"**Expense Reimbursement Amount**" means an aggregate amount equal to the reasonable and documented out-of-pocket costs, fees, and expenses of Purchaser (including legal, accounting, and other consulting fees and expenses, other than any success or similar fees payable to any financial advisors, consultants or other Persons) incurred in connection with the transactions contemplated to occur pursuant to this Agreement, including, without limitation, (a) the negotiation and execution of this Agreement, and (b) carrying out its obligations under this Agreement prior to the Closing; *provided, however*, that such Expense Reimbursement Amount shall not exceed an amount equal to $225,000.

"**FCC**" means the Federal Communications Commission.

"**FCC Consent**" has the meaning specified in Section 2.5(b).

"**FCC Permits**" has the meaning specified in Section 2.5(a).

"**Final Sale Order**" has the meaning specified in Section 7.2(c).

"**Financial Statements**" has the meaning specified in Section 4.2(b).

"**FIRPTA Certificate**" means a certificate, duly executed by D.W.S., pursuant to Treasury Regulations Section 1.1445-2(b) to the effect that D.W.S. is not a foreign person within the meaning of Section 1445 of the Code.

"**Fundamental Representations**" means the representations and warranties set forth in Sections 4.1 (relating to corporate authority and other matters concerning Sellers), Section 4.2(e) and (g) (relating to title matters), Section 4.15(b) (relating to brokers and finders concerning Sellers), Sections 5.1(a)-(f) (relating to the matters concerning Purchaser provided therein) and Section 5.1(g) (relating to brokers and finders concerning Purchaser).

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Body**" means any:

(a)     nation, state, county, city, town, village, district, or other jurisdiction of any nature

36

(b)    federal, state, local, municipal, foreign, or other government;

(c)    governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)    multi-national organization or body; or

(e)    body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"**Hazardous Materials**" means pollutants, contaminants, pesticides radioactive substances, solid wastes or hazardous or extremely hazardous, special, dangerous or toxic wastes, substances, chemicals or materials regulated under any Environmental Law.

"**Intellectual Property**" has the meaning specified in <u>Section 4.11(a)</u>.

"**Inventory**" has the meaning specified in <u>Section 1.2(a)</u>.

"**Key Man Life Insurance Policy**" means all life insurance policies issued by Northwestern Mutual under which Sellers are the beneficiaries.

"**Knowledge**" means with respect to Sellers, the actual or constructive knowledge of a fact or matter after due inquiry of John L. Reed and Traci E. Nally, and with respect to Purchaser, the actual or constructive knowledge of a fact or matter after due inquiry of Larry J. Perrotto, Mark J. Perrotto or Joan R. Williams.

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, court order, consent, decree, regulation, license, permit, statute, or treaty.

"**Liens**" means any lien, security interest, mortgage defect, exception, restriction, pledge, option, lease or sublease occupancy agreement oil gas or mineral lease, grant or reservation, claim, easement right of way, reservation encroachment or encumbrance.

"**Mastheads**" has the meaning specified in <u>Section 1.2(f)</u>.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of a Newspaper or Radio Station, (b) the value of the Purchased Assets, or (c) the ability of Sellers to consummate the transactions contemplated hereby on a timely basis; *provided*, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) any changes, conditions or effects in the United States economies or securities or financial markets in general; (ii) change conditions or effects that generally affect the industries in which the Newspapers or Radio Stations operate; or (iii) conditions caused by acts of terrorism or war (whether or not declared).

"**News-Gazette**" has the meaning specified in the introductory paragraph to this Agreement.

"**Newspapers**" has the meaning specified in the Recitals.

"**Non-Compete Period**" has the meaning specified in <u>Section 9.9(a)</u>.

"**Overbid**" means the first higher and better bid above the Purchase Price *plus* the Expense Reimbursement Amount *plus* $100,000 on account of all of the Purchased Assets.

"**Permits**" has the meaning specified in Section 4.7(b).

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party, or government (whether national, federal state, provincial, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"**Personal Property**" has the meaning specified in Section 1.2(b).

"**Petition Date**" has the meaning specified in the Recitals.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Prepaids**" has the meaning specified in Section 1.2(j).

"**Purchase Price**" has the meaning specified in Section 3.1.

"**Purchased Assets**" has the meaning specified in Section 1.2.

"**Purchaser**" has the meaning specified in the introductory paragraph to this Agreement.

"**Purchasers' Ancillary Documents**" has the meaning specified in Section 5.1(b).

"**Purchaser's Schedules**" has the meaning specified in Section 5.1.

"**Radio Station Fee Property**" means the parcel(s) of real property owned in fee by D.W.S. and described on Exhibit E, and all buildings, structures and improvements located thereon, together with all oil, gas and other minerals thereunder and all easements and appurtenances thereto and all licenses, approvals, permits, privileges, variances, and other rights or agreements affecting the ownership or use of such property.

"**Radio Station Leased Property**" means the leasehold estate of real property owned by D.W.S. and described on Exhibit F, and all buildings, structures and improvements located thereon, together with all oil, gas and other minerals thereunder and all easements and appurtenances thereto and all licenses, approvals, permits, privileges, variances, and other rights or agreements affecting the ownership or use of such property.

"**Real Property**" means the Radio Station Fee Property and the Radio Station Leased Property.

"**Release**" means any spill, discharge, leak, emission, escape, injection, dumping, or other release or threatened release of any Hazardous Materials into the environment, whether or not notification or reporting to any Governmental Body was or is required, including any Release which is subject to CERCLA.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Area**" means the geographic area that is 100 miles from the county seats of each of Champaign, Piatt and Ford Counties, Illinois.

"**Returns**" means all or any portion of any returns, declarations, reports, statements and other documents required to be filed in respect of Taxes, and "Return" means any one of the foregoing Returns.

"**Sale Hearing**" means the Bankruptcy Court hearing to consider the sale of the Purchased Assets.

"**Sale Motion**" means a motion seeking entry of the Sale Order.

"**Sale Order**" means a final, non-appealable order of the Bankruptcy Court under Section 363 of the Bankruptcy Code, that has not been, nor is subject to being, appealed, reversed, vacated or reconsidered, in form and substance satisfactory to Purchaser in its sole discretion, which, among other things and without limitation: (a) approves (i) this Agreement, the Transaction Documents and the execution, delivery, and performance by Seller of this Agreement, the other Transaction Documents and the other instruments and agreements contemplated hereby and thereby; (ii) the sale of the Purchased Assets to Purchaser free and clear of all Liens, Claims, interests and encumbrances, including without limitation the Withdrawal Liabilities or any successor liability Claims; (iii) the assumption of the Assumed Liabilities by Purchaser on the terms set forth herein and in the other Transaction Documents; (iv) the assumption by Sellers and assignment to Purchaser of the Assigned Contracts on the terms set forth herein and in the other Transaction Documents; and (v) approval of the amount of the Cure Amounts on a final basis; (b) determines that Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code; (c) provides that the Closing will occur in accordance with the terms and conditions hereof; and (d) provides for the waiver by the Parties of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk sales Tax, bulk transfer or similar Legal Requirements of any jurisdiction that may be applicable.

"**Schedules**" has the meaning set forth in ARTICLE IV.

"**Seller**" has the meaning specified in the introductory paragraph to this Agreement.

"**Seller's Ancillary Documents**" has the meaning specified in Section 4.1(c).

"**Successor Liability Claims**" has the meaning specified in Section 1.1.

"**Target Net Working Capital**" means negative $130,000.

"**Tax**" or "**Taxes**" shall mean all taxes and other charges imposed by any federal, state, local or foreign governmental authority including taxes or other governmental charges imposed on gross or net income, minimum tax, gross receipts, profits or gains property tangible or intangible assets transfers (including stock transfers), sales, use, ad valorem, franchise capital net worth license withholding on amounts paid to any person payroll, employment, excise, severance, stamp documentary, occupation, premium, environmental or windfall profits, customs, duty or other tax governmental fee or other like assessment or charge of any kind whatsoever together with any interest or any penalty, additions to tax or additional amount.

"**Tax Representations**" means the representations and warranties set forth in Section 4.12.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"**Trademarks**" has the meaning specified in Section 4.11(a).

"**Transition Agreements**" has the meaning specified in Section 8.3(g).

"**Transaction Documents**" means this Agreement, the Bills of Sale, the Assignment and Assumption Agreements, the Deed, the Transition Agreements, an assignment document in respect of the Radio Station Permits, and any other documents required to be delivered hereunder.

"**WARN**" means the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. §2101 et seq., and all corresponding state laws, including those of the State of Illinois.

"**Withdrawal Liabilities**" has the meaning specified in Section 2.2.

# EXHIBIT B

## FORM OF BILL OF SALE

This BILL OF SALE AND ASSIGNMENT (this "**Agreement**"), dated as of _____, 2019 (the "**Effective Date**"), is entered into by and between News-Gazette, Inc., an Illinois corporation, D.W.S., Inc., a Delaware corporation ("**Seller**"), and Champaign Multimedia Group, LLC, an Illinois limited liability company ("**Purchaser**").

WHEREAS, Sellers and Purchaser filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

WHEREAS, Sellers and Purchaser have entered into that certain Asset Purchase Agreement, dated [●], 2019 (the "**Purchase Agreement**"), pursuant to which Seller has agreed to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser has agreed to accept from Seller, for consideration and upon and terms and conditions set forth in the Purchase Agreement, the Purchased Assets.

WHEREAS, on _____, 2019, the Bankruptcy Court entered an order approving the sale of the Purchased Assets to the Purchaser and authorizing the Sellers to consummate the transactions contemplated by the Purchase Agreement.

WHEREAS, unless otherwise defined in this Agreement, capitalized terms used in this Agreement have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, in consideration of the parties' obligations under the Purchase Agreement and other good and valuation consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1. <u>Sale and Purchase</u>.  Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, and Purchaser hereby purchases and accepts from Seller, all of Seller's right, title, and interest in and to all of the Purchased Assets.

2. <u>Purchase Agreement; Representations and Warranties of Seller</u>.  The provisions of this Agreement are subject, in all respects, to the terms and conditions of the Purchase Agreement. All of Sellers' representations and warranties with respect to the Purchased Assets, which are contained in the Purchase Agreement, are incorporated herein by this reference and are hereby confirmed and ratified as true, complete and accurate as of the date hereof. In addition, nothing contained in this Agreement shall be deemed to supersede, restrict, impair, or diminish in any respect any of the obligations, agreements, covenants, representations, or warranties of Sellers or Purchaser contained in the Purchase Agreement. To the extent any term or provision herein conflicts or is inconsistent with any term or provision of the Purchase Agreement, the Purchase Agreement shall control in all respects.

3. <u>Confirmatory Instruments</u>.  The parties to this Agreement will execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may reasonably be necessary or requested by another party in order to consummate, evidence or implement expeditiously the transactions contemplated by this Agreement.

4. <u>Governing Law</u>.  This Agreement shall be construed in accordance with the laws of the State of Illinois, without regard to its conflicts of law principles.

5. <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, Seller and Purchaser each has caused this Bill of Sale and Assignment to be executed by its duly authorized representative as of the Effective Date.

**SELLER**:

**News-Gazette, Inc. & D.W.S., Inc.**

By:_____
Name:_____
Title:_____

**PURCHASER**:

**Champaign Multimedia Group, LLC**

By:_____
Name: Larry J. Perrotto
Title:   Chairman

# EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Assignment and Assumption**"), dated as of \_\_\_\_\_, 2019 (the "**Effective Date**"), is entered into by and between News-Gazette, Inc., an Illinois corporation, and D.W.S., Inc., a Delaware corporation (each an "**Assignor**"), and Champaign Multimedia Group, LLC, an Illinois limited liability company ("**Assignee**").

WHEREAS, Assignors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

WHEREAS, Assignors and Assignee have entered into that certain Asset Purchase Agreement, dated [●], 2019 (the "**Purchase Agreement**"), pursuant to which Assignors have agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to accept from Assignors, for consideration and upon and terms and conditions set forth in the Purchase Agreement, the Purchased Assets.

WHEREAS, on _____, 2019, the Bankruptcy Court entered an order approving the sale of the Purchased Assets to the Assignee and authorizing the Assignors to consummate the transactions contemplated by the Purchase Agreement.

WHEREAS, unless otherwise defined in this Agreement, capitalized terms used in this Agreement have the meanings ascribed to them in the Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Assignor and Assignee hereby agree as follows:

1. Assignment.

   a) Assignor hereby transfers, conveys and assigns unto Assignee all of Assignor's rights, title and interest in and to the Assigned Contracts and Intellectual Property of the Newspapers, together with such other rights, causes of action and remedies as may arise by operation of law, in law or equity, in connection with any of such Assigned Contracts and Intellectual Property of the Newspapers.

   b) Assignor hereby irrevocably constitutes and appoints Assignee as Assignor's true and lawful attorney, with full power of substitution, in Assignor's name and stead, but on behalf and for the benefit of Assignee, to demand and receive any and all of the Assigned Contracts and Intellectual Property of the Newspapers, and to give receipts and releases for and in respect of the same, and any part thereof, and from time to time to prosecute in its name, or otherwise, which Assignee may deem proper for the collection or reduction to possession of any of the business properties or assets comprising the Assigned Contracts and Intellectual Property of the Newspapers or for the collection or enforcement of any claim or right of any kind hereby assigned, granted, transferred, or set over.

2. Assumption. Assignee hereby accepts all of Assignor's rights, title and interest in and to the Assigned Contracts and Intellectual Property of the Newspapers. Assignee hereby assumes all obligations and liabilities related to or arising in connection with

44

the Assigned Contracts and Intellectual Property of the Newspapers arising on or after the date hereof; *provided,* that Assignee will not be responsible for the performance of any Assumed Contract in connection with any period prior to the date hereof, and in no event shall Assignee be responsible for a breach of contract, breach of warranty or other liability of Assignor under the Assigned Contracts.

3. <u>No Amendment</u>. This Assignment and Assumption shall not alter, modify or amend the terms of the Purchase Agreement or the Assigned Contracts and Intellectual Property of the Newspapers in any respect.

4. <u>Binding Effect</u>. This Assignment and Assumption shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5. <u>Further Assurances</u>. The Assignor agrees to take all such further action and execute such further documents as may be reasonably necessary or desirable to perfect the Assignee's interest in the Assigned Contracts and Intellectual Property of the Newspapers.

6. <u>Conflict</u>. In the event of a conflict between the terms and provisions of this Assignment and Assumption and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

7. <u>Governing Law</u>. This Assignment and Assumption shall be governed by and interpreted in accordance with the laws of the State of Illinois (without giving effect to principles of conflicts of law).

8. <u>Counterparts</u>. This Assignment and Assumption may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one document.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee each has caused this Assignment and Assumption Agreement to be executed by its duly authorized representative as of the Effective Date.

**ASSIGNOR**:

**News-Gazette, Inc. & D.W.S., Inc.**

By:_____

Name:_____

Title:_____

**ASSIGNEE**:

**Champaign Multimedia Group, LLC**

By:_____

Name:  Larry J. Perrotto

Title:   Chairman

Execution Document

# EXHIBIT D

## SAMPLE CALCULATION OF CLOSING NET WORKING CAPITAL
## AND
## ADJUSTMENT AMOUNT[1]

Current Assets

| | |
|---|---|
| Accounts Receivable | $831,478.54[2] |
| Allowance for Doubtful Accounts | ($41,573.93)[3] |
| Inventory | $ 18,406.73 |
| Prepaids | $   7,805.04 |
| Total Current Assets | $816,116.38 |

Current Liabilities

| | |
|---|---|
| Prepaid Subscriptions | $1,054,720.03 |
| Total Current Liabilities | $1,054,720.03 |

| | |
|---|---|
| **Closing Net Working Capital** | **($238,603.65)** |
| **Target Net Working Capital** | **($130,000.00)** |
| **Adjustment Amount** | **($108,603.60)** |

---

[1] Financial information is as of July 31, 2019. Updated financial information will be furnished pursuant to Section 3.2(b).

[2] Represents Accounts Receivable of the Newspapers.

[3] Represents five percent (5%) of outstanding Accounts Receivable of the Newspapers.

## EXHIBIT E

## RADIO STATION FEE PROPERTY

Commencing at the Southeast corner of Section 24, in Township 19 North, Range 8, East of the Third Principal Meridian and running thence West on said Section line, 2426.15 feet; thence Northerly 25 feet to the North line of the Section line public road and the Westerly Right-of-Way line of State Highway 25 (Federal Route 45) for a True Point of Beginning; thence North 6 degrees 31 minutes 00 seconds East along the said Westerly Highway Right-of-Way line, 704.55 feet; thence West 754.96 feet; thence South 700 feet; thence East 675 feet to the True Point of Beginning, situated in the Southwest ¼ of the Southeast ¼ and in the Southeast ¼ of the Southwest ¼ of Section 24, except that part conveyed to the City of Champaign by Deed recorded in Book 1872, at page 600, as Document Number 92R35433, in Champaign County, Illinois, and also except that part taken by the State of Illinois as Parcel Number 5207017 in Champaign County, Illinois, Condemnation Case 88-L-500.

The above described tract of land is more particularly described as follows:

A tract of land being part of the South 1/2 of Section 24, Township 19 North, Range 8 East of the Third Principal Meridian, Champaign County, Illinois, with bearings on Illinois State Plane Coordinate System, East Zone NAD 83:

Beginning at the Southeast corner of Lot 14 in the "Final Plat of Lot 14, Par 3 Development", as recorded in Plat Book "CC" on page 209 in the Champaign County Recorder's Office, said corner also being on the Westerly Right-of-Way line of State Highway 25 (Federal Route 45), proceed South 07° 36' 06" West along said Westerly Right-of-Way line, 17.90 feet to the Northeasterly corner of a tract of land taken by the State of Illinois as Parcel Number 5207017 in Champaign County Condemnation Case 88-L-S00; thence South 83° 34' 35" West along a Westerly line of said condemnation tract, 10.02 feet; thence South 16° 36' 18" West along a Westerly line of said condemnation tract, 200.46 feet; thence South 07° 02' 48" West along a Westerly line of said condemnation tract, 416.11 feet; thence South 70° 29' 31" West along a Southerly line of said condemnation tract, 108.77 feet; thence South 88° 36' 17" West along a Northerly line of said condemnation tract 150.67 feet to the Northeast corner of a tract of land as shown on a Right-of-Way Plat recorded in Book 1872, at page 602 in said Champaign County Recorder's Office; thence South 89° 14' 11" West along a Northerly line of said tract shown on a Right-of-Way Plat, 252.04 feet; thence South 88° 31' 13" West along a Northerly line of said tract shown on a Right-of-Way Plat, 133.61 feet to the Southeast corner of Fox Drive in the "Final Plat of Lot 3, Par 3 Development" recorded as Document Number 1998Rl4068 in said Champaign County Recorder's Office; thence North 00° 22' 41" East along an East Right-of-Way line of said Fox Drive, along the East line of an "Urbana Champaign Sanitary District" Pump Station tract of land and along an East line of said Fox drive, 675.29 feet to a corner of said Fox Drive, said corner also being on the South line of Lot 12 in the "Final Plat of Lot 12 and 13, Par 3 Development" recorded as Document Number 1997Rl1610 in said Champaign County Recorder's Office; thence South 89° 29' OS" East along said South line of Lot 12, along the South line of Lot 13 in said "Final Plat of Lot 12 and 13, Par 3 Development" and along the South line of said Lot 14 to the Point of Beginning.

## EXHIBIT F

## RADIO STATION LEASED PROPERTY

Port of the Northwest Quarter of Section 4, Township 16 North, Range 9 East of the Third Principal Meridian. more particularly described as follows:

Commencing at a railroad spike marking the West Quarter Corner of Section 4, Township 16 North. Range 9 East" of the Third Principal Meridian as recorded in monument record book number 1. page 350 at the Douglas County Recorder's Office; thence azimuth 359 degrees 31 minutes 54 seconds (azimuths referenced to the Illinois State Plane Coordinate System East Zone Datum of 1983 (1997 adjustment)) 2304.58 feet along the approximate centerline of TR 1450E; thence azimuth 89 degrees 31 minutes 54 seconds, 199.34 feet to on Iron pin with cap #3140 marking the Point of Beginning: thence azimuth 359 degrees 31 minutes 50 seconds, 100.00 feet to on Iron pin with cap #3140; thence azimuth 89 degrees 31 minutes 50 seconds 100.00 feet to an Iron pin with cop #3140; thence azimuth 179 degrees 31 minutes 50 seconds 100.00 feet to an Iron pin with cap #3140; thence azimuth 269 degrees 31 minutes 50 seconds 100.00 feet to the Point of Beginning. containing 0.230 acres, more or less.

AND. a 25 foot wide access easement from the west line of the above described 0.230 acre Tract of Land to Township. Road 1450 East, the centerline more particularly described as follows: Commencing at the Southwest Corner of the above described 0.230 acre Tract of Land; thence azimuth 359 degrees 31 minutes 50 seconds along the west line of said Tract of Land 50.00 feet to the Point of Beginning of said centerline: thence azimuth 269 degrees 31 minutes 50 seconds along sold centerline 199.34 feet to a point on the approximate centerline of said TR 1450E. said point being the point of' terminus of said centerline.

AND, three 50 foot wide guy wire easements for the construction and use of guy wire support structures, said three 50 foot wide guy wire easements being 120 degrees apart from -the center of the FM tower point and located as shown on this plat of survey.

**EXHIBIT G**
**SALE ORDER**

[INSERT CAPTION]

**ORDER (I) AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF DEBTORS [INSERT DEBTORS NAMES]TO [INSERT PURCHASER'S NAME] FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion, (the "**Sale Motion**")[4] of [INSERT DEBTORS NAME(S)] ("**Debtor**"), filed by the above-captioned debtors in the above-captioned cases on _____. _____, 2019, Dk. No. ____, for, among other things, entry of an order (this "**Sale Order**") (A) authorizing and approving Debtors' entry into that certain Asset Purchase Agreement with [INSERT NAME OF PURCHASER] ("**Purchaser**"), together with all related documents, agreements, exhibits, schedules, and addenda thereto (as may be amended, the "**Purchaser APA**"), a copy of which is attached hereto as Attachment 1, approving the sale (the "**Sale**") of substantially all of Debtors' assets as set forth in the Purchaser APA (collectively, the "**Purchaser Purchased Assets**"), free and clear of all liens, claims, encumbrances and interests of any kind to Purchaser; (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**")[5] of Debtors that may be assumed and assigned to

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Purchaser APA (as defined below) or, if not defined in the Purchaser APA, the Sale Motion.

[5] Unless context otherwise requires, the term "**Assigned Contracts**" as used herein shall refer only to those agreements listed in the bankruptcy notice specified in Section 2.3(d) of the Purchaser APA, as such listing may be amended through Closing.

Purchaser in connection with the Sale, subject to and at the time of the Closing of the Sale; and (C) granting related relief; and the Court having previously entered the Order: (I) Approving Bid Procedures for Sale of Substantially All of the Debtors' Assets; (II) Approving Designation of Stalking Horse Bidder for Sale of Debtors' Assets; (III) Approving Certain Bid Protections for the Stalking Horse; (IV) Authorizing and Scheduling an Auction; (V) Scheduling Hearing for Approval of the Sale of Assets Free and Clear of Liens and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; (VI) Approving Certain Deadlines and the Form, Manner, and Sufficiency of Notice; and (VII) Granting Other Related Relief, Docket No. _____, on _____, ____ 2019, (the "**Bid Procedures Order**"); and the Court having conducted the Sale Hearing on _____, _____, 2019; and all parties in interest having been heard or having had the opportunity to be heard regarding the Purchaser APA; and it appearing that adequate and proper notice of the Sale Motion has been given and that no other or further notice need be given; and the Sale Hearing having been held to consider the relief requested in the Sale Motion; and upon the record of the Sale Hearing and all of the proceedings held before the Court; and the Court having found and determined that the relief sought in the Sale Motion is in the best interests of Debtors, their estate, their creditors and all other parties in interest; and that the legal and factual bases set forth in the Sale Motion, and the testimony adduced at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

Execution Document

**IT IS HEREBY FOUND AND DETERMINED THAT:**[6]

      A.     <u>Jurisdiction</u>. The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §157(b)(1).

      B.     <u>Venue</u>. Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §1408. This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

      C.     <u>Statutory Predicates</u>. The statutory and legal predicates for the relief requested in the Sale Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Bankruptcy Local Rule _____.

      D.     <u>Notice</u>. Notice of the proposed Sale of the Purchaser Purchased Assets and the Sale Hearing has been provided to the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the District of Delaware; (ii) [counsel for the Committee]; (iii) the District Director of Internal Revenue; (iv) [NEED TO ADD UNIONS AND THEIR COUNSEL, INCLUDING PENSION FUNDS]; (v) all entities known, as of the date of this Sale Motion, to have a lien, or to have asserted a lien, on the Purchaser Purchased Assets; (vi) all Debtors' creditors; and (vii) all other parties requesting notice in the Debtors' chapter 11 cases (collectively, the "**Notice Parties**"). [Notice of the Sale was uploaded to the Court's Electronic Access to Sales Information system and was published in the _____.]

      E.     <u>Notice Sufficient</u>. Based upon the affidavits of service previously filed with the Court and the evidence presented at the Sale Hearing, adequate and sufficient notice of the Sale

---

[6] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

Motion, Sale Hearing, the Sale, and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assigned Contracts to Purchaser, has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9006 and Local Bankruptcy Rule _____. A reasonable opportunity to object and be heard with respect to the Sale, the Sale Motion and the relief requested therein, the assumption and assignment of the Assigned Contracts to Purchaser and the amounts necessary under section 365(b) of the Bankruptcy Code to cure defaults thereunder, as such amounts have been transmitted pursuant to a written notice delivered to the applicable counterparty, has been afforded to all interested persons and entities, including the Notice Parties.

F.    Purchaser Purchased Assets Property of the Estates.    The Purchaser Purchased Assets sought to be transferred and/or assigned by Debtors to Purchaser pursuant to the Purchaser APA are property of Debtors' estate and title thereto is vested in Debtors' estate.

G.    Sufficiency of Marketing.    Based upon the record of the Debtors' chapter 11 cases, all creditors and other parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Purchaser Purchased Assets. Under the circumstances, Debtors and its professionals have adequately and appropriately marketed the Purchaser Purchased Assets.

H.    Corporate Authority.    Subject to the entry of this Sale Order, Debtors: (i) have full power and authority to execute the Purchaser APA and all other documents contemplated thereby; (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Purchaser APA (collectively, the "**Transactions**"), and (iii) have taken all company action necessary to authorize and approve the Purchaser APA and the sale of

the Purchaser Purchased Assets, and any actions required to be performed by Debtors in order to consummate the Transactions contemplated in the Purchaser APA. No consents or approvals, other than those expressly provided for in the Purchaser APA or this Sale Order, are required for Debtors to consummate the Sale.

  I.  <u>Arm's-Length Sale and Purchaser's Good Faith</u>.  The Purchaser APA was negotiated and is undertaken by Debtors and Purchaser at arm's-length without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Neither Purchaser nor any of its affiliates, members, officers, directors, or shareholders is an "insider" of either of the Debtors as that term is defined by section 101(31) of the Bankruptcy Code. Purchaser (i) recognized that Debtors were free to deal with any other party interested in acquiring the Purchaser Purchased Assets and (ii) willingly subjected the Purchaser Purchased Assets to a competitive bidding process in accordance with the Bid Procedures Order. All payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed, Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common identity of directors or controlling stockholders exists between Purchaser and the Debtors. As a result of the foregoing, Purchaser is a "good faith buyer" within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with the Sale specifically and this chapter 11 case generally.

  J.  <u>Sale Highest or Best Offer</u>.  The offer submitted by Purchaser for the Purchaser Purchased Assets as reflected in the Purchaser APA, including the form and total

consideration to be realized thereunder, is the highest and best offer for the Purchaser Purchased Assets. No other person or entity or group of persons or entities has offered to purchase the Purchaser Purchased Assets for an amount that would provide greater value to Debtors than Purchaser, including through the reduction of claims against Debtors' estate. The Court's approval of the Sale Motion with respect to the Purchaser Purchased Assets, the Purchaser APA, and the Transactions, maximize Debtors' recovery for the Purchaser Purchased Assets, and, thus, is in the best interests of Debtors and their estates, creditors and all other parties in interest.

K.     No Fraudulent Transfer.  The purchase price set forth in the Purchaser APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable law, and may not be avoided under section 363(n) or any other section of the Bankruptcy Code. The Purchaser APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither Debtors nor Purchaser has entered into the Purchaser APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

L.     No Liability under Section 363(n).  Neither Debtors nor Purchaser engaged in any conduct that would cause or permit the Purchaser APA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

M.     Transfer of Purchaser Purchased Assets Free and Clear.  Debtors are the sole and lawful owners of the Purchaser Purchased Assets. Pursuant to section 363(f) of the

Bankruptcy Code, and except as otherwise provided in the Purchaser APA and this Sale Order, and except for Assumed Liabilities, the transfer of each of the Purchaser Purchased Assets to Purchaser will be, as of the Closing, a legal, valid, and effective transfer of the Purchaser Purchased Assets, which transfer vests or will vest Purchaser with all right, title, and interest of Debtors to the Purchaser Purchased Assets free and clear of, among other things, (i) all Liens, claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, royalties, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or permission, subleases, leases, conditional sale arrangements, (ii) all claims as defined in section 101(5) of the Bankruptcy Code including all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of Debtors or any other person prior to Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of Debtors' chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, including but not limited to the Withdrawal Liabilities, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or unmatured, material on non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of Debtors' chapter 11 case, and whether imposed by agreement, understanding, law, equity, successor liability or otherwise (clauses (i), (ii), and (iii), together, the "**Interests**").

      N.    <u>Free and Clear Findings Required by Purchaser</u>. Purchaser would not have entered into the Purchaser APA and would not consummate the transactions contemplated thereby if the Sale was not free and clear of any and all Interests (other than Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code, or if Purchaser would, or in the future could, be liable for any of such Interests. Effective upon the Closing, Purchaser shall not be responsible for any Interests (other than Assumed Liabilities), including in respect of the following: (i) labor or employment agreements; (ii) all mortgages, deeds of trust, and security interests; (iii) any intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (iv) any welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of Debtors, any affiliate of Debtors, or any member of Debtors' "control group;" (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation

laws or any other similar state laws, (k) the Worker Adjustment and Retraining Notification Act, 29 U.S.C §§ 2101 et. seq., or (l) any other state or federal benefits or claims relating to any employment with Debtors or any of its predecessors; (vi) Interests arising under any environmental, health and safety laws with respect to any assets owned or operated by Debtors or any corporate predecessor at any time prior to the Closing and any liabilities of Debtors other than the Assumed Liabilities; (vii) any bulk sales Tax, bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) any and all Interests arising out of violations, or other non-compliance with any law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or any other authority or requirement enforced by, or under the supervision of the Occupational Safety and Health Administration; and (x) any theories of successor liability or causes of action related thereto. A sale of the Purchaser Purchased Assets other than one free and clear of all Interests would yield substantially less value for Debtors' estate, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Purchaser APA maximizes Debtors' recovery on the Purchaser Purchased Assets, and, thus, is in the best interests of Debtors and its estate, creditors and all other parties in interest.

O.    Satisfaction of Section 363(f) Standards. Debtors may sell the Purchaser Purchased Assets free and clear of all Interests because, with respect to each creditor or other person or entity asserting an Interest, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale or the Sale Motion with respect to the

Purchaser Purchased Assets are deemed to have consented to the Sale Motion with respect to the Purchaser Purchased Assets and to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

P.      No Successor Liability.  Purchaser is not holding itself out to the public as a continuation of Debtors and is not an "insider" or "affiliate" of Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders exists now or has ever existed between Purchaser and Debtors. The conveyance of the Purchaser Purchased Assets does not amount to a consolidation, merger or *de facto* merger of Purchaser and Debtors and/or Debtors' estates, there is no substantial continuity between Purchaser and Debtors, there is no continuity of enterprise between Debtors and Purchaser, Purchaser is not a joint employer or co-employer with Debtors or a mere continuation of Debtors or their estates, and Purchaser does not constitute a successor to Debtors or their estates. Purchaser's acquisition of the Purchaser Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. Purchaser's operations shall not be deemed a continuation of Debtors' business as a result of the acquisition of the Purchaser Purchased Assets. Purchaser would not have acquired the Purchaser Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

Q.      Assignment Objection Procedures.  Prior to the filing of the Sale Motion, Purchaser had not indicated to Debtors which Assigned Contracts, if any, Purchaser would request to be assumed and assigned as part of the Purchaser APA. Therefore, to conserve the parties' and the Court's resources, as well as to avoid unnecessary cost and potential confusion to counterparties to the Assigned Contracts (each a "**Counterparty**" and collectively,

the "**Counterparties**"), Debtors have requested that the Court approve the Assignment Objection Procedures (as defined below). Such Assignment Objection Procedures are fair, reasonable, and protect the interests of all Counterparties to Assigned Contracts.

  R. <u>Assigned Contracts</u>. Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Debtors or Purchaser as a result of the assumption and/or assignment of the Assigned Contracts. All Counterparties of the Assigned Contracts who did not or do not timely file an objection to the assumption and assignment of the Assigned Contract(s) to which they are counterparty are deemed to consent to the assumption by Debtors of their respective Assigned Contract(s) and the assignment thereof to Purchaser, and Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof. Upon the assignment and sale to Purchaser, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to Purchaser, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer. Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of Debtors, their

estates and creditors, and other parties in interest. The Assigned Contracts being assigned to Purchaser are an integral part of the Sale and, accordingly, their assumption and assignment are reasonable and an enhancement to the value of Debtors' estate.

S.    Cure/Adequate Assurance.   Pursuant to the Purchaser APA, the Cure Amounts will be paid by Purchaser as "**Assumed Liabilities**" under the Purchaser APA. Subject to any objections submitted in accordance with the Assignment Objection Procedures (as defined below), Purchaser has demonstrated adequate assurance of future performance of all Assigned Contracts within the meaning of section 365 of the Bankruptcy Code, including its promise to perform Debtors' obligations under the Assigned Contracts for periods on and after the Closing. The Cure Amounts are deemed the amounts necessary to "cure" all "defaults" (each, within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts. Except as provided by the Assignment Objection Procedures (as defined below), any objections to the Cure Amounts, to the extent not otherwise resolved, are hereby overruled. To the extent that any Counterparty failed to timely object to its Cure Amount or the assignment of its Assigned Contract or to raise any other alleged default or breach of contract, such Counterparty is deemed to have consented to such Cure Amount and to the assignment of its respective Assigned Contract(s) to Purchaser and to have waived any other defaults or breaches. The payment of the Cure Amounts as provided in the Purchaser APA is appropriate and is deemed to fully satisfy Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by Debtors, and the assignment by Debtors to Purchaser, of each of the Assigned Contracts.

T.    <u>Purchaser Purchased Assets Assignable</u>.    Any contractual provision or

applicable non-bankruptcy law that purports to prohibit, restrict, or condition assignment of any

of the Purchaser Purchased Assets has been satisfied or is otherwise unenforceable under section

365 of the Bankruptcy Code.

U.    <u>Sale as Exercise of Business Judgment</u>.    Entry into and consummation of

the Purchaser APA constitute the exercise by Debtors of sound business judgment, and such acts

are in the best interests of Debtors, their estates and creditors, and all parties in interest. The Court

finds that Debtors have articulated good and sufficient business reasons justifying the Sale.

Additionally: (i) the Purchaser APA constitutes the highest and best offer for the Purchaser

Purchased Assets; (ii) the Purchaser APA and the closing thereon presents the best opportunity to

realize the maximum value of the Purchaser Purchased Assets and avoid a decline and devaluation

of the Purchaser Purchased Assets; (iii) there is risk of deterioration of the value of the Purchaser

Purchased Assets if the Sale is not consummated promptly; and (iv) the Purchaser APA and the

closing thereon will provide a greater recovery for Debtors' creditors than would be provided by

any other presently available alternative. Debtors have demonstrated compelling circumstances

and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside

of, a plan of reorganization.

V.    <u>Compelling Reasons for an Immediate Sale</u>.    Good and sufficient reasons

for approval of the Purchaser APA have been articulated by Debtors. Debtors have demonstrated

compelling circumstances for the Sale outside: (a) the ordinary course of business, pursuant to

section 363(b) of the Bankruptcy Code; and (b) a plan of reorganization, in that, among other

things, the immediate consummation of the Sale is necessary and appropriate to preserve and to

maximize the value of Debtors' estates. To maximize the value of the Purchaser Purchased Assets and to preserve the viability of the business to which the Purchaser Purchased Assets relate, it is essential that the Sale occur promptly. Time is of the essence in consummating the Sale.

W.    <u>Expense Reimbursement Fee</u>.   Champaign Multimedia Group, LLC ("**CMG, LLC**") has expended considerable time, money, and energy pursuing the purchase of the Purchaser Purchased Assets and has engaged in extended arm's-length and good faith negotiations with Debtors. Recognizing this expenditure of time, energy, and resources, Debtors have agreed to pay the Expense Reimbursement Fee to CMG, LLC in the event Debtors consummate the Sale of the Purchaser Purchased Assets with a party other CMG, LLC or its Affiliate(s). The Expense Reimbursement Fee is (a) an actual and necessary cost and expense of preserving Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred upon Debtors' estates by AMG; and (c) reasonable and appropriate in light of the size and nature of the proposed sale, the commitments that have been made, and the efforts that have been expended by CMG, LLC. Debtors have demonstrated a sound business justification for authorizing the payment of the Expense Reimbursement Fee to CMG, LLC, which Expense Reimbursement Fee has been negotiated at arm's-length and is reasonable under the circumstances.

X.    <u>No Sub Rosa Plan</u>.  The Sale does not constitute a *sub rosa* chapter 11 plan. The Sale neither impermissibly restructures the rights of Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization for Debtors.

Y.    <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. §158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court

expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Sale Motion Granted</u>.  The relief requested in the Sale Motion with respect to the Purchaser Purchased Assets is GRANTED and the Sale is approved, all as set forth in this Sale Order.

2.    <u>Objections Overruled</u>.  All objections with regard to the relief sought in the Sale Motion with respect to the Assets that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

3.    <u>Approval</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchaser APA, the assumption and assignment of the Assigned Contracts to Purchaser as of the Closing Date, and the sale of the Purchaser Purchased Assets and the other transactions contemplated thereby are hereby approved in all respects. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Debtors, Purchaser, and each of their respective officers, agents, professionals and other representatives are authorized and directed to perform their obligations under, and comply with the terms of, the Purchaser APA, and to consummate the Sale, including the sale, transfer and assignment of all of Debtors' right, title and interest in the Purchaser Purchased Assets to Purchaser free and clear of any and all Interests (other than the Assumed Liabilities) in accordance with the terms of the Purchaser APA and this Sale Order.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Debtors, Purchaser and each of their respective officers, directors, employees, professionals, agents and other representatives are each hereby

authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the sale of the Purchaser Purchased Assets to Purchaser and the Closing of the Sale, pursuant to the Purchaser APA and this Sale Order, (b) assume and assign the Assigned Contracts to be assumed and assigned to Purchaser as of the Closing Date, and (c) perform, consummate, implement and close fully the Purchaser APA together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchaser APA. Debtors and Purchaser are hereby authorized and directed to perform their respective covenants and undertakings as provided in the Purchaser APA prior to or after the Closing of the Sale without further order of the Court. Purchaser and Debtors shall have no obligation to close the Sale except as is contemplated and provided for in the Purchaser APA.

4.     <u>Transfer Free and Clear</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the Closing, neither Purchaser or any of its Affiliates nor any of their respective successors and assigns shall have any liability for any Interest, except for Assumed Liabilities, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether as a successor, vicariously or otherwise, of any kind, nature or character whatsoever, including for any Interests arising under, without limitation:  (i) any labor or employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (iv) any welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any affiliate of Debtors, or any member of Debtors' "control group", including but not limited to the Withdrawal Liabilities; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability

related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) the Worker Adjustment and Retraining Notification Act, 29 U.S.C §§ 2101 et. seq., or (l) any other state or federal benefits or claims relating to any employment with Debtors or any of its predecessors; (vi) Interests arising under any environmental, health and safety laws with respect to any assets owned or operated by Debtors or any corporate predecessor at any time prior to the Closing Date and any liabilities of Debtors other than the Assumed Liabilities; (vii) any bulk sales Tax, bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (ix) any and all Interests arising out of violations, or other non-compliance with any law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or any other authority or requirement enforced by, or under the supervision of the Occupational Safety and Health Administration; and (x) any theories of successor liability or causes of action related thereto. All Interests, to the extent not paid in full at Closing, shall attach to the proceeds of the sale of the Purchaser Purchased Assets, in the order of priority, with the same validity, force and effect which they now have as against the Purchaser Purchased Assets, subject to any rights, claims and defenses that Debtors and other parties in interest may possess with respect thereto.

5.     <u>Surrender of Possession</u>.  Any and all Purchaser Purchased Assets in the possession or control of any person or entity, including any vendor, supplier or employee of Debtors, shall be transferred to Purchaser free and clear of all Interests, except for Assumed Liabilities, and shall be delivered to Purchaser and deemed delivered at the time of Closing (or such other time as provided in the Purchaser APA).

6.     <u>Valid Transfer</u>.  Effective upon the Closing, the transfer to Purchaser of Debtors' rights, title and interests in the Purchaser Purchased Assets pursuant to the Purchaser APA shall be, and hereby is deemed to be, a legal, valid and effective transfer of Debtors' right, title and interest in the Purchaser Purchased Assets, and vests with or will vest in Purchaser all right, title and interest of Debtors in the Purchaser Purchased Assets, free and clear of all Interests (other than Assumed Liabilities).

7.     <u>Injunction</u>.  Except as expressly provided in the Purchaser APA or this Sale Order, effective upon the Closing all Persons and Entities (as those terms are defined under Section 101 of the Bankruptcy Code), including, but not limited to, all debt security holders, equity security holders, holders of any preferential purchase rights or similar rights, including, but not limited to tag along rights, drag along rights and co-sale rights, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons holding Interests (other than Assumed Liabilities) against or in Debtors or Debtors' interests in the Purchaser Purchased Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of Debtors' chapter 11 case, whether imposed by agreement, understanding, law, equity, successor liability or otherwise), shall be and

hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against Purchaser, or its affiliates, agents, advisors, representatives, officers, successors and assigns, the Purchaser Purchased Assets, or the interests of Debtors or Purchaser in such Purchaser Purchased Assets, including, without limitation, taking any of the following actions with respect to an Interest (other than, with respect to Purchaser only, the Assumed Liabilities): (a) commencing or continuing in any manner any action or other proceeding against such parties or the Purchaser Purchased Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against such parties or the Purchaser Purchased Assets; (c) creating, perfecting or enforcing any liens, claims, encumbrances or other interests against such parties or the Purchaser Purchased Assets; (d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due Purchaser or its affiliates, agents, advisors, representatives, officers, successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.  All persons are hereby enjoined from taking any action that would interfere with or adversely affect Debtors' ability to transfer the Purchaser Purchased Assets in accordance with the terms of the Purchaser APA and this Sale Order.  Following the Closing, no holder of an Interest (including as such term is used in section 363(f)) against Debtors shall interfere with Purchaser's title to or use and enjoyment of the Purchaser Purchased Assets.

8.    Good Faith Buyer.  The Purchaser APA has been entered into by Purchaser in good faith and Purchaser is a good faith buyer of the Purchaser Purchased Assets as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal

of the authorization of the Sale provided herein shall neither affect the validity of the Sale nor the transfer of the Purchaser Purchased Assets to Purchaser, free and clear of Interests, unless such authorization is duly stayed before the Closing pending such appeal. Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

9.    <u>No Bulk Sales/Bulk Sales Tax</u>.  No bulk sales law or any similar law or bulk sales Tax of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchaser APA, the Sale Motion and this Sale Order.

10.    <u>Fair and Equivalent Value</u>.  The consideration provided by Purchaser for the Purchaser Purchased Assets under the Purchaser APA shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

11.    <u>Transfer of Marketable Title</u>.  Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of Debtors' rights, title and interests in the Purchaser Purchased Assets and/or a bill of sale transferring good and marketable title in such Purchaser Purchased Assets to Purchaser at the Closing pursuant to the terms of the Purchaser APA, free and clear of all Interests (other than Assumed Liabilities).

12.    <u>No Successor Liability</u>.  The consummation of the Sale does not amount to a consolidation, merger or *de facto* merger of Purchaser and Debtors and/or its estate, there is no substantial continuity between Purchaser and Debtors, there is no continuity of enterprise between

Debtors and Purchaser, Purchaser is not a mere continuation of Debtors or its estate, and Purchaser does not constitute a successor to Debtors or its estate. Notwithstanding any state and/or federal law or any other law (whether in equity, common law or statutory law), upon the Closing, Purchaser's acquisition of the Purchaser Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of the Closing. Purchaser's operations shall not be deemed a continuation of Debtors' business as a result of the acquisition of the Purchaser Purchased Assets. The transfer of the Purchaser Purchased Assets to Purchaser, except as otherwise set forth in the Purchaser APA, does not, and will not, subject Purchaser to any liability whatsoever, with respect to operation of the Debtors' business prior to the Closing.

13.    _Assignment Objection Procedures._    The following "Assignment Objection Procedures" are hereby approved:

a.    On or before the Closing Date, Debtors shall file a notice (the "**Purchaser Cure Notice**") with the Court identifying the name of each Assigned Contract and the proposed cure amount associated with such Assigned Contract, and shall serve such notice on the Counterparty to each Assigned Contract.

b.    Each Counterparty to an Assigned Contract shall have 10 days from the date the Purchaser Cure Notice is served (the "**Objection Deadline**") to object to the proposed cure amount, or to the assumption and assignment of the Assigned Contract to Purchaser on any ground (including non-monetary defaults, adequate assurances of future performance, etc.).

c.    Debtors, at the direction of Purchaser, and without any Court order, may amend the Purchaser Cure Notice at any time prior to the Closing Date to add or remove Assigned Contracts. If an Assigned Contract is added to the Purchaser Cure Notice by such amendment(s), the Objection Deadline for the Counterparty to such newly added Assigned Contract(s) shall be extended to a date that is 10 days after the date the amended Purchaser Cure Notice is served.

d.    If a Counterparty does not file an objection on or before the Objection Deadline, it waives any right to object to the assumption of its Assigned Contract by Debtors and the assignment of its Assigned Contract to Purchaser, and such Assigned Contract shall be deemed assumed and assigned as of the Closing Date.

e.    If a Counterparty files a timely objection and such objection is not otherwise resolved by the parties, the Court will resolve such objection at a hearing on a date designated by the Court.  To the extent an objection is not resolved prior to the Closing, Purchaser may, without further approval of the Court or notice to any party, elect to (i) not have Debtors assume and assign the Assigned Contract to it or (ii) have Debtors postpone the assumption of such Assigned Contract until the resolution of such objection; *provided that* Debtors, Purchaser, and the relevant Counterparty shall have authority to compromise, settle, or otherwise resolve any objection without further order of the Court, with any such agreed upon Cure Amount being paid to the Counterparty as a condition subsequent to such assumption and assignment.

f.    Any timely filed objection by a Counterparty to an Assigned Contract in accordance with that certain Notice to Counterparties to Executory Contracts and Unexpired Leases that May Be Assumed and Assigned, Docket No. _____ (the "**Original Cure Notice**"), shall be deemed fully preserved and shall be considered a timely filed objection by such counterparty to the assumption and assignment of its Assigned Contract pursuant to the Purchaser APA.

g.    If a Counterparty's objection is resolved after the Closing Date and the relevant contract is to be assumed and assigned pursuant to such resolution, then such Counterparty's Assigned Contract will be deemed assumed and assigned as of the Closing Date.

h.    Upon assignment of any Assigned Contract, such Assigned Contract and any Counterparty to such Assigned Contract shall be subject to the terms of this Sale Order.

i.    Debtors' assumption of any Assigned Contract is subject to the consummation of the Purchaser Sale.

14.    <u>Authorization to Assign</u>.  Pursuant to section 365(f) of the Bankruptcy Code, and notwithstanding any provision of any contract governing the Purchaser Purchased Assets or any Assigned Contract to be assumed and assigned to Purchaser or applicable non–bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchaser Purchased Assets or the

Assigned Contracts, Debtors are authorized to (a) assign, sell and transfer the Purchaser Purchased Assets to Purchaser and (b) assume and assign the Assigned Contracts to Purchaser, which assignments shall take place on and be effective as of the Closing or as otherwise provided by a separate order of this Court. Notwithstanding the foregoing, as of the date of entry of this Sale Order, if a Counterparty timely filed an objection in accordance with the Assignment Objection Procedures and such objection remains unresolved, or if such Counterparty's Objection Deadline has not yet passed, the assignment of such Counterparty's Assigned Contract shall be conditioned upon the resolution of such objection in accordance with the Assignment Objection Procedures.

   a.  There shall be no accelerations, assignment fees, increases, or any other fees charged to Purchaser or Debtors as a result of the assumption and assignment of the Purchaser Purchased Assets and the Assigned Contracts.

   b.  Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts to be assumed and assigned to Purchaser as of Closing. Notwithstanding the foregoing, unless required by Purchaser under the Purchaser APA, Debtors shall not be required by the Court to assume and assign any Assigned Contracts, and, if no such assumption and assignment occurs, no Cure Amounts shall be due and no adequate assurance of future performance shall be required.

   c.  Debtors are authorized to execute and deliver to Purchaser such agreements, documents and other instruments as may facilitate or document the sale, assignment, transfer, conveyance and delivery of the Assigned Contracts to Purchaser. Debtors shall file a final notice listing all Assigned Contracts as soon as practicable following the closing of the Sale.

15.    <u>Assigned Contracts</u>. As of the Closing, subject to the provisions of this Sale Order, Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assigned Contracts to be assumed and assigned to Purchaser first arising and attributable to the time period occurring on or after the Closing Date and shall have all rights thereunder. Each Counterparty to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against Debtors or Purchaser, or the property of either of them, any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of transactions contemplated by the Purchaser APA, including the Sale and the assumption and assignment of the Assigned Contracts. Any party that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to object to the assumption and assignment of such Assigned Contract in accordance with the Assignment Objection Procedures.

a.    Upon Closing, (i) all defaults (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through the payment of the Cure Amounts, (ii) no other amounts will be owed by Debtors, its estate or Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assigned Contracts and (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against Debtors, its estate, Purchaser, or the Purchaser Purchased Assets, that any additional amounts are due or that any defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing,

whether declared or undeclared, or known or unknown. Purchaser's promise pursuant to the terms of the Purchaser APA to pay the Cure Amounts and to perform Debtors' obligations under the Assigned Contracts for the period on or after the Closing shall constitute adequate assurance of its future performance under the Assigned Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code.

b.      Upon assumption of the Assigned Contracts, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to Purchaser notwithstanding any provision in such Assigned Contracts or other restrictions prohibiting assignment or transfer. The assumption and assignment of the Assigned Contracts as authorized under this Sale Order will take effect as of the Closing. Furthermore, other than Assigned Contracts, no other executory contract or unexpired lease shall be deemed assumed by Debtors and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code. The failure of Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of Debtors' or Purchaser's rights to enforce every term and condition of such Assigned Contract.

c.      All Counterparties to the Assigned Contracts to be assumed and assigned to Purchaser as of the Closing shall cooperate and expeditiously execute and deliver, upon the reasonable request of Purchaser, and shall not charge Debtors or Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

16.    <u>Release of Interests</u>.  Effective upon the Closing, this Sale Order:  (a) is and shall be effective as a determination that all Interests (other than Assumed Liabilities) of any kind or nature whatsoever existing as to the Purchaser Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; (b) is and shall be binding upon and shall govern the acts of all Persons and Entities (as those terms are defined in Section 101 of the Bankruptcy Code), including but not limited to, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchaser Purchased Assets conveyed to Purchaser, and all recorded Interests (other than Assumed Liabilities) against the Purchaser Purchased Assets shall be deemed stricken from such Persons' and/or Entities' records, official and/or otherwise.

17.    <u>Approval to Release Interests</u>.  If any person or entity that has filed financing statements, mortgages, mechanic's liens or other documents or agreements evidencing Interests in, Liens on, or claims against the Purchaser Purchased Assets shall not have delivered to Debtors before the Closing, in proper form for filing and executed by the appropriate parties, the appropriate documentation with respect to the release of such Interests, Debtors and Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchaser Purchased Assets. Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which,

once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests against the Purchaser Purchased Assets other than the Assumed Liabilities. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

18.     _Allocation of Purchaser Purchased Assets_.    Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Purchaser Purchased Assets, including the Assigned Contracts, among its affiliates, designees, assigns, and/or successors, in a manner as it in its sole discretion deems appropriate, and to assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Purchaser Purchased Assets, including the Assigned Contracts, to its affiliates, designees, assignees and/or successors with all of the rights and protections accorded to Purchaser under this Sale Order and the Purchaser APA with respect thereto. Debtors shall cooperate with and take all actions reasonably requested by Purchaser to effectuate any of the foregoing.

19.     _Expense Reimbursement Fee_.    The Expense Reimbursement Fee is approved, which shall not exceed $_____, and shall be payable by Debtors to CMG, LLC at closing on the sale of the Purchaser Purchased Assets only in the event that Debtors consummate the Sale of the Purchaser Purchased Assets with a party other CMG, LLC or its Affiliate(s). For the avoidance of doubt, Purchaser shall have no liability for the Expense Reimbursement Fee.

20.     _Governmental Authorization to Effectuate Sale and Assignments_.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the transactions contemplated by the Purchaser APA. No governmental unit may

revoke or suspend any lawful right, license, trademark or other permission relating to the use of

the Purchaser Purchased Assets sold, transferred or conveyed to Purchaser on account of the filing

or pendency of this chapter 11 case or the consummation of the Transactions. For the avoidance

of doubt, the sale of the Purchaser Purchased Assets authorized herein shall be of full force and

effect, regardless of whether Debtors or any of its affiliates lack good standing in any jurisdiction

in which such entity is formed or is authorized to transact business.

21.    <u>Authorization of Purchaser to Operate</u>. To the greatest extent available under

applicable law and to the extent provided for under the Purchaser APA, Purchaser shall be

authorized, as of the Closing, to operate under any license, permit, registration, and governmental

authorization or approval of Debtors with respect to the Purchaser Purchased Assets, and, to the

greatest extent available under applicable law and to the extent provided for under the Purchaser

APA, all such licenses, permits, registrations, and governmental authorizations and approvals are

deemed to have been transferred to Purchaser as of the Closing.

22.    <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>. To the extent this Sale

Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the

Debtors' chapter 11 cases, the terms of this Sale Order shall govern. To the extent there is any

inconsistency between the terms of this Sale Order and the terms of the Purchaser APA (including

all ancillary documents executed in connection therewith), the terms of this Sale Order shall

govern.

23.    <u>Binding Effect of Sale Order; Subsequent Orders</u>. This Sale Order and the

Purchaser APA shall be binding in all respects upon Debtors and all successors and assigns of the

Debtors, their estates, all creditors of, and holders of equity interests in, Debtors, any holders of

Liens, claims or other Interests in, against or on all or any portion of the Purchaser Purchased Assets (whether known or unknown), Purchaser and all successors and assigns of Purchaser, all successors and assigns to the Purchaser Purchased Assets and any trustee, examiner, "responsible person" or other fiduciary appointed in this chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code. The Purchaser APA shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to Purchaser hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest. This Sale Order shall not be modified by any chapter 11 plan(s) confirmed in these chapter 11 cases or any subsequent order(s) of this Court.

24. <u>Failure to Specify Provisions</u>. The failure specifically to include or make reference to any particular provisions of the Purchaser APA or any related ancillary document in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchaser APA and all related ancillary documents are authorized and approved in their entirety.

25. <u>Retention of Jurisdiction</u>. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Sale Order, including, without limitation, the authority to: (i) interpret, implement and enforce the terms and provisions of this Sale Order (including the exculpation, release and injunctive provisions in this Sale Order) and the terms of the Purchaser APA, all amendments thereto and any waivers and consents thereunder; (ii) protect Purchaser, or the Purchaser Purchased Assets, from and against any Interests (other than Assumed

Liabilities); (iii) compel delivery of all Purchaser Purchased Assets to Purchaser; (iv) compel

Debtors and Purchaser to perform all of their respective obligations under the Purchaser APA; and

(v) resolve any disputes arising under or related to the Purchaser APA or the Sale.

26.    <u>Automatic Stay</u>.  Purchaser shall not be required to seek or obtain relief from the

automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the

Purchaser APA or any other Sale-related document. The automatic stay imposed by section 362

of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of

this Sale Order.

27.    <u>No Material Modifications</u>.   The Purchaser APA and any related agreements,

documents or other instruments may be modified, amended, or supplemented through a written

document signed by the parties thereto in accordance with the terms thereof without further order

of the Court; *provided, however*, that any such modification, amendment or supplement is neither

material nor materially changes the economic substance of the transactions contemplated hereby.

28.    <u>Immediate Effect</u>.  This Sale Order constitutes a final order within the meaning of

28 U.S.C. §158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the

Court expressly finds there is no reason for delay in the implementation of this Sale Order and,

accordingly:  (i) the terms of this Sale Order shall be immediately effective and enforceable upon

its entry and the fourteen (14) day stay provided in Bankruptcy Rule 6004(h) and Bankruptcy

Rule 6006(d) is hereby expressly waived and shall not apply; (ii) Debtors are not subject to any

stay in the implementation, enforcement or realization of the relief granted in this Sale Order; and

(iii) Debtors may, in their discretion and without further delay, take any action and perform any

act authorized under this Sale Order.

29.    <u>Provisions Non-Severable</u>.  The provisions of this Sale Order are nonseverable and mutually dependent.

30.    <u>Satisfaction of Conditions Precedent</u>.  Neither Purchaser nor Debtors shall have an obligation to close the Transactions until all conditions precedent in the Purchaser APA to each of their respective obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Purchaser APA.

_____          _____
Date                                     United States Bankruptcy Judge

Execution Document

# EXHIBIT H
# BIDDING PROCEDURES ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWS-GAZETTE, INC., *et al.*,[7] | Case No. 19-_____ (__) |
| Debtors. | Jointly Administered |

## ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL, OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING FORM AND MANNER OF THE SALE, CURE AND OTHER NOTICES; AND (D) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE

Upon the motion ("Motion")[8] of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company") pursuant to sections 105, 363, 364, 365 and 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), for (I) an order (the "Bidding Procedures Order") (A) approving the Debtors' proposed auction (the "Auction") and the bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "Bidding Procedures") to be employed in connection with the proposed sale (the "Sale") of all, or substantially all, of the Debtors' assets (the "Assets"); (B) approving certain potential bid protections in connection therewith; (C) establishing

---

[7]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: The News-Gazette, Inc. (0894) and D.W.S., Inc. (____). The Debtors' headquarters are located at 15 Main Street, Champaign, Illinois 61820.

[8]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

procedures for the assumption and assignment of executory contracts and unexpired leases; (D) approving the form and manner of notice of the Sale, the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "Cure Notice") and the other notices set forth herein; and (E) scheduling the Auction and a hearing before the court (the "Sale Hearing") to consider approval of the Sale (collectively, (I) (A) through (E) above, the "Bidding Procedures Relief"); and (II) an order (the "Sale Order") authorizing (A) the Sale of the Assets to the bidder(s) with the highest or otherwise best bid(s) (the "Successful Bidder") free and clear of all claims, liens, interests and encumbrances as provided therein; and (B) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidders; and (III) certain related relief; and the Court having considered that portion of the Motion seeking the Bidding Procedures Relief, and the arguments of counsel made and the evidence adduced, at the hearing held on that portion of the Motion (the "Bidding Procedures Hearing"); and due and sufficient notice of the Bidding Procedures Hearing and the relief sought therein having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the Bidding Procedures Relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT:**[9]

A.      This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion

---

[9]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365, 503 and Bankruptcy Rules 2002, 6004, 6006 and 9014.

B.     The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

C.     The Debtors have articulated good and sufficient business reasons for the Court to (i) approve the Bidding Procedures, the Assumption and Assignment Procedures, the form and manner of the Sale Notice, the Cure Notice and the other notices of the Motion, the Auction and the Sale Hearing as set forth herein, (ii) set the date for the Auction, the Sale Hearing, and the other dates set forth herein and (iii) grant the relief requested in the Motion as provided herein.

D.     Due, sufficient and adequate notice of the Bidding Procedures Hearing and the relief granted in this Order has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required. The Debtors' notice of the Motion and the relief requested in the Motion for which approval was sought at the Bidding Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, this Bidding Procedures Order and that portion of the Motion being approved hereby is required.

E.     The Debtors' Sale Notice, Cure Notice and other notices with respect to the Sale, the Auction, the assumption and assignment procedures set forth in section E of the Motion

---

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(the "Assumption and Assignment Procedures"), and the Sale Hearing are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof and no further notice of each is necessary or required.

F.      The Bidding Procedures, substantially in the form attached as Exhibit A, and incorporated herein by reference as if fully set forth herein, are fair, reasonable and appropriate, were negotiated in good faith and represent the best method for maximizing the value of the Debtors' estates in connection with the Sale.

G.      The Bid Protections, to the extent payable under any Stalking Horse APA and the terms and restrictions of this Order, shall be deemed (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b), (ii) of substantial benefit to the Debtors' estates, and (iii) reasonable and appropriate in light of the size and nature of the transactions.

H.      The Assumption and Assignment Procedures are reasonable and appropriate.

I.      Champaign Multimedia Group, LLC (the "Stalking Horse Bidder") has submitted a bid (the "Stalking Horse Bid") to purchase substantially all of the Purchased Assets under the terms and conditions of that certain asset purchase agreement by and between the Stalking Horse Bidder and the Debtors (the "Stalking Horse APA").

J.      The Stalking Horse APA and the protections being afforded the Stalking Horse Bidder are reasonably designed to maximize the value to be achieved for the Purchased Assets in connection with the Bid Procedures. As such, the Bid Protections (defined below) and the Bid Procedures, (1) are reasonable and appropriate under the circumstances, (2) confer a benefit to the

Debtors' estates, and (3) are supported by, and constitute a proper exercise of, the Debtors' sound business judgment.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      Those portions of the Motion seeking approval of the Bidding Procedures Relief are GRANTED, as set forth herein.

2.      Any objection to the portions of the Motion seeking approval of the Bidding Procedures Relief or any other relief granted in this Order, to the extent not resolved, waived or withdrawn, and all reservations of rights included therein, is hereby overruled and denied on the merits.

**A.      The Stalking Horse Bidder**

3.      The Stalking Horse Bidder is approved as the stalking horse bidder for the purchase of the Purchased Assets, on the terms and conditions of the Stalking Horse APA, subject to: (i) higher and better bids under the terms of the Bid Procedures; (ii) approval by this Court after proper notice and hearing.

4.      The Stalking Horse Agreement is hereby approved as the Form APA (the "Form APA") for purposes of submitting a Qualifying Bid and is appropriate and reasonably calculated to enable the Debtors and other parties in interest to easily compare and contrast the differing terms of the Bids presented at the Auction.

**B.      Bid Protections for the Stalking Horse Bidder**

5.      The following bid protections ("Bid Protections") shall govern the conduct of the sale of the Debtor's Assets:

>       (a)   To reimburse the Stalking Horse Bidder in connection with the proposed sale and serving as the Stalking Horse Bidder, in the event that the Successful Bidder (as that term is defined in the Bid Procedures) is not the Stalking Horse

Execution Document

Bidder and the sale of the Purchased Assets to a Successful Bidder, other than the Stalking Horse Bidder, closes, then the Stalking Horse Bidder shall be entitled to an expense reimbursement the (the "Expense Reimbursement Fee") as an allowable administrative expense under Section 503(b) of the Bankruptcy Code and shall be paid at the closing of a sale to a Successful Bidder who is not the Stalking Horse Bidder;

(b) Notwithstanding anything in the Stalking Horse APA to the contrary, the Expense Reimbursement Fee shall be limited to the aggregate amount equal to the reasonable and documented out-of-pocket costs, fees, and expenses of the Stalking Horse Bidder (including legal, accounting, and other consulting fees and expenses, other than any success or similar fees payable to any financial advisors, consultants or other Persons) incurred in connection with the transactions contemplated to occur pursuant to the Stalking Horse APA, including, without limitation, (a) the negotiation and execution of the Stalking Horse APA, and (b) carrying out its obligations under the Stalking Horse APA prior to the Closing; *provided, however*, that such Expense Reimbursement Amount shall not exceed an amount equal to $225,000;

(c) The minimum cash overbid amount shall equal the minimum amounts set forth in the Bidding Procedures attached hereto, which include pro rata amounts for the cash consideration for the Acquired Assets, *plus* the Expense Reimbursement Fee, *plus* a minimum overbid.  For the avoidance of doubt, bidding on the Debtor's Assets at any auction shall proceed in increments of not less than $100,000 on a pro rata basis; and

(d) In the event of a credit bid by a secured creditor (a "Credit Bid"), any Credit Bid submitted or made by a secured creditor, and that may be permitted by the Court, shall include a cash component sufficient to pay (in addition to all costs required by the Bid Procedures Order and after the return of the Deposit to any Stalking Horse Bidder as provided in the Stalking Horse APA), the maximum amount of the Expense Reimbursement Fee (i.e. $225,000) as an administrative expense (with any remaining balance of such maximum amount to be returned upon the Court's determination of the allowable Expense Reimbursement Fee), which Expense Reimbursement Fee shall be paid at the closing of a sale to a secured creditor who makes a Credit Bid and is the Successful Purchaser.

## C.    Bidding Procedures

6.    The Bidding Procedures in the form attached hereto as Exhibit A and incorporated herein by reference as if fully set forth in this Order are hereby APPROVED in their entirety.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the

Bidding Procedures. The failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

**D.      The Bid Deadline**

7.      As further described in the Bidding Procedures, a potential Bidder who desires to make a Bid for the Assets that satisfies the bidding requirements set forth in the Bidding Procedures shall deliver its Bid, so as to be received by no later than **5:00 p.m. (prevailing Central Time)** on **[September 27], 2019** (the "Bid Deadline") to the following parties (collectively, the "Notice Parties"):

> (i)     **The Sellers**, 15 East Main Street, Champaign, Illinois 61820, Attention: John Reed (jreed@newsgazetteinc.com) and Traci Nally, Esq. (tnally@newsgazetteinc.com);
>
> (ii)    **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 N. LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller (nmiller@nge.com); and [add Delaware local counsel];
>
> (iii)   **Broker to the Sellers**, Dirks, Van Essen, Murray & April, 119 East Marcy Street, Suite 100, Santa Fe, New Mexico, Attn: Phil Murray (phil@dirksvanessen.com).

**E.      Notices of Sale, Bidding Procedures, Bid Protections and the Sale Hearing**

8.      The notices described below are hereby approved, and the service or publication thereof (as applicable) as described below constitutes proper, timely, adequate and sufficient notice of the Sale, the Bidding Procedures, and the Sale Hearing, and no other or further notice shall be required.

9.      Within three (3) Business Days after the entry of this Order, or as soon thereafter as practicable, the Debtors (or their agents) shall serve this Order and the Bidding Procedures by

first-class mail, postage prepaid, or by email, where available, upon the following parties

(collectively, the "Supplemental Notice Parties"):

    (a)    all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years;

    (b)    all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets;

    (c)    all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion;

    (d)    the U.S. Trustee;

    (e)    the Federal Communications Commission;

    (f)    the Internal Revenue Service;

    (g)    the Securities and Exchange Commission;

    (h)    the U.S. Attorney for the District of Delaware;

    (i)    parties under collective bargaining agreements, including without limitation the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444 for the Circulation District Managers and the Printing, Publishing and Media Workers Sector of the Communications Workers of America, Champaign-Urbana Typographical Union Local No. 444/14407 for the Newsroom;

    (j)    multiemployer pension plans in which or to which a Debtor or any of its Affiliates is or was participating or contributing, including without limitation the CWA/ITU Negotiated Pension Plan and the GCIU-Employer Retirement Fund; and

    (k)    all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

10.    On [September 3], 2019, as set forth in the certificate of service filed on [●], 2019

[Docket No. ____], the Debtors (or their agents) served by first-class mail, postage prepaid, a notice

of sale (the "Sale Notice") upon all known creditors of the Debtors and all counterparties to the

Debtors' executory contracts and unexpired leases.  Such notice is deemed sufficient and proper notice of the Sale to such creditors and contract counterparties.

11.     On or about [September 17], 2019, the Debtors shall publish the Sale Notice on one occasion in *USA Today* and the *Champaign News-Gazette*.  Such publication notice is deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

12.     The Sale Hearing to approve the Sale shall be held on [October 1]**, 2019 at 10:00 a.m. (prevailing Eastern Time),** at the United States Bankruptcy Court for the District of Delaware, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801, before the Honorable [●].

13.     All objections to the Sale (a "Sale Objection") must be in writing and filed on and served so as to be received by **[September 27], 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801.  In addition, any Sale Objection must be served on the Notice Parties and counsel to the Stalking Horse Purchaser, John M. Steiner, Esq., 525 William Penn Place, 28th Floor, Pittsburgh, PA 15219, jsteiner@leechtishman.com,  so as to be received on or before the Sale Objection Deadline; provided however, that any objections to the conduct of the Auction or selection of the Successful Bid or Back-Up Bids (a "Supplemental Objection") shall be in writing, filed with the Court, together with proof of service, and served so as to be received by the Notice Parties and any Stalking Horse Bidder and its counsel, on or before the commencement of the Sale Hearing.

14.     Failure to file and serve a Sale Objection or Supplemental Objection as aforesaid shall be deemed to be consent to the Sale for purposes of section 363(f) of the Bankruptcy Code.

15.     The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest either by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the court, in each case subject to the Bidding Procedures.

**F.     The Auction**

16.     The Debtors are authorized, subject in all respects to the terms of this Order and the Bidding Procedures, to conduct the Auction with respect to the Assets.  The Auction shall take place on **[September 30], 2019 at 10:00 a.m. (prevailing Central Time)** at the offices of **[Local Delaware Counsel]**, or such other place and time as the Debtors shall notify all Qualified Bidders and each of their respective counsel and advisors.  The Debtors are authorized, subject to the terms of this Order and the Bidding Procedures, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

17.     Only the Debtors, the Stalking Horse Bidder and the Qualified Bidders, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Bidder and such other Qualified Bidder(s) will be entitled to make any Bids at the Auction.  The Debtors and their professionals shall direct and preside over the Auction, and the Auction shall be transcribed.

18.     The Stalking Horse Bidder (in its capacity as a Qualified Bidder) and each other Qualified Bidder participating in the Auction must confirm that it has (a) not engaged in any collusion with respect to the bidding or Sale of the Assets, (b) reviewed, understands and accepts the Bidding Procedures and (c) consented to the core jurisdiction of the Court.

19.     Subject to the rights of parties in interest to (i) challenge the Sale or the Sale Process, (ii) challenge the Debtors' decisions with respect to the Sale Process, or (iii) such other rights as such parties may have under applicable law, the Debtors may, in each case pursuant and subject to, and in accordance with, the Bidding Procedures, (a) determine, in their business judgment, which Qualified Bid is the highest and best proposal for the Assets and which is the next highest and best proposal for the Assets and (b) reject any bid that, in the Debtors' business judgment, is (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules or (z) contrary to the best interests of the Debtors and their estates.

20.     Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Bidder shall be a Qualified Bidder.

**G.    The Stalking Horse APA**

21.     Pursuant to sections 105, 363, 364 and 503 of the Bankruptcy Code, the Debtors are hereby authorized and directed to pay the Bid Protections at the Closing of any Competing Transaction pursuant to and subject to the terms and conditions set forth in the Stalking Horse APA, as an administrative expense of the estate.

**H.    Contract and Lease Assumption and Assignment Procedures**

22.     The Assumption and Assignment Procedures as set forth in the Motion are hereby approved and made part of this Order as if fully set forth herein.  The Assumption and Assignment Procedures are appropriate and fair to all non-Debtor counterparties and comply in all respects with the Bankruptcy Code.

23.     The decision to assume and assign the applicable assumed and assigned contracts and/or leases to the Successful Bidder(s) is subject to Court approval and the consummation of a Sale of the Assets. Accordingly, absent the consummation of such Sale, the applicable assumed and assigned contracts and/or leases shall not be deemed assumed and/or assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

(a)     **Cure Notice**

24.     On [September 3], 2019, as set forth in the certificate of service filed on [●], 2019 [Docket No. ____], the Debtors (or their agents) served by first-class mail, postage prepaid, Cure Notices upon all counterparties to the Debtors' executory contracts and unexpired leases and any other affected parties. Such notice is (a) reasonably calculated to provide sufficient and effective notice to all non-Debtor counterparties to assumed and assigned contracts or leases and any other affected parties of the Debtors' intent to assume and assign some or all of such contracts or leases and to afford the non-Debtor counterparty to each such contract or lease the opportunity to exercise any rights affected by the Motion pursuant to Bankruptcy Rules 2002, 6004 and 6006, and (b) hereby approved.

25.     The inclusion of a contract or lease on a Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder, the Successful Bidder(s) or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed and assigned in connection with the Sale of the Assets. The Debtors retain all of their rights, claims and causes of action with respect to the contracts or leases listed on the Cure Notice.

**(b)**    **Contract and/or Lease Objection Procedures**

26.    All Contract and/or Lease Objections must be filed and served so as to be received by [**September 27**], **2019 at 4:00 p.m. (prevailing Eastern Time)** (the "Contract and/or Lease Objection Deadline").

27.    Any Contract and/or Lease Objection must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801, and served so as to be received by the Notice Parties on or before the Contract and/or Lease Objection Deadline.

28.    Any Contract and/or Lease Objection must state (a) the basis for such objection and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

29.    Any Contract and/or Lease Objection solely to the Cure Amount(s) shall not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party objects solely to Cure Amount(s): (i) the Debtors may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties; or (ii) notwithstanding anything in the Successful Bidders APA to the contrary, the Successful Bidder may elect to remove such contract and/or lease that is the subject of the Contract and/or Lease Objection from its list of Assigned Contracts to be assumed and assigned and have no obligation to take an assignment of, or pay a Cure Amount for, said contract and/or lease.  So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s)

or lease(s).  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

30.     If no Contract and/or Lease Objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

31.     As soon as reasonably practicable after receiving the schedule from the Stalking Horse Bidder or other Qualified Bidder, the Debtors will prepare and file a list of those executory contracts and unexpired leases that such bidders elect to have assumed and assigned (the "Designated Contracts") at Closing pursuant to section 365 of the Bankruptcy Code, subject to any right to add or delete executory contracts or unexpired leases in accordance with the Stalking Horse APA.

32.     As soon as reasonably practicable thereafter, the Debtors will post on the Case Website (a) the list of any Designated Contracts, which the Debtors will update as and when executory contracts or unexpired leases are added or deleted by any such Bidders and (b) a description of the Bidders and information as to the Bidders' ability to perform the Debtors' obligations under the relevant Designated Contracts.

33.     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder under the applicable executory contract(s) or unexpired lease(s) (an "Adequate Assurance Objection" and together with a Contract and/or Lease Objection, an "Objection"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the Court and serve such objection on the Debtors, the Notice Parties

Execution Document

and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is received on or before **12:00 p.m. (prevailing Eastern Time)** on [**September 27**], **2019** (the "Adequate Assurance Objection Deadline"). An Adequate Assurance Objection shall be filed on or before the Adequate Assurance Objection Deadline in accordance with, and subject to, the Contract Objection Procedures set forth above.

34.     If any non-Debtor counterparty does not timely file and serve a Contract and/or Lease Objection, an Adequate Assurance Objection and/or an Objection as set forth above, such counterparty will be: (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

**I.      Related Relief**

35.     The Debtors are hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Order.

36.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

37.     The Debtors are authorized to proceed with the Sale without the necessity of complying with any state or local bulk transfer tax or state or local bulk transfer laws or requirements.

Execution Document

38.     This Order shall be binding on the Debtors, including any chapter 7 or chapter 11

trustee or other fiduciary appointed for the Debtors' estates.

39.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d),

7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

40.     This Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation or interpretation of this Order.

41.     Any and all objections to the Sale are hereby preserved and subject to the terms and

deadlines set forth in this Order.

Dated: _____, 2019
      Wilmington, Delaware

                      _____
                      THE HONORABLE [●]
                      UNITED STATES BANKRUPTCY JUDGE

## BIDDING PROCEDURES

These bidding procedures (the "Bidding Procedures") set forth the process by which The News-Gazette, Inc. and D.W.S., Inc. (collectively, the "Company" or the "Sellers") shall conduct a sale (the "Sale") by auction (the "Auction") of some or substantially all of their assets.

On [•], 2019, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Sellers to determine the highest and otherwise best offer(s) for their assets, subject to the process and procedures set forth below.

The Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "Chapter 11 Cases") captioned *In re The News-Gazette, Inc. et al.,* Ch. 11 Case No. 19-____ (___) (Bankr. D. Del. [●], 2019).

On [August 30], 2019, the Sellers filed the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, Interests and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "Sale Motion").[10]  The Bidding Procedures Order and the order approving the Sale are referred to herein, collectively, as the "Sale Orders."

As referenced in the Sale Motion, the Sellers are aware of numerous prospective buyers that may submit, or already have submitted, letters of intent and/or indications of interest to become a purchaser for some or all of the Sellers' assets (collectively, the "Prospective Purchasers").

## I.    ASSETS TO BE SOLD

The Sale Motion contemplates one or a combination of multiple offers to purchase all or substantially all of the Sellers' assets (such assets that a Successful Bidder acquires pursuant to the terms of the Stalking Horse APA or Modified Asset Purchase Agreement (as defined below) that is consummated in connection with the Successful Bid of such Successful Bidder, collectively, the "Acquired Assets").  A party may participate in the bidding process by submitting a Bid (as defined below) for all of the Acquired Assets or for smaller subsets of the Acquired Assets (as described in more detail below, the "Lots").

---

[10]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Sale Motion.

Subject to the terms of the Sale Orders, upon the consummation of the Successful Bid and payment of all consideration in accordance with the terms thereof, all of the Sellers' right, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, interests, charges, options and interests thereon (collectively, the "Liens") except as otherwise provided in the Stalking Horse Agreement or Modified Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto), with such Liens to attach to the proceeds of the sale of the Acquired Assets with the same validity and priority as such Liens applied against the Acquired Assets immediately prior to the consummation of such Successful Bid.

## II.    BIDDING PROCESS

### A.    Overview

The Sellers and their advisors will, subject to the other provisions of these Bidding Procedures:

1.    coordinate the efforts of Preliminary Interested Purchasers (as defined below) in conducting their due diligence investigations;

2.    receive offers from Bidders (as defined below);

3.    determine whether any person is a Qualified Bidder (as defined below); and

4.    conduct the Auction and further negotiate any offers made to purchase the Acquired Assets.

### B.    Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Sellers and to submit competing bids for the Acquired Assets. The Sellers will assist Preliminary Interested Purchasers in conducting their respective due diligence investigations and will accept Bids until **[September 27], 2019 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline"), subject to any extension of the Bid Deadline in accordance with, and subject to, these Bidding Procedures.

The key dates for the Sale process are as follows:[11]

| [September 27], 2019 at 5:00 p.m. CST | **Bid Deadline**:  Due Date to submit a Qualified Bid and Good Faith Deposit (each as defined below) |
| --- | --- |

---

[11] These dates are subject to extension or adjournment as provided for herein with respect to one or more Lots (as defined below) or other applicable Acquired Assets.

| | |
|---|---|
| **[September 30]**, 2019 at 10:00 a.m. CST | **Auction**:  To be held at Neal, Gerber & Eisenberg, LLP, 2 N. LaSalle St., Suite 1700, Chicago, IL 60602 [OTHER PLEADINGS INDICATE LOCAL DELAWARE OFFICE] |
| **[October 2]**, 2019 at 10:00 a.m. EDT | **Sale Hearing**:  To be held at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801 |

C.    Access to Diligence Materials

To participate in the bidding process either as a Stalking Horse Bidder or to effectuate an alternate sale transaction for some or substantially all of the Acquired Assets (an "Alternate Transaction") and to receive access to due diligence materials (the "Diligence Materials"), a party must submit to the Sellers an executed confidentiality agreement in substantially the same form as that which was previously approved by Murray (as defined below) and circulated to Prospective Purchasers, and otherwise in form and substance satisfactory to Murray and the Sellers (a "Confidentiality Agreement"), and provide preliminary evidence satisfactory to the Sellers and their advisors of such party's financial wherewithal to consummate a transaction as a Stalking Horse Bidder or through an Alternate Transaction.

A party who executes such a Confidentiality Agreement for access to Diligence Materials, and provides such preliminary evidence of financial wherewithal, shall be a "Preliminary Interested Purchaser." The Sellers will afford any Preliminary Interested Purchaser the time and opportunity to conduct reasonable due diligence in accordance with a diligence protocol determined by the Sellers and their advisors; provided, however, that the Sellers shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) on or before the Bid Deadline.

The Sellers reserve the right to withhold any Diligence Materials that the Sellers determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Purchaser who is a competitor or customer of the Sellers or is affiliated with any competitor or customer of the Sellers.  Neither the Sellers nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Purchaser.

All due diligence requests must be directed to Dirks, Van Essen, Murray & April, Attention Phil Murray ("Murray"), at Phil@dirksvanessen.com.

D.    <u>Due Diligence from Bidders</u>

Each Preliminary Interested Purchaser and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Sellers or their advisors regarding such Preliminary Interested Purchaser or Bidder, as applicable, and its contemplated transaction. Failure by a Preliminary Interested Purchaser or Bidder (other than any Stalking Horse Bidder) to comply with requests for additional information and due diligence access may be a basis for the Sellers to determine that such Bidder is not a Qualified Bidder.

## III.    AUCTION QUALIFICATION PROCESS

<u>Qualifying Bids</u>.  To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (other than any party designated as a Stalking Horse Purchaser) (each, a "<u>Bidder</u>"), must be reasonably determined by the Sellers to satisfy each of the following conditions:

1.    <u>Good Faith Deposit</u>:  Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds, in the amount of ten percent (10%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement (as defined below), which deposit shall be held in an escrow account to be identified and established by the Sellers (the "<u>Good Faith Deposit</u>").

2.    <u>Executed Agreement</u>:  Each Bid must be based on the Stalking Horse APA, and such Bid must include binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "<u>Modified Asset Purchase Agreement</u>").  A Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto) marked against the applicable Stalking Horse APA to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to a Stalking Horse Bidder, such as the expense reimbursement and break-up fee provisions contained in any Stalking Horse APA, which terms shall not be in any Modified Asset Purchase Agreement).  Each Modified Asset Purchase Agreement must exclude any and all preference, fraudulent conveyance, and other claims of Sellers arising under Chapter 5 of the Bankruptcy Code or similar state law.

3.    <u>Scope of Bid / Lots</u>:  A Bid must be for all or substantially all of the Acquired Assets or for one or more of the following Lots (or such other Lots as the Sellers may otherwise agree to):[12]

---

[12]    Any Bid for the Radio Lot that does not also include a bid for the Newspaper Lot, and vice versa, must include a commitment to enter into an IP sharing agreement on substantially the same terms that

Execution Document

> (a)   substantially all of the assets of the newspaper business (the "<u>Newspaper Lot</u>");
>
> (b)   substantially all of the assets of the Radio Business, including the relevant real estate assets (the "<u>Radio Lot</u>");

4.   <u>Minimum Bid</u>:   A Bid must have a purchase price that includes a combination of cash, in the amounts below, as well as the assumption of any postpetition liabilities, if any, and cure costs associated with the relevant Lot,[13] and subject to any adjustments typical of similar transactions, that, in the Sellers' reasonable business judgment, has a value equal to or greater than the following, subject to the terms of these Bidding Procedures:

> (a)   For substantially all of the Acquired Assets:  $4,825,000;
>
> (b)   For the Newspaper Lot:  $2,412,500;
>
> (c)   For the Radio Lot: $2,412,500.

5.   <u>Designation of Assigned Contracts and Leases; Cure Costs</u>:   A Bid must specifically (a) identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers and (b) provide for the Bidder's payment in full in cash of all of the cure costs related to any such executory contracts and unexpired leases.

6.   <u>Designation of Assumed Liabilities</u>:   A Bid must identify all liabilities which the Bidder proposes to assume.

7.   <u>Corporate Authority</u>:   A Bid must include written evidence reasonably acceptable to the Sellers demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction then the Bidder must furnish written evidence reasonably acceptable to the Sellers of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

8.   <u>Disclosure of Identity of Bidder</u>:   A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders in the case of a Bidder which is an entity

---

exist today. Any bid for less than substantially all of the assets of the Debtors must allocate the purchase price to each Lot included in such bid. Any other Lot that could be evaluated by the Debtors pursuant to Section IX.E., below, should also include an allocation of value as described in this footnote.

[13] A schedule of the post-petition liabilities for each lot and a schedule of estimated cure costs for executory contracts that could be assumed by any Bidder has been made available in the electronic data room that each Prospective Purchaser has access to.

specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid (including any co-bidder or team bidder), and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid must also fully disclose any connections or agreements with the Sellers, the Stalking Horse Bidder or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Sellers.

9.  <u>Proof of Financial Ability to Perform:</u>  A Bid must include detailed, written evidence that the Sellers may conclude, in consultation with their advisors, demonstrates that the Bidder has and will continue to have the necessary financial ability to consummate the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia,* the following:

    (a)   contact names and numbers for verification of financing sources;

    (b)   evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Sellers in the amount of the cash portion of such Bid as are needed to consummate the Alternate Transaction;

    (c)   the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Sellers;

    (d)   a description of the Bidder's pro forma capital structure; and

    (e)   any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers demonstrating that such Bidder has the ability to consummate the Alternate Transaction.

10.  <u>Regulatory and Third Party Approvals</u>:  A Bid must set forth (a) each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, (b) the time period within which the Bidder

expects to receive such regulatory and third-party approvals, (c) those actions the Bidder will take to ensure receipt of such approvals as promptly as possible, and (d) a detailed description of any steps the Bidder will take to address any delay in obtaining such approvals (*e.g.* transition services agreement).

11.    Contact Information and Affiliates:  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

12.    Contingencies:    Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Sellers than those set forth in the Stalking Horse APA, as determined by the Sellers in good faith, and (b) may not be conditioned on (i) obtaining financing, (ii) any internal approvals or credit committee approvals, or (iii) the outcome or review of due diligence, including with respect to any environmental, employee, vendor, labor, health and/or safety matters.

13.    Irrevocable:  Each Bid must be irrevocable until ten (10) business days after the conclusion of the Sale Hearing for the relevant Acquired Assets or Lot; provided that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the earlier of the consummation of the Sale of the relevant Acquired Assets or Lot or the Extended Outside Date (as defined below).

14.    Compliance with Diligence Requests:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Sellers to the reasonable satisfaction of the Sellers.

15.    As-Is, Where-Is:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the applicable Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the applicable Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Stalking Horse APA.

16.    Confidentiality Agreement:  To the extent not already executed, the Bid must include an executed Confidentiality Agreement.

Execution Document

17.    Termination Fees:  The Bid (other than a Bid pursuant to the Stalking Horse APA) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

18.    Adherence to Bid Procedures:  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

19.    Closing Date:  The Bid must include a commitment to consummate the transactions contemplated by the Modified Asset Purchase Agreement by no later than **[December 4], 2019** or such later date as Debtors may agree to in writing (the "Outside Date").  In no event shall the consummation of the Sale occur later than **[January 19], 2020** without the written consent of Debtors (any such date, the "Extended Outside Date").  In the event the Bid contemplates an Extended Outside Date in order to address any antitrust, regulatory or permitting issues, the Bid must include a mechanism to cover any and all costs incurred after the Outside Date in a manner acceptable to the Sellers.

20.    No Late Bids:  Unless otherwise ordered by a Court, the Sellers shall not consider any Bids for the Acquired Assets or with respect to any Lot submitted after the conclusion of the Auction for the Acquired Assets or with respect to any such Lot, and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

21.    Bid Notice:  The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline:

    (a)    The Sellers, 15 East Main Street, Champaign, Illinois 61820, Attention: John Reed (jreed@newsgazetteinc.com) and Traci Nally, Esq. (tnally@newsgazetteinc.com);

    (b)    Counsel to the Sellers, Neal Gerber & Eisenberg, LLP, 2 N. LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller (nmiller@nge.com); and [local Delaware counsel];

    (c)    Broker to the Sellers, Dirks, Van Essen, Murray & April 119 East Marcy Street, Suite 100, Santa Fe, NM 87501, Attention:  Phil Murray (phil@dirksvanessen.com).

A Bid received from a Bidder before the Bid Deadline that meets all of the above requirements for the Acquired Assets shall constitute a "Qualified Bid" and such Bidder shall constitute a "Qualified Bidder"; provided that if the Sellers receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Sellers will promptly provide the Bidder with notice of the basis for the disqualification of such Bid and provide such Bidder with the opportunity to remedy any deficiencies prior to the Bid Deadline; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Sellers to the satisfaction of the Sellers, then the Sellers may disqualify any Qualified Bidder and Qualified Bid, in the Sellers' discretion, and such Bidder shall not be entitled to attend or participate in the Auction.

Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph 22 above as provided therein. All Qualified Bids will be considered, but the Sellers reserve their right to reject any or all bids. However, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred. Additionally, notwithstanding anything herein to the contrary, the Stalking Horse APA submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid. The Sellers will inform counsel to the Stalking Horse Bidder, and any Qualified Bidders, whether the Sellers consider any Bid to be a Qualified Bid as soon as practicable but in no event later than one day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Sellers and their agents and representatives (other than as may be set forth in a definitive agreement executed by the Sellers), regarding the Sellers, any of the Acquired Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

Without the consent of the Sellers, a Qualified Bidder may not amend, modify or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Bid, during the period that such Bid is required to remain irrevocable and binding.

## IV.    AUCTION

### A.    Auction

If multiple Qualified Bids (including the Stalking Horse APA) with respect to the same Acquired Assets or Lots are submitted by the Bid Deadline, the Sellers will conduct the Auction to determine the highest and otherwise best Qualified Bid with respect to such Acquired Assets or Lots.

B.    Assessment Criteria

The Sellers' determination of the highest and otherwise best Qualified Bid with respect to the Acquired Assets will take into account any factors the Sellers reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following:

1.    the amount and nature of the consideration, including any assumed liabilities and retention of employees;

2.    the type and nature of any modifications to the Stalking Horse APA requested by each Bidder in such Bidder's Modified Asset Purchase Agreement;

3.    the extent to which such modifications are likely to delay the consummation of the sale of the applicable asset(s) and the cost to the Sellers of such modifications or delay;

4.    the total consideration to be received by the Sellers and the net consideration to be received by the Sellers after taking into account the Stalking Horse Bidder's Bid Protections with respect to each round of bidding;

5.    the likelihood of the Bidder's ability to consummate a transaction and the timing thereof, including the ability to obtain, or waive, as applicable, regulatory approvals;

6.    the net benefit to the Sellers' estates (collectively, the "Bid Assessment Criteria").

C.    Cancellation of the Auction

If multiple Qualified Bids for the Acquired Assets or Lots have not been timely received, then the Auction for the Acquired Assets or Lots will be canceled.

**V.    PROCEDURES FOR THE AUCTION**

If multiple Qualified Bids for the Acquired Assets or Lots have been timely submitted by the Bid Deadline, then the Sellers will commence the Auction for such Acquired Assets or Lots on [●], 2019 at 10:00 a.m. (prevailing Central Time) at the offices of [local Delaware Counsel], or such other place and time as the Sellers shall notify all Qualified Bidders, subject to these Bidding Procedures.

The Auction will be conducted according to the following procedures:

A.    Participation

Only the Sellers, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Bidder and any such other Qualified Bidders will be entitled to make any Bids at the Auction.

B.    The Sellers Shall Conduct the Auction

The Sellers and their advisors shall direct and preside over the Auction, and the Auction shall be transcribed. The Sellers will conduct the Auction in the manner they reasonably determine will result in the highest and otherwise best Qualified Bid(s), including, without limitation, by requiring separate rounds of bulk and/or Lot bidding and sealed bidding, open outcry, or any other form of Bid submission (including in connection with any bulk or Lot bidding). Any rules developed by the Sellers will provide that each Qualified Bidder will be permitted what the Sellers determine to be an appropriate amount of time to respond to the previous bid at the Auction.

C.    Auction Baseline Bids

Prior to commencement of the Auction, the Sellers will provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement that is the highest and otherwise best Qualified Bid for the applicable Acquired Assets as determined by the Sellers (such highest and otherwise best Qualified Bid, the "Auction Baseline Bid"). In addition, at the start of the Auction, the Sellers will describe the terms of the Auction Baseline Bids to the other Qualified Bidders.

D.    Joint Bidding and Anti-Collusion Representations

Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Court.

Before submitting any Bid with co-bidding or team bidding arrangements, whether formal or informal, among a Qualified Bidder and any third party (including any other Preliminary Interested Purchaser or Qualified Bidder) (such a Bid, a "Joint Bid"), each Qualified Bidder must disclose such Joint Bid to the Sellers, and the Sellers may determine whether the Joint Bid constitutes a Qualified Bid for purposes of participating in the Auction. The identity of any and all co-bidders or team bidders involved in submitting any Joint Bid, if the Sellers determine that such Joint Bid constitutes a Qualified Bid, will be disclosed on the record at the Auction.

E.    Terms of Overbids

The Sellers will accept Overbids, as further described below. An "Overbid" is any bid made at the Auction subsequent to the Sellers' announcement of the Auction Baseline Bid. To

submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

1.   Minimum Overbid Increments:  Any Overbid after and above the Auction Baseline Bid shall be made in increments determined by the Sellers valued at not less than such amount as shall be announced at the Auction (in an amount greater than the pro rata amount of any approved bid protections or sale-related administrative expenses), in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Sellers.

2.   Credit Bidding:  Only the Stalking Horse Bidder may credit bid the amount of any Bid Protections.

3.   Remaining Terms Are the Same as for Qualified Bids:  Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse APA or Modified Asset Purchase Agreement, as the case may be, in connection therewith.  Any Overbid must remain open and binding on the Bidder as provided herein.

At the Sellers' discretion, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers), reasonably demonstrating such Bidder's ability to consummate the Alternate Transaction proposed by such Overbid.

F.   Announcement and Consideration of Overbids

1.   Announcement of Overbids:  The Sellers will announce at the Auction the material terms of each Overbid, the total amount of consideration and form offered in each such Overbid (including the cash or cash equivalent component thereof), and the basis for calculating such total consideration.

2.   Consideration of Overbids:  Subject to the deadlines set forth herein, the Sellers reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Sellers and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; modify or supplement any or all of the Auction procedures or rules; or give Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers in their reasonable business judgment may

require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.  When comparing Overbids to the immediately preceding Qualified Bid, the Sellers will treat any credit bid as being made in cash or in cash equivalents.

G.    Other Procedures

1.    <u>Jurisdiction of the Court</u>:  All Qualified Bidders (including the Stalking Horse Bidder) at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the determination of what constitutes a Qualified Bid and the procedures used to make that determination, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

2.    <u>Stalking Horse Bidder Bid</u>:  The Stalking Horse Bidder shall be entitled to (a) credit bid all or a portion of its Bid Protections, consistent with these Bidding Procedures; and (b) submit additional bids and make modifications to the Stalking Horse APA at the Auction consistent with these Bidding Procedures.

3.    <u>Additional Bids; Modifications</u>:  All Qualified Bidders, including the Stalking Horse Bidder, shall have the right to submit additional bids and make additional modifications to the Stalking Horse APA or Modified Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to such Stalking Horse APA or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Sellers' business judgment, be less favorable to the Sellers than the terms of such original agreement.

4.    <u>Subsequent Bids</u>:  Each Qualified Bidder must submit a subsequent Bid that satisfies the minimum bid increment in each round of bidding in order to continue participating in the Auction.  Qualified Bidders shall not be allowed to skip rounds of bidding on the Acquired Assets and/or a particular Lot once they participate in the Auction for the Acquired Assets and/or any given Lot.

H.    Additional Procedures

The Sellers may at any time establish, at or prior to the Auction, other or additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the

Stalking Horse APA. Any Auction rules adopted by the Sellers that would modify any of the terms of the Stalking Horse APA or the rights of the Stalking Horse Bidder under the Bidding Procedures (as may be consensually modified at the Auction) requires the consent of the Stalking Horse Bidder.

I.   Sale Is As Is/Where Is

Except as otherwise may be provided in the Stalking Horse APA, any Modified Asset Purchase Agreement, or any order by the Court approving any Sale of the Acquired Assets as contemplated hereunder, the Acquired Assets sold pursuant to the Bidding Procedures shall be conveyed upon the consummation of the purchase and sale in their then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

J.   Closing the Auction

The Auction will continue in additional rounds of bidding until the Sellers select the Bid(s) that represent the highest and otherwise best offer(s) for the Acquired Assets (a "Successful Bid," and the Bidder(s) submitting such Successful Bid(s), a "Successful Bidder"). The Successful Bidders shall have the rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or Modified Asset Purchase Agreement. In selecting each Successful Bid, the Sellers will consider the Bid Assessment Criteria.

The Sellers may close the Auction with respect to the relevant Acquired Assets or Lots when all Successful Bidder(s) submit fully executed sale and transaction documents memorializing the terms of the Successful Bid(s), and the Sellers announce the Successful Bid(s) and the Successful Bidder(s). Promptly after the Auction closes with respect to the relevant Acquired Assets or Lots, the Sellers will file with the Court a notice of the Successful Bid(s) and the Successful Bidder(s) with respect to the relevant Acquired Assets or Lots.

The Sellers shall not consider any Bids for the Acquired Assets and/or any Lot submitted after the conclusion of the Auction with respect to the Acquired Assets and/or any such Lot.

K.   Backup Bidder

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest and otherwise best Bid at the Auction (other than the Stalking Horse Bidder) with respect to some or substantially all of the Acquired Assets, as determined by the Sellers, in the exercise of their business judgment, will be designated as a backup bidder (a "Backup Bidder"). A Backup Bidder shall be required to keep its last submitted Bid (the "Backup Bid") open and irrevocable until the earlier of the consummation of the transaction with the Successful Bidder or the Extended Outside Date.

Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the Acquired Assets, the Sellers may deem the Backup Bidder for such assets to have the new

Successful Bid, and the Sellers will be authorized, without further order of the Court, to consummate the transaction with such Backup Bidder at the price of its last bid. Such Backup Bidder will be deemed to be the Successful Bidder and the Sellers will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Court. All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Sellers on and as of the date that the Court approves the Bid as the Successful Bid.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than the Stalking Horse Bidder) with respect to some or substantially all of the Acquired Assets or any given Lot or Lots, the Stalking Horse Bidder will NOT be required to be a Backup Bidder and will be permitted to terminate the Stalking Horse APA as provided therein and be entitled to the return of its Deposit as provided in the Stalking Horse APA.

## VI.    BID PROTECTIONS

The Stalking Horse Bidder is entitled to the Bid Protections (i) in the amounts set forth in, and in accordance with the terms of, the Stalking Horse APA and the Bidding Procedures Order, and (ii) which shall be paid at the Closing of any sale of the Acquired Assets or any Lot(s) to any bidder that is not the Stalking Horse Bidder.

Pursuant to the Bidding Procedures Order, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

## VII.    SALE HEARING

The Successful Bid and Backup Bid (or, if no Qualified Bid other than that of the Stalking Horse Bidder is received, then the Stalking Horse APA) will be subject to approval by the Court. The sale hearing to approve the Successful Bids and any Backup Bids shall take place on **[October 2], 2019** at 10:00 a.m. (EDT) before the Court (the "Sale Hearing").

The Sale Hearing may be adjourned by the Sellers with respect to certain Acquired Assets or Lots, subject to the terms herein.

## VIII.    RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders (except the Stalking Horse Purchaser) shall be held in one or more escrow accounts by the Sellers, but shall not become property of the Sellers' estates absent further order of the Court or as expressly provided below. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than three (3) business days after the conclusion of the Sale Hearing. The Good Faith Deposit of a Backup Bidder, if any, shall be returned to such Backup Bidder no later than seventy-two (72) hours after the consummation of the transaction with the Successful Bidder. If the Successful Bidder timely consummates the winning transaction, its Good

Faith Deposit shall be credited towards the applicable purchase price. If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate an Alternate Transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Sellers. Notwithstanding anything in this paragraph to the contrary, the Good Faith Deposit of the Stalking Horse Bidder shall be held as provided in the Stalking Horse APA and shall be returned to the Stalking Horse Bidder in accordance with the Stalking Horse APA.

## IX.   RESERVATION OF RIGHTS OF THE SELLERS

Notwithstanding anything to the contrary herein, the Sellers further reserve the right as they may reasonably determine to be in the best interest of their estates to:

A.   determine which Bidder(s) is a Qualified Bidder(s);

B.   determine which Bid(s) is a Qualified Bid(s);

C.   determine which Qualified Bid is the highest and best proposal for the Acquired Assets and which is the next highest and best proposal for the Acquired Assets;

D.   reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Sellers and their estates;

E.   determine any Lots and revise the minimum bid values above with respect to any Lot;

F.   impose additional terms and conditions with respect to all potential Bidders;

G.   extend the deadlines set forth herein; and

H.   modify the Bidding Procedures and implement additional procedural rules that the Sellers determine, in their business judgment, will better promote the goals of the bidding process and discharge the Sellers' fiduciary duties; provided however that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse APA, the Bidding Procedures Order or any other Order of the Court, unless agreed in writing by the Stalking Horse Bidder and Sellers or otherwise ordered by the Court.

**EXHIBIT I-1: FORM OF TRANSITION AGREEMENT (East Main Street)**

**REAL ESTATE LICENSE AGREEMENT**

THIS REAL ESTATE LICENSE AGREEMENT (this "**License Agreement**"), made as of the ___ day of November, 2019, is between News-Gazette, Inc., an Illinois corporation, having its principal office at 15 East Main Street, Champaign, Illinois 61820 ("**Licensor**"), and Champaign Multimedia Group, LLC, an Illinois limited liability company, having an office at 805 South Logan Street, West Frankfort, Illinois 62896 ("**Licensee**"). Licensor and Licensee are referred to collectively as the "**Parties**".

WHEREAS, Licensor is the fee owner of the property located at 15 East Main Street, Champaign, Illinois 61820 (the "**Property**"); and

WHEREAS, the Parties desire by this License Agreement to provide for the licensing by Licensor to Licensee of the right to use and occupy the street level floor (known as the 2nd floor) of the Property (the "**Licensed Area**").

NOW, THEREFORE, intending to be legally bound hereby, the Parties agree as follows:

1.      License. Licensor hereby grants to Licensee, and Licensee hereby accepts, a license (the "**License**") to use and occupy the Licensed Area for the purposes hereafter provided for the License Period (as defined in Section 2). Licensee and its employees, agents and invitees are authorized to use (for their intended purpose) all other areas in and about the Property which are used in common with others, such as lobbies, hallways, elevators, stairways, restrooms, delivery areas, 1st floor conference rooms, breakrooms and parking areas (collectively, the "**Common Areas**"), subject to the Property's rules and regulations.

Licensee has inspected the Licensed Area and agrees to accept the Licensed Area "AS-IS", "WHERE-AS" and "WITH ALL FAULTS" on the date hereof.

2.      License Period. The "**License Period**" for the Licensed Area shall commence on the date hereof (the "**Commencement Date**"), and shall expire on the last day of the sixth (6th) full calendar month following the Commencement Date (the "**Expiration Date**"). Following the Expiration Date Licensee shall have the right to renew this license under the same terms for an additional 3 month period. Notwithstanding the foregoing this License Agreement shall be revocable by either Party after the Expiration Date upon thirty (30) days' prior written notice furnished by the terminating party to the non-terminating party.

3.      License Fee. Licensee shall pay a license fee (the "**License Fee**") for the Licensed Area in the monthly amount of Twelve Thousand Dollars ($12,000). The License Fee shall be payable by Licensee to Licensor in advance each calendar month during the License Period, by no later than the tenth (10th) day of each month, and shall be made payable to Licensor in United States dollars and delivered to Licensor at the address specified herein or such other address as Licensor may designate by written notice from time to time; *provided that*, on the Commencement Date, Licensee shall pay a portion of the License Fee that is calculated on a per diem basis for the number of days from the Commencement Date through the last day of the month in which the Commencement Date occurs (both dates inclusive).

4.      Utilities. Licensor shall provide the same utilities to and for the benefit of the Licensed Area which otherwise serve the Property. Licensee shall pay for such utilities on the basis of one-third (1/3rd) of the total costs for the Property. Licensor shall send to Licensee invoices which identify (a) the

utilities provided during the period specified, (b) the total costs of such utilities for the Property for such period, and (c) the amount of Licensee's one-third ($1/3^{rd}$) share thereof. Licensee shall pay for its share of such utilities to the same address as its monthly payment of the License Fee within ten (10) days after receipt of an invoice.

5.    <u>Use</u>. The Licensed Area shall be used for general office use and uses ancillary thereto.

6.    <u>Compliance with Laws and Regulations</u>.

(a)    Licensee shall promptly comply with all present and future:

(i)    rules and regulations published by the Licensor (if any) including, without limitation, regulations applicable to use, storage and disposal of hazardous substances and waste and other environmental matters, security policies and procedures, which have been published from time to time with respect to the use of and access to the Licensed Area, provided Licensee has received a copy of them; and

(ii)    applicable laws and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law having jurisdiction applicable to the Licensed Area.

7.    <u>Access</u>. Licensee, its employees, contractors and agents shall have the right of access to the Licensed Area and Common Areas twenty-four (24) hours per day, seven (7) days per week. Licensor, its employees, contractors and agents shall also have access to the Licensed Area upon prior notice to Licensee.

8.    <u>Repairs and Services</u>. Throughout the License Period, Licensee shall take good care of the Licensed Area and commons areas. Licensee shall also be responsible for the cost to repair any damage to the Licensed Area other than damage from the elements, fire or other casualty to the Property, or from the gross negligence or intentional misconduct of Licensor, or its agents or employees. Licensee shall provide and furnish routine maintenance services for the Licensed Area, including commons areas. Licensor shall make all necessary structural repairs to and maintain major mechanical systems serving the Licensed Area. Licensor will contract for snow removal. The repair obligations outlined herein shall survive any cancellation, expiration or termination, for any reason, of this License Agreement.

9.    <u>Right to Inspect</u>. Lessor reserves the right to inspect the premises, which, except for emergency situations, will take place during normal business hours and upon reasonable prior notice.

10.    <u>Damage and Destruction</u>.

(a)    Neither Licensor nor Licensee shall have any responsibility to the other or their respective agents, contractors, tenants, or other invitees in the event of any damage to or theft or loss of any equipment or property of the other party and the party incurring such damage, theft, or loss shall look to its own insurance coverage (and to any self-insured portion of the damage, theft, or loss), if any, for recovery in the event of any such damage, theft, or loss.

(b)    If all, or a portion, of the Licensed Area is destroyed or damaged by fire or other casualty, this License shall terminate. The License Fee shall abate as of the date of the casualty.

11.   Insurance.

(a)   Licensee shall, at its own cost and expense, maintain and keep in force at all times during the License Period:

(i)   commercial general liability insurance, which shall include coverage against claims for personal injury, death or property damage occurring on, in or about the Licensed Area with respect to the Licensed Area and Licensee's conduct of business therein; Licensor shall be named as an additional insured; and

(ii)   employers' liability and workers' compensation insurance to the extent required by the laws of State of Illinois.

(b)   Notwithstanding anything to the contrary set forth in this License Agreement, Licensor and Licensee hereby release one another and their respective partners, officers, employees, and property manager from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for loss or damage covered by said insurance, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible.

12.   Mutual Indemnification. Each Party (the "**Indemnifying Party**") shall indemnify, defend, save and hold harmless the other Party, and its officers, directors, members, partners, employees, agents, affiliates, successors, and permitted assigns (collectively, the "**Indemnified Parties**") against all claims made or judicial or administrative actions filed which allege that any of the Indemnified Parties is liable to the claimant by reason of:

(a)   any injury to or death of any person, or damage to or loss of property, or any other thing occurring on or about any part of the Property, or in any manner growing out of, resulting from or connected with the use, condition or occupancy of the Licensed Area if caused by any negligent or wrongful act or omission of the Indemnifying Party or its agents, partners, contractors, employees, permitted assigns, licensees, sublessees, invitees, or any other person or entity for whose conduct the Indemnifying Party is legally responsible;

(b)   violation by the Indemnifying Party of any contract or agreement to which the Indemnifying Party is a party in each case affecting any part of the Licensed Area or the occupancy or use thereof by the Indemnified Party; and

(c)   violation of or failure to observe or perform any condition, provision or obligation of or under this Agreement on the Indemnifying Party's part to be observed or performed hereunder. The indemnity obligations outlined herein shall survive any cancellation, expiration, or termination, for any reason, of this License Agreement.

13.   Assignment or Sublicensing. The license granted hereby is personal to Licensee and shall not be assigned, nor shall Licensee sublicense or otherwise permit or suffer the occupancy of the Licensed Area by any third party without the prior written consent of Licensor, which consent shall not be unreasonably withheld or delayed. Notwithstanding anything to the contrary contained herein, Licensee shall have the right to assign or sublicense this License Agreement to any affiliate of Licensee, notice of which shall promptly be given to Licensor. As used herein, the term affiliate means any legal entity which

controls, is controlled by or is under common control with Licensee or in which Licensee owns more than a fifty percent (50%) interest.

14.     Alteration; Restoration. Licensee may not make any structural alterations, installations, additions, or improvements in or to the Licensed Area without the prior written consent of Licensor, which consent may be withheld or conditioned in Licensor's sole and absolute discretion. Any signage to be used by Licensee with respect to the Licensed Area must be approved in writing by Licensor, which approval may be withheld or conditioned in Licensor's reasonable discretion. Notwithstanding the foregoing, Licensor shall not unreasonably withhold, delay, or condition its consent to non-structural alterations. Any permitted alteration must be removed and the affected Licensed Area restored, at Licensee's sole cost and expense, when this License Agreement terminates.

15.     Default. If either Party defaults in the performance of any of its obligations hereunder, and such default continues for more than ten (10) days after receipt of written notice from the non-defaulting Party, the non-defaulting Party shall have the right to terminate this License Agreement and pursue any other remedies available at law or in equity, except as limited in Section 15 hereof.

16.     Limitation of Liability. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LICENSE AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, PUNITIVE, SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES WHATSOEVER, INCLUDING LOSS OF GOODWILL OR LOSS OF PROFITS.

Licensor and Licensee agree that none of their respective directors, officers, employees, shareholders, or any of their (or any of those parties') respective agents shall have any personal obligation hereunder and that Licensor and Licensee shall not seek to assert any claim or enforce any of their rights hereunder against any of such parties.

17.     Notices.

(a)     All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (iii) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient and on the next Business Day, if sent after normal business hours of the recipient or (iv) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested postage prepaid.

(b)     Any notice, demand, request, or communication by Licensor to Licensee shall be addressed to Licensee at its address stated in the preamble hereto, Attention: Larry J. Perrotto, Chairman, unless otherwise directed in writing by Licensee by notice similarly given.

(c)     Any notice, demand, request, or communication by Licensee to Licensor shall be addressed to Licensor at its address stated in the preamble hereto, Attention: John L. Reed, President, unless otherwise directed in writing by Licensor by notice similarly given.

18.    Surrender. On the Expiration Date or the extension or sooner termination of the License Period as provided herein, Licensee shall: (a) vacate and surrender full and complete possession of the Licensed Area to Licensor, vacant and broom clean, in its "as-is" condition and state of repair, subject only to: (i) Section 13 hereof; (ii) reasonable wear and tear; (iii) damage by the elements, fire, or other casualty (unless such damage is caused by the gross negligence or wrongful act of Licensee, its employees or agents); and (iv) damage caused by the gross negligence or wrongful act of Licensor, its employees or agents; and (b) remove all furniture, electronic equipment, computers, and other personal property and furnishings from the Licensed Area which are owned or leased by Licensee. Licensee shall only be required to restore, alter, or improve the Licensed Area as specifically set forth in this License Agreement. The surrender obligations outlined herein shall survive any cancellation, expiration, or termination, for any reason, of this License Agreement

19.    Subordination. This License Agreement and the license granted herein are subject and subordinate to all ground and underlying leases affecting the Property or the real property, and to all mortgages which may now or hereafter affect such leases, the Property or the real property.

20.    Warranties. EXCEPT AS SET FORTH IN THIS LICENSE AGREEMENT, THE PARTIES DO NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT OR THE LICENSED AREA, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

21.    Inability to Perform. Neither Party shall be responsible for delays in the performance of its obligations caused by events beyond the Party's reasonable control, including, but not limited to: (a) acts of God; (b) flood, fire, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; and (d) national or regional emergency.

22.    Miscellaneous.

(a)    This License Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(b)    This License Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

(c)    The section titles herein are for convenience only and do not define, limit, or construe the contents of such sections.

(d)    All attachments and exhibits to this License Agreement are hereby made a part hereof as if fully set out herein.

(e)    If any provision in this License Agreement is found to be in violation of any law or otherwise unenforceable, all other provisions remain unaffected in full force and effect.

(f)    This License Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns and shall not be modified except by an express written agreement signed by a duly authorized representative of both Parties.

Execution Document

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have duly executed this License Agreement to be effective as of the date first above written.

LICENSOR:

NEWS-GAZETTE, INC.

By_____

Name: John L. Reed

Title: President


LICENSEE:

CHAMPAIGN MULTIMEDIA GROUP, LLC

By_____

Name: Larry J. Perrotto

Title: Chairman

**EXHIBIT I-2: FORM OF TRANSITION AGREEMENT (Paxton Building)**

**REAL ESTATE LICENSE AGREEMENT**

THIS REAL ESTATE LICENSE AGREEMENT (this "**License Agreement**"), made as of the ___ day of November, 2019, is between News-Gazette, Inc., an Illinois corporation, having its principal office at 15 East Main Street, Champaign, Illinois 61820 ("**Licensor**"), and Champaign Multimedia Group, LLC, an Illinois limited liability company, having an office at 805 South Logan Street, West Frankfort, Illinois 62896 ("**Licensee**"). Licensor and Licensee are referred to collectively as the "**Parties**".

WHEREAS, Licensor is the fee owner of the property known as the Paxton Building and located at 208 N. Market, Paxton, IL 60957 (the "**Property**"); and

WHEREAS, the Parties desire by this License Agreement to provide for the licensing by Licensor to Licensee of the right to use and occupy the Property.

NOW, THEREFORE, intending to be legally bound hereby, the Parties agree as follows:

1.      License. Licensor hereby grants to Licensee, and Licensee hereby accepts, a license (the "**License**") to use and occupy the Property for the purposes hereafter provided for the License Period (as defined in Section 2).

Licensee has inspected the Property and agrees to accept the Property "AS-IS", "WHERE-AS" and "WITH ALL FAULTS" on the date hereof.

2.      License Period. The "**License Period**" for the Property shall commence on the date hereof (the "**Commencement Date**"), and shall expire on the last day of the sixth (6th) full calendar month following the Commencement Date (the "**Expiration Date**"). Following the Expiration Date Licensee shall have the right to renew this license under the same terms for an additional 3 month period. Notwithstanding the foregoing this License Agreement shall be revocable by either Party after the Expiration Date upon thirty (30) days' prior written notice furnished by the terminating party to the non-terminating party.

3.      License Fee. Licensee shall pay a license fee (the "**License Fee**") for the Property in the monthly amount of Six Hundred Twenty-Five Dollars ($625).The License Fee shall be payable by Licensee to Licensor in advance each calendar month during the License Period, by no later than the tenth (10th) day of each month, and shall be made payable to Licensor in United States dollars and delivered to Licensor at the address specified herein or such other address as Licensor may designate by written notice from time to time; *provided that*, on the Commencement Date, Licensee shall pay a portion of the License Fee that is calculated on a per diem basis for the number of days from the Commencement Date through the last day of the month in which the Commencement Date occurs (both dates inclusive).

4.      Utilities. During the License Period the Property shall continue to be served by all utilities which currently serve the Property. The cost for such utility service is included in the License Fee.

5.      Use. The Property shall be used for general office use and uses ancillary thereto.

6.      Compliance with Laws and Regulations.

(a)      Licensee shall promptly comply with all present and future:

        (i)       rules and regulations published by the Licensor (if any) including, without limitation, regulations applicable to use, storage and disposal of hazardous substances and waste and other environmental matters, security policies and procedures, which have been published from time to time with respect to the use of and access to the Property, provided Licensee has received a copy of them; and

        (ii)     applicable laws and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law having jurisdiction applicable to the Property.

7.     <u>Access</u>. Licensee, its employees, contractors and agents shall have the right of access to the Property and Common Areas twenty-four (24) hours per day, seven (7) days per week. Licensor, its employees, contractors and agents shall also have access to the Property upon prior notice to Licensee.

8.     <u>Repairs and Services</u>. Throughout the License Period, Licensee shall take good care of the Property. Licensee shall also be responsible for the cost to repair any damage to the Property other than damage from the elements, fire or other casualty to the Property, or from the gross negligence or intentional misconduct of Licensor, or its agents or employees. Licensee shall provide and furnish routine maintenance services for the Property. Licensor shall make all necessary structural repairs to and maintain major mechanical systems serving the Property. The repair obligations outlined herein shall survive any cancellation, expiration or termination, for any reason, of this License Agreement.

9.     <u>Right to Inspect</u>. Lessor reserves the right to inspect the Property, which, except for emergency situations, will take place during normal business hours and upon reasonable prior notice.

10.    <u>Damage and Destruction</u>.

        (a)     Neither Licensor nor Licensee shall have any responsibility to the other or their respective agents, contractors, tenants, or other invitees in the event of any damage to or theft or loss of any equipment or property of the other party and the party incurring such damage, theft, or loss shall look to its own insurance coverage (and to any self-insured portion of the damage, theft, or loss), if any, for recovery in the event of any such damage, theft, or loss.

        (b)     If all, or a portion, of the Property is destroyed or damaged by fire or other casualty, this License shall terminate. The License Fee shall abate as of the date of the casualty.

11.    <u>Insurance</u>.

        (a)     Licensee shall, at its own cost and expense, maintain and keep in force at all times during the License Period:

        (i)       commercial general liability insurance, which shall include coverage against claims for personal injury, death or property damage occurring on, in or about the Property with respect to the Property and Licensee's conduct of business therein; Licensor shall be named as an additional insured; and

        (ii)     employers' liability and workers' compensation insurance to the extent required by the laws of State of Illinois.

(b)    Notwithstanding anything to the contrary set forth in this License Agreement, Licensor and Licensee hereby release one another and their respective partners, officers, employees, and property manager from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for loss or damage covered by said insurance, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible.

12.    Mutual Indemnification. Each Party (the "**Indemnifying Party**") shall indemnify, defend, save and hold harmless the other Party, and its officers, directors, members, partners, employees, agents, affiliates, successors, and permitted assigns (collectively, the "**Indemnified Parties**") against all claims made or judicial or administrative actions filed which allege that any of the Indemnified Parties is liable to the claimant by reason of:

(a)    any injury to or death of any person, or damage to or loss of property, or any other thing occurring on or about any part of the Property, or in any manner growing out of, resulting from or connected with the use, condition or occupancy of the Property if caused by any negligent or wrongful act or omission of the Indemnifying Party or its agents, partners, contractors, employees, permitted assigns, licensees, sublessees, invitees, or any other person or entity for whose conduct the Indemnifying Party is legally responsible;

(b)    violation by the Indemnifying Party of any contract or agreement to which the Indemnifying Party is a party in each case affecting any part of the Property or the occupancy or use thereof by the Indemnified Party; and

(c)    violation of or failure to observe or perform any condition, provision or obligation of or under this Agreement on the Indemnifying Party's part to be observed or performed hereunder. The indemnity obligations outlined herein shall survive any cancellation, expiration, or termination, for any reason, of this License Agreement.

13.    Assignment or Sublicensing. The license granted hereby is personal to Licensee and shall not be assigned, nor shall Licensee sublicense or otherwise permit or suffer the occupancy of the Property by any third party without the prior written consent of Licensor, which consent shall not be unreasonably withheld or delayed. Notwithstanding anything to the contrary contained herein, Licensee shall have the right to assign or sublicense this License Agreement to any affiliate of Licensee, notice of which shall promptly be given to Licensor. As used herein, the term affiliate means any legal entity which controls, is controlled by or is under common control with Licensee or in which Licensee owns more than a fifty percent (50%) interest.

14.    Alteration; Restoration. Licensee may not make any structural alterations, installations, additions, or improvements in or to the Property without the prior written consent of Licensor, which consent may be withheld or conditioned in Licensor's sole and absolute discretion. Any signage to be used by Licensee with respect to the Property must be approved in writing by Licensor, which approval may be withheld or conditioned in Licensor's reasonable discretion. Notwithstanding the foregoing, Licensor shall not unreasonably withhold, delay, or condition its consent to non-structural alterations. Any permitted alteration must be removed and the affected Property restored, at Licensee's sole cost and expense, when this License Agreement terminates.

15.     <u>Default</u>. If either Party defaults in the performance of any of its obligations hereunder, and such default continues for more than ten (10) days after receipt of written notice from the non-defaulting Party, the non-defaulting Party shall have the right to terminate this License Agreement and pursue any other remedies available at law or in equity, except as limited in <u>Section 15</u> hereof.

16.     <u>Limitation of Liability</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LICENSE AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, PUNITIVE, SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES WHATSOEVER, INCLUDING LOSS OF GOODWILL OR LOSS OF PROFITS.

Licensor and Licensee agree that none of their respective directors, officers, employees, shareholders, or any of their (or any of those parties') respective agents shall have any personal obligation hereunder and that Licensor and Licensee shall not seek to assert any claim or enforce any of their rights hereunder against any of such parties.

17.     <u>Notices</u>.

(a)     All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (iii) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient and on the next Business Day, if sent after normal business hours of the recipient or (iv) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested postage prepaid.

(b)     Any notice, demand, request, or communication by Licensor to Licensee shall be addressed to Licensee at its address stated in the preamble hereto, Attention: Larry J. Perrotto, Chairman, unless otherwise directed in writing by Licensee by notice similarly given.

(c)     Any notice, demand, request, or communication by Licensee to Licensor shall be addressed to Licensor at its address stated in the preamble hereto, Attention: John L. Reed, President, unless otherwise directed in writing by Licensor by notice similarly given.

18.     <u>Surrender</u>. On the Expiration Date or the extension or sooner termination of the License Period as provided herein, Licensee shall: (a) vacate and surrender full and complete possession of the Property to Licensor, vacant and broom clean, in its "as-is" condition and state of repair, subject only to: (i) <u>Section 13</u> hereof; (ii) reasonable wear and tear; (iii) damage by the elements, fire, or other casualty (unless such damage is caused by the gross negligence or wrongful act of Licensee, its employees or agents); and (iv) damage caused by the gross negligence or wrongful act of Licensor, its employees or agents; and (b) remove all furniture, electronic equipment, computers, and other personal property and furnishings from the Property which are owned or leased by Licensee. Licensee shall only be required to restore, alter, or improve the Property as specifically set forth in this License Agreement. The surrender obligations outlined herein shall survive any cancellation, expiration, or termination, for any reason, of this License Agreement

19.     Subordination. This License Agreement and the license granted herein are subject and subordinate to all ground and underlying leases affecting the Property or the real property, and to all mortgages which may now or hereafter affect such leases, the Property or the real property.

20.     Warranties. EXCEPT AS SET FORTH IN THIS LICENSE AGREEMENT, THE PARTIES DO NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT OR THE PROPERTY, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

21.     Inability to Perform. Neither Party shall be responsible for delays in the performance of its obligations caused by events beyond the Party's reasonable control, including, but not limited to: (a) acts of God; (b) flood, fire, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; and (d) national or regional emergency.

22.     Miscellaneous.

(a)     This License Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(b)     This License Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

(c)     The section titles herein are for convenience only and do not define, limit, or construe the contents of such sections.

(d)     All attachments and exhibits to this License Agreement are hereby made a part hereof as if fully set out herein.

(e)     If any provision in this License Agreement is found to be in violation of any law or otherwise unenforceable, all other provisions remain unaffected in full force and effect.

(f)     This License Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns and shall not be modified except by an express written agreement signed by a duly authorized representative of both Parties.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have duly executed this License Agreement to be effective as of the date first above written.

LICENSOR:

NEWS-GAZETTE, INC.

By_____

Name: John L. Reed

Title: President


LICENSEE:

CHAMPAIGN MULTIMEDIA GROUP, LLC

By_____

Name: Larry J. Perrotto

Title: Chairman

# EXHIBIT J: FORM OF DEED

## <u>CORPORATE WARRANTY DEED</u>

The Grantor, D.W.S., Inc., a Delaware corporation, for Two Dollars and 00/100 ($2.00) and other good and valuable consideration, in hand paid, **CONVEYS AND WARRANTS** to the Grantee, Champaign Multimedia Group, LLC, an Illinois limited liability company, the following described real estate:

Commencing at the Southeast corner of Section 24, in Township 19 North, Range 8, East of the Third Principal Meridian and running thence West on said Section line, 2426.15 feet; thence Northerly 25 feet to the North line of the Section line public road and the Westerly Right-of-Way line of State Highway 25 (Federal Route 45) for a True Point of Beginning; thence North 6 degrees 31 minutes 00 seconds East along the said Westerly Highway Right-of-Way line, 704.55 feet; thence West 754.96 feet; thence South 700 feet; thence East 675 feet to the True Point of Beginning, situated in the Southwest ¼ of the Southeast ¼ and in the Southeast ¼ of the Southwest ¼ of Section 24, except that part conveyed to the City of Champaign by Deed recorded in Book 1872, at page 600, as Document Number 92R35433, in Champaign County, Illinois, and also except that part taken by the State of Illinois as Parcel Number 5207017 in Champaign County, Illinois, Condemnation Case 88-L-500.

The above described tract of land is more particularly described as follows:

A tract of land being part of the South l/2 of Section 24, Township 19 North, Range 8 East of the Third Principal Meridian, Champaign County, Illinois, with bearings on Illinois State Plane Coordinate System, East Zone NAD 83:

Beginning at the Southeast corner of Lot 14 in the "Final Plat of Lot 14, Par 3 Development", as recorded in Plat Book "CC" on page 209 in the Champaign County Recorder's Office, said corner also being on the Westerly Right-of-Way line of State Highway 25 (Federal Route 45), proceed South 07° 36' 06" West along said Westerly Right-of-Way line, 17.90 feet to the Northeasterly corner of a tract of land taken by the State of Illinois as Parcel Number 5207017 in Champaign County Condemnation Case 88-L-500; thence South 83° 34' 35" West along a Westerly line of said condemnation tract, 10.02 feet; thence South 16° 36' 18" West along a Westerly line of said condemnation tract, 200.46 feet; thence South 07° 02' 48" West along a Westerly line of said condemnation tract, 416.11 feet; thence South 70° 29' 31" West along a Southerly line of said condemnation tract, l08.77 feet; thence South 88° 36' 17" West along a Northerly line of said condemnation tract 150.67 feet to the Northeast corner of a tract of land as shown on a Right-of-Way Plat recorded in Book 1872, at page 602 in said Champaign County Recorder's Office; thence South 89° 14' 11" West along a Northerly line of said tract shown on a Right-of-Way Plat, 252.04 feet; thence South 88° 31'

13" West along a Northerly line of said tract shown on a Right-of-Way Plat, 133.61 feet to the Southeast corner of Fox Drive in the "Final Plat of Lot 3, Par 3 Development" recorded as Document Number 1998Rl4068 in said Champaign County Recorder's Office; thence North 00° 22' 41" East along an East Right-of-Way line of said Fox Drive, along the East line of an "Urbana Champaign Sanitary District" Pump Station tract of land and along an East line of said Fox Drive, 675.29 feet to a corner of said Fox Drive, said corner also being on the South line of Lot 12 in the "Final Plat of Lot 12 and 13, Par 3 Development" recorded as Document Number 1997Rl1610 in said Champaign County Recorder's Office; thence South 89° 29' 05" East along said South line of Lot 12, along the South line of Lot 13 in said "Final Plat of Lot 12 and 13, Par 3 Development" and along the South line of said Lot 14 to the Point of Beginning.

Permanent Parcel Index No. 45-20-24-378-002
Commonly known as 2301 S. Neil Street, Champaign, Illinois 61820

Subject to:      (1)   Real estate taxes for the year 2019 (not yet due and payable) and subsequent years;
            (2)   Covenants, conditions, restrictions and easements of record;
            (3)   All applicable zoning laws and ordinances;

This Deed is made, executed and delivered under and pursuant to the authority given by the Board of Directors of the aforesaid Grantor, D.W.S., Inc., and in witness whereof, the said Grantor corporation has caused this instrument to be signed by its President on the date herein executed, and that the said Officer pursuant to said authority has the powers to execute this Warranty Deed of conveyance to the Grantee herein.

Execution Document

DATED this _____ day of November, 2019.

D.W.S., Inc.

By: _____
John L. Reed, President

Attest:

By: _____
Traci E. Nally, Secretary

STATE OF ILLINOIS

COUNTY OF CHAMPAIGN

I, the undersigned, a Notary Public in and for said County, in the state aforesaid, do hereby certify that John L. Reed and Traci E. Nally personally known to me to be the President and Secretary of said Corporation, whose name is subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as such respective officer, he signed and delivered said instrument of writing on behalf of such corporation, pursuant to the authority given by the Board of Directors of said corporation, as the free and voluntary act and deed of said corporation for the uses and purposes therein set forth.

Given under my hand and notarial seal this ___ day of November, 2019.

_____
Notary Public

**AFTER RECORDING RETURN TO AND SEND TAX BILLS TO**:
Champaign Multimedia Group, LLC
Attention:  Larry J. Perrotto, Chairman
c/o Community Media Group, Inc.
PO Box 10
West Frankfort, IL  62896

**Prepared by:**
Traci E. Nally, General Counsel
The News-Gazette, Inc.
15 Main St., P. O. Box 677
Champaign, IL  61824-0677
Telephone:  217/351-5375; Facsimile:  217/351-5245
E-Mail:  tnally@news-gazette.media

| NO. | SCHEDULE REFERECE | SCHEDULE |
|---|---|---|
| 1. | 1.2(b) | Personal Property |
| 2. | 1.2(c) | Assigned Contracts [to be completed] |
| 3. | 1.2(j) | Prepaids |
| 4. | 1.3 | Other Excluded Assets |
| 5. | 3.1 | Wire Transfer Instructions |
| 6. | 3.5 | Allocation of Purchase Price |
| 7. | 4.1(f) | Consents |
| 8. | 4.2(c) | Inventory older than 60 days |
| 9. | 4.2(d) | Pending Insurance Claims |
| 10. | 4.2(e) | Liens, Claims and Encumbrances |
| 11. | 4.2(g) | Lease for the Radio Station Real Property |
| 12. | 4.2(h) | Exceptions to Legal Requirements for Radio Station Real Property |
| 13. | 4.3(a) | Advertising Revenues |
| 14. | 4.3(c) | Advertising Contracts |
| 15. | 4.6(a) | Exceptions to Ordinary Course of Conduct |
| 16. | 4.7(a) | Contracts |
| 17. | 4.7(b) | Permits |

| NO. | SCHEDULE REFERECE | SCHEDULE |
|---|---|---|
| 18. | 4.7(c)(i) | FCC Permits |
| 19. | 4.7(c)(ii) | FCC Complaints |
| 20. | 4.7(c)(iii) | Antennae Structure Registration Numbers |
| 21. | 4.9(a) | Actions |
| 22. | 4.9(c) | Compliance with Legal Requirements |
| 23. | 4.10(a) | Environmental Notices |
| 24. | 4.10(c) | Containers |
| 25. | 4.10(d) | Asbestos, PCB's |
| 26. | 4.10(f) | Environmental Reports |
| 27. | 4.11(a) | Intellectual Property |
| 28. | 4.15(b) | Commissions and Fees |
| 29. | 5.1(e) | Consents required of Purchaser other than Sale Order and FCC Consent |
| 30. | 5.1(h) | Actions (Purchaser) |

## SCHEDULE 1.2(B)

## PERSONAL PROPERTY

**Included personal property**:

- Everything on attached lists, unless identified as excluded, below
- Furniture, computer equipment, and accessories to outfit all employees of Purchaser's newspaper and radio operations, that we own, have in our possession and if not on attached lists

**Excluded personal property (even if contained on lists below)**:

- Items owned by employees
- Anything in the Helen Mary Stevick Senior Citizen's Center
- All personal property located in the administrative mezzanine
- Anything owned by the Marajen Stevick Foundation, including but not limited to foundation files and records
- The shed on the northeast side of 15 Main St, Champaign
- Anything located in the HR/Legal department, including legal files, employment-personnel-labor-pension files and records, furniture and office equipment and computers
- Artwork, including but not limited to wall art, statuary, and other art for display that was not produced by Sellers' photographers
- Lobby furniture and decorative accessories
- Garden Room tables, chairs and matching bamboo furniture
- Rosie Sandifur statuettes
- Tools, equipment and parts needed to maintain Sellers' retained real estate including the News-Gazette truck used by the maintenance staff and snowblower
- Bricks recognizing 30-year employees in patio around "Read All About It!" Rosie Sandifur statue
- "Read All About It!" Rosie Sandifur statue (owned by City of Champaign)
- MS Dynamics and QuickBooks accounting software and necessary server hardware
- Carpet installed at 15 Main St and leftover matching carpet
- Window treatments at 15 Main St
- Granite Replacement tiles for 15 main St
- Silver ingots recycled from film
- Commons areas furniture
- Fixtures and mechanical systems attached to 15 Main St, Champaign or 208 N. Market, Paxton

## Machinery and Equipment

| Asset ID | Acq. Date | Description | Acquisition | Book Value |
|---|---|---|---|---|
| ECC000112 | 09/07/2007 | UNIDEN BCD996T SCANNER-M&E | 570 | 0 |
| NEWS004724 | 08/28/2009 | 1-NIKKON D700 D-SLR-PHOTO | 2,668 | 0 |
| NEWS004737 | 04/01/2010 | 6-NIKON 300 DS/1-MB-D10-PHOTO | 10,619 | 0 |
| NEWS004779 | 07/01/2012 | 2Q PHOTO EQ REPLACEMENT | 3,495 | 0 |
| NEWS004781 | 09/01/2012 | 3Q PHOTO EQ REPLACEMENT | 3,357 | 40 |
| NEWS004783 | 11/01/2012 | 4Q PHOTO EQ REPLACEMENT | 1,695 | 63 |
| NG004806 | 06/01/2013 | NIKON D-600 CAMERA BODY(2) | 2,830 | 382 |
| NG004814 | 01/22/2014 | NIKON D600 BODY & BATTERY PACK | 2,879 | 731 |
| NG004815 | 01/22/2014 | NIKON D600 BODY & BATTERY PACK | 2,879 | 731 |
| NG004817 | 05/15/2014 | LIVESTREAM STUDIO HD51 | 19,001 | 6,334 |
| NG004840 | 12/23/2014 | NIKON D750 BODY & BATTERY PACK | 1,998 | 999 |
| NG004850 | 03/18/2015 | NIKON-D750 BODY QTY 4 | 5,797 | 3,391 |
| NG004852 | 05/18/2015 | ATLAS AIR COMPRESSOR | 1,432 | 927 |
| NG004866 | 11/17/2015 | SNOWBLOWER 30 IN 2 STAGE | 665 | 576 |
| NG004887 | 04/01/2018 | NIK-12341  NIK-AFS 70-200 2.8E FL ED 20063 SERIAL #248825 | 533 | 2,264 |
| NG004888 | 04/01/2018 | NIK-12341  NIK-AFS 70-200 2.8E FL ED 20063 SERIAL #248832 | 533 | 2,264 |
| 004889 | 04/01/2018 | NIK-10172  NIK-D500 DX BODY ONLY SERIAL #3043479 | 361 | 1,536 |
| NG004890 | 04/01/2018 | NIK-10172  NIK-D500 DX BODY ONLY 1559 SERIAL #3043480 | 361 | 1,536 |
| NG004891 | 04/01/2018 | NIK-10172  NIK-D500 DX BODY ONLY 1559 SERIAL #3043550 | 361 | 1,536 |
| NG004892 | 04/01/2018 | NIK-10172  NIK-D500 DX BODY ONLY 1559 SERIAL #3043668 | 361 | 1,536 |
| NG004893 | 04/01/2018 | NIK-12341  NIK-AFS 70-200 2.8E FL ED 20063 SERIAL #250256 | 533 | 2,264 |
| NEWS004903 | 07/01/2018 | J50 Jogger | 209 | 1,141 |
| NEWS004900 | 09/28/2018 | Newspaper Display Racks | 442 | 2,935 |
| DWS000035 | 1/1/1969 | TRANSMITTER PRIOR 69 | 10,997.00 | 0.00 |
| DWS000037 | 12/31/1972 | TRANSMITTER 1972 | 28,238.00 | 0.00 |
| DWS000043 | 2/1/1986 | FM TRANSMITTER | 67,719.00 | 0.00 |
| DWS000065 | 9/1/1984 | MARTI ELECTRONIC EQP | 2,128.00 | 0.00 |
| DWS000066 | 10/1/1984 | MARTI ELECT UNIT | 2,200.00 | 0.00 |
| DWS000094 | 6/23/1988 | BROADCAST CONSOLE | 4,576.00 | 0.00 |
| DWS000098 | 7/19/1988 | DELTA AMP | 1,307.00 | 0.00 |
| DWS000214 | 12/31/1988 | HARRIS EXCITER | 5,278.00 | 0.00 |
| DWS000228 | 10/20/1990 | WHEATSTONE-CONSOLE | 21,205.00 | 0.00 |
| DWS000289 | 11/30/1994 | AM CONSOLE A-500A | 33,872.00 | 0.00 |
| DWS000750 | 4/3/2000 | NAUTEL ND1 1KW AM TRANSMITTER | 24,029.05 | 0.00 |
| WS001530 | 4/16/2003 | COMREX VECTOR CODEC PORT | 8,843.94 | 0.00 |

| Asset ID | Date | Description | Acquisition | Book Value |
|---|---|---|---|---|
| DWS001660 | 10/21/2003 | 1-ORBAN 8200 SIGNATURE SERIES | 6,864.37 | 0.00 |
| /S001718 | 4/15/2005 | ERI SHPX-5AE 5-BAY FM TRANSMITTER | 50,525.28 | 0.00 |
| DWS001719 | 4/15/2005 | MARTI SRPT30-150 TRNSMTTR-S&T | 3,659.44 | 0.00 |
| DWS001721 | 5/16/2005 | HARRIS AIRWAVE DIG12 MAINFRM-S&T | 14,130.13 | 0.00 |
| DWS001723 | 5/16/2005 | HARRIS SOURCE GEAR-S&T | 2,397.77 | 0.00 |
| DWS001731 | 10/31/2005 | HARRIS ORBAN AM OPTIMOD-S&T | 4,041.90 | 0.00 |
| DWS001734A | 7/6/2006 | HARRIS WDWS PENNY TALK STUDIO EQUIP-S&T | 3,005.06 | 0.00 |
| DWS001754 | 6/19/2008 | IDELEC SWITCH/CONTROLLER-TRNSMTTR | 9,056.29 | 0.00 |
| DWS001761 | 8/1/2010 | WUIL HARRIS Z5CD TRNSMTTR/HJ7-50A TRNSMSSN LINE-T&T | 71,333.34 | 8,666.66 |
| DWS001762 | 8/1/2010 | WUIL ANCILLARY EQUIPMENT-S&T | 24,000.00 | 0.00 |
| DWS001765 | 8/1/2010 | WUIL ERI LPX-2E ANTENNA W/ RADOMES-T&T | 50,000.00 | 0.00 |
| DWS001767 | 8/1/2010 | SHURE UR24D/SM58-J5 WIRELESS MIC SYS-S&T | 3,235.00 | 0.00 |
| DWS001768 | 8/1/2010 | WUIL BSW STUDIO EQP & MONITORS-S&T | 12,779.19 | 0.00 |
| DWS001771 | 8/1/2010 | WUIL MOSELEY SL9003Q-2S TRNSMTR LINK SYS-T&T | 13,474.60 | 1,637.12 |
| DWS001772 | 8/1/2010 | WUIL SCALA PR-950 ANTENNA-T&T | 998.40 | 0.00 |
| DWS001773 | 8/1/2010 | WUIL BURK ARC PLUS SL REMOTE CTRL HRDWR-S&T | 4,308.98 | 0.00 |
| DWS001775 | 10/1/2010 | WUIL MARK P9A72GN-U ANTENNA-T&T | 1,741.25 | 0.00 |
| DWS001776 | 11/1/2010 | WUIL ORBAN 5500 PRCSSR/BURK ARC REMOTE CTRL-S&T | 4,888.05 | 0.00 |
| /S001777 | 8/1/2010 | WUIL HARRIS MODULE PA 850W-S&T | 2,601.30 | 0.00 |
| DWS001780 | 5/18/2011 | WUIL FM exciter | 5,354.55 | 0.00 |
| DWS001781 | 6/1/2012 | ENDEC EAS ENCODER/DECODER | 4,030.76 | 0.00 |
| DWS001782 | 4/1/2013 | HARRIS NETWAVE AUDIO | 7,631.25 | 915.75 |
| DWS001783 | 8/1/2013 | COMREX PORTABLE ACCESS | 13,375.74 | 2,449.08 |
| DWS001786 | 4/14/2015 | AM MODULATION MONITOR | 1,238.28 | 801.26 |
| DWS001787 | 8/27/2015 | FLASHHEAD TOWER LIGHTS | 3,931.11 | 3,094.71 |
| DWS001788 | 4/1/2016 | FLASHHEAD TOWER LIGHTS | 851.64 | 982.61 |
| DWS001790 | 5/1/2017 | AUDIO OVER IP DUPLEX AUDIO TRANSMISSION VERSION 2 | 919.31 | 2,050.69 |
| DWS001793 | 11/15/2017 | Radio Studio equipment at 15 Main | 55,948.00 | 179,033.52 |
| DWS001794 | 2/7/2018 | 3.7M PRODELIN ANTENNA | 2,820.83 | 11,117.46 |
| DWS001796 | 3/28/2019 | Inovonics Broadcaset Modulation Monitor Model 531N Serial 4356 | 139.16 | 2,782.94 |
| DWS001798 | 3/1/2019 | Wheatstone M4-IPUSB  Micophone Blade | 169.96 | 3,399.04 |

## Furniture

| Asset ID | Acq. Date | Description | Acquisition | Book Value |
|---|---|---|---|---|
| NEWS001090 | 05/30/1991 | 2-3DR FILE/2-OVERBIN | 1,634 | 0 |
| WS001088 | 06/30/1991 | 7-STEELCASE PANELEND | 1,177 | 0 |

| | | | | |
|---|---|---|---|---|
| NEWS001095 | 08/27/1991 | FURNITURE-LEGAL OFFC | 13,420 | 0 |
| WS001094 | 08/30/1991 | FURNITURE-TELEMARKTG | 8,139 | 0 |
| NEWS001100 | 09/19/1991 | FURNITURE-MARKETING | 2,787 | 0 |
| NEWS001144 | 07/24/1992 | DESK W/KEYBOARD ARM | 1,411 | 0 |
| NEWS001198 | 05/04/1993 | OFFICE CHAIRS, 2 | 1,105 | 0 |
| NEWS001199 | 05/13/1993 | DESKS, FILES | 2,803 | 0 |
| NEWS001211 | 09/01/1993 | 2 DRAWER LAT FILES | 1,071 | 0 |
| NEWS001218 | 09/25/1993 | COMPUTER DESK TOP | 1,400 | 0 |
| NEWS000179 | 04/15/1996 | 2 STEEL BOOKCASES | 2,143 | 0 |
| NEWS000181 | 04/26/1996 | CUBICLES | 21,193 | 0 |
| NEWS001480 | 01/08/1997 | OFFICE FURNITURE | 3,932 | 0 |
| NEWS001490 | 04/21/1997 | FILE PANEL INSTALLATION | 9,480 | 0 |
| NEWS002270 | 05/14/1999 | 78" SERVER CABINET | 1,534 | 0 |
| DI000530 | 02/08/2001 | 3-7066 DMI DESKS | 6,551 | 0 |
| NEWS004060 | 09/06/2002 | SMOKERM FURNITURE-STEVICK BLDG | 2,372 | 0 |
| NEWS004470 | 12/05/2003 | 7-WRKSTAT/3-HON FILES(FIN) | 31,581 | 0 |
| NEWS004531 | 01/06/2005 | 2-HON CHAIRS-CIRC | 548 | 0 |
| NEWS004533 | 01/26/2005 | 8-LZYBOY HIBACK CHAIRS-CIRC | 2,577 | 0 |
| NEWS004534 | 02/07/2005 | 12-4X4/6-GUEST CHAIRS-DANVILLE | 2,784 | 0 |
| NEWS004538 | 02/28/2005 | DESK/CRDNZA/FILES/CABINET/CHAIR-ADMIN | 9,866 | 0 |
| NEWS004551 | 04/22/2005 | 4-HON 2DWR FILES-ADV | 625 | 0 |
| ECC000050 | 04/18/2006 | 6-DESKS/5-CRDNZA/9-FILES/19-CHAIRS | 6,616 | 0 |
| ECC000052 | 04/24/2006 | 11-VLA TASK CHAIRS | 735 | 0 |
| C000053 | 04/28/2006 | 2-VLA TASK CHAIRS | 134 | 0 |
| C000054 | 05/09/2006 | 3-EXECUTIVE DESKS | 3,042 | 0 |
| NEWS004609 | 06/30/2006 | 13-HAN TASK CHAIRS-CIRC | 3,099 | 0 |
| NEWS004615 | 08/24/2006 | CHAIR REFURBISHMENTS-CIRC | 1,268 | 0 |
| ECC000086 | 12/22/2006 | 7-DESKS/5-CRDNZA/3-FILES/2-HUTCH,CRDNZA,BKCASE-GTOWN F&F | 4,620 | 0 |
| NEWS004644 | 04/02/2007 | BELKIN 4-POST RACK-F&F-EDIT | 389 | 0 |
| NEWS004645 | 05/09/2007 | DELL RACK MOUNT 3U RAILS-F&F-EDIT | 285 | 0 |
| ECC000098 | 06/12/2007 | 2-HON DESKS/2-2DRWR/2-4DRWR-F&F TUSCOLA | 1,353 | 0 |
| ECC000100 | 07/23/2007 | 6-CHAIRS/4-4 LN PHONES-F&F PAXTON | 776 | 0 |
| ECC000101 | 07/26/2007 | CHAIR/MAT/4LN PHONE-F&F PAXTON | 236 | 0 |
| NG004877 | 04/01/2017 | OFFICE CHAIRS 26 QTY PRE-OWNED | 607 | 693 |
| NG004880 | 11/15/2017 | Lobby Furn 15 Main | 2,364 | 4,390 |
| DWS001370 | 5/27/2002 | 2,766 FT NEW CARPET-F&F | 9,818.44 | 0.00 |
| DWS001702 | 3/8/2004 | 1-EXEC DESK 4-CHAIRS-F&F | 1,478.13 | 0.00 |
| DWS001722 | 5/16/2005 | HARRIS PR&E PRDN RM FURN-S&T | 9,351.71 | 0.00 |
| DWS001733 | 5/20/2006 | CARPET-CONF RM/OFC/STUDIO-F&F | 3,874.22 | 0.00 |
| DWS001734B | 7/6/2006 | HARRIS WDWS PENNY TALK F&F-F&F | 3,401.98 | 0.00 |
| DWS001737 | 8/4/2006 | PENNY TALK OTHER FURNITURE-F&F | 1,579.01 | 0.00 |
| DWS001743 | 9/14/2007 | 6-RELATE SIDE CHAIRS-F&F | 1,325.33 | 0.00 |
| DWS001745 | 9/26/2007 | 2-JOSELYN ACCENT CHAIRS/MELIA BENCH-F&F | 1,128.15 | 0.00 |
| DWS001746 | 9/26/2007 | RACETRACK CONFERENCE TABLE-F&F | 204.19 | 0.00 |
| WS001792 | 11/15/2017 | Radio Studio furniture at 15 Main | 1,197.60 | 5,988.02 |

## Office Equipment

| Asset ID | Acq. Date | Description | Acquisition | Book Value |
|----------|-----------|-------------|-------------|------------|
| NEWS004400 | 09/01/2003 | ASURA AUTO FILE REPAIR SFTWR-COMP | 25,922 | 0 |
| NEWS004430 | 10/27/2003 | EDGIL PMT EDGCPTR BATCH SFTWR-FIN | 21,674 | 0 |
| NEWS004440 | 11/07/2003 | NEC 2000 IPS PHONE SYS HRDWR-IS | 71,239 | 0 |
| NEWS004450 | 11/07/2003 | NEC 2000 IPS PHONE SYS SFTWR-IS | 16,757 | 0 |
| NEWS004499 | 06/22/2004 | NEC PBX AUTO CALL HRDWR-IS | 2,142 | 0 |
| NEWS004500 | 06/22/2004 | NEC PBX AUTO CALL SFTWR-IS | 5,206 | 0 |
| NEWS004505 | 09/10/2004 | PHONE SYS PWR RELAY-OFC EQP | 681 | 0 |
| NEWS004516 | 11/16/2004 | DSI DIMENS INSGT ATLANTIS SOFT-CIRC | 271,003 | 0 |
| NEWS004577 | 11/23/2005 | XPANCEX DATABASE MIGRATION-COMP | 18,240 | 0 |
| NEWS004582 | 12/23/2005 | EPSON DFX-9000 IMPACT PRNTR-ADV/DI | 2,713 | 0 |
| NEWS004597 | 06/01/2006 | SUNFIRE V490/V440 SERVERS-ADV | 107,722 | 0 |
| NEWS004614 | 08/01/2006 | VISION DATA 2.9 CLASS SOFTWR-ADV | 159,318 | 0 |
| NEWS004631 | 12/22/2006 | BARRACUDA FIREWALL SFTWR-IS | 1,798 | 0 |
| NEWS004633 | 01/02/2007 | BARRACUDA SPAM FIREWALL-IS | 1,446 | 0 |
| NEWS004693 | 02/11/2008 | SAXOPRESS R6 SW UPGRD-EDIT | 48,085 | 0 |
| NEWS004695 | 03/31/2008 | VISION DATA PROFIT CNTR UPGRD-ADV | 3,500 | 0 |
| NEWS004702 | 07/31/2008 | MS DYNAMIC SL V7 UPGRD-FIN | 8,705 | 0 |
| NEWS004705 | 08/22/2008 | BARRACUDA WEB FILTER 410/UPDTS-IS | 4,742 | 0 |
| ECC000120 | 09/03/2008 | ELITE PHONE SYS ST. JOE-OGDEN | 1,195 | 0 |
| NEWS004720 | 05/12/2009 | VISION DATA HMLNK/ETEAR/EDGIL-CLASS | 10,855 | 0 |
| NEWS004743 | 05/01/2010 | DROBO ELITE ARRAY/8 DRIVES-IT | 4,549 | 0 |
| NEWS004746 | 07/01/2010 | VISION ANALYZER MYSQL DB-ADV | 10,000 | 0 |
| NEWS004748 | 07/01/2010 | 10-WIDOWS SRVR 2008 STD-IT | 6,874 | 0 |
| NEWS004749 | 07/01/2010 | 2-DROBO ARRAYS/16-DRVS/RACKS/2-SWTCHS-IT | 11,524 | 0 |
| NEWS004750 | 07/01/2010 | VMWARE VSPHERE SOFT-IT | 25,766 | 0 |
| NEWS004751 | 07/01/2010 | 3-DELL R710'S-IT | 15,173 | 0 |
| NEWS004771 | 02/01/2011 | 2011 CTP HARDWARE | 2,015 | 0 |
| ECC000125 | 06/01/2011 | Adobe InDesign CS5 | 11,313 | 0 |
| NEWS004782 | 10/01/2012 | EDITORIAL SAXO HDW UPGRADE | 28,355 | 0 |
| NEWS004784 | 10/01/2012 | EDITORIAL SAXO SFT UPGRADE | 1,820 | 0 |
| NG004786 | 01/01/2013 | PC & MONITORS 18 UNITS | 22,513 | 0 |
| NG004787 | 01/22/2013 | BNA FIXED ASSETS DESKTOP PRO | 1,381 | 0 |
| NG004789 | 02/01/2013 | EDGIL CC SOFTWARE UPGRADE | 8,760 | 0 |
| NG004803 | 04/01/2013 | PAYWALL PROJECT | 7,823 | 0 |
| NG004808 | 11/15/2013 | SL 2011 FP1 UPGRADE | 13,413 | 0 |
| NG004810 | 12/01/2013 | MAC MINI SERVER | 1,279 | 0 |
| NG004811 | 12/01/2013 | SERVER VIRTUALIZATION | 37,432 | 0 |
| NG004812 | 12/01/2013 | VMWARE VSPHERE | 14,824 | 0 |
| NG004813 | 12/01/2013 | XPANCE SOFTWARE UPGRADE | 17,114 | 0 |
| NG004826 | 02/01/2014 | LG TV NEWSROOM | 2,000 | 0 |
| NG004827 | 02/01/2014 | LG TV NEWSROOM | 2,000 | 0 |
| NG004828 | 02/01/2014 | LG TV NEWSROOM | 2,000 | 0 |
| NG004822 | 03/01/2014 | ADOBE VOLUME LICENSE | 2,559 | 0 |

| | | | | |
|---|---|---|---|---|
| NG004816 | 04/01/2014 | DELL OPTIPLEX 760 20 UNITS | 5,715 | 0 |
| 004818 | 06/13/2014 | DELL 755MINI TOWER PC 2.6GHZ(36 UNITS) | 10,000 | 0 |
| NG004824 | 09/01/2014 | DELL OPTIPLEX 760 (61) | 17,338 | 294 |
| NG004825 | 09/01/2014 | DELL OPTIPLEX 780 (25) | 7,245 | 123 |
| NG004848 | 11/01/2014 | BARRACUDA SPAM FIREWALL | 3,335 | 0 |
| NG004839 | 11/19/2014 | SHOPKEEP POS | 965 | 51 |
| NG004859 | 05/01/2015 | TOSHIBA STUDIO 455 #2357 | 2,316 | 409 |
| NG004860 | 05/01/2015 | TOSHIBA STUDIO 455 #2358 | 2,316 | 409 |
| NG004858 | 05/06/2015 | MAC BOOK PRO 2012 QTY 2 | 1,677 | 296 |
| NG004854 | 05/20/2015 | EMAIL BACKUP | 811 | 143 |
| NG004861 | 07/01/2015 | MICROSOFT WINDOWS SERVER | 38,071 | 0 |
| NG004862 | 07/01/2015 | MICROSOFT WINDOWS REMOTE | 14,541 | 0 |
| NG004863 | 07/01/2015 | MICROSOFT OFFICE | 55,346 | 0 |
| NG004864 | 07/01/2015 | MICROSOFT WINDOWS VIRTUAL DESKTOP | 2,000 | 0 |
| NG004865 | 08/01/2015 | QB 2015 PREMIER | 1,334 | 0 |
| NG004870 | 04/01/2016 | VD GANNETT INTERFACE SOFTWARE | 4,800 | 0 |
| NG004871 | 07/06/2016 | MACBOOK PRO | 1,326 | 824 |
| NG004873 | 01/25/2017 | NEWSCYCLE CONTENT SYSTEM UPGRADE | 4,728 | 763 |
| NG004872 | 02/01/2017 | LAPTOP COMPUTERS FOR ADVERTISING DEPT | 5,216 | 5,216 |
| NG004881 | 11/15/2017 | Radios for Executive Offices 15 Main | 431 | 801 |
| NG004886 | 12/01/2017 | Mac Book Pro/Jason Frye | 716 | 1,433 |
| NEWS004901 | 10/18/2018 | Dell Optiplex 7010 Desktop Computers  20 units | 850 | 4,250 |
| NEWS004902 | 11/19/2018 | Dell Optiplex 7010 Desktop Computers 20 units | 777 | 4,403 |
| WS000151 | 8/1/1984 | FIREPROOF CABINET | 1,005 | 0 |
| /S001420 | 7/10/2002 | SCOTT STUDIOS SS32 HRDWR-S&T | 21,465 | 0 |
| DWS001430 | 7/10/2002 | SCOTT STUDIOS SS32 SFTWR-S&T | 9,266 | 0 |
| DWS001440 | 7/12/2002 | 2-17"LCD MONITORS/UPS SUPPL-S&T | 1,673 | 0 |
| DWS001700 | 12/18/2003 | NEC 2000 IPS PHONE SYS-OFC | 15,999 | 0 |
| DWS001774 | 8/1/2010 | WUIL BURK AP2010 SFTWR-S&T | 494 | 0 |
| DWS001778 | 8/1/2010 | WIDE ORBIT SRVRS/HD'S/MISC HRDWR-S&T | 32,474 | 0 |
| DWS001779 | 8/1/2010 | WIDE ORBIT SRVR&RADIO AUTO SFTWR-S&T | 35,085 | 0 |
| DWS001789 | 5/4/2016 | WIDEORBIT AUTOMATION RADIO CONTROL SYSTEM | 3,037 | 1,758 |

## Vehicles

| Asset ID | Acq. Date | Description | Acquisition | Book Value |
|---|---|---|---|---|
| ECC000018 | 09/14/2004 | 2004 CHEVROLET 3500 CARGO VAN VIN 4055 | 27,456 | 0 |
| NEWS004508 | 09/30/2004 | 2005 TOYOTA COROLLA LE 4DR-ADV VIN 8018 | 16,887 | 0 |
| NEWS004618 | 08/31/2006 | 2006 GMC SAVANA 2500 CARGO-CIRC VIN 2847 | 29,717 | 0 |
| NEWS004712 | 10/28/2008 | 2007 FORD E-250 VIN 1168 | 16,229 | 0 |
| NEWS004714 | 10/28/2008 | 2007 FORD E-250 VIN 5940 | 16,229 | 0 |
| 004841 | 12/29/2014 | 2004 DODGE CARAVAN 2D4GP44L94R542427 | 1,867 | 133 |

| NG004844 | 12/29/2014 | 2002 DODGE CARAVAN 1B8GP25342B655029 | 2,893 | 207 |
| 004845 | 12/29/2014 | 2005 DODGE CARAVAN 1D4GP25B15B416377 | 4,667 | 333 |
| NG004846 | 12/29/2014 | 2001 DODGE CARAVAN 2B8GP44G8R154077 | 2,333 | 167 |
| NG004853 | 05/26/2015 | 2015 ISUZU TRUCK | 41,851 | 7,385 |
| DWS001738 | 10/26/2006 | 2007 GMC SAVANA 1500 CARGO VAN VIN 5104 | 38,380 | - |

## Detailed IT Hardware List
(Some items duplicated from office equipment)

## Main Office – Lower Level

North Conference Room
3x Dell Optiplex Desktops
3x Monitor
1x Projector

## Main Office – Ground Floor

Main area, Photo
3x Mac Minis
4x Monitors
3x Apple MacBooks

Main area, Editorial
1x HP G5-255 Laptop
1x Apple iMac Desktop
14x Dell Optiplex Desktop (includes OGG scanner streaming box on floor)
16x Apple Mac Mini Desktop
34x Monitors
3x TVs

Main area, Radio
4x Dell Optiplex Desktops (Kiser / Ditman / Loane / Vorel)
4x Monitors

ADP Kiosk
1x Dell Optiplex Desktop
1x Monitor

Lobby, CCC
5x Dell Optiplex Desktops
5x Monitors
1x Apple iPad (cash register machine)

Lobby, Radio
2x Dell Optiplex Desktops (MCR & Barnhart)
4x Monitors (1 monitor is on lobby shelf for slide show display)

Circulation
12x Dell Optiplex Desktops
14x Monitors

Mezzanine, Radio
4x Dell Optiplex Desktops
6x Monitors

Mezzanine, Editorial
2x Dell Optiplex Desktops (Adalberto & Intern)
3x Monitors

Mezzanine, SAXO testing
1x Dell Optiplex Desktop
1x Mac Mini
2x Monitors

Studios
DWS:
1x TV
3x Monitors
1x Dell Optiplex Desktop
1x Raspberry Pi
1x Wheatstone IP-88E
1x Wheatstone IP-88A
1x Wheatstone M4IP-USB
1x Wheatstone LX-24
4x Wheatstone TS4

HMS:
1x TV
3x Monitors
1x Dell Optiplex Desktop
1x Raspberry Pi
1x Wheatstone IP-88E
1x Wheatstone IP-88A
1x Wheatstone M4IP-USB
1x Wheatstone LX-24

Production:
2x Monitors
1x Dell Optiplex Desktop

1x Wheatstone IP-88E
1x Wheatstone IP-88A
1x Wheatstone M4IP-USB
1x Wheatstone LX-24


KIO:
3x Monitors
1x Dell Optiplex Desktop
1x Raspberry Pi
1x Wheatstone IP-88CB
1x Wheatstone L-8

News Production:
1x Dell Optiplex Desktop
1x Monitor
1x Wheatstone M4IP-USB

**Main Office – 3rd Floor**

Advertising
14x Dell Optiplex Desktop
25x Monitors
1x MacBook
10x HP G5-255 Laptop


Creative Services, Marketing & Magazines
7x Dell Optiplex Desktop
4x Apple Mac Mini Desktop
20x Monitors
1x Mac Pro

Digital Media
3x Dell Optiplex Desktop
9x Monitors
2x Apple iPad
1x MacBook
1x TV

**Main Office – 4th Floor**


Darren's Area
Dell XPS Desktop
Dell Optiplex Desktop

3x monitors
Apple iMac Desktop
5-port network switch
Digital desk phone
Apple iPhone SE
HP G5-255 Laptop
CyberPower UPS 850AVR
Wheatstone IP-88AD
2x Wheatstone M4IP-USB
ASUS Laptop
2x Dell PowerEdge 860
Dell PowerEdge 1950
Dell PowerEdge R610
Dell PowerEdge R210
2x Apple Mac Mini Desktop
3x Apple iPad


Central Area
2x Dell XPS Desktop
2x monitors
Dell PowerEdge 860
Dell PowerEdge 2950
20x Dell Optiplex Desktop
7x HP G5-255 Laptop


Stan's Area
1x Dell XPS Desktop
13x Monitors
29x Dell Optiplex Desktop
Dell PowerEdge 860

Storage Closet
40x Dell Optiplex Desktop
4x Dell PowerEdge 860
1x Monitor
10x Apple Mac Mini Desktop


Overflow Area
31x 4:3 Monitors
2x Dell PowerEdge 2950
Livestream PC + assorted audio accessories
Comrex BRIC
Comrex Remote unit

2x Apple Mac Mini Desktop

**Main Office - Server Room**

Vision Data Rack
2x CRT Monitors
1x SUN SunFire V490
1x SUN SunFire V440
1x SUN StorEdge 3510
1x Tape Drive (retired)
1x Network switch

StarTech Rack
1x HP Laptop
8x Dell PowerEdge 860
3x DroboElite
1x Network switch
1x Smart-UPS 3000

Rear Rack
2x Network switch

Satellite Receiver Rack
5x XDS Receivers
1x iPump 6420 Receiver

WideOrbit/Wheatstone Rack (Tripp Lite)
PDM Dump Unit
2x Dell PowerEdge R210
Belkin IP-KVM
Keyboard/Mouse Console
1x Wheatstone IP-88A
1x Wheatstone IP-88AD
Sage Emergency Alert System Unit
3x Cisco 24-port multicast switches
1x Cisco 8-port multicast switch (not currently in use)
5x Dell PowerEdge R610
2x Comrex BRIC
3x Comrex STAC VIP
4x AdderPro KVM Device
1x Smart-UPS 3000
1x Smart-UPS RT 3000 XL 208v

1x UPS 208-110v Step-Down Transformer
3x Network switch

VMWare Rack (Belkin)
4x Dell PowerEdge 2950
1x Dell PowerEdge R210
1x Dell PowerEdge 860
3x Dell PowerEdge R720
4x Dell PowerEdge R710
2x Network switch
3x Smart-UPS 3000

Network Rack (Hubbell)
1x Barracuda Webfilter
1x Barracuda Email filter
1x Dell PowerEdge R210
1x Dell PowerEdge 860
1x Dell Optiplex Desktop
1x WideOrbit "green machine" workstation
Ubiquiti Wireless Equipment

Other
NEC IP 2000 PBX Phone Switch with 6 units
3x TVs
9x Power Distribution Units

Not in Use
2x Wheatstone EDGE Blade
1x Apple Mac Mini Server
4x Monitors
2x Network switch
1x Drobo 4-Bay USB

**Remote Offices**


**Rantoul**
Front Office
3x Dell Optiplex Desktop
1x Monitors
Network switch

Editor's Office
2x Apple Mac Mini Desktop
2x Monitors
Network switch

<u>Sales Office</u>
3x Dell Optiplex Desktop
3x Monitors

<u>Circulation Office</u>
1x Dell Optiplex Desktop
1x Monitors


**<u>Paxton</u>**
<u>Front Office</u>
1x Dell Optiplex Desktop
1x Monitors
Toshiba MFP

<u>Editorial</u>
2x Apple Mac Mini Desktop
2x Monitors
2x Dell Optiplex Desktop
1x ASUS Desktop
Network switch

**<u>Monticello</u>**
<u>Front Office</u>
1x Dell Optiplex Desktop
1x Monitor
Toshiba MFP

<u>Editor's Office</u>
3x Dell Optiplex Desktop
1x Apple Mac Mini Desktop
2x Monitor
Network switch

<u>Assistant Editor's Office</u>
1x Dell Optiplex Desktop
1x Apple Mac Mini Desktop
2x Monitor
Network switch

<u>Sales Office</u>
1x Dell Optiplex Desktop
1x Monitor
Lexmark Color Laser Printer
Network switch

**Hancock**

Front Counter
2x Dell Optiplex Desktop
2x Monitors
Lexmark Laser Printer

Back Office
3x Dell Optiplex Desktop
2x Monitor
Network switch

**Danville**

Front Office
1x Dell Optiplex Desktop
1x Apple Mac Mini Desktop
3x Monitors

Sales Office 1
1x Dell Optiplex Desktop
2x Monitors

Sales Office 2
1x Dell Optiplex Desktop
1x Monitor

Editorial
2x Dell Optiplex Desktop
2x Monitors

Garage
4x Dell Optiplex Desktop
2x Monitors

Circulation Office
2x Dell Optiplex Desktop
2x Monitors

**2301 S Neil**

Unused WKIO Studio
1x Dell Optiplex Desktop
1x Monitor

MCR Rack

2x Wheatstone IP-88A

Network rack
2x HP ProCurve Switch

Bomb Shelter Rack
Cisco 8-port multicast switch
1x HP ProCurve Switch
1x Dell PowerEdge 860
1x Dell PowerEdge R210

## Detailed IT Software List
(Most items duplicated from office equipment)

### VMWare ESXi
10x vSphere Standard Edition, used per CPU socket
1x vSphere Midsize Acceleration Kit (gives us 6 additional CPU sockets)
Total: 16 CPU sockets licensed

VMWARE1: 1 CPU
VMWARE2: 2 CPUs
VMWARE3: 1 CPU
VMWARE4: 2 CPUs
VMWARE5: 2 CPUs
VMWARE6: 2 CPUs
VMWARE7: 2 CPUs
VMWARE8: 2 CPUs
VMWARE9: 2 CPUs
Total: 16 CPUs

10x VMware vShield Endpoint
10x VMware ThinApp Client
1x VMware ThinApp Virtualization Packager
10x VMware Horizon
1x VMware vCenter Server
1x VMware Workstation

### Microsoft
6x Microsoft Windows Virtual Desktop Access
80x Microsoft Remote Desktop CALs
300x Microsoft Server CALs
16x Microsoft Server Standard

160x Microsoft Office Standard 2013
Microsoft Dynamics SL

## Adobe Creative Cloud
13x InCopy
10x InDesign
11x All Apps
16x Photoshop

## Adobe Retail
14x Adobe Audition
8x Photoshop Elements
4x Premiere Elements
Elements licenses have been decommissioned and replaced with newer versions over the years, so this is my best-guess for how many are actually in use.

## Other Software
1x TechTool Pro
49 RealVNC
1x EventMeister
1x MultiPing and PingPlotter
15x Photo Mechanic
Oracle License for DSI
DSI Circulation
Pitney Bowes Spectrum
Oracle License for SAXo
1x WideOrbit Server
6x WideOrbit Radio Station
Triton Digital
Edgil
Bulk Mailer
Asura
CompleteFTP Server
iExplorer
ACD
CallAccount
2x FirstProof
QuickBooks Premier Edition 2018
VisualTraffic
XpanceX
Vision Data

# SCHEDULE 1.2(j)

## PREPAIDS

**The News-Gazette, Inc**.

| Vendor | Description |
| --- | --- |
| Netrix | VMWare subscription / support |
| Netrix | Barracuda hardware maintenance |
| Netrix | Virtual desktop access |
| Netrix | Endpoints advanced security |
| SEI | Sunfire server maintenance |
| JW Player / Longtail | Digital video platform |

**DWS, Inc.**

| Vendor | Description |
| --- | --- |
| Illinois Premium Seating | Season tickets as required by sports broadcasting agreement. |
| Fighting Illini Sports Properties | Radio rights fee for sports broadcasting agreement |
| Fighting Illini Sports Properties | Marketing fee as required by sports broadcasting agreement. |

## SCHEDULE 1.3

### OTHER EXCLUDED ASSETS

See Schedule 1.2(b) for excluded assets.

## SCHEDULE 3.1

### WIRE TRANSFER INSTRUCTIONS

Source: https://www.atgf.com/tools-publications/wire-transfer-instructions-commercial-accounts

**Commercial Title and Escrow:**

# Wire Transfer Instructions: Commercial Accounts

**IMPORTANT NOTE:** Wire instruction fraud is on the rise. ATG will *never* send revised or new wire instructions by email. *Posted 12-16-16*

**Corporate Address:**
Attorneys' Title Guaranty Fund, Inc.
One South Wacker Drive, 24th Floor
Chicago, IL 60606-4654

**NOTE: Wire instructions to be used *ONLY* for First American closings being closed by ATG as title and escrow agent.**

**When wiring funds to Attorneys' Title Guaranty Fund, Inc. First American Commercial Account, please use the following wire instructions:**

Harris Bank N.A.
111 West Monroe Street
Chicago, IL 60603

**ABA/Routing Transit Number:** 071000288
**To Credit:** Attorneys' Title Guaranty Fund, Inc., Commercial Closing Escrow Account
**Account:** 179-092-2
**Reference:** Escrow No.

**PLEASE NOTE:** Incoming funds *must* be in the form of a wire transfer. ACH transfers are not accepted and will be sent back to the sender.

## SCHEDULE 3.5

## ALLOCATION OF PURCHASE PRICE[1]

| | |
|---|---|
| Real Estate | $2,245,000 |
| Intangibles and Goodwill | |
| Accounts Receivable | $790,000 |
| Prepaid Expenses | $7,800 |
| Prepaid Subscriptions | $1,055,000 |
| Other Intangibles and Goodwill | $257,200 |
| Machinery and Equipment | $1,200,000 |

---

[1] Purchase Price: $4,500,000 (cash) and $1,055,000 (prepaid subscriptions / Assumed Liabilities). Total: $5,555,000.

## SCHEDULE 4.1(f)

### EXCEPTIONS TO CONSENT REPRESENTATION

Consents required:

Federal Communications Commission

United States Postal Service

## SCHEDULE 4.2(c)

## INVENTORY OLDER THAN SIX MONTHS

Circulation supplies inventory does contain items that were acquired more than six months in the past.

Some rubber bands, plastic bags, and newspaper tubes were purchased prior to February 1 2019, and are still being used. Sellers utilize inventory on a first-in first-out basis, and purchase supplies inventory in bulk for favorable pricing.

The oldest inventory item is "Sunday" rubber bands which were purchased in July 2018. In Sellers' experience, no meaningful degradation of inventory quality has occurred, and circulation supplies older than six months are being used regularly by carriers with no complaint.

## SCHEDULE 4.2(d)

### PENDING INURANCE CLAIMS

There are no pending insurance claims related to the purchased assets.

## SCHEDULE 4.2(e)

## LIENS, CLAIMS AND ENCUMBRANCES

News-Gazette Media currently leases the following multifunction printers from Toshiba. Toshiba either owns them or has a lien against them.

- Toshiba ES 4508A, ID# 2404, Ser # CGDF10821; located on 4th floor of 15 Main St., Champaign
- Toshiba ES 4508A, ID# 2402, Ser #CGFF21465; located on 2nd floor of 15 Main St., Champaign
- Toshiba ES 2500AC, ID# 2407, Ser #CFFF14701, located at 839 E Voorhees Suite B, Danville
- Toshiba ES 2500AC, ID# 2405, Ser #CFFF14708, located at 216 E. Sangamon Ave, A, Rantoul
- Toshiba ES 4505AC, ID# 2403, Ser #CFFF36774, located on 3rd floor of 15 Main St., Champaign
- Toshiba ES256, Ser# C2CD29420, located at 118 E. Washington, Monticello [Sellers will own before closing]

## SCHEDULE 4.2(g) - Ground Lease

### LEASE

THIS GROUND LEASE is made and entered into this _31st_ day of _Oct_, 2006, by and between Bill J. and Amanda B. Bozdech ("Landlord") and Champaign Partners, LLC An Oklahoma Limited Liability Company ("Tenant").

### RECITALS.

A.    Landlord owns certain real property located in Section 4 Township 16N Range 5 East in Douglas County, IL to be more formally described by survey at tenants sole cost and expense (the "Premises") and the parties have agreed to a long-term lease transaction involving the Premises.

B.    The parties have agreed to memorialize their respective rights and obligations in this Ground Lease.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.    Premises. Subject to Section 2, Landlord hereby leases the Premises to Tenant and Tenant hereby takes the same from Landlord.

2    Inspection Period/Term  The Tenant's Inspection Period hereunder shall be Six ( 6 ) months (for which Tenant shall pay a nonrefundable fee to Landlord in the amount of $1,500.00). Tenant can extend the Inspection Period for an additional Six ( 6 ) months by giving Landlord written notice and paying an additional nonrefundable fee in the amount of $1,500.00  To the extent Tenant approves the Premises pursuant to such inspections, the Lease Term shall begin at the end of the Inspection Period and shall continue thereafter for a period of Twenty ( 20 ) years (the "Initial Term"); provided that this Lease will automatically be renewed for Two ( 2 ) additional terms (each a "Renewal Term") of Ten ( 10 ) years each, unless Tenant provides Landlord written notice of its intention not to renew not less than thirty (30) days prior to the expiration of the Initial Term or any Renewal Term.

3.    Use.  Tenant shall comply with all laws applicable to Tenant's use of the Premises. Tenant shall have the right to use the Premises for any lawful purpose.  If Tenant approves the Premises in writing during the Inspection Period, Tenant will be bound for the Term and shall have the right to immediately commence construction of the Tenant Improvements  For purposes of this Lease, "Tenant Improvements" shall mean all buildings, installations, structures and equipment and all their components to be located on the Premises, whether constructed on the Premises or off the Premises in a manner which allows their assembly on the Premises and later removal  All Tenant Improvements on the Premises shall be the property of Tenant and can be removed by Tenant if Tenant elects upon termination of the Lease.

4    Tenant Obligations

4.1    Payment of Rent.  Tenant shall pay to Landlord equal installments of rent in the amount of $900 per month, totaling $10,600 per year, payable monthly in advance, which amount will be increased by 20% at the end of each five (5) year period during the term of this Lease (including any Renewal Terms)

4.2    Payment of Taxes  Tenant shall pay or cause to be paid all real estate taxes levied against all personal property of Tenant located on the Premises plus all business, license, sales and excise taxes levied against Tenant in connection with its occupancy of the Premises.

4.3     Payment for Utilities.   Tenant shall pay or cause to be paid for all water, electricity, gas, telephone, trash collection and other utility services used by Tenant in connection with its occupancy of the Premises.

4.4     General Insurance Requirements.  Tenant shall maintain at Tenant's expense the insurance described in this Lease. Tenant may provide insurance through a blanket policy. Tenant shall provide Landlord with certificates of insurance upon request confirming coverage and confirming that policies will not be terminated without thirty days prior notice to Landlord. Landlord acknowledges and agrees that Tenant will satisfy all or some part of its insurance obligations and/or other obligations hereunder through certain subtenants and/or licensees.

4.5     Casualty Insurance.    Tenant shall maintain casualty insurance with endorsements for all perils, covering the Tenant Improvements and all of Tenant's personal property located in the Premises in an amount not less than 100% of the replacement value thereof.  The replacement value shall be determined by Tenant or Tenant's insurer.

4.6     Liability Insurance.   Tenant shall maintain comprehensive general liability insurance with combined single limit coverage in the amount not less than $1,000,000.  The liability insurance shall provide coverage against claims for bodily injury, personal injury, death and property damage occurring on the Premises.

4.7     Tenant Construction.  Tenant may at any time construct, install, and/or change, replace the Tenant Improvements, provided all of the foregoing is accomplished in accordance with all applicable laws.

4.8     Surrender of Premises, Removal of Improvements.  Upon any termination of this Lease, Tenant shall promptly vacate and shall remove within forty-five (45) days of the date of termination all of the tenant improvements.

5.      Landlord Obligations.

5.1     Quiet Enjoyment.    Landlord shall assure Tenant of quiet enjoyment and possession of the Premises so long as Tenant performs all of its obligations under this Lease.

5.2     Restrictions on Use of Other Property.  Landlord shall not allow the use of any real property leased or owned by Landlord and/or any affiliate of Landlord and located within the same section (section 4) of the exterior boundary of the Premises for the operation of a communications tower.

6.      Liens and Claims.   Landlord and Tenant shall maintain the Premises free of all involuntary liens and other claims or encumbrances caused by their acts or omissions.  Each shall be entitled to contest such liens or other claims or encumbrances at their own expense, but must post appropriate security to protect the interests of the other.

7.      Condemnation.  Condemnation means any impairment of Tenant's use of the Premises by act or omission of government authority, including without limitation, a change in applicable law, exercise of the power of eminent domain, or exercise of other government authority such as alteration of a public street directly serving the Premises.  A voluntary sale by Landlord to any party having the power to effect a condemnation either under a threat of exercise of that power, or while proceedings are pending, shall be deemed to be a Condemnation. No such sale shall be made without the prior consent of Tenant.  The proceeds, including any judgment and interest, arising form any Condemnation shall be deemed the Condemnation Award.  Whether this Lease is canceled or not canceled upon a Condemnation, the rights of Landlord and Tenant shall be governed by this Section. Any award shall be allocated and paid to Tenant until Tenant recovers its full investment in the Tenant Improvements, and

thereafter shared by Landlord and Tenant in accordance with the laws of the state in which the Premises are located. If, in Tenant's reasonable judgment, a Condemnation renders the Premises unsuitable for Tenant's continued operation of a broadcast tower Tenant may, by notice to Landlord, cancel this Lease. It will be reasonable for Tenant to determine the Premises are unsuitable for Tenant's continued operation after a Condemnation if there is a reduction in the amount of business revenue received at the Premises following the Condemnation, or if any of the Tenant Improvements are altered in any manner. If Tenant fails to cancel this Lease upon a Condemnation, the Rent for the remainder of the Term shall be reduced in the same proportion that the amount of business revenue received on the Premises decreases during the twelve months immediately after the Condemnation in relation to the business revenue received on the Premises during the twelve month period immediately before the Condemnation.

   8.   Destruction (Acts of God) of Tenant Improvements.   Subject to the limitations of this Section, Tenant shall promptly repair and restore all Tenant Improvements which are damaged but which have not incurred Substantial Destruction. Substantial Destruction means damage or destruction to Tenant Improvements with a value equal to twenty five percent (25%) or more of their replacement value as reasonably determined by Tenant. Within ninety (90) days after Substantial Destruction, Tenant shall elect to either (a) repair and restore all Tenant Improvements, or (b) remove all personal property and terminate this Lease.

   9.   Default by Tenant.   Tenant will be in default under this Lease (a) if Tenant fails to pay any amount due within fifteen (15) days after receipt of notice from Landlord stating the amount due and demanding payment: and (b) if Tenant fails to commence performance of any other obligation of Tenant within thirty (30) days after receipt of notice from Landlord stating the obligation which Tenant has failed to perform and demanding performance and diligently pursue completion of the required performance. If Tenant fails to timely cure any default following notice, then Landlord may terminate this Lease and the parties shall have no further duties obligations or liabilities to one another.

   10.   Default by Landlord.   Landlord will be in default under this Lease if Landlord fails to pay any obligation under any mortgage, trust, deed, judgment, assessment, tax or other encumbrance affecting the Premises or fails to perform any obligation specified under this Lease. If Landlord fails to (a) commence performance of any obligation of Landlord within thirty (30) days after receipt of notice from Tenant stating the obligation which Landlord has failed to perform and demanding performance and (b) diligently pursue completion of the required performance, then Tenant, in addition to all other remedies at law or in equity, shall have the right to pay, perform or discharge any such obligation. Should Tenant elect to pay or perform any such obligation, Landlord shall, within thirty (30) days from the date of Tenant's demand, reimburse Tenant in the full amount expended by Tenant in connection therewith. If Landlord fails to reimburse   Tenant within such time, Tenant may offset the amount of such reimbursement against Rent.

   11.   Attorneys' Fee.   If an action is commenced to enforce any provision of this Lease, the prevailing party is determined by a final court judgment shall be entitled to recover from the other party such reasonable attorneys' fees and costs incurred in the action as the court may award.

   12   Representations and Warranties.

      12.1   Landlord Representations and Warranties.   The following representations and warranties are made for the benefit of Tenant.

         12.1.1   If Landlord is an individual or individuals, each individual executing this Lease represents and warrants that he or she is duly authorized to execute and deliver this Lease;

         12.1.2   If more than one person is Landlord, they represent and warrant that the obligations of such persons as Landlord are joint and several.

12.1.3   Landlord represents and warrants that this Lease is binding on Landlord in accordance with its terms;

12.1.4   Landlord represents and warrants that Landlord is the fee owner of the Premises; and

12.1.5   Landlord represents and warrants that Landlord has no knowledge of (i) enacted, pending or proposed condemnation proceedings or other governmental action, (ii) pending or threatened litigation, (iii) pending or proposed plans to alter access to the Premises, (iv) the presence on the Premises of anything dangerous to humans such as Hazardous Materials, or (v) any other fact, matter or condition which would adversely affect the construction of Tenant Improvements or the operation of a communications tower on the Premises.

12.2   Tenant Representations and Warranties   The following representations and warranties are made for the benefit of Landlord:

12.2.1   Tenant represents and warrants that Tenant is duly organized, validly existing, in good standing in the State of Oklahoma, and has all requisite power and authority to own and lease property and conduct business in the state where the Premises are located, and each individual executing this lease on behalf of Tenant represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of Tenant; and

12.2.2   Tenant represents and warrants that this Lease is binding on Tenant in accordance with its terms.

12.2.3   Tenant represents and warrants that the improvements on the Property will be constructed and maintained in compliance with all applicable laws or governmental rules and regulations.

12.3   Brokers.  Landlord and Tenant represent and warrant to each other that they have not engaged or dealt with any broker or agent with respect to the Premises.  Landlord and Tenant shall each defend, indemnify and hold the other harmless from and against all claims, losses and liabilities incurred by the indemnified party in connection with any claim or demand by any person or entity for any broker's, finder's or other fee or compensation in connection with the indemnifying party's entry into this Lease.

12.4   Termination of Lease and Removal of Equipment   It is mutually understood and agreed that this Lease is of a unique value to Tenant and is expected to remain so, but that technological developments, changing conditions and regulatory agencies could, in the future, render the radio transmission and receive site on the Premises to be of little or no value to Tenant.   Therefore, notwithstanding anything herein contained to the contrary, Tenant shall have the right and option at any time during the term of this Lease or any extension options thereof, to terminate this Lease without penalty or liability for future rent provided Tenant gives at least ninety (90) days notice to Landlord of such intent to terminate this Lease   Upon such termination, Tenant shall have the right to remove all of its equipment, tower, building and other facilities from the Premises, consistent with the terms hereof and shall do so within ninety (90) days after the effective date of termination or shall forfeit all such equipment, tower, building and other facilities to Landlord.

13   Assignment and Subleasing.  Tenant will grant third party licensees the right to install and operate communications equipment on its tower and related access rights, etc. in the ordinary course of its business and all such activities are approved. Tenant shall also have the right to assign this Lease and/or enter into subleases. The Landlord's consent shall not be required, but Tenant will give the

Landlord written notice of any such transaction. Any assignee or sublessee will be required to fully abide by the terms and provisions of the Lease.

14. Miscellaneous Provisions.

14 1 Amendment. This Lease may be changed only by a written amendment executed by Landlord and Tenant.

14.2 Consents. Whenever a party is asked to provide consent under this Lease, such party shall not unreasonably withhold or delay giving the consent requested.

14.3 Disclaimer of Partnership. Nothing in this Lease shall be deemed or construed to create a relationship of principal and agent, partnership, or joint venture between Landlord and Tenant.

14.4 Estoppel Certificates. Landlord and Tenant shall each execute and deliver to the other, within fifteen days after request, an estoppel certificate addressing such matters as may be reasonably requested by an existing or prospective mortgagee, a prospective transferee of the Premises, or a prospective transferee of Tenant's leasehold interest

14 5 Holding Over. Any holding over after expiration of the Term shall be as a tenancy from month to month subject to all provisions of this Lease

14 6 Interpretation of Lease. This Lease shall be interpreted to give effect to its fair meaning and shall be construed as though it was prepared by both parties. This Lease contains the entire agreement of Landlord and Tenant, and all prior negotiations, documents, and discussions are superseded by this Lease. The invalidity of any provision of this Lease shall not affect the validity of any other provision of this Lease. Section headings in this Lease are for convenience only and shall not be used in interpreting its provisions. This Lease shall be interpreted in accordance with the laws of the State of Oklahoma

14 7 Memorandum of Lease. Landlord shall execute, acknowledge and deliver to Tenant, a memorandum of this Lease in form satisfactory to Tenant and suitable for recordation in the official records of the jurisdiction in which the Premises are located

14.8 Notices All notices required or permitted herein must be in writing and shall be deemed to have been duly given the first business day following the date of service if served personally or by telecopier, telex or other similar communication to the party to whom notice is to be given, or on the third business day after mailing if mailed to the party to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, at the address set forth below or to such other addresses as either party hereto may designate to the other by notice from time to time for this purpose. All notices shall be given as follows.

Landlord:        William J Bazdech
                 1485 County Rd 1550 North

                 Villa Grove, IL. 61956

Tenant:          Champaign Partners, LLC
                 6403 NW Grand Blvd Suite 207
                 Oklahoma City, OK 73116

14.9    Reference   All references to this Lease include reference to all amendments to this Lease   All references to the Term in this Lease include reference to all extensions of this Lease by exercise of options to extend or by written agreement between Landlord and Tenant   References to the Premises include reference to all or a part of the Premises   References to Landlord or Tenant including, bind, and inure to the benefit of, their officers, agents, employees, successor in interest and assignees.

14.10   Time and Excusable Delays.   The time for performance of an obligation or the satisfaction of any contingency under this Lease shall be extended for the period during which a party is prevented from performing by the act or omission of the other party, acts of God, government, or other force or event beyond the reasonable control of such party.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

LANDLORD

TENANT:

**ACKNOWLEDGMENT**

STATE OF OKLAHOMA    )
                     )  SS·
COUNTY OF OKLAHOMA   )

The foregoing instrument was acknowledged before me this 24 day of
October 2006, by _____

_____
Notary Public

My Commission Expires:
August 12, 2007
(SEAL)   #99013267

**ACKNOWLEDGMENT**

STATE OF _Illinois_ )
                    )  SS·
COUNTY OF _Douglas_ )

The foregoing instrument was acknowledged before me this 31 day of
Oct. 2006 by _William Bazdach_

_____
Notary Public

My Commission Expires:
07-31-06
(SEAL)

```
*OFFICIAL SEAL*
SCOTT R. BECCUE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/31/10
```

# FIRST AMENDMENT TO GROUND LEASE

This First Amendment to the Ground Lease dated October 31, 2006 by and between Bill J. and Amanda Bozdech (Landlord) and Champaign Partners, LLC (Tenant) (the "First Amendment") is made and entered into as of January 26, 2006, with reference to the following:

## RECITALS

A. The parties desire to amend the Lease pursuant to this First Amendment.

B. Any and all capitalized terms not specifically defined in this First Amendment shall have the meaning(s) attributed to them in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The lease option currently expires on April 31, 2007. The parties agree to extend that option period for an additional 30 days or until May 31, 2007

2. The rent for the initial term will be increased from $900 to $1,000 per month.

3. The legal description will be amended to be the NW quarter of the NW quarter of section 5 township 16 North Range 5 East. A survey will be conducted a tenants expense to more formally describe the new site and this survey shall be attached to this First Amendment as Exhibit A.

4. The parties agree that upon the execution and delivery of this First Amendment by both parties, the Lease shall be amended as set forth herein and the subject transactions shall be governed by the original Lease as amended by this First Amendment. Except as specifically set forth in this First Amendment, the terms and provisions hereof shall not impair or otherwise affect the rights and obligations of the parties as set forth in the original lease.

5. This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

IN WITNESS WHEREOF, Landlord and Tenant have executed this First Amendment to Lease as of the date set forth above.

LANDLORD:

TENANT:

### ACKNOWLEDGMENT

STATE OF Illinois        )
                         )        SS:
COUNTY OF Illinois       )

The foregoing instrument was acknowledged before me this _27th_ day of
_Dec._____, 2006, by _Scott R. Beccue_

_____
Notary Public

My Commission Expires:

_____
(SEAL)

OFFICIAL SEAL
SCOTT R. BECCUE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/31/10

### ACKNOWLEDGMENT

STATE OF Oklahoma      )
                       )        SS:
COUNTY OF Oklahoma     )

The foregoing instrument was acknowledged before me this _20th_ day of
_December_, 2006, by _Melanie Maguire_

_____
Notary Public

My Commission Expires:
_Oct. 27 2010_
(SEAL)

## SUBORDINATION AND NON-DISTURBANCE AGREEMENT

This Subordination and Non-Disturbance Agreement ("Agreement") is entered into as of the ____ day of May, 2007, by and between Longview State Bank, its successors and/or assigns ("Lender"), and Champaign Partners LLC, an Oklahoma limited liability company ("Tenant").

### RECITALS:

A.    Tenant is the holder of a leasehold estate in certain real property located in the County of Douglas, State of Illinois, and more particularly described on Exhibit A attached hereto and made a part hereof (the "Property") pursuant to the provisions of a certain lease dated October 31, 2006 between the Bozdechs, as landlord, and Tenant, as tenant (the "Lease").

B.    Lender has made one or more loans to the Bozdechs which are secured by one or more Mortgages (the "Mortgage(s)") granted by the Bozdechs to or for the benefit of Lender and encumbering the Property, or some portion thereof.

C.    Tenant has agreed to subordinate the Lease to the Mortgage and to the lien thereof, and Lender has agreed to grant non-disturbance rights to Tenant under the Lease on the terms and conditions hereinafter set forth.

### AGREEMENT

For good and valuable consideration, Tenant and Lender agree as follows:

1.    Subordination.  The Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the terms, covenants and provisions of the Mortgage and to the lien thereof, including without limitation, all renewals, increases, modifications, consolidations, replacements and extensions thereof, and to all sums secured thereby and advances made thereunder.

2.    Non-Disturbance.  If any action or proceeding is commenced by Lender for the foreclosure of the Mortgage(s) or the sale of the Property, Tenant shall not be named as a party therein unless such joinder shall be required by law; provided, however, such joinder shall not in any event result in the termination of the Lease or disturb the Tenant's possession or use of the premises demised thereunder, and the sale of the Property in any such action or proceeding and the exercise by Lender of any of its other rights under the Mortgage(s) shall be made subject to all rights of Tenant under the Lease, provided that at the time of the commencement of any such action or proceeding or at the time of any such sale or exercise of any such other rights Tenant shall not be in default under any of the terms, covenants or conditions of the Lease or of this Agreement on Tenant's part to be observed or performed beyond any applicable notice or grace period.

3.    Notices.  Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if by Federal Express or other reliable overnight courier service for next Business Day delivery, on the next Business Day

after delivered to such courier service; or (c) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier as set forth below:

If to Tenant: Champaign Partners LLC
6403 NW Grand Blvd., Suite 207
Oklahoma City, OK 73116
Attention: John Maguire
Telephone: (405) 463-0512
Facsimile: (405) 463-0546

If to Lender: Longview State Bank
_____
_____
Attention: _____
Telephone: ( __ ) _____
Facsimile: ( __ ) _____

or addressed as such party may from time to time designate by written notice to the other parties. For purposes of this Section 3, the term "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in the state where the Property is located. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

4.      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Lender and Tenant and their respective successors and assigns.

5.      Governing Law.  This Agreement shall be deemed to be a contract entered into pursuant to the laws of the State of Illinois and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State of Illinois.

6.      Miscellaneous.  This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

- 2 -

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

LONGVIEW STATE BANK

By: _____

Name: DAVID K. GRACE

Title:   PRESIDENT

CHAMPAIGN PARTNERS, LLC, an Oklahoma limited liability company

By: CK MEDIA PARTNERS LLC, an Oklahoma limited liability company, its Manager

By: _____

John Maguire, Manager

T:\8789.7001\W\FRE\SNDA-Bozdcch Lease 050407 (220261).DOC

- 3 -

## ESTOPPEL CERTIFICATE

THIS ESTOPPEL CERTIFICATE is made by the undersigned ("Landlord") in connection with the sale by Champaign Partners, LLC ("Seller") to D.W.S., Inc. ("Buyer") of radio station WUIL(FM), Arcola, Illinois (the "Station"). Landlord acknowledges that Buyer and Seller will rely on this Certificate in connection with such transaction and hereby certifies as follows:

1.    Landlord and Seller are parties to the lease described below (the "Lease") pursuant to which Landlord (as sole holder of the lessor interest thereunder) leases to Seller the premises described therein (the "Premises"). The Lease has not been amended or modified (except as may be described below), is in full force and effect and is enforceable in accordance with its terms.

2.    To Landlord's knowledge, no breach or default by Landlord or Seller exists under the Lease and no event has occurred or condition exists that, with notice or time or both, would constitute such a breach or default. Without limiting the foregoing, all rent due under the Lease prior to the date hereof has been paid in full.

3.    To Landlord's knowledge, no breach or default exists under any ground lease, mortgage, deed of trust, security agreement or other instrument or agreement affecting the Premises, and no event has occurred or condition exists that, with notice or time or both, would constitute such a breach or default. To Landlord's knowledge, there is no condemnation or other similar proceeding pending or threatened relating to or affecting the Premises.

4.    The current rental amount, term and address for notices under the Lease is set forth on *Exhibit A* attached hereto.

5.    To the extent the Lease requires such consent, Landlord hereby consents to the assignment by Seller and assumption by Buyer of the Lease and Seller's interest thereunder upon closing of the sale of the Station by Seller to Buyer. *No B ABB*
& *Copy of Lease attached,*

IN WITNESS WHEREOF, the undersigned Landlord has duly executed this Certificate as of the date set forth below.

LANDLORD:

Date: __6/25__ , 2010

Date: __6/25__ , 2010

Bill J. Bozdech

Amanda B. Bozdech

## EXHIBIT A

### (WUIL(FM), Arcola, Illinois)

Current monthly rent:                    $ 1,000/month

Commencement date:                   May 14, 2007

Expiration date:                         May 13, 2027

Renewals:                               Two 10 yr terms

Tenant address for notices:            D.W.S., Inc.
                                        2301 South Neil Street
                                        Champaign, IL  61820
                                        Attention: John Foreman

Landlord address for notices:          William Bozdech
                                        1485 County Road 1550 North
                                        Villa Grove, IL 61956

8H -1579

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment and Assumption") is made as of July 9, 2010 between Champaign Partners, LLC, an Oklahoma limited liability company ("Assignor") and D.W.S., Inc., a Delaware corporation ("Assignee").

This Assignment and Assumption is made pursuant to that certain Asset Purchase Agreement (the "Agreement") dated April 15, 2010 between Assignor and Assignee with respect to the following radio station (the "Station"):

WUIL(FM), Arcola, Illinois (FCC Facility ID #57469)

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the Agreement, Assignor hereby assigns to Assignee the Lease (defined below) and all of Assignor's rights, interests and benefits thereunder, free and clear of Liens (other than Permitted Liens), and Assignee hereby assumes and agrees to be bound by and perform the obligations of Assignor arising thereunder after Closing.

As used herein, "Lease" means the Lease dated October 31, 2006, as amended, among Bill J. and Amanda B. Bozdech, as landlord, and Assignor, as tenant, for the Station's transmitter site located in Douglas County, Illinois.

This Assignment and Assumption may be signed in any number of counterparts with the same force and effect as if all signatures appeared on one and the same instrument. This Assignment and Assumption is made pursuant to (and does not modify) the Agreement, which contains certain representations, warranties and covenants regarding the Lease. Capitalized terms used herein and not defined shall have the respective meanings ascribed to such terms in the Agreement.

[SIGNATURE PAGE FOLLOWS]

13137463

SIGNATURE PAGE TO
ASSIGNMENT AND ASSUMPTION OF LEASE

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment and Assumption as of the date first set forth above.

ASSIGNOR:                    CHAMPAIGN PARTNERS, LLC

By: _____
   Name: John S. Maguire
   Title:    Manager of DSC Ventures, LLC
             Manager of CK Media Partners, LLC
             Manager of Champaign Partners, LLC


ASSIGNEE:                    D.W.S., INC.


By: _____
   Name:  John Foreman
   Title:  President

<u>SIGNATURE PAGE TO</u>
<u>ASSIGNMENT AND ASSUMPTION OF LEASE</u>

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment and Assumption as of the date first set forth above.

ASSIGNOR:              CHAMPAIGN PARTNERS, LLC

By: _____
      Name:  John S. Maguire
      Title:     Manager of DSC Ventures, LLC
                  Manager of CK Media Partners, LLC
                  Manager of Champaign Partners, LLC

ASSIGNEE:              D.W.S., INC.

By: _____
      Name:  John Foreman
      Title:  President



## LEGAL DESCRIPTION

Part of the Northwest Quarter of Section 4, Township 16 North, Range 9 East of the Third Principal Meridian, more particularly described as follows:

Commencing at a railroad spike marking the West Quarter Corner of Section 4, Township 16 North, Range 9 East of the Third Principal Meridian as recorded in monument record book number 1, page 350 of the Douglas County Recorder's Office; thence azimuth 359 degrees 31 minutes 54 seconds (azimuths referenced to the Illinois State Plane Coordinate System East Zone Datum of 1983 (1997 adjustment) 2304.58 feet along the approximate centerline of TR H50E; thence azimuth 89 degrees 31 minutes 54 seconds, 199.34 feet to an iron pin with cap *9140 marking the Point of Beginning; thence azimuth 359 degrees 31 minutes 50 seconds, 100.00 feet to an iron pin with cap *9140; thence azimuth 89 degrees 31 minutes 50 seconds 100.00 feet to an iron pin with cap *9140; thence azimuth 179 degrees 31 minutes 50 seconds 100.00 feet to an iron pin with cap *9140; thence azimuth 269 degrees 31 minutes 50 seconds 100.00 feet to the Point of Beginning, containing 0.230 acres, more or less.

AND, a 25 foot wide access easement from the west line of the above described 0.230 acre Tract of Land to Township Road H50 East, the centerline more particularly described as follows: Commencing at the Southwest Corner of the above described 0.230 acre Tract of Land, thence azimuth 359 degrees 31 minutes 50 seconds along the west line of said Tract of Land 50.00 feet to the Point of Beginning of said centerline; thence azimuth 269 degrees 31 minutes 50 seconds along said centerline 199.34 feet to a point on the approximate centerline of said TR H50E, said point being the point of terminus of said centerline.

AND, three 50 foot wide guy wire easements for the construction and use of guy wire support structures, said three 50 foot wide guy wire easements being 120 degrees apart from one another, the center point and located as shown on this plat of survey.

Dated this _____ day of _____, 2006 A.D.

_____
Daniel E. Hoelscher, I.P.L.S. *9140
LICENSE EXPIRES NOVEMBER 30, 2008

## GENERAL NOTES

1. FIELD WORK FOR THIS SURVEY WAS COMPLETED DECEMBER 18, 2006.
2. AZIMUTHS ARE BASED ON ILLINOIS STATE PLANE COORDINATE SYSTEM EAST ZONE DATUM OF 1983 (1997 ADJUSTMENT).
3. SEE SURVEYOR'S DESCRIPTION FOR DETAILS.
4. NO RESEARCH WAS MADE FOR EASEMENTS, VACATIONS OR DEDICATIONS.

### The Upchurch Group
surveyors
engineers
architects

Professional Design
Firm Corporation
License No. 184-002460

1321 North 11th Street
Mattoon, Illinois 61938
Phone 217.234.5111
e-mail: upchurchgroup@upchurchgroup.com

SHEET 1 OF 1

F.B. *467

Job No. 106096-01
Date DEC. 22, 2006
Drawn S. EWING
Checked DEH
Revised

## DSC VENTURES

## PLAT OF SURVEY

PART OF THE NORTHWEST 1/4
SEC. 4, T16N, R9E, 3RD P.M.
CAMARGO TOWNSHIP
DOUGLAS COUNTY, ILLINOIS

### SCALE: 1"=100'

0    100    200

### DISTANCE TABLE

| LINE NO. | AZIMUTH | DISTANCE |
|----------|---------|----------|
| 1 | 359°31'50" | 50.00' |
| 2 | 269°31'50" | 199.34' |

CENTER POINT OF FM TOWER
(WGS 84)
LATITUDE: 39°52'42.60" NORTH
LONGITUDE: 088°11'50.78" WEST
GROUND ELEVATION: 658.5 (NAVD 88)
GEODETIC LOCATION AND
ELEVATION OF IRON PIN
AT FM TOWER CENTER POINT
DETERMINED BY GPS OBSERVATION

### LEGEND

IRON PIN (1/2"∅ x 30") SET W/*9140 CAP
IRON PIN (1/2"∅ x 30") SET
POWER POLE
OVERHEAD ELECTRIC LINE

AREA OF TRACT ±0.230 ACRES

POINT OF BEGINNING
0.230 AC. TRACT
POINT OF COMMENCEMENT
ACCESS EASEMENT

POINT OF BEGINNING
ACCESS EASEMENT

POINT OF COMMENCEMENT
RAILROAD SPIKE AT WEST QUARTER CORNER
SEC. 4, T16N, R9E, 3RD P.M. PER
MON. REC. DOC. NO. 211669 FILED
JULY 7, 1999 IN BOOK 1 PAGE 350
DOUGLAS COUNTY

50' WIDE GUY WIRE EASEMENT

50' WIDE GUY WIRE EASEMENT

50' WIDE GUY WIRE EASEMENT

CENTERLINE 25' WIDE ACCESS EASEMENT

APPROXIMATE CENTERLINE TR H50E



SCALE: 1"=100'

0    100    200

North

GROUND ELEVATION 657.2'

100'x100' FENCE ENCLOSURE WITH GRAVEL SURFACE INSIDE FENCED AREA

10'x40' FENCE ENCLOSURE

CENTER POINT OF FM TOWER
(NGS 84)
LATITUDE: 39°52'42.60" NORTH
LONGITUDE: 088°11'50.78" WEST
GROUND ELEVATION: 658.5 (NAVD 88)
GEODETIC LOCATION AND
ELEVATION OF IRON PIN
AT FM TOWER CENTER POINT
DETERMINED BY GPS OBSERVATION

120°00'00"

.001

120°00'00"

100'

.01

10'x20'
TRANSMITTER
BUILDING

10'x40' FENCE
ENCLOSURE

330.00'

330.00

120°00'00"

199.34'

10'x40' FENCE
ENCLOSURE

GROUND
ELEVATION
658.5'

GROUND
ELEVATION
659.4'

TR 155ON    OL & CHF?

TR 145OE    OIL & CH?3

CENTERLINE 25' WIDE
ACCESS EASEMENT

APPROXIMATE
CENTERLINE
TR 1450E

LEGEND
● IRON PIN 1/2" Ø x 33" SET
  w/3340 CAP
○ GUY ANCHOR
  POWER POLE
─ OVERHEAD ELECTRIC LINE
─── FENCE

DSC VENTURES

## SITE PLAN

PART OF THE NORTHWEST 1/4
SEC. 4, T16N, R9E, 3RD P.M.
CAMARGO TOWNSHIP
DOUGLAS COUNTY, ILLINOIS

F.B. #467
Job No. 2I06Q96-01
Date DEC. 22, 2006
Drawn S. EWING
Checked DEH
Revised

SHEET 1 OF 1

The Upchurch Group
surveyors
engineers
architects
Professional Design
Firm Corporation
License No. 184-002401
e-mail: upchurchgroup@upchurchgroup.com
133 North 5th Street
Monticello, IL 61856
Phone: 217.335.3177

## SCHEDULE 4.2(h)

## EXCEPTIONS TO LEGAL REQUIREMENTS ON RADIO STATION REAL ESTATE

- No known violation of Legal Requirements.
- Seller has provided a copy of July 24, 2019 title commitment.

## Schedule 4.3(a) Trailing Twelve Month Revenue - Newspaper

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Newspaper Advertising** | | | | | | | | | | | | | |
| **The News-Gazette** | | | | | | | | | | | | | |
| ***Retail*** | | | | | | | | | | | | | |
| Local Retail Display | $106,387.80 | $149,901.17 | $137,723.94 | $160,127.86 | $147,173.72 | $98,592.77 | $115,179.08 | $147,210.34 | $143,211.06 | $102,383.37 | $100,717.12 | $82,838.47 | $1,488,900.70 |
| Preprint | 110,141.46 | 109,048.65 | 103,044.07 | 194,115.13 | 121,009.05 | 74,472.36 | 79,614.87 | 92,535.40 | 88,781.66 | 98,651.81 | 95,746.93 | 85,669.27 | 1,252,830.67 |
| Local Allowances | (1,293.47) | (195.00) | (664.00) | (2,155.92) | (2,917.04) | 0.00 | (3,113.74) | (171.77) | (8,174.80) | (9,082.10) | 0.00 | (4,906.95) | (32,654.79) |
| Trade-Outs | (5,000.00) | (6,694.40) | (8,112.50) | (6,975.00) | (8,087.50) | (5,175.00) | (6,487.50) | (11,526.30) | (9,428.16) | (7,700.00) | (6,598.80) | (10,675.00) | (90,450.16) |
| Contributions | (2,278.88) | (15,599.01) | (3,070.45) | (14,285.23) | (16,946.29) | (4,487.87) | (10,283.69) | (15,889.73) | (20,810.02) | (20,553.26) | (31,427.80) | (7,454.95) | (163,087.18) |
| Retail Color | 606.50 | 1,175.50 | 676.69 | 1,138.00 | 560.00 | 0.00 | 227.48 | 398.50 | 475.86 | 383.94 | 203.94 | 0.00 | 5,855.81 |
| National Retail Display | 1,588.80 | 1,588.80 | 1,588.80 | 0.00 | 0.00 | 0.00 | 1,588.80 | 1,586.80 | 1,588.80 | 1,588.80 | 1,588.80 | 1,588.80 | 14,299.20 |
| National Preprint | 7,075.26 | 10,527.30 | 7,135.12 | 9,507.93 | 6,429.59 | 8,601.77 | 7,978.53 | 11,406.97 | 9,375.70 | 8,840.22 | 10,106.36 | 9,830.33 | 106,815.08 |
| National Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Commission Incentive | (1,350.88) | (2,220.22) | (1,591.93) | (1,660.81) | (1,181.39) | (1,290.29) | (1,502.09) | (2,250.03) | (2,265.55) | (1,762.30) | (1,891.40) | (1,765.54) | (20,732.43) |
| National Color | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Home Town Welcome | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Special Sections | 13,377.45 | 637.50 | 637.50 | 11,385.50 | 637.50 | 2,887.50 | 0.00 | 50,695.00 | 8,805.33 | 32,794.00 | 0.00 | 12,515.00 | 134,372.28 |
| Multiplatform Projects | 78,585.00 | 0.00 | 0.00 | 3,974.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 72,171.00 | 154,730.00 |
| ***Total Retail*** | ***307,839.04*** | ***248,170.29*** | ***237,387.24*** | ***355,171.46*** | ***248,686.65*** | ***171,601.24*** | ***183,201.74*** | ***273,997.58*** | ***211,559.88*** | ***205,544.48*** | ***167,909.15*** | ***239,810.43*** | ***2,850,879.18*** |
| ***Class Display*** | | | | | | | | | | | | | |
| Classified Display Local | 18,390.45 | 21,801.54 | 22,137.00 | 18,194.61 | 16,873.13 | 8,252.83 | 12,241.55 | 9,025.45 | 9,702.64 | 14,246.62 | 13,667.29 | 11,486.49 | 176,019.70 |
| Classified Display Allowances | 0.00 | 0.00 | (275.20) | (517.41) | 0.00 | (216.06) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1,008.67) |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display Color | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ***Total Class Display*** | ***18,390.45*** | ***21,801.54*** | ***21,861.80*** | ***17,677.20*** | ***16,873.13*** | ***8,036.87*** | ***12,241.55*** | ***9,025.45*** | ***9,702.64*** | ***14,246.62*** | ***13,667.29*** | ***11,486.49*** | ***175,011.03*** |
| ***Class Line*** | | | | | | | | | | | | | |
| Classified Line Local | 45,552.72 | 42,155.66 | 41,423.86 | 32,590.82 | 34,550.83 | 27,148.17 | 31,050.22 | 32,373.77 | 29,182.89 | 34,350.70 | 36,514.77 | 29,872.67 | 416,767.08 |
| Class Line Local Allowances | (376.09) | (692.90) | (351.25) | (248.05) | (165.13) | (1,239.95) | (72.86) | 0.00 | (32.84) | (616.38) | (848.80) | (215.46) | (4,859.68) |
| Classified Line National | 265.44 | 1,450.44 | 303.36 | 1,497.84 | 1,317.72 | 0.00 | 293.88 | 1,943.44 | 2,161.44 | 682.56 | 618.20 | 293.88 | 10,826.20 |
| Class Line Sales Discount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Box Charges | 15.00 | 0.00 | 0.00 | 0.00 | 15.00 | 15.00 | 0.00 | 0.00 | 15.00 | 15.00 | 0.00 | 0.00 | 105.00 |
| Legals | 16,258.10 | 17,088.80 | 27,239.12 | 22,084.96 | 23,254.15 | 15,211.32 | 19,475.48 | 26,225.53 | 20,400.86 | 30,177.30 | 18,236.23 | 32,761.21 | 268,413.06 |
| ***Total Class Line*** | ***61,715.17*** | ***60,002.00*** | ***68,645.09*** | ***55,925.57*** | ***58,972.57*** | ***41,134.54*** | ***50,746.69*** | ***60,542.74*** | ***51,727.37*** | ***64,609.18*** | ***54,518.40*** | ***62,712.36*** | ***691,251.68*** |
| ***Other Daily*** | | | | | | | | | | | | | |
| General Adv. Allowances | 713.25 | 0.00 | 405.79 | (489.25) | (7,664.49) | 1,247.32 | (1,980.10) | 686.55 | 0.00 | 0.00 | 3,566.76 | 0.00 | (3,514.45) |
| Obituary Revenue | 24,516.78 | 24,821.86 | 29,182.35 | 28,653.83 | 24,387.37 | 25,605.43 | 24,920.85 | 30,469.22 | 26,572.28 | 29,658.30 | 25,778.23 | 26,346.11 | 320,912.61 |
| CU Wedding Announcements | 80.00 | 20.00 | 90.00 | 0.00 | 0.00 | 110.00 | 110.00 | 60.00 | 50.00 | 0.00 | 0.00 | 0.00 | 520.00 |
| Garage Sale Kits | 34.00 | 22.00 | 12.00 | 1.00 | 0.00 | 0.00 | 0.00 | 1.00 | 4.00 | 10.00 | 20.00 | 26.00 | 130.00 |
| TV Week | 875.00 | 700.00 | 700.00 | 875.00 | 700.00 | 700.00 | 700.00 | 875.00 | 700.00 | 875.00 | 700.00 | 700.00 | 9,100.00 |

## Schedule 4.3(a) Trailing Twe... .onth Revenue - Newspaper

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Other Daily** | 26,219.03 | 25,563.86 | 30,390.14 | 29,040.30 | 17,422.88 | 27,662.75 | 23,750.75 | 32,091.77 | 27,326.28 | 30,543.30 | 30,064.99 | 27,072.11 | 327,148.16 |
| **Accent TMC** | | | | | | | | | | | | | |
| Local Retail Display | 75.00 | 75.00 | 509.00 | 817.50 | 172.50 | 112.50 | 60.00 | 120.00 | 0.00 | 2,977.07 | 230.00 | 172.50 | 5,421.07 |
| Local Retail Allowances | (98.00) | (75.00) | 0.00 | (760.88) | 0.00 | 0.00 | (138.00) | 0.00 | (201.39) | (6,406.04) | 0.00 | (566.90) | (8,246.21) |
| Preprint | 33,673.11 | 26,981.42 | 43,544.00 | 45,944.76 | 36,927.60 | 33,069.63 | 24,604.97 | 27,647.71 | 31,555.98 | 38,127.01 | 29,046.54 | 31,355.24 | 402,480.97 |
| Local Retail Color | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18.00 |
| National Preprint | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display Local | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Display Color | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line Local | 701.34 | 646.04 | 649.31 | 714.84 | 303.88 | 274.61 | 410.25 | 238.72 | 297.06 | 377.06 | 334.16 | 233.50 | 5,180.77 |
| Classified Line Allowances | 0.00 | 0.00 | 0.00 | (178.00) | (17.85) | 0.00 | 0.00 | (15.76) | 0.00 | 0.00 | 0.00 | 0.00 | (211.61) |
| Classified Line National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Line Sales Discount | 0.00 | (137.96) | (157.79) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (295.75) |
| **Total Accent** | 34,351.45 | 27,489.50 | 44,644.52 | 46,538.22 | 37,386.13 | 33,456.74 | 24,937.22 | 28,008.67 | 31,651.65 | 35,075.10 | 29,613.70 | 31,194.34 | 404,347.24 |
| **Total News-Gazette Revenue** | 448,515.14 | 383,027.19 | 402,928.79 | 504,382.75 | 379,341.36 | 281,892.14 | 294,877.95 | 403,666.21 | 331,967.82 | 350,018.68 | 295,773.53 | 372,275.73 | 4,448,637.29 |
| **Rantoul Press** | | | | | | | | | | | | | |
| Local Retail Display | 8,297.72 | 6,368.27 | 7,507.64 | 5,790.76 | 5,798.93 | 4,047.88 | 4,812.64 | 5,467.54 | 7,442.76 | 7,507.33 | 5,886.71 | 5,959.73 | 74,685.91 |
| Preprint | 9,494.41 | 7,319.04 | 11,896.21 | 11,470.10 | 10,672.44 | 9,280.56 | 5,627.07 | 7,756.37 | 8,114.45 | 8,968.07 | 7,730.00 | 8,193.12 | 106,523.14 |
| Local Allowances | (180.00) | (180.00) | (180.00) | 0.00 | (375.00) | 0.00 | (150.00) | (82.12) | (61.52) | (332.88) | (487.50) | (30.00) | (2,059.02) |
| Trade-Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Retail Color | 0.00 | 70.00 | 685.00 | 0.00 | 0.00 | 10.00 | 0.00 | 0.00 | 0.00 | 40.00 | 0.00 | 0.00 | 805.00 |
| Classified Display Local | 202.50 | 0.00 | 468.00 | 305.90 | 372.00 | 540.00 | 234.00 | 0.00 | 178.20 | 14.42 | 0.00 | 125.99 | 2,429.01 |
| Class Display Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (12.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line Local | 2,265.76 | 2,529.53 | 1,915.81 | 1,816.13 | 1,101.90 | 1,026.86 | 735.15 | 1,078.77 | 1,740.75 | 1,672.23 | 596.39 | 698.16 | 17,178.04 |
| Class Line Local Allowances | (415.18) | (121.51) | 0.00 | 0.00 | (38.69) | 0.00 | 0.00 | (3,405.75) | 0.00 | 0.00 | 0.00 | (36.25) | (4,017.38) |
| Classified Line National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Line Sales Discount | 0.00 | (50.11) | (50.11) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (100.22) |
| Legals | 1,546.35 | 1,060.10 | 3,547.78 | 3,011.00 | 1,133.57 | 671.25 | 993.75 | 1,072.50 | 1,168.94 | 930.25 | 1,645.82 | 812.25 | 17,593.56 |
| Sold Supplements Retail | 0.00 | 3,010.68 | 4,660.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,670.68 |
| **Total Rantoul Press** | 21,211.56 | 20,004.00 | 30,450.33 | 22,393.89 | 18,665.16 | 16,576.95 | 12,253.21 | 11,875.31 | 18,583.58 | 18,799.42 | 15,172.32 | 15,723.00 | 220,708.72 |
| **Ford County Record** | | | | | | | | | | | | | |
| Local Retail Display | 6,015.07 | 4,603.72 | 8,051.77 | 5,324.92 | 9,130.46 | 4,302.31 | 4,323.08 | 4,544.25 | 4,380.52 | 6,515.92 | 3,558.00 | 4,126.36 | 64,876.48 |
| Preprint | 1,401.85 | 733.21 | 1,258.61 | 624.18 | 667.24 | 547.24 | 618.60 | 1,351.70 | 1,062.69 | 2,094.61 | 1,178.31 | 1,798.45 | 13,336.89 |
| Local Allowances | (68.70) | (75.43) | (97.33) | 0.00 | (4.86) | 0.00 | (7.56) | (10.81) | (86.34) | (1.08) | (98.96) | (111.20) | (561.25) |
| Trade-Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Retail Color | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Schedule 4.3(a) Trailing Twelve Month Revenue - Newspaper**

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Classified Display Local | 146.70 | 0.00 | 204.51 | 233.23 | 327.55 | 62.10 | 0.00 | 1,836.20 | 0.00 | 219.16 | 72.60 | 159.68 | 3,061.73 |
| Class Display Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line Local | 1,714.73 | 829.02 | 1,807.44 | 1,419.61 | 733.06 | 788.87 | 1,008.86 | 785.53 | 868.59 | 476.15 | 360.59 | 1,632.75 | 12,415.19 |
| Class Line Local Allowances | (181.03) | (2.58) | 0.00 | (19.12) | (38.69) | 0.00 | 0.00 | (15.76) | 0.00 | 0.00 | 0.00 | 0.00 | (257.18) |
| Classified Line National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Line Sales Discount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Legals | 3,555.90 | 2,095.83 | 3,619.74 | 3,180.22 | 4,699.10 | 3,791.40 | 1,469.17 | 1,892.64 | 1,269.80 | 4,055.40 | 3,796.67 | 1,921.36 | 35,347.23 |
| Sold Supplements Retail | 0.00 | 2,715.79 | 0.00 | 6,716.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,431.79 |
| **Total Ford County Record** | **12,584.52** | **10,899.56** | **14,844.74** | **17,479.04** | **15,513.85** | **9,491.92** | **7,412.15** | **10,183.75** | **7,485.36** | **13,361.38** | **8,867.21** | **9,529.40** | **137,652.88** |
| **Mahomet Citizen** | | | | | | | | | | | | | |
| Local Retail Display | 3,853.09 | 2,528.77 | 2,713.40 | 5,504.32 | 3,690.67 | 1,547.87 | 1,914.51 | 4,234.96 | 2,816.26 | 5,023.21 | 5,234.10 | 4,286.01 | 43,347.17 |
| Preprint | 1,169.83 | 983.80 | 1,193.56 | 1,614.85 | 981.05 | 692.67 | 578.71 | 1,197.68 | 1,250.85 | 1,547.73 | 1,101.41 | 671.66 | 12,983.82 |
| Local Allowances | 0.00 | (25.72) | (225.00) | 0.00 | 0.00 | (405.00) | 0.00 | (98.25) | (512.00) | (290.00) | 0.00 | 0.00 | (1,559.97) |
| Trade-Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Retail Color | 742.50 | 618.00 | 784.00 | 712.00 | 491.50 | 0.00 | 0.00 | 0.00 | 0.00 | 14.42 | 0.00 | 0.00 | 3,282.42 |
| Classified Display Local | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Display Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line Local | 381.79 | 303.18 | 452.37 | 318.84 | 130.81 | 166.41 | 264.00 | 81.14 | 86.58 | 474.11 | 111.99 | 98.00 | 2,671.22 |
| Class Line Local Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Line Sales Discount | 0.00 | (9.51) | 0.00 | (10.52) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (20.03) |
| Legals | 619.50 | 873.00 | 658.08 | 1,029.00 | 334.50 | 1,912.50 | 0.00 | 1,812.00 | 90.75 | 274.50 | 200.25 | 297.00 | 8,101.08 |
| Sold Supplements Retail | 0.00 | 13,369.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13,369.67 |
| **Total Mahomet Citizen** | **6,766.71** | **18,641.19** | **5,496.41** | **9,168.49** | **5,628.53** | **3,910.45** | **2,757.22** | **7,227.53** | **3,734.44** | **7,043.97** | **6,647.75** | **5,352.69** | **82,375.38** |
| **Journal Republican** | | | | | | | | | | | | | |
| Local Retail Display | 13,992.49 | 13,150.06 | 19,113.58 | 18,482.51 | 11,261.65 | 11,223.48 | 10,095.25 | 15,228.06 | 10,860.27 | 17,803.71 | 13,052.12 | 14,225.25 | 168,488.43 |
| Preprint | 1,209.52 | 1,101.77 | 1,902.59 | 1,662.59 | 1,119.97 | 959.38 | 660.24 | 536.25 | 765.12 | 935.39 | 616.44 | 778.86 | 12,247.24 |
| Local Allowances | (364.07) | (157.50) | (157.50) | 0.00 | 0.00 | 0.00 | 0.00 | (154.12) | (18.66) | (1,497.70) | 0.00 | 0.00 | (2,349.55) |
| Trade-Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Retail Color | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| Classified Display Local | 1,056.00 | 498.25 | 551.25 | 828.00 | 688.50 | 630.75 | 611.25 | 464.00 | 417.76 | 624.96 | 532.38 | 724.63 | 7,725.73 |
| Class Display Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line Local | 1,238.27 | 857.02 | 734.64 | 802.43 | 525.53 | 663.00 | 561.00 | 369.48 | 831.08 | 624.83 | 678.31 | 1,198.86 | 9,084.45 |
| Class Line Local Allowances | 0.00 | (102.64) | 0.00 | 0.00 | (38.70) | 0.00 | (4.25) | (1,026.25) | 0.00 | 0.00 | 0.00 | 0.00 | (1,173.84) |
| Classified Line National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Line Sales Discount | 0.00 | (20.63) | (15.77) | 0.00 | 0.00 | 0.00 | (4.50) | (4.41) | 0.00 | 0.00 | 0.00 | (9.00) | (54.31) |
| Legals | 2,153.95 | 724.20 | 3,093.66 | 1,544.80 | 1,356.77 | 2,259.03 | 1,158.06 | 1,316.69 | 1,065.23 | 2,138.32 | 2,003.01 | 2,000.03 | 20,933.75 |
| Sold Supplements Retail | 0.00 | 2,715.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,550.00 | 0.00 | 0.00 | 14,265.77 |

**Schedule 4.3(a) Trailing Twelve Month Revenue - Newspaper**

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Journal Republican** | **19,285.16** | **18,766.30** | **25,422.45** | **23,418.43** | **14,913.72** | **15,735.64** | **13,078.05** | **16,727.70** | **13,940.80** | **32,179.51** | **16,882.26** | **18,918.65** | **229,268.67** |
| **Independent News** | | | | | | | | | | | | | |
| Local Retail Display | 16,007.65 | 10,415.19 | 12,506.45 | 10,408.50 | 7,333.19 | 7,285.33 | 6,314.35 | 8,804.31 | 10,715.43 | 14,437.83 | 12,715.46 | 15,064.17 | 132,038.06 |
| Preprint | 13,637.29 | 10,893.52 | 15,017.69 | 14,216.09 | 11,693.11 | 14,676.11 | 9,791.95 | 8,518.02 | 6,280.65 | 9,268.85 | 7,311.42 | 9,748.07 | 131,136.77 |
| Local Allowances | (289.75) | (150.00) | (150.00) | 0.00 | 0.00 | (100.00) | (720.63) | 0.00 | (104.50) | (449.46) | (306.95) | 0.00 | (2,270.91) |
| Trade-Outs | 0.00 | 0.00 | 0.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1,048.50) | (1,048.50) | 0.00 | (2,097.00) |
| Retail Color | 225.00 | 228.00 | 136.00 | 222.50 | 130.00 | 67.00 | 75.00 | 148.00 | 175.20 | 15.00 | 15.00 | 0.00 | 1,426.70 |
| Classified Display Local | 22.50 | 0.00 | 123.00 | 0.00 | 60.00 | 0.00 | 138.75 | 0.00 | 676.00 | 307.99 | 0.00 | 94.50 | 1,422.74 |
| Class Display Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 5.00 |
| Classified Display National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Line Local | 1,177.06 | 1,143.19 | 1,301.70 | 1,364.28 | 229.28 | 916.33 | 1,026.15 | 2,125.11 | 281.83 | 586.48 | 322.96 | 658.06 | 11,132.46 |
| Class Line Local Allowances | 0.00 | (114.75) | 0.00 | 0.00 | (72.04) | (90.00) | 0.00 | (15.76) | 0.00 | 0.00 | 0.00 | 0.00 | (292.55) |
| Classified Line National | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class Line Sales Discount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Legals | 4,044.57 | 4,449.25 | 3,556.44 | 3,360.16 | 2,700.77 | 3,670.91 | 2,745.86 | 6,131.95 | 3,161.25 | 3,704.50 | 2,115.75 | 4,920.75 | 44,562.06 |
| Sold Supplements Retail | 0.00 | 2,917.70 | 0.00 | 8,900.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,818.20 |
| **Total Independent News** | **34,824.54** | **29,782.10** | **32,571.28** | **38,492.03** | **22,074.31** | **26,435.68** | **19,371.43** | **25,608.41** | **21,293.36** | **26,822.69** | **21,115.14** | **30,485.55** | **328,876.52** |
| **Target Shopper** | | | | | | | | | | | | | |
| Local Retail Display | 4,167.55 | 3,898.51 | 5,981.82 | 3,758.87 | 3,097.00 | 2,550.96 | 3,007.56 | 3,269.51 | 4,110.62 | 3,437.61 | 3,450.21 | 4,056.25 | 44,776.47 |
| Preprint | 6,464.83 | 5,934.00 | 8,535.36 | 9,137.86 | 8,488.50 | 7,698.00 | 5,036.93 | 4,866.00 | 7,225.29 | 5,036.93 | 5,567.96 | 5,632.50 | 79,955.16 |
| Local Allowances | 0.00 | (135.65) | 0.00 | 0.00 | 0.00 | 0.00 | (65.00) | (87.86) | 0.00 | (20.00) | (39.00) | 0.00 | (358.36) |
| Retail Color | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified Display Local | 22.50 | 0.00 | 63.12 | 63.12 | 45.90 | 0.00 | 0.00 | 0.00 | 0.00 | 14.42 | 0.00 | 0.00 | 209.06 |
| Classified Line Local | 277.14 | 205.67 | 312.58 | 99.00 | 90.41 | 169.87 | 25.04 | 33.08 | 141.33 | 174.15 | 55.34 | 88.55 | 1,672.16 |
| Sold Supplements Retail | 0.00 | 0.00 | 2,717.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,717.79 |
| **Total Target Shopper** | **10,932.12** | **9,901.68** | **17,911.67** | **13,058.85** | **11,711.81** | **10,418.83** | **8,004.53** | **8,100.71** | **11,477.24** | **8,643.11** | **9,034.41** | **9,777.30** | **128,972.26** |
| **Total Weekly Newspaper Advertising** | **105,604.61** | **107,984.83** | **126,696.88** | **124,010.73** | **88,507.37** | **81,569.47** | **62,876.59** | **79,723.41** | **76,514.78** | **106,850.08** | **77,719.09** | **89,786.59** | **1,127,854.43** |
| **Total Newspaper Advertising Reven.** | **554,119.75** | **491,022.02** | **529,625.67** | **628,363.48** | **467,848.73** | **363,461.61** | **357,754.54** | **483,389.62** | **408,482.60** | **456,866.76** | **373,492.62** | **462,062.32** | **5,576,491.72** |
| **Digital Advertising Revenue** | | | | | | | | | | | | | |
| **The News-Gazette** | | | | | | | | | | | | | |
| Auto Finder | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Classified | 3,142.45 | 3,217.53 | 3,446.88 | 2,722.32 | 2,337.24 | 1,674.12 | 1,812.80 | 2,683.28 | 2,240.01 | 2,490.92 | 3,135.46 | 2,396.97 | 31,299.98 |
| Real Estate Online | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Display | 20,890.34 | 34,734.94 | 25,272.00 | 21,269.15 | 13,227.38 | 14,558.00 | 16,317.00 | 20,461.50 | 18,199.86 | 19,315.00 | 15,813.00 | 13,772.00 | 233,860.17 |
| Display Allow | 20.00 | (1,979.25) | (2,600.00) | 0.00 | (1,200.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1,200.00) | 0.00 | (5,778.25) |
| Classified Allow | (0.39) | 0.00 | (0.39) | (0.43) | (0.72) | 0.00 | (1.12) | (14.60) | (5.59) | (45.26) | (2.04) | (0.40) | (70.94) |

**Schedule 4.3(a) Trailing Twe...onth Revenue - Newspaper**

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/2019 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employment | 17,978.36 | 16,616.76 | 13,773.23 | 10,970.94 | 13,739.99 | 12,102.60 | 12,841.75 | 12,316.60 | 10,208.21 | 12,685.83 | 11,874.69 | 12,288.32 | 157,377.28 |
| Legal | 1,454.74 | 896.03 | 1,838.38 | 2,031.81 | 2,406.93 | 824.38 | 1,377.96 | 1,802.85 | 1,743.40 | 2,249.46 | 1,234.67 | 2,267.66 | 20,130.27 |
| Hot-Spot | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Deal of the Day | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Digital News Racks | 375.00 | 375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 750.00 |
| Multiplatform Projects | 26,195.00 | 0.00 | 0.00 | 1,236.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,057.00 | 51,488.75 |
| **Total The News-Gazette** | **70,035.50** | **53,863.01** | **41,730.10** | **38,260.54** | **31,710.82** | **29,159.10** | **32,348.39** | **37,249.63** | **32,385.89** | **36,695.95** | **30,855.78** | **54,761.55** | **489,056.26** |
| **Rantoul Press** | | | | | | | | | | | | | |
| Classified | 139.73 | 116.25 | 103.83 | 84.18 | 37.25 | 67.60 | 35.00 | 66.18 | 80.89 | 74.70 | 56.62 | 42.78 | 905.01 |
| Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Online Legal | 41.24 | 28.28 | 94.61 | 50.38 | 30.23 | 17.90 | 26.50 | 28.16 | 13.41 | 29.25 | 43.89 | 21.66 | 425.51 |
| **Total Rantoul Press** | **180.97** | **144.53** | **198.44** | **134.56** | **67.48** | **85.50** | **61.50** | **94.34** | **94.30** | **103.95** | **100.51** | **64.44** | **1,330.52** |
| **Ford County Record** | | | | | | | | | | | | | |
| Classified | 150.87 | 109.62 | 94.94 | 91.23 | 49.44 | 60.05 | 45.85 | 57.37 | 66.29 | 63.96 | 53.52 | 66.98 | 910.00 |
| Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25.00 |
| Online Legal | 117.72 | 69.85 | 104.62 | 106.00 | 156.64 | 124.78 | 48.17 | 60.68 | 41.52 | 63.72 | 115.19 | 52.24 | 1,051.13 |
| **Total Ford County Record** | **268.59** | **179.47** | **199.56** | **197.23** | **206.08** | **184.83** | **119.02** | **118.05** | **107.81** | **127.68** | **168.71** | **119.10** | **1,996.13** |
| **Mahomet Citizen** | | | | | | | | | | | | | |
| Classified | 47.88 | 37.73 | 13.50 | 18.34 | 12.50 | 10.73 | 19.91 | 8.11 | 4.22 | 68.03 | 10.76 | 9.24 | 260.95 |
| Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Online Legal | 16.52 | 23.28 | 17.55 | 0.60 | 8.92 | 51.00 | 0.00 | 48.32 | 2.42 | 7.32 | 4.90 | 7.92 | 188.75 |
| **Total Mahomet Citizen** | **64.40** | **61.01** | **31.05** | **18.94** | **21.42** | **61.73** | **19.91** | **56.43** | **6.64** | **75.35** | **15.66** | **17.16** | **449.70** |
| **Journal Republican** | | | | | | | | | | | | | |
| Classified | 74.98 | 67.40 | 54.69 | 44.82 | 26.46 | 17.00 | 27.91 | 16.61 | 37.72 | 34.45 | 45.29 | 21.88 | 469.21 |
| Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (4.25) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (4.25) |
| Online Legal | 68.61 | 24.14 | 86.48 | 54.82 | 44.43 | 74.49 | 36.20 | 40.69 | 32.97 | 30.88 | 66.76 | 64.27 | 624.74 |
| **Total Journal Republican** | **143.59** | **91.54** | **141.17** | **99.64** | **70.89** | **91.49** | **59.86** | **57.30** | **70.69** | **65.33** | **112.05** | **86.15** | **1,089.70** |
| **Independent News** | | | | | | | | | | | | | |
| Classified | 75.39 | 31.40 | 31.16 | 28.47 | 23.87 | 22.69 | 28.87 | 13.48 | 21.72 | 24.08 | 23.13 | 13.97 | 338.23 |
| Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Online Legal | 107.42 | 118.65 | 94.40 | 88.73 | 70.69 | 97.46 | 71.91 | 89.43 | 84.30 | 97.91 | 54.22 | 129.02 | 1,104.14 |
| **Total Independent News** | **182.81** | **150.05** | **125.56** | **117.20** | **94.56** | **120.15** | **100.78** | **102.91** | **106.02** | **121.99** | **77.35** | **142.99** | **1,442.37** |
| **Niche Websites** | | | | | | | | | | | | | |
| IlliniHQ Online Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AHome Online Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CIB Online Display | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Niche Websites** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |

Schedule 4.3(a) Trailing Twe.    .onth Revenue - Newspaper

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Digital Services & Other** | | | | | | | | | | | | | |
| Web Site Development | 1,343.02 | 859.11 | 2,403.14 | 890.90 | 1,128.32 | 1,738.63 | 1,288.07 | 3,651.87 | 1,532.38 | 2,060.28 | 1,973.10 | 1,885.30 | 20,755.32 |
| Online AdSearch | 0.00 | 0.00 | 0.00 | 0.00 | 15.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.00 |
| Library Search Fees | 0.00 | 15.00 | 15.00 | 0.00 | 6.00 | 0.00 | 0.00 | 62.50 | 36.00 | 6.00 | 6.00 | 0.00 | 151.50 |
| Other Electronic Pub | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Agency Services | 96.00 | 96.00 | 96.00 | 96.00 | 96.00 | 96.00 | 96.00 | 96.00 | 96.00 | 96.00 | (96.00) | 0.00 | 864.00 |
| Google Consumer Surveys | 6,112.65 | 6,626.20 | 7,210.70 | 4,138.80 | 3,713.25 | 3,842.40 | 3,657.60 | 3,916.26 | 3,011.65 | 2,973.15 | 2,688.50 | 1,533.80 | 49,424.96 |
| Online Display, Network | 14,538.00 | 14,286.30 | 12,521.07 | 24,018.14 | 25,346.60 | 15,883.40 | 16,328.30 | 16,922.81 | 15,210.34 | 15,049.49 | 14,671.53 | 14,232.36 | 199,008.37 |
| Online Preprints, Network | 1,112.01 | 1,100.16 | 1,268.32 | 1,547.59 | 1,307.18 | 1,385.08 | 1,178.79 | 1,165.43 | 1,178.67 | 1,224.07 | 1,088.33 | 563.77 | 14,121.60 |
| Other Digital | 1,199.50 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 156.00 | 3,200.00 | 3,162.50 | 3,162.50 | 3,162.50 | 3,500.00 | 18,043.00 |
| **Total Digital Services & Other** | **24,401.21** | **23,067.77** | **23,614.23** | **30,791.43** | **31,712.35** | **23,045.71** | **22,796.76** | **29,034.87** | **24,228.74** | **24,571.49** | **23,493.96** | **21,715.23** | **302,383.75** |
| | | | | | | | | | | | | | |
| **Total Digital Advertising Revenue** | **95,277.07** | **77,557.38** | **66,040.11** | **69,619.54** | **63,883.60** | **52,748.51** | **55,416.22** | **66,713.53** | **57,000.09** | **61,751.74** | **54,824.02** | **76,906.62** | **797,748.43** |
| | | | | | | | | | | | | | |
| **Niche / Other Revenue** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Magazine Advertising** | | | | | | | | | | | | | |
| CIB | 9,990.75 | 800.25 | 19,604.75 | 800.25 | 9,179.50 | 0.00 | 7,473.25 | 0.00 | 10,653.25 | 1,775.00 | 8,275.75 | 0.00 | 68,552.75 |
| CIB Allowances | (900.00) | 0.00 | (900.00) | 0.00 | (900.00) | (100.00) | (900.00) | 0.00 | (900.00) | 0.00 | (275.00) | 0.00 | (4,875.00) |
| At Home | 616.66 | 616.66 | 9,011.66 | 616.66 | 616.66 | 9,865.66 | 616.66 | 616.66 | 9,199.00 | 617.00 | 1,367.00 | 10,442.00 | 44,022.28 |
| At Home Allowances | 0.00 | (1,800.00) | (500.00) | 0.00 | 0.00 | (1,725.00) | 0.00 | (1,000.00) | (900.00) | 0.00 | 0.00 | (750.00) | (5,275.00) |
| At Home Trade Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (500.00) | 0.00 | 0.00 | (500.00) | 0.00 | 0.00 | 0.00 | (1,500.00) |
| At Home Subscriptions | 715.00 | 702.28 | 741.61 | 651.69 | 566.64 | 840.92 | 435.12 | 693.27 | 695.33 | 647.51 | 643.57 | 683.00 | 8,116.00 |
| I Do | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,093.33 | 133.33 | 133.33 | 0.00 | 7,349.99 |
| I Do Allowances | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (280.00) | 0.00 | 0.00 | 0.00 | (280.00) |
| Other Revenue | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Magazines** | **10,422.47** | **319.19** | **27,958.02** | **2,068.60** | **9,561.80** | **8,201.58** | **7,626.03** | **309.93** | **25,950.91** | **3,172.84** | **10,144.65** | **10,375.00** | **116,111.02** |
| | | | | | | | | | | | | | |
| **U of I Sports** | | | | | | | | | | | | | |
| Advertising Revenue | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Program Sales | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| IlliniHQ Sports Publication | 14,628.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,628.75 |
| IlliniHQ Subscriptions | 3.00 | 0.00 | 0.00 | 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.00 |
| **Total U of I Sports** | **14,631.75** | **0.00** | **0.00** | **0.00** | **3.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **14,634.75** |
| | | | | | | | | | | | | | |
| **Events and Expos** | | | | | | | | | | | | | |
| Events & Expos | 1,600.00 | 1,875.00 | 7,558.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,620.00 | 25.00 | 0.00 | 0.00 | 45,678.54 |
| **Total Events and Expos** | **1,600.00** | **1,875.00** | **7,558.54** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **34,620.00** | **25.00** | **0.00** | **0.00** | **45,678.54** |
| | | | | | | | | | | | | | |
| **Total Niche / Other Revenue** | **26,654.22** | **2,194.19** | **35,516.56** | **2,068.60** | **9,564.80** | **8,201.58** | **7,626.03** | **309.93** | **60,570.91** | **3,197.84** | **10,144.65** | **10,375.00** | **176,424.31** |

Schedule 4.3(a) Trailing Twe.          .onth Revenue - Newspaper

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/2019 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Advertising Revenue | 676,051.04 | 570,773.59 | 631,182.34 | 700,051.62 | 541,297.13 | 424,411.70 | 420,796.79 | 550,413.08 | 526,053.60 | 521,828.34 | 438,461.29 | 549,343.94 | 6,550,664.46 |

## Schedule 4.3(a) Trailing Tv...  ve Month Revenue - Radio

### TIME

| | ACTUAL August 8/31/18 | ACTUAL September 9/30/18 | ACTUAL October 10/31/18 | ACTUAL November 11/30/18 | ACTUAL December 12/30/18 | ACTUAL January 01/31/19 | ACTUAL February 02/28/19 | ACTUAL March 03/31/19 | ACTUAL April 04/30/19 | ACTUAL May 05/31/19 | ACTUAL June 06/30/19 | ACTUAL July 7/31/2019 | TOTAL 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Local Advertising-AM | $74,959.54 | $67,986.68 | $76,488.35 | $81,038.43 | $71,816.76 | $59,682.77 | $61,421.23 | $75,435.72 | $76,761.90 | $76,283.03 | $67,190.05 | $66,671.41 | $855,737.87 |
| Local Advertising-FM | 46,865.34 | 52,411.75 | 51,641.13 | 55,996.95 | 48,671.76 | 41,523.59 | 43,326.59 | 52,591.89 | 51,345.17 | 53,773.73 | 45,785.83 | 44,327.51 | 588,261.24 |
| Local Advertising-Political | 0.00 | 125.00 | 22,455.00 | 16,501.00 | (830.00) | 361.25 | 189.00 | 2,566.00 | 565.00 | 0.00 | 0.00 | 0.00 | 41,952.25 |
| Local Advertising-WKIO | 8,933.90 | 7,788.01 | 7,482.04 | 7,995.50 | 7,915.09 | 6,677.53 | 6,761.53 | 9,128.71 | 8,599.59 | 7,793.88 | 6,355.96 | 6,814.34 | 92,246.08 |
| Christal-AM | 2,288.00 | 10,828.00 | 12,816.00 | 8,538.70 | 7,921.00 | 12,238.00 | 12,763.00 | 9,389.00 | 4,570.25 | 6,600.05 | 12,653.00 | 2,157.20 | 102,762.20 |
| Christal-FM | 5,575.00 | 9,857.00 | 7,874.00 | 5,921.00 | 4,957.00 | 5,484.00 | 2,595.50 | 7,404.00 | 3,832.00 | 3,189.00 | 7,551.00 | 2,888.00 | 67,127.50 |
| Christal-WKIO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 351.00 | 0.00 | 351.00 |
| Christal Political | (70.55) | 0.00 | 0.00 | 3,842.95 | 1,974.00 | 3,504.21 | 0.00 | 3,284.00 | 848.00 | (54.03) | (59.22) | 0.00 | 15,218.36 |
| Trade Revenue | 34,838.60 | 23,959.67 | 27,041.19 | 21,641.67 | 28,155.63 | 32,388.67 | 22,006.67 | 30,622.31 | 28,756.20 | 24,227.54 | 16,694.88 | 18,897.37 | 309,230.40 |
| Trade Expense | (34,838.60) | (23,959.67) | (27,041.67) | (21,641.67) | (28,155.63) | (32,388.67) | (22,006.67) | (30,622.31) | (28,756.20) | (24,227.54) | (16,694.88) | (18,897.37) | (309,230.40) |
| Football | 1,944.25 | 25,289.31 | 25,103.29 | 24,582.21 | 5,244.54 | 2,519.85 | 2,807.54 | 2,346.71 | 1,615.00 | 1,615.00 | 1,555.00 | 1,675.00 | 96,297.70 |
| Basketball | 1,075.00 | 340.00 | 340.00 | 14,978.00 | 18,054.65 | 23,407.65 | 22,562.65 | 21,172.65 | 2,916.90 | 2,917.00 | 1,075.00 | 1,075.00 | 109,914.50 |
| Deal of the Day | 618.00 | 897.50 | 993.00 | 1,410.50 | 638.50 | 953.00 | 974.00 | 951.00 | 340.00 | 758.00 | 1,110.00 | 896.00 | 10,539.50 |
| Web/Digital sales | 1,777.07 | 1,872.66 | 2,420.84 | 1,095.19 | 1,481.84 | 1,070.84 | 640.84 | 696.00 | 1,094.18 | 731.52 | 731.52 | 681.52 | 14,294.02 |
| Multiplatform Projects | 26,195.00 | 0.00 | 0.00 | 1,236.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,057.00 | 51,488.75 |
| **Total Time Sales** | **170,160.55** | **177,395.91** | **209,562.65** | **223,137.18** | **167,847.14** | **157,422.69** | **154,041.88** | **184,965.68** | **152,507.99** | **153,607.18** | **144,299.14** | **151,242.98** | **2,046,190.97** |
| Christal Commissions-AM | (449.26) | (1,390.28) | (1,825.97) | (2,329.32) | (1,316.29) | (2,489.34) | (1,966.33) | (2,602.83) | (762.20) | (830.54) | (1,614.68) | (505.43) | (18,082.47) |
| Christal Commissions-FM | (853.55) | (1,395.00) | (1,305.23) | (1,203.48) | (730.21) | (580.65) | (334.76) | (647.64) | (504.34) | (489.46) | (962.75) | (381.26) | (9,398.33) |
| Christal Commissions-WKIO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (22.06) | (85.55) | (68.49) | (2.04) | (44.75) | (24.10) | (266.99) |
| Agency Commissions-AM | (2,291.36) | (3,801.70) | (3,793.32) | (4,035.19) | (3,070.78) | (3,923.41) | (3,430.45) | (4,067.04) | (3,492.99) | (3,632.68) | (4,451.51) | (2,398.44) | (42,388.89) |
| Agency Commissions-FM | (2,954.26) | (4,892.66) | (4,407.84) | (3,726.53) | (2,630.63) | (2,617.74) | (1,995.62) | (3,209.08) | (3,113.58) | (3,071.76) | (3,916.57) | (2,458.53) | (38,994.40) |
| Agency Commissions-WKIO | (339.54) | (400.12) | (362.48) | (300.60) | (385.77) | (297.68) | (278.63) | (367.73) | (435.69) | (285.83) | (347.49) | (330.90) | (4,132.46) |
| **Total Commissions** | **(6,887.97)** | **(11,879.76)** | **(11,694.84)** | **(11,595.12)** | **(8,133.68)** | **(9,908.84)** | **(8,027.85)** | **(10,979.87)** | **(8,397.29)** | **(8,322.31)** | **(11,337.75)** | **(6,098.66)** | **(113,263.94)** |
| **Net Time Income** | **163,272.58** | **165,516.15** | **197,867.81** | **211,542.06** | **159,713.46** | **147,513.85** | **146,014.03** | **173,985.81** | **144,110.70** | **145,284.87** | **132,961.39** | **145,144.32** | **1,932,927.03** |

## SCHEDULE 4.3(c)

## LIST OF ADVERTISING CONTRACTS

**Preprint Advertising Contracts**

| Advertiser | Agency | Contact | Phone |
|---|---|---|---|
| Aldi | NSA Media | Alan Dodge | 630-729-2136 |
| Best Buy | Starcom | Eric Toepper | 312-220-1520 |
| Big Lots | Quad | Tricia Ward | 212-583-6535 |
| County Market | Niemann Foods | Ron Cook | 217-221-5600 |
| CVS | NSA Media | Bill Waltzek | 630-729-7675 |
| Dick's Sporting Goods | planitretail | Ashley O'Brien | 860-640-2891 |
| Family Dollar | Quad | Rukmini Sukhram | 212-583-6557 |
| Blains Farm & Fleet | Quad | Vicki Feulner | 518-581-4376 |
| Furniture Row | | Beth Connely | 303-293-2437 |
| Home Depot | Agenti | Darcy Rybozyk | 630-729-7774 |
| Hometown Stores | NSA Media | Catie Harper | catie.harper@nsamedia.com |
| JCPenney | Agenti | Nina Horvath | 612-758-8648 |
| Kohls | Agenti | Jim Atwood | 612-874-3092 |
| Lowes | Quad | Tricia Ward | 212-583-6535 |
| Macys | RPM | Bridget Rabel | 424-488-6950 |
| Meijer | NSA Media | Nicole Kiolbasa | 630-729-2245 |
| Menards | Agenti | Eric Johnson | 612-758-8832 |
| Michaels | Quad | Benita O'Dell | 864-241-8127 |
| News America | | Lindsay Brown | 212-782-8094 |
| Office Depot | NSA Media | Justin Rademacher | 612-758-8707 |
| Rural King | Quad | Loriane Pereira | 212-583-6523 |
| Save A Lot | NSA Media | Alan Dodge | 630-729-2136 |
| Schnucks | | Kelly Petersen | 314-994-4781 |
| Shoe Carnival | Quad | Erica Sarka | 419-538-6263 |
| Slumberland | | Paul Hausladen | 217-351-1111 |
| Staples | Agenti | Nina Horvath | 612-758-8648 |
| Target | NSA Media | Janie Hartwig-Smith | 630-729-2129 |
| Tuesday Morning | NSA Media | Janie Hartwig-Smith | 630-729-2129 |
| Ulta | NSA Media | Alan Dodge | 630-729-2136 |
| Valassis | | Therese Kiwak | KiwakT@valassis.com |
| Walgreens | NSA Media | Adam Buth | 630-729-2318 |
| Walmart | Agenti | Selena Khori | 612-874-3070 |

**Other Advertising Contracts**

Gies College of Business (sponsorship of "U of I 150 and Beyond" website)

University of Illinois Department of Intercollegiate Athletics Trade Agreement

Krannert Center For the Performing Arts Corporate Sponsorship

**SCHEDULE 4.6(a)**

**EXCEPTIONS TO ORDINARY CONDUCT OF BUSINESS SINCE 1-1-2018**

(i)   Casualty losses:
- a. August 2018 2001 Dodge Grand Caravan VIN 2B8GP44G81R154077 in accident, repaired
- b. July 2018 2007 GMC Savana 3500, VIN 1GDJG31U071251944, in accident, insurance payment received and title given to insurance company

(ii)   Material change in conduct or nature of operations
- a. Circulation operations moved from 2303 Apollo Drive to 115 Convenience Center Road, when Apollo Drive facility was sold in May-June 2018.
- b. Carrier routes for Newspapers converted from porch delivery to property delivery during 2017 and 2018.

(iii)   Non-ordinary course capital expenditures – None

(iv)   Change in accounting methods or principles – None

(v)   Factored A/R - None

# SCHEDULE 4.7(a)

# LIST OF ALL CONTRACTS

**Leases**

| Counterparty | Purpose |
| --- | --- |
| Miguel & Monica Ornelas | Lease of office space for Rantoul Press |
| Adams Memorial | Lease of Danville, IL office space |
| Champaaign Market Place LLC | License for occupancy of distribution center at Market Place Mall |
| Thomas McPheeters | Lease of Monticello, IL office space |
| Village of Rantoul | Warehouse space for equipment storage |
| William J. Bozdech | WKIO ground lease |
| Toshiba Financial Services | Multi-function printer leases |

**Employment**

| Counterparty | Purpose |
| --- | --- |
| Brian Barnhart | Employment |
| Michael Haile | Employment |
| Traci Nally | Employment |
| John Reed | Employment |
| Jim Rossow | Employment-related |

**Production & Transportation**

| Counterparty | Purpose |
| --- | --- |
| Gatehouse Media Illinois Holdings, Inc | Contract for printing of all Newspapers |
| RK Distribution, LLC | Hauling of newspapers from production site to Champaign, IL |
| Gannett Imaging and Ad Design Center | Third-party provider of ad design services |

**Circulation**

| Counterparty | Purpose |
| --- | --- |
| Walz Label & Mailing Systems | Address labelling software and equipment maintenance |
| Alliance For Audited Media | Circulation audit service |

## Digital Media

| Counterparty | Purpose |
|---|---|
| TownNews.com | Newspaper websites |
| JW Player / Longtail AD Solutions | Video distribution platform |
| SecondStreet Media | UPickem contesting application and MyCapture photo reprints |
| Taboola, Inc. | Native / sponsored content |
| Undertone | Ad network |
| Technavia Press, Inc | Digital replica edition of newspaper |
| Adventive | Rich media ad design service |

## Circulation

| Counterparty | Purpose |
|---|---|
| Dow Jones & Company, Inc | Home delivery and single copy delivery of Wall Street Journal and Barron's |
| The News York Times Sales Company | Home delivery and single copy delivery of New York Times |
| Athlon Media Group | Distribution of Parade Magazine |
| Tribune Publishing | Home delivery and single copy delivery of Chicago Tribune |
| Gannett Satellite Information Network, Inc. | Home delivery and single copy delivery of USA Today |
| Various | Sample carrier (home delivery) contract |
| Various | Sample bundle hauler contract |

## Editorial and News

| Counterparty | Purpose |
|---|---|
| The Associated Press | Newspaper Wire Service |
| Tribune Content Agency | Syndicated Columnists / Cartoons |
| AMU Syndication | Syndicated Columnists / Cartoons |
| The Washington Post News Service | Syndicated Columnists / Cartoons |
| Cagle Cartoons | Cartoons |
| New York Times Syndication | Syndicated Columnists / Cartoons |
| FYI Television | TV Grids |
| King Features | Syndicated Comics / Puzzles |
| Urbana Free Library | Use of NG content in archives |
| Various | Sample stringer / freelance agreement |
| Creators Syndicate, Inc | Syndicated Services |

**General and Admin**

| Counterparty | Purpose |
|---|---|
| Main Street Management, Inc | Parking |
| Verizon Wireless | Cell phones, cellular data access |
| Allied Waste Hauling | Garbage and Recycling at 15 Main |
| Gail Keutemeyer | Monticello office cleaning (oral) |
| Dana Burress | Danville office cleaning |
| CI Digital | Maintenance of multi-function printers/copies (4 agreements) |
| Pepsi | Vending agreement at 15 Main |
| Constellation Energy | Utilities - Electric |
| ADP, Inc. | Payroll, HR benefits, ACA, timekeeping |
| Midwest Fiber | Recycling of returned newspapers |
| Integrys | Utilities – Gas |
| Nicor Gas | Utilities – Gas |
| Consolidated Communications | Internet and point-to-point data connections, telephone service |
| SEI | Sunfire server maintenance |
| Illinois American Water Co | Utilities – Water |
| Urbana Champaign Sanitary District | Utilities - Sewer |
| Eastern Illini Electric Cooperative | Utilities - Electric – WKIO tower |
| AT&T | Utilities - Telephone |
| Constellation New Energy, Inc. | Utilities – Electric |
| Ameren Illinois | Utilities – Gas & Electric |
| Mediacom | Internet connectivity – remote offices |
| Village of Rantoul | Utilities – Electric & Water – Rantoul |
| City of Paxton | Utilities – Water – Paxton |
| Windstream | Utilities – Telephone - |
| Call One | Utilities – Telephone |
| Aqua Illinois | Utilities – Water – Danville |
| Danville Sanitary District | Utilities – Sewer – Danville |
| Republic Services | Trash Hauling |
| Quicksilver | Mail aggregation service |
| Benefit Planning Consultants | Employee Benefits – HRA and Flex spending accounts |
| AFLAC | Employee Benefits – supplemental insurance |
| Bloomberg BNA | Fixed assets software maintenance |
| Netrix, LLC | Vendor for various IT maintenance services |
| Tucker Cleaning Service | Cleaning service for Rantoul office |
| Health Alliance | Employee Benefits – Health Insurance |
| SIS | Employee Benefits – GAP Medical Coverage |
| MetLife | Employee Benefits – Dental, Life, Vision |

**Radio**

| Counterparty | Purpose |
|---|---|
| Associated Press | Wire service |
| ASCAP | Music Licensing |
| BMI | Music Licensing |
| Global Music Rights, LLC | Music Licensing |
| SESAC | Music Licensing |
| Radio Music License Committee | Music Licensing |
| Sound Exchange | Music Licensing |
| Vipology | Music-related content for WHMS & WKIO websites |
| A-ware Software | Musicmaster music scheduling software |
| Wideorbit, Inc. | Maintenance and support for radio automation system |
| Rich Vanslyke Productions | WKIO imaging |
| Christal Radio | National rep agency |
| Firstcom | Production music |
| Premiere Radio Networks | Syndicated content |
| Westwood One, Inc. | Syndicated content |
| Greg Soulje | Meteorologist |
| Amy Brooks Smith | WHMS imaging |
| Eastlan Ratings LLC | Ratings service |
| Fighting Illini Sports Properties | UI sports broadcast rights and marketing agreement |
| Spring Green | 2301 S. Neil lawn maintenance |
| Evans Horticultural Services | 2301 S. Neil lawn maintenance |
| University of Illinois Foundation | UI basketball premium seating |
| University of Illinois Division of Intercollegiate Athletics | UI basketball premium seating |
| University of Illinois | In-stadium telephone access |
| | |

## SCHEDULE 4.7(b)

### LIST OF PERMITS, LICENSES, REGISTRATIONS AND GOVERNMENTAL AGREEMENTS

Sellers have no knowledge of any permit, registration or governmental approval, agreement or consent issued (or in the process of being issued) to Seller, or any agreement with a Governmental Body that relates to a Newspaper or Radio Station beyond those contemplated in:

4.5(e) – Postal Permits
4.7(c)(i) – FCC Permits

## SCHEDULE 4.7(c)(i)

## FCC LICENSES AND PERMITS

Broadcast Licenses

    WDWS-AM Facility ID 14961

    WHMS-FM Facility ID 19462

    WKIO-FM Facility ID 57469

Broadcast Construction Permit

    Translator Permit File Number: W230CW BNPFT-20171219ACV

Remote Pickup Licenses

    KLR 535

    KU2540

Studio Transmitter Link Licenses

    WMV457

    WPNJ920

    WPNJ943

## SCHEDULE 4.7(c)(ii)

## FCC COMPLAINTS

None.

## SCHEDULE 4.7(c)(iii)

## ANTENNA STRUCTURE REGISTRATION NUMBERS

| Station | ASR Number |
| --- | --- |
| WDWS, WHMS | 1009559 |
| WKIO | 1257848 |

**SCHEDULE 4.9(a)**

**ACTIONS PENDING**

There are no actions pending that are reasonably likely to impair the purchased Assets.

But, given the broad definition of Actions under the APA, Sellers disclose:

1. An inquiry on May 22, 2019 from the Disability Rights Bureau of the Illinois Attorney General's Office regarding residential delivery of newspapers for disabled subscribers. Sellers have provided a copy of the letter and response.

2. An inquiry on June 27, 2018 from the City of Champaign regarding the placement of newspaper tubes in the public right-of-way. Sellers have provided a copy of relevant correspondence.

**SCHEDULE 4.9(c)**

**COMPLIANCE WITH LEGAL REQUIREMENTS**

Unless otherwise disclosed in the Asset Purchase Agreement or Schedules – None.

## SCHEDULE 4.10(a)

## ENVIRONMENTAL NOTICES

Sellers have provided copies of the following environmental notices:

- Notice of Violation (UST) 2-8-2016 (resolved in March 2016)
- Notification for Underground Storage Tanks, 3-3-2016
- Certificate of Financial Responsibility & Acceptance 3-29-2019

## SCHEDULE 4.10(c)

## CONTAINERS

One container at 2301 S Neil St. Out of service for 40+ years. Heating Oil Tank. Registered with State Fire Marshall's office. Emptied of all water and other leftover liquid 3-1-2016. Removal will be handled pursuant to Asset Purchase Agreement.

# SCHEDULE 4.10(d)

## ASBESTOS, PCBs, etc

- No liens under environmental laws
- Seller has provided reports on asbestos and PCBs to Purchaser.

## SCHEDULE 4.10(f)

## ENVIRONMENTAL REPORTS

Seller has provided the following reports:

- 2301 S Neil, Champaign  Phase I performed by Geocon, July 6, 2012
- 2301 S Neil, Champaign  Phase II performed by Geocon, July 6, 2012
- 2301 S. Neil, Champaign PCB-Containing Equipment Survey performed by Robinson Engineering, August 19, 2019
- 2301 S. Neil, Champaign Asbestos Survey performed by Robinson Engineering, August 21, 2019

## SCHEDULE 4.11(a)

## INTELLECTUAL PROPERTY

Trademarks/Service Marks. Seller has provided copies of registrations and renewals.

### News-Gazette, Inc.

| Name of Mark | gov't ofc | date of reg | date of expiration |
|---|---|---|---|
| Accent - logo | IL | 7/23/2009 | 7/23/2024 |
| At Home in Central Illinois - logo | IL | 7/23/2009 | 7/23/2024 |
| Central Illinois Business - logo | IL | 7/23/2009 | 7/23/2024 |
| The County Star - logo | IL | 8/4/2009 | 8/4/2024 |
| The County Star - words only | IL | 8/4/2009 | 8/4/2024 |
| Ford County Record | Il | 4/2/2019 | 4/2/2024 |
| Forty Under 40 | IL | 5/24/2013 | 6/8/2023 |
| I Do - logo | IL | 10/28/2010 | 10/28/2020 |
| IlliniHQ - logo | IL | 8/27/2013 | 8/27/2023 |
| IlliniHQ.com - logo | IL | 11/20/2008 | 11/20/2023 |
| The Independent News - logo | IL | 8/4/2009 | 8/4/2024 |
| The Independent News - words only | IL | 8/4/2009 | 8/4/2024 |
| The Leader - new logo | IL | 6/3/2014 | 6/3/2024 |
| The Leader - words only | IL | 8/4/2009 | 8/4/2024 |
| Mahomet Citizen - logo | IL | 8/4/2009 | 8/4/2024 |
| Mahomet Citizen - words only | IL | 8/4/2009 | 8/4/2024 |
| The News- Gazette (masthead) | US | 12/24/1991 | 12/24/2022 |
| The News-Gazette - logo | IL | 5/23/2013 | 6/8/2023 |
| The News-Gazette - words only | IL | 5/23/2013 | 6/8/2023 |
| news-gazette.com | IL | 5/23/2013 | 6/8/2023 |
| The News-Gazette Community Newspapers | IL | 8/31/2009 | 8/31/2024 |
| News-Gazette Media - logo | IL | 4/2/2019 | 4/2/2024 |
|  |  |  |  |
| NG Medallion | IL | 6/6/2013 | 6/8/2023 |
| NGM Edge - logo | IL | 4/2/2019 | 4/2/2024 |
| On The Go - logo | IL | 4/2/2019 | 4/2/2024 |
| The People's Choice | IL | 4/15/2019 | 4/15/2024 |
| Piatt County Journal Republican - words only | IL | 8/4/2009 | 8/4/2024 |
| The Rantoul Press - logo | IL | 4/2/2019 | 4/2/2024 |
| Rantoul Press - words only | IL | 8/4/2009 | 8/4/2024 |
| Seventy Over 70 - logo | IL | 4/2/2019 | 4/2/2024 |

| Target Shopper - logo | IL | 4/2/2019 | 4/2/2024 |
| Your Illini Sports Headquarters | IL | 8/27/2013 | 8/27/2023 |

## D.W.S., Inc.

| Name of Mark | gov't ofc | date of reg | date of expiration |
|---|---|---|---|
| Classic Hits WKIO 107.9 FM | IL | 5/23/2013 | 6/8/2023 |
| Coffee with the Plant Experts - words only | IL | 10/29/2010 | 10/29/2020 |
| Illini Game Day - words only | IL | 8/9/2012 | 8/9/2022 |
| It's All About The Music | IL | 6/10/2013 | 6/8/2023 |
| Lite Rock 97.5, WHMS - FM - logo | IL | 5/24/2013 | 6/8/2023 |
| NewsTalk 1400 WDWS-AM - logo | IL | 8/13/2009 | 8/13/2024 |
| Penny For Your Thoughts - words only | IL | 8/31/1994 | 8/31/2024 |
| Play It Forward for Fan Frenzy | IL | 9/12/2014 | 9/12/2019 |
| Sportstalk - words only | IL | 8/13/2009 | 8/13/2024 |

**Domain Names**

| | |
|---|---|
| illinitoday.com | n-gmedia.com |
| news-gazette.media | news-gazette.com |
| ngm.news | news-gazette.news |
| ngmedia.io | news-gazettehomes.com |
| 1079wkio.com | news-gazettemedia.com |
| abelink.net | newsgazette.com |
| allillini.com | newsgazette.media |
| athomeillinois.com | newsgazettehomes.com |
| c-uthere.com | newsgazettemedia.com |
| centralillinoisathome.com | ng-autofinder.com |
| centralillinoisbusiness.com | ngautofinder.com |
| cibmag.com | ngdigitalservices.com |
| colescountyleader.com | ngebertfest.com |
| county-star.com | ngmdeals.com |
| direct-impressions.com | ngmedge.com |
| eciclassifieds.com | paxtonrecord.net |
| fordcountyrecord.com | rantoulpress.com |
| getflipside.com | savoystar.com |
| idomagazine.com | the-independent-news.com |
| illinihq.com | thenews-gazetteinc.com |
| illinihqmagazine.com | thenewsgazetteinc.com |
| jobschampaign.com | tuscolajournal.com |
| journal-republican.com | tuscolajournal.net |
| leaderlandnews.com | tuscolanews.net |
| leroyfcpress.com | uofi150.com |
| leroypress.com | vermiliongazette.com |
| mcitizen.com | wdws.com |
| n-g.me | wheelyhungry.com |
| n-g.tv | whms.com |
| n-gds.com | wkio1079.com |

## SCHEDULE 4.15(b)

### Commissions and Fees

Seller has an ongoing agreement with the following broker to assist in the sale of assets contemplated by this agreement:

> Dirks, Van Essen, Murry & April
> 119 East Marcy Street
> Suite 100
> Santa Fe, NM  87501
> (505)-820-2700

Seller has a relationship with a local real estate broker, but no agreement has been in force since November 30, 2018. The local real estate broker is not entitled to any commissions or fees associated with the transactions contemplated, but Seller is disclosing the broker out of an abundance of caution:

> Alex Ruggieri
> SVN / Ramshaw Real Estate
> 505 W University Ave
> Champaign, IL  61820
> (217)-841-4382

## SCHEDULE 5.1(e)
### CONSENTS REQUIRED OTHER THAN THE SALE ORDER AND THE FCC CONSENT

None

## SCHEDULE 5.1(h)
## ACTIONS

None